**STOLL STOLL BERNE**
**LOKTING & SHLACHTER P.C**
Timothy S. DeJong, OSB No. 940662
Keith A. Ketterling, OSB No. 913368
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: tdejong@stollberne.com
kketterling@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Court-Appointed Liaison Counsel for*
*Lead Plaintiff and the Class*

[additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| IN RE KINDERCARE LEARNING COMPANIES, INC. SECURITIES LITIGATION | Case No. 3:25-cv-01424-AR<br><br>CLASS ACTION ALLEGATION<br><br>INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff City of Dearborn Police & Fire Revised Retirement System ("Dearborn" or "Lead Plaintiff"), on behalf of itself and all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by KinderCare Learning Companies, Inc. ("KinderCare" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.    This federal securities class action asserts strict liability claims under the Securities Act of 1933 (the "1933 Act") relating to KinderCare's initial public offering (the "IPO"), commenced on or about October 9, 2024, of over 27 million shares of common stock at a price of $24.00 per share.  This federal securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired KinderCare common stock pursuant and/or traceable to the

---

[1] On November 13, 2025, this Court appointed Dearborn to serve as Lead Plaintiff in this action to represent the interests of the proposed Class of damaged KinderCare investors (ECF No. 43). As part of its responsibility as Lead Plaintiff, Dearborn is filing this interim complaint to preserve claims by taking the following steps: (a) clarifying the definitions of the KinderCare IPO (defined herein), the Offering Documents (defined herein) used in connection with the IPO, and the Class (defined herein); (b) adding certain underwriters of the IPO and Partners Group (USA) Inc. as defendants; and (c) adding a claim under §12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2) (Count II, herein). The filing of this interim complaint is without prejudice to Lead Plaintiff's forthcoming Amended Complaint, the scheduling of which is being negotiated by the parties to this action, and which will be filed in accordance with the Court's September 9, 2025 Order (ECF No. 12 at ¶4).

Offering Documents issued in connection with the IPO, and who were damaged thereby, *i.e.*, the Class.

## JURISDICTION AND VENUE

2.     The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act, 15 U.S.C. §77v.

3.     This Court has personal jurisdiction over each of the Defendants and venue is proper in this District. Defendants conducted the IPO in substantial part from this District, drafted the Offering Documents (defined below) in substantial part in this District, disseminated the statements alleged to be false and misleading herein from this District, and solicited purchasers of KinderCare common stock in and from this District.

## PARTIES

4.     Lead Plaintiff Dearborn, as set forth in its previously-filed Certification (ECF No. 23-1), purchased KinderCare common stock pursuant and/or traceable to the Offering Documents and was damaged thereby.

5.     Defendant KinderCare is a provider of early childhood and school-age education in the United States. The Company is headquartered in Lake Oswego, Oregon, and its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "KLC."

6.     Defendant Paul Thompson ("Thompson") served as KinderCare's Chief Executive Officer ("CEO") at the time of the IPO.

7.     Defendant Anthony Amandi ("Amandi") served as KinderCare's Chief Financial Officer at the time of the IPO.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

8.    Defendant John T. Wyatt ("Wyatt") served as KinderCare's CEO from 2012 through May 2024, including in 2015 when private equity firm Partners Group (defined below) acquired KinderCare (then known as Knowledge Universe). Defendant Wyatt served as Chairman of the Company's Board of Directors ("Board") at the time of the IPO.

9.    Defendant Jean Desravines ("Desravines") served as a director of KinderCare at the time of the IPO.

10.    Defendant Christine Deputy ("Deputy") served as a director of KinderCare at the time of the IPO.

11.    Defendant Michael Nuzzo ("Nuzzo") served as a director of KinderCare at the time of the IPO.

12.    Defendant Benjamin Russell ("Russell") served as a director of KinderCare at the time of the IPO. At the time of the IPO, Defendant Russell also served as a Senior Vice President at Defendant Partners Group.

13.    Defendant Joel Schwartz ("Schwartz") served as a director of KinderCare at the time of the IPO. At the time of the IPO, Defendant Schwartz was also a Partner at Defendant Partners Group.

14.    Defendant Alyssa Waxenberg ("Waxenberg") served as a director of KinderCare at the time of the IPO.

15.    Defendant Preston Grasty ("Grasty") served as a director of KinderCare at the time of the IPO. At the time of the IPO, Defendant Grasty was also a Senior Investment Leader at Defendant Partners Group.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

16.     The Defendants identified in ¶¶6-15 are referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Offering Documents (as defined herein). In addition, several Individual Defendants were named as directors of KinderCare in the Offering Documents as detailed above. The Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. In particular, the Individual Defendants reviewed, edited, and approved the Offering Documents, participated in the IPO, and solicited the purchase of KinderCare common stock in the IPO for their own benefit and the benefit of KinderCare and Partners Group as directors, executive officers, and/or major shareholders of the Company and/or the principals of Partners Group.

17.     The Individual Defendants conducted the roadshow along with the Underwriter Defendants (defined herein) to solicit the purchase of KinderCare common stock in the IPO. The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

18.     Defendant Partners Group Holding AG ("Partners Group") is a Swiss private equity firm. Partners Group (through investment funds affiliated with, advised by, or managed by affiliates of Partners Group) owned KinderCare prior to the IPO. Immediately after consummation of the IPO, Partners Group (through affiliated entities) owned a controlling interest (69%) in KinderCare's outstanding shares, including the full exercise of the Underwriter Defendants' over-allotment option. Partners Group further exercised its control over the Company through its nomination of five of the Board's eight directors. Indeed, the Offering Documents acknowledged that, following the IPO, KinderCare would be a "controlled company" within the meaning of the

4

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

corporate governance rules of the NYSE. The Offering Documents further acknowledged that Partners Group controlled KinderCare, including control over the election of KinderCare's directors, business affairs, policies, appointment of management, and entrance into business combinations or dispositions and other corporate transactions.

19.    Partners Group (USA) Inc. ("PG USA") is a Delaware-registered, fully-owned subsidiary of Partners Group. In August 2015 and through the completion of the IPO, KinderCare was party to a management services agreement with PG USA through which PG USA provided management and advisory services to the Company on an ongoing basis for an annual management fee of $4.9 million payable in equal quarterly installments.

20.    Prior to going public, Partners Group and PG USA extracted tens of millions of dollars from KinderCare through a variety of service transactions and other agreements with the Company.

21.    Defendants Goldman Sachs & Co. LLC ("Goldman Sachs"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Barclays Capital Inc. ("Barclays"), J.P. Morgan Securities LLC ("J.P. Morgan"), UBS Securities LLC ("UBS"), Robert W. Baird & Co. Inc. ("Baird"), BMO Capital Markets Corp. ("BMO"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Macquarie Capital (USA) Inc. ("Macquarie"), Loop Capital Markets LLC ("Loop Capital"), Samuel A. Ramirez & Company, Inc. ("Ramirez"), and R. Seelaus & Co., LLC ("Seelaus"), are collectively referred to herein as the "Underwriter Defendants." Pursuant to the 1933 Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Offering Documents as follows:

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

(a)     The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities. They served as underwriters of the IPO and shared in the over $36 million in underwriting fees generated by the IPO, which included the full exercise of the underwriters' over-allotment option. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of KinderCare common stock in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market KinderCare common stock, and those personnel worked on and approved the content of the Offering Documents.

(b)     In addition, Barclays and UBS received additional proceeds from the IPO, as the net proceeds from the offering were used in substantial part to repay loans issued by these banks to KinderCare.

(c)     The Underwriter Defendants demanded and obtained an agreement from KinderCare that KinderCare would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that KinderCare had purchased millions of dollars in directors' and officers' liability insurance.

(d)     Representatives of the Underwriter Defendants also assisted KinderCare and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of KinderCare, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the

6

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

Underwriter Defendants had continual access to confidential corporate information concerning KinderCare's operations and financial prospects.

(e)    In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with KinderCare's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which KinderCare stock would be sold; (iii) the language to be used in the Offering Documents; and (iv) what disclosures about KinderCare would be made in the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and KinderCare's management and top executives, such as the Individual Defendants, the Underwriter Defendants knew, or should have known, of KinderCare's existing problems as detailed herein.

(f)    The Underwriter Defendants solicited and sold in the IPO KinderCare common stock to Lead Plaintiff and other members of the Class for their own financial benefit. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

22.    The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Lead Plaintiff and the Class.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

**SUBSTANTIVE ALLEGATIONS**

23.     KinderCare provides early education and child care services in the United States. The Company opened its first facility in 1969 and since then has grown to over 2,400 locations in 41 states and the District of Columbia. The Company serves children ranging from 6 weeks to 12 years of age with over 1,500 early childhood education ("ECE") centers and approximately 900 before-school and after-school sites.

24.     The Company operates under three main brands designed to address key parent demographics: (i) KinderCare Learning Centers ("KCLC"); (ii) Crème School; and (iii) Champions. KCLC claims to be the largest private provider of early child care and education centers in the United States by center capacity. Crème School is the Company's "premium" child care offering. Champions is a provider of before-school and after-school programs onsite at schools in the United States.

25.     KinderCare contends its "mission is to provide high-quality ECE for families of all backgrounds and means." KinderCare emphasizes the purported effectiveness of its programs in "children from lower income or minority populations," and has a special program for military service members and certain federal workers.

26.     Over 30% of the Company's revenues come from federal subsidies, primarily provided through the Child Care Development Fund ("CCDF"), as authorized under the Child Care & Development Block Grant ("CCDBG"), a federal program that provides funding to states to assist low-income families with child care costs. In 2024, for instance, KinderCare received $942.1 million in subsidy revenue from government agencies, approximately 35% of the Company's $2.66 billion total revenue.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

27.    Swiss private equity firm Partners Group acquired KinderCare in 2015. Partners Group has long sought to take KinderCare public. The Company was initially set to go public in late 2021 when Partners Group sought to raise up to $540 million at an approximate $3 billion valuation. But the Company's listing was unexpectedly postponed on the day of its scheduled IPO, with KinderCare ultimately abandoning its plans while citing unexplained "regulatory delays."

28.    Three years later, on September 6, 2024, KinderCare filed with the SEC a registration statement for the IPO on Form S-1, which, after amendments on September 30, 2024 and October 7, 2024, was declared effective on October 8, 2024 (the "Registration Statement"). On October 9, 2024, KinderCare filed with the SEC a description of KinderCare's common stock on Form 8-A (the "Form 8-A"). Also on October 9, 2024, KinderCare filed a registration statement for the IPO on Form S-8 with the SEC for the Amended and Restated 2022 Incentive Award Plan and the 2024 Employee Stock Purchase Plan, which incorporated by reference the Registration Statement, the Form 8-A, and the Prospectus (defined herein) (the "Incentive Award and Employee Stock Registration Statement," and together with the Registration Statement, Form 8-A, and the Prospectus, the "Offering Documents"). On October 9, 2024, KinderCare filed with the SEC a prospectus for the IPO on Form 424B4, which was incorporated into and formed part of the Offering Documents (the "Prospectus").

29.    On or about October 9, 2024, Defendants used the Offering Documents to sell over 27 million shares of KinderCare common stock to investors at $24 per share, which included the full exercise of the Underwriter Defendants' over-allotment option. The IPO raised $648 million in gross offering proceeds.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

30. The Offering Documents contained material misrepresentations about KinderCare's business, the quality of care and education it has purportedly provided "throughout" its history, and the nature and magnitude of the risks and uncertainties that investors faced at the time of the IPO.

31. For example, the Offering Documents praised the "unwavering" and "constant" "high-quality" care that KinderCare teachers and employees provided to "each" student and their families, going so far as to describe the child care offered by the Company as "the highest quality care possible" and a "safe, nurturing and engaging environment."

32. In truth, prior to the IPO KinderCare provided substandard care, including numerous incidents of child endangerment, for example, instances where toddlers escaped facilities and roamed into traffic, children were left locked in facilities or buses, and kids were subject to intentional acts of physical, verbal, and sexual abuse.

33. Since the IPO, which occurred less than one year before the filing of this complaint, the price of KinderCare stock has fallen to lows below $4 per share – a fraction of the $24 per share IPO price. The price of KinderCare stock has remained substantially below the IPO price at the time of filing this complaint.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS[2]

34. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements

---

[2] Emphasis is added to quotations unless stated otherwise.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

35.     Specifically, the Offering Documents stated that KinderCare delivered "the highest quality care possible" to "each child" on a "constant" basis, stating in pertinent part as follows:

Since we first opened our doors and rang our bell in 1969, our calling has remained consistent: to help hard-working families pursue their dreams. The world has changed in the last 50 years, and so have we. ***Through it all, our commitment to delivering the highest quality care possible for families, regardless of who they are or where they live has never changed***. From one red roof to over 2,000 locations nationwide, today we're a collection of thousands of big and little stories being written every day. ***A community of more than 43,000 passionate employees striving to make each child's potential shine***. A human-powered network in 40 states working individually and collectively. ***Through it all, what we do for children and families remains constant. We are caregivers. We are educators. We impart a lifetime love of learning. But we are so much more. We are builders. Of confidence in children. Of unshakable self-worth. Of conviction they carry with them as they take their first steps, and every step toward taking on the world***.

36.     The Offering Documents further represented that the Company was grounded in "four pillars" that enabled the Company, through the "best teachers and center staff," to deliver the "best care and education" to "[e]very family" and "their child" in a "safe" and "nurturing" environment that included KinderCare's purportedly "unwavering devotion to children," stating in pertinent part as follows:

Our company purpose is grounded in four pillars:

**Educational Excellence**

Every family wants the best care and education for their child. ***We deliver that through our proprietary curriculum, our commitment to accreditation – the third-party validation of the high standards in our classrooms, and through assessments that consistently prove KinderCare children are better prepared for kindergarten and beyond than their peers outside our programs***.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

**People & Engagement**

*Our industry-first talent filter helps us hire the best teachers and center staff who will thrive in our classrooms*. Our annual employee and family engagement surveys build culture, identify how to best serve children and families, and drive business performance. That's helped us win the Gallup Exceptional Workplace Award for the last eight years – one of only two employers globally.

**Health & Safety**

*We hold sacred our responsibility to protect and nurture the children in our care. Our rigorous safety standards across all classrooms are reinforced by ongoing training and measurement tools*. We build healthy bodies and minds through nutritious meals, and physical activity programs, and our dedicated resources support teacher and child mental health and emotional safety.

**Operations & Growth**

*We bring these high-quality standards to more families and communities each season*. We do this by building new centers and inviting smaller high-quality providers to join KinderCare. We work with school administrators and public and private employers to expand access to our programs. As we grow our reach, we reinvest in all our pillars to elevate our impact in each.

*These pillars guide each of our employees every day, in classrooms across the country*. While our footprint is large, it's the footsteps of each child in our care that inspire us. *Our unwavering devotion to children gives families peace of mind to pursue their dreams and to integrate work and life*. Because strong and vibrant communities depend on access to high-quality child care for all, we serve the full socio-economic spectrum of American families – from the public to the private sector and those of modest means. This isn't a requirement from regulators or any branch of government, it's a matter of principle we've held true to for the last 55 years and will continue upholding for all the years ahead of us.

37.     Similarly, in describing the Company's "Mission," the Offering Documents highlighted the "safe, high-quality" care the Company provided to "each" child, stating in pertinent part as follows:

*We build confidence for life by providing safe, high-quality early childhood and school-age education and care for families of all backgrounds and means. Serving children from six weeks to 12 years of age, we are committed to providing each of them with the very best start in life through high quality educational experiences in a nurturing and engaging environment.*

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

38.     Likewise, the Offering Documents emphasized the Company's purported provision of "high-quality" education and care to "all children . . . in a safe, nurturing and engaging environment," stating in pertinent part as follows:

> *We are the largest private provider of high-quality ECE in the United States by center capacity. We are a mission-driven organization, rooted in a commitment to providing all children with the very best start in life.* We serve children ranging from six weeks to 12 years of age across our market-leading footprint of over 1,500 early childhood education centers with capacity for over 200,000 children and approximately 900 before- and after school sites located in 40 states and the District of Columbia as of June 29, 2024. *We believe families choose us because of our differentiated, inclusive approach and our commitment to delivering every child a high-quality educational experience in a safe, nurturing and engaging environment*.
>
> *Our steadfast commitment to quality education offers an attractive value proposition to the children, families, schools and employers we serve, driven by our market-leading scale, proprietary curriculum instructed by our talented teachers and dedication to safety, access and inclusion*.

39.     The Offering Documents further described the Company's operating strategy as being designed, based on the Company's "four pillars," to "consistently" "deliver a high-quality" "education experience" "for every child and family" "across all of [KinderCare's] centers and sites," stating in pertinent part as follows:

> *Our operating strategy is designed to deliver a high-quality, outcomes-driven, education experience for every child and family we serve across all of our centers and sites*. This self-reinforcing strategy is anchored in four pillars:
>
> *             *             *
>
> •       **People & Engagement.** *We utilize a proprietary, data-driven approach to attract, hire and develop exceptional talent. We believe that our culture builds emotional connections between our employees and our mission and values, driving high engagement across our organization.*
>
> •       **Health & Safety.** *We consistently adhere to strict procedures across all of our centers to provide a healthy, safe environment for our children and our workforce and to deliver confidence and peace of mind to families.*

13

40.     The Offering Documents emphasized that "throughout" the Company's 50-plus-year history KinderCare had delivered "high-quality" education and care without any mention of the numerous lapses in care quality during that time, representing: "We have provided children and families with high-quality ECE for over 50 years." The Offering Documents continued by stating: "Throughout our history, we have empowered parents seeking to enter the workforce with options for excellent early childhood education and care."

41.     In a section about "Employee and Family Retention and Engagement" and the Company's "Culture and Values," the Offering Documents characterized the quality of care provided by KinderCare teachers in unequivocally positive terms, stating in pertinent part as follows:

Our belief that we are more than just teachers is core to our culture and serves as a guiding principle across all actions we take. ***Our teachers are advocates for their students, giving them the confidence to try new things and develop socially. We summarize our calling to impact children and families in our actionable and behavior-based Service Values, which are shared by all our teams***:

- ***I build great relationships with families;***

- ***I anticipate and quickly resolve parent concerns;***

- ***I genuinely care about every child in my classroom;***

- ***My team works together to make our center warm and welcoming;***

- ***An important part of my job is talking with parents about their children; and***

- ***I respond to the unique needs and interests of every child.***

42.     Likewise in a section discussing "Health & Safety," the Offering Documents highlighted the "robust practices" and "rigorous health and safety standards" maintained in "all" of the Company's locations, stating in applicable part as follows:

14

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

*We employ robust practices that support the overall well being of the children we serve, as well as our employees and staff.*

**Classroom Safety**

*We maintain rigorous health and safety standards within all our classrooms across our over 2,400 centers and sites. Center directors regularly provide safety training to their teachers and staff to ensure our employees are updated on our latest protocols and adhere to our safety standards.* Twice a month, teachers and children participate in disaster drills, including fire, active threat, earthquake and tornado scenarios among others. Several times daily, we conduct name-to-face roll calls to ensure all children are safe and accounted for and building access is restricted to only authorized family members. In addition, we partner with medical experts to monitor and continually improve our health and safety protocols at our centers and sites.

43.    The statements in ¶¶34-41 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a)    that numerous incidents of child abuse, neglect, and harm had occurred at KinderCare facilities;

(b)    that KinderCare did not provide the "highest quality care possible" at its facilities, and, indeed, in numerous instances had failed to provide even basic care, meet minimum standards in the child care industry, or comply with the laws and regulations governing the care of children; and

(c)    that, as a result of (a)-(b) above, KinderCare was exposed to a material, undisclosed risk of lawsuits, adverse regulatory action, negative publicity, reputational damage, and business loss.

44.    Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

§229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

45.    Under Item 303, the Offering Documents were required to disclose the actual standard of care utilized in KinderCare facilities, as well as the attendant risks, as these facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in KinderCare stock speculative or risky. No such disclosures were made.

46.    Indeed, the risk factors that were provided in the Offering Documents were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose the adverse events that had already occurred and therefore posed an imminent threat to the Company's business and operations. For example, the Offering Documents stated that "*reported* incidents or *allegations* of inappropriate, illegal or harmful acts to a child at any child care center or site, or through a third-party provider, whether or not directly related to or involving us, *could*" negatively impact KinderCare's business, but failed to disclosed the numerous incidents of inappropriate conduct or otherwise substandard care that had occurred at KinderCare facilities prior to the IPO. Moreover, the statement that reports or allegations of misconduct *could* negatively impact a child care company's business is simply an acknowledgement of a general risk to the industry, not a disclosure of the specific misconduct present at KinderCare facilities, especially when read in conjunction with the Offering Documents' repeated emphasis that KinderCare provides the "highest quality care possible." By definition, the

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

provision of the "highest quality care" would render any such allegations of impropriety untrue. Likewise, the Offering Documents included a misleading description of the risks relating to lawsuits or governmental actions in response to lapses in care quality because the Offering Documents failed to disclose any actual incidents of misconduct underpinning those actions, did not admit that any allegations levied against the Company in connection therewith were in fact true, and in fact countered their veracity by claiming that the relevant risks remained "[w]hether or not claims have merit." In addition, the Offering Documents affirmatively represented: "We are not currently involved in any litigation that we expect, either individually or in the aggregate, will have a material and adverse effect on our business, financial condition or results of operations."

## EVENTS FOLLOWING THE IPO

47.     On April 3, 2025, research analyst Edwin Dorsey published a report about KinderCare titled "Problems at KinderCare Learning Companies (KLC)" in a newsletter known as "The Bear Cave" (the "Bear Cave Report"). The Bear Cave Report summarized the results of its investigation into KinderCare as follows:

> Today's investigation from The Bear Cave finds that KinderCare often fails to deliver the safe and nurturing environment it promises parents and taxpayers. The Bear Cave finds that toddlers escape from the KinderCare daycares onto busy roads, are left alone locked inside KinderCare buildings and buses, and are physically, verbally, and sexually abused, with many cases going unreported until bystanders raise alarm or video evidence circulates. In sum, The Bear Cave believes KinderCare is a broken business that harms the children and families it claims to help.

48.     The Bear Cave Report then provided a litany of examples, some of which are discussed below, where the Company utterly failed to care for children in its custody. Examples included an 11-month-old child becoming ill from exposure to cocaine, which was later found in a worker's backpack in the infant room. The site in question had numerous prior safety violations,

17

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

which – far from the highest quality care possible – included "'staff being aggressive with infants,'" "'undocumented injuries,'" and "'access to power tools and toxic chemicals.'"

49.     Another example involved a three-year-old toddler found roaming the streets outside a KinderCare center that had previously been cited for ten violations during an unannounced visit by state licensing inspectors, which included violations of health and safety protocols. At the same facility, a teacher was also suspended for leaving a child unattended.

50.     In another instance, KinderCare personnel locked a 2-year-old alone inside a facility when the child's mother arrived 15 minutes late to retrieve her. The mother had to call the police who pried the door open in order to free the child.

51.     Similarly, at yet another KinderCare location, personnel left a 5-year-old child alone and locked in an 80-degree-plus bus for two hours.

52.     Even more shocking, the Bear Cave Report cited incidents of intentional child abuse. For instance, after two suspicious parents sewed a recording device into their 20-month-old toddler's jacket, the recorded audio captured a KinderCare employee threatening children. Verbal threats to the children included the following:

- "I'm gonna go and I'm going to beat both of y'all. That's what I'm going to do."

- "I'm about to throw some b*tch swings at some of y'all right now."

- "Get up and move! Sit down (baby whimpers). Sit you're a** down. Come sit down [name redacted]."

- "Touch it and you die."

- "Just get away from me because I will end up in jail."

INTERM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

53.    In another incident, one KinderCare teacher repeatedly poured water on a sleeping child while another filmed the abuse for social media consumption. The child had previously been sent home several times for having what the staff claimed were "accidents."

54.    In a particularly shocking incident, a KinderCare teacher was arrested for child abuse after reportedly "'yelling at the victim and repeatedly punching the child with both an open and closed fist to the back and side of the head.'"

55.    On several occasions, individuals employed by KinderCare were later arrested on charges of child sex abuse.

56.    On April 3, 2025, KinderCare responded to the Bear Cave Report, acknowledging that the incidents had occurred, that KinderCare was not only aware of the incidents but had investigated them (despite the fact that they were not disclosed in the Offering Documents), and that the incidents ran contrary to the quality of care that the Company had claimed to provide in the Offering Documents, stating in relevant part as follows:

> We are aware of this report. These were isolated incidents and not reflective of KinderCare's values and the high standards we set for ourselves. In the event that incidents do happen in our centers, we have a strict protocol to promptly notify families and licensing agencies. We also work quickly to resolve issues directly with families by taking accountability and addressing what went wrong. To that end, in each of these referenced incidents, we conducted an investigation and have taken all actions necessary to ensure the safety of the children in our care, including the termination of teachers who were at fault.

57.    On April 24, 2025, online magazine *Evie* issued an article titled "Why Are Babies Testing Positive For Cocaine At The Nation's Biggest Daycare Chain?" The article described the Bear Cave Report as a "damning new investigative report [that] has pulled back the curtain on what might be the worst scandal in America's childcare system at KinderCare." The article stated the "long list of scandals begs the question: How many isolated incidents does it take before it

19

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

starts to become a pattern?" The article also gathered negative reviews from parents, some of whom "describe absolute chaos" and recommended avoiding KinderCare facilities "'at all costs.'"

58.    On June 5, 2025, Edwin Dorsey published a follow-up report in The Bear Cave titled "More Problems at KinderCare (KLC)" (the "Second Bear Cave Report"). The Second Bear Cave Report noted: "Now these concerns are entering the mainstream, allegations against the company are growing, [and] lawmakers are demanding accountability . . . ." As evidence, the Second Bear Cave Report cited a statement from a congresswoman questioning the continued federal funding of KinderCare:

> We'll be writing to House leadership and DOGE to address this disgusting report.
>
> If you can't keep children safe – and worse, are complicit in their abuse – you do NOT deserve a dime of taxpayer funding.

59.    Since the IPO less than a year before the date of this complaint, the price of KinderCare stock has fallen to lows near $9 per share – ***substantially less than half the $24 per share IPO price***. The price of KinderCare stock has remained substantially below the IPO price at the time of filing this complaint.

## CLASS ACTION ALLEGATIONS

60.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of: all persons and entities that purchased KinderCare common stock pursuant, or traceable, or both, to the Offering Documents issued in connection with KinderCare's IPO, which commenced on or about October 9, 2024 (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

61.     The members of the Class are so numerous that joinder of all members is impracticable. KinderCare common stock is actively traded on the NYSE and millions of shares were sold in the IPO. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by KinderCare or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

62.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

63.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the 1933 Act;

(b)     whether statements made by Defendants to the investing public in the Offering Documents misrepresented material facts about the business, operations, and risks of investing in KinderCare; and

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

65.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants

66.    Lead Plaintiff repeats and realleges ¶¶1-64 by reference.

67.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

68.    This Count does not sound in fraud. Lead Plaintiff does not allege that any of the Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

69.    The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

70.    The Defendants named herein were responsible for the contents and dissemination of the Offering Documents as signatories and/or directors of the Company named with their consent in the Offering Documents or as the underwriters of the IPO.

71.    KinderCare, which was owned by Partners Group, is the registrant and issuer of the common stock sold in and pursuant to the IPO and the Offering Documents. As the issuer of the

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

shares of KinderCare common stock sold in and pursuant to the IPO, KinderCare is strictly liable to Lead Plaintiff and the Class for the material misstatements and omissions. Signatories of the Offering Documents, and possibly other Defendants, may also be strictly liable to the Class for such material misstatements and omissions.

72.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

73.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements. Rather, each such statement concerns existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

74.    By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

75.    Lead Plaintiff purchased KinderCare common stock registered pursuant to the Offering Documents and traceable to the IPO.

76.    Lead Plaintiff and the Class have sustained damages. The value of KinderCare common stock has declined substantially subsequent to and due to Defendants' violations.

77.    At the time of their purchases of KinderCare common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that

23

Lead Plaintiff filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff filed this complaint.

## COUNT II

### For Violation of §12(a)(2) Act
### Against All Defendants

78.     Lead Plaintiff repeats and realleges ¶¶1-76 by reference.

79.     This Count is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against all Defendants.

80.     This Court does not sound in fraud. Lead Plaintiff does not allege that any of the Defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

81.     Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of KinderCare common stock pursuant to the defective Prospectus that respectively formed in relevant part the Offering Documents. The actions of solicitation by these Defendants including participating in the preparation of the false and misleading Prospectus and marketing the common stock to investors, including members of the Class.

82.     The Prospectus for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

83.     Each of the Defendants named on this Count owed Lead Plaintiff and other members of the Class that purchased KinderCare common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be

24

stated in order to make the statements contained therein not misleading. By virtue of each of the Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

84. Lead Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus issued in connection with the IPO at the time they purchased KinderCare common stock.

85. By reason of the conduct alleged herein, the Defendants violated Section 12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class that purchased KinderCare common stock pursuant to the Prospectus issued in connection with the Offering Documents sustained substantial damages in connection therewith. Accordingly, Lead Plaintiff and the other members of the Class that hold the common stock issued pursuant to the Prospectus issued in connection with the Offering Documents have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members that have sold their KinderCare common stock seek damages to the extent permitted by law.

86. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiff filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff filed this complaint.

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

**COUNT III**
**For Violation of §15 of the 1933 Act**
**Against Partners Group, PG USA, KinderCare, and the Individual Defendants**

87.    Lead Plaintiff repeats and realleges ¶¶1-85 by reference.

88.    This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, against Partners Group, PG USA, KinderCare, and the Individual Defendants.

89.    Partners Group and PG USA controlled KinderCare at the time of the IPO through Partners Group's ownership of KinderCare shares, its appointment of KinderCare executives and members of the Board, and both entities' control over the Company through various transactions and agreements with KinderCare, and their historical relationship with the Company and its management.

90.    The Individual Defendants controlled KinderCare at the time of the IPO by virtue of their status as directors and/or senior officers as detailed herein. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of KinderCare and/or through their positions with Partners Group and PG USA.

91.    Defendants KinderCare, Partners Group, and PG USA controlled the Individual Defendants and all of their employees.

92.    The Defendants named herein each also participated in the violations of §11 of the 1933 Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the Offering Documents, selling KinderCare common stock in and pursuant to the IPO, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

26

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR

## PRAYER FOR RELIEF

Lead Plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: November 20, 2025

/s/ Lauren A. Ormsbee
Lauren A. Ormsbee (*pro hac vice*)
Lisa M. Strejlau (*pro hac vice*)
David Saldamando (*pro hac vice*)
Jacqueline E. Lacovara (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: lormsbee@labaton.com
lstrejlau@labaton.com
dsaldamando@labaton.com
jlacovara@labaton.com

27

*Court-Appointed Lead Counsel for*
*Lead Plaintiff and the Class*


**STOLL STOLL BERNE LOKTING &**
**SHLACHTER P.C**
Timothy S. DeJong, OSB No. 940662
Keith A. Ketterling, OSB No. 913368
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: tdejong@stollberne.com
kketterling@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Court-Appointed Liaison Counsel for*
*Lead Plaintiff and the Class*

INTERIM COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:25-cv-01424-AR