**STOLL STOLL BERNE**
**LOKTING & SHLACHTER P.C**
Timothy S. DeJong, OSB No. 940662
Keith A. Ketterling, OSB No. 913368
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: tdejong@stollberne.com
kketterling@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Liaison Counsel for*
*Lead Plaintiff and the Class*

[additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

|  |  |
|---|---|
| IN RE KINDERCARE LEARNING COMPANIES, INC. SECURITIES LITIGATION | Case No. 3:25-cv-01424-AR<br><br>CLASS ACTION ALLEGATION<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION .................................................................................. 2

    A.    KinderCare's Offering Documents Focus On Health, Safety, And Staffing .......... 2

    B.    KinderCare's Centers Regularly Violated Health, Safety, And Staffing
        Regulations, Putting The Company's Financial Success At Risk ......................... 5

    C.    The Price Of KinderCare Stock Declines After the IPO ..................................... 8

    D.    Summary Of The Claims ................................................................................. 10

II.   JURISDICTION AND VENUE .......................................................................... 11

III.  PARTIES AND WITNESSES ............................................................................ 12

    A.    Plaintiffs ........................................................................................................ 12

    B.    Defendants ..................................................................................................... 13

        1.    KinderCare .......................................................................................... 13

        2.    The Individual Defendants.................................................................... 13

        3.    Partners Group .................................................................................... 16

        4.    The Underwriter Defendants................................................................. 18

    C.    Former Employees Of KinderCare .................................................................. 23

IV.   SUBSTANTIVE ALLEGATIONS ..................................................................... 27

    A.    KinderCare's Business And Regulatory Requirements...................................... 27

    B.    Partners Group Acquires KinderCare And Attempts Its First IPO...................... 31

    C.    KinderCare Goes Public In October 2024 ........................................................ 32

    D.    The Offering Documents Contained Materially False And Misleading
        Statements of Fact and Omitted Material Information ........................................ 35

        1.    The Offering Documents Contained Misstatements And Omissions
            About KinderCare's Compliance With Rigorous Safety Standards
            And Government Regulations.................................................................... 36

            a.    State Agencies Documented Systemic and Widespread
                Health and Safety Violations at KinderCare Leading Up To
                the IPO ........................................................................................ 40

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

b.    Legal Proceedings Further Detail Widespread Health And Safety Issues At The Time Of The IPO ........................................ 60

c.    Former Employees Corroborate KinderCare's Systemic Violations Of Health and Safety Practices and Regulations......... 72

2.    The Offering Documents Contained Misstatements And Omissions About KinderCare's Employee Engagement And Staffing ..................... 88

a.    Former Employees Show That KinderCare Alienated Quality Childcare Providers And Employed Unqualified Staff............................................................................................ 91

b.    Litigation And Regulatory Action Further Evidence The Company's Failure to Engage in Appropriate or Compliant Labor Practices At The Time Of The IPO ................................. 102

3.    The Offering Documents Contained Misstatements And Omissions About KinderCare's Operating Strategies and Risk Factors ................. 106

a.    The Offering Documents Contained Misstatements and Omissions Concerning the Company's Operating Strategies ..... 106

b.    The Offering Documents Contained Misstatements and Omissions About The Risks At The Time Of The IPO Around Noncompliance With Safety Laws, Adverse Publicity, and Staff....................................................................... 110

4.    The Offering Documents Failed To Disclose Material Information Required To Be Disclosed By Regulation S-K....................................... 116

E.    Post-IPO Events Demonstrate That The Offering Documents Were Materially False And Misleading At The Time of the IPO ................................ 120

1.    Q3 2024 Earnings (November 20, 2024)................................................ 120

2.    Q4 2024 Earnings (March 30, 2025) .................................................... 121

3.    The Bear Cave Report (April 3, 2025).................................................. 122

4.    Q1 2025 Earnings (May 13, 2025) ....................................................... 127

5.    Q2 2025 Earnings (August 12, 2025) ................................................... 128

6.    Goldman Sachs Communacopia And Technology Conference (September 8, 2025).............................................................................. 130

7.    Q3 2025 Earnings (November 12, 2025)............................................... 130

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

V.      DEFENDANTS DID NOT CONDUCT A REASONABLE INVESTIGATION
        OR POSSESS REASONABLE GROUNDS TO BELIEVE THE ACCURACY
        OF THE STATEMENTS IN THE OFFERING DOCUMENTS .................................. 131

VI.     CLASS ACTION ALLEGATIONS ............................................................. 133

VII.    CAUSES OF ACTION UNDER THE SECURITIES ACT .......................................... 135

COUNT I  For Violation of §11 of the Securities Act Against KinderCare, the Individual
         Defendants, and the Underwriter Defendants ................................................. 135

COUNT II  For Violation of §12(a)(2) of the Securities Act Against KinderCare, the
          Individual Defendants, and the Underwriter Defendants ................................. 138

COUNT III  For Violation of §15 of the Securities Act Against Partners Group and the
           Individual Defendants ..................................................................... 140

VIII.   PRAYER FOR RELIEF .............................................................................. 142

IX.     JURY TRIAL DEMANDED ........................................................................ 143

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

Lead Plaintiff City of Dearborn Police & Fire Revised Retirement System ("Dearborn" or "Lead Plaintiff") and additional named plaintiff Venkata Surya Teja Gollapalli ("Gollapalli") (collectively with Lead Plaintiff, "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation undertaken by their undersigned counsel including Court-appointed Lead Counsel, Labaton Keller Sucharow LLP, which included a review and analysis of: (i) regulatory filings made by KinderCare Learning Companies, Inc. ("KinderCare," "KLC," or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts of earnings calls, and other public statements by the Company and other Defendants (as defined herein in Sec. III. B); (iii) Company website, marketing, and training materials; (iv) price and volume data for KinderCare common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former KinderCare employees ("FEs")[1]; (viii) public records concerning KinderCare, including monitoring and inspection reports of KinderCare facilities maintained by state regulatory agencies as well as court records and dockets of actions concerning KinderCare or the facts related to this action; and (ix) other publicly available materials and data. Counsel's investigation into the factual matters alleged herein continues and many of the relevant facts are known only by the Defendants (as defined herein) or are exclusively within their custody or control. Plaintiffs believe

---

[1] The terms "former employees" and "FE" refer to the former KinderCare employees whose reports are discussed in this Complaint. In order to preserve the former employees' anonymity while maintaining readability, the Complaint uses the pronouns "she" and "her" in connection with all the FEs, regardless of actual gender. Each FE is designated by number, such that former employee 1 is referred to as "FE-1," etc.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    On October 9, 2024, KinderCare launched an initial public offering ("IPO") of its common stock, raising over $662 million in gross proceeds. This action brings strict liability and negligence claims against KinderCare and the other responsible Defendants for misrepresentations and omissions of material facts required to be made in the Offering Documents[2] pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"). Plaintiffs bring this federal securities class action on behalf of a Class (defined *infra* at ¶359) of all persons or entities who purchased or otherwise acquired KinderCare common stock pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and who were damaged thereby.

### A.    KinderCare's Offering Documents Focus On Health, Safety, And Staffing

2.    Headquartered in Lake Oswego, Oregon, KinderCare promotes itself as "the largest private provider of high-quality Early Childhood Education ("ECE") in the United States by center capacity," and parents and caregivers entrust the Company to keep tens of thousands of children and infants safe each day. The Company's ability to expand enrollment was key to the IPO's success. Defendants made representations throughout the Offering Documents about KinderCare's

---

[2] The "Offering Documents" are defined as: (i) the registration statement for the IPO on Form S-1 filed by KinderCare on September 6, 2024, as amended on September 30, 2024 and October 7, 2024, and declared effective on October 8, 2024 (the "S-1 Registration Statement"); (ii) the description of KinderCare's common stock filed by KinderCare on October 9, 2024 on Form 8-A (the "Form 8-A"); (iii) the registration statement filed by KinderCare on Form S-8 for the Amended and Restated 2022 Incentive Award Plan and the 2024 Employee Stock Purchase Plan, which was discussed in the S-1 Registration Statement and incorporated by reference the S-1 Registration Statement, the Form 8-A, and the Prospectus (defined below) (the "S-8 Registration Statement" and together with the S-1 Registration Statement, the "Registration Statements")); and (iv) the prospectus filed by KinderCare on Form 424B4 on October 9, 2024 KinderCare, which was incorporated into and formed part of the Offering Documents (the "Prospectus").

strict adherence to rigorous health and safety practices at each of its facilities, and KinderCare's successful hiring and retention of qualified childcare professionals to staff its facilities. KinderCare specifically tied its facilities' adherence to its represented health and safety practices and staffing success as essential to its continued success and reputation. Indeed, in its "roadshow" presentation to potential IPO investors, KinderCare represented that its "tangible advantages" over smaller competitors included its "safety and compliance best practices," "better talent attraction and retention," "brand recognition," and "investment in facilities." KinderCare also explained that its nationwide facilities were managed through the Company's "centralized operations."

3.    Throughout the Offering Documents, KinderCare linked the Company's historical, current, and future performance to its commitment to and compliance with health, safety, and staff. For example, Defendant and CEO at the time of the IPO, Paul Thompson, wrote a personal letter to investors in the Offering Documents, stating: "***We hold sacred our responsibility to protect and nurture the children in our care***."[3] Thompson assured investors that KinderCare's "***rigorous safety standards across all classrooms are reinforced by ongoing training and measurement tools***" and that KinderCare's "***dedicated resources support teacher and child mental health and emotional safety***."

4.    The Offering Documents assured investors that—at the time of the IPO— KinderCare was "***continuing to comply with applicable laws and regulations***," including "***minimum qualifications and background checks for our center personnel as well as teacher-to-child ratios and various health [] and safety regulations***."

5.    The Offering Documents also described that the Company's "***industry-first talent filter helps us hire the best teachers and center staff***," that the Company was prioritizing hiring

---

[3] All bold and italics has been added unless stated otherwise.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

and retaining qualified teachers and staff by providing "*competitive compensation*," and that the Company's "onboarding program . . . ensures new employees are grounded in our protocols and culture, from *safe interactions with children and understanding local licensing regulations* to building relationships with families."

6.      The Offering Documents also told investors that KinderCare based its "operating strategy" on "four pillars" that "enhance our value to children and families and [] drive improved operating performance." The Offering Documents listed the first of these pillars as "Health & Safety," explained as the Company's "*consistent[] adhere[nce] to strict procedures across all of our centers to provide a healthy, safe environment for our children and our workforce*." The Offering Documents listed as the second pillar "People & Engagement," explained as the Company's focus to "*attract, hire, and develop exceptional talent*." The fourth and final pillar listed is "Operations & Growth," through which the Company would "*deliver profitable growth and [] fund consistent reinvestment into our service offerings*" through "*proprietary operating procedures to deliver a high-quality, consistent experience across our centers and sites*." Additionally, the Offering Documents cited KinderCare's best practices and operating strategies as positioning the Company for growth through its "*strong track record of improving occupancy rates*."

7.      The market credited these and other similar statements. For example, in its November 4, 2024 analyst report initiating coverage of KinderCare, Deutsche Bank found that "KLC management executed impressively by improving teacher hiring and retention," crediting the Company's "culture and strategies to hire and retain staff," and highlighting that "[t]he company provided competitive compensation, prioritizing the development and retention of its teaching staff, investing in training and providing career growth opportunities." The market also

understood these metrics to be material to KinderCare and its ability to succeed. For example, in its November 4, 2024 report initiating coverage of KinderCare, Baird Equity Research acknowledged, "There are also various state laws/regulations with which KinderCare **_must_** comply including those that require teachers and other staff members to meet certain educational and other minimum requirements as well as certain prescribed minimum adult-to-child ratios," and noted that "[w]e consider these factors **_key_** day-to-day operating risks for KinderCare."

8.    However, the Offering Documents failed to disclose systemic health, safety, employee, and operational failings throughout the nation's KinderCare facilities. These failings had resulted in widespread and substantiated violations of government health and safety regulations across KinderCare's centers, multiple serious legal proceedings against the Company, and enrolled family defections. These undisclosed conditions already impaired the Company's enrollment growth at the time of the IPO and posed still greater material risks to the financial metrics on which the IPO was premised.

## B.    KinderCare's Centers Regularly Violated Health, Safety, And Staffing Regulations, Putting The Company's Financial Success At Risk

9.    Lead Counsel's investigation involved an analysis of **_thousands_** of Monitoring and Inspection Reports (defined herein) involving hundreds of KinderCare's facilities (also referred to as "centers") in the nine months leading up to the IPO, together with a review of legal complaints against KinderCare, harrowing local news and investigative reporting, and interviews with former employees of KinderCare. This investigation discovered that, by way of illustration, state authorities cited nearly **_half_** of KinderCare's over 1,500 ECE facilities across the country for violations of state laws in the nine months leading up to the IPO. Indeed, as further disclosed through news reports following the IPO, and as further evidenced by the accounts of six former employees, KinderCare routinely violated mandatory laws and regulations, leading to an

5

extraordinary number of documented violations that state regulators themselves substantiated as posing *immediate* health and safety risks to the children and infants under the Company's care.

10.     As explained by former KinderCare employees—and contrary to the assurances in the Offering Documents—KinderCare prioritized profit margins over the quality of its labor and the quality of its care, which threatened its ability to generate sustainable enrollment growth, comply with mandatory government regulations, and ensure the health and safety of children enrolled at KinderCare facilities.

11.     Lead Counsel's investigation demonstrated that, rather than complying with "*minimum qualifications and background checks for our center personnel*" and providing "*competitive compensation*" to its staff—as claimed in the Offering Documents—KinderCare offered noncompetitive salaries, frequently compensating employees at or below the minimum wages required by law. Former employees further explained that these noncompetitive wages and labor practices prevented KinderCare from hiring and retaining qualified staff. KinderCare then hired substandard, unqualified, or unvetted staff, a practice confirmed by former employees and demonstrated through hundreds of violations documented in Monitoring and Inspection Reports in just the nine months leading up to the IPO.

12.     KinderCare's hiring, staffing, and training failings contradicted representations in the Offering Documents and contributed to and caused widespread, systemic health and safety violations by the Company.

13.     By way of illustration, Lead Counsel conservatively identified and reviewed 1,181 reports citing violations concerning *nearly 2,000 health and safety violations at 680 KinderCare KCLC facilities* in just the nine-month period prior to the Offering (from January 1, 2024 to October 9, 2024)—amounting to *45% of the Company's ECE centers at the time of the IPO*.

| KinderCare Health & Safety Violations<br>Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — USA | |
| --- | --- |
| **Nature of Health & Safety Violation** | **Incidents** |
| Staff Physical Abuse of Minor | 127 |
| Staff Verbal/Mental Abuse of Minor | 48 |
| Noncompliance with Staff-to-Child Ratios | 243 |
| Child Unattended | 217 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 900 |
| Medical Attention Required | 45 |
| Other Health and Safety Incidents | 402 |
| **TOTAL** | **1,982** |

14.    As discussed herein, these health and safety violations cited in Monitoring and Inspection Reports—but undisclosed in the Offering Documents—posed substantiated risks (and in many cases, caused actual harm) to children and infants, including physical and verbal abuse, incidents requiring medical attention, children left unattended, failure to maintain mandated staff-to-child ratios, failure to perform adequate background checks on staff, and failure to provide adequate training to staff. KinderCare's pervasive harmful conditions not only caused injuries to children and infants, but also directly impacted KinderCare's enrollment, operations, and financial performance.

15.    Multiple lawsuits filed against KinderCare by parents of injured children further corroborate and elaborate on these incident reports, as do local news accounts. And former employee accounts describe how the policies implemented and directed by the Company

essentially caused these violations to occur on a broader, systemic basis; for example, KinderCare required its centers to continuously grow enrollment but would not provide the staff and resources required to support those additional enrollments in accordance with state laws until *after* the children were already enrolled.

### C.    The Price Of KinderCare Stock Declines After the IPO

16.    The Offering Documents' representations described above and herein failed to disclose the fact that nearly half of KinderCare's ECE facilities committed ***nearly 2,000 violations of health and safety regulations*** in the months leading up to the IPO, that the Company faced lawsuits alleging dangerous and even criminal acts occurring at KinderCare's facilities, and that these conditions seriously threatened KinderCare's reputation, enrollment, revenues, and growth prospects.

17.    Less than six weeks after the IPO, KinderCare released its third quarter 2024 earnings results, a release that one analyst later noted was largely "***viewed . . . as a disaster***." In this earnings release, the Company reported "flat" enrollment growth for the IPO quarter, and unexpectedly declined to provide guidance for its future performance. When KinderCare did provide guidance the following quarter, in March 2025, the Company indicated flat and even decelerating growth in 2025.

18.    Then, in April 2025, a report published by an independent investigative reporter exposed a history of disturbing and undisclosed violations and unsafe behavior at KinderCare facilities. This investigative report aggregated local news stories documenting safety incidents at numerous facilities, adding firsthand accounts from impacted parents and KinderCare staff. This report described how KinderCare's failure to comply with regulations and its own stated practices regularly threatened the health and safety of the children in its care. For example, one incident

described a Wisconsin KinderCare facility with a lengthy history of safety violations, including "staff being aggressive with infants," "undocumented injuries," children having "access to power tools and toxic chemicals," and a report of an infant who became ill from exposure to cocaine brought to the facility by a staff member. This incident resulted in the staff member's arrest and revocation of the facility's license. This investigative report was described as a "***damning new investigative report [that] has pulled back the curtain on what might be the worst scandal in America's childcare system at KinderCare***."

19.     By August 2025, less than one year after the IPO, Defendant Thompson stated there were "center-level and local market-specific" issues, including poor performing centers that had been identified "late last year"—*i.e.* late 2024 when the IPO launched. But the Offering Documents did not disclose any such issues; to the contrary, the Offering Documents emphasized KinderCare's "strong track record of improving occupancy rates ***across our portfolio*** . . . through a combination of strategic investments in technology, ***talent*** and ***implementing best practices across our centers***." Yet, KinderCare now contradicted those statements, acknowledging that the underperforming centers identified "late last year" were only "***now*** benefiting from the same proven practices and frameworks that have driven strong results in our highest performing centers."

20.     Ultimately, by November 2025—the end of the first full year as a public company—analysts at Barclays in a report titled "Not making the grade, getting held back," observed that even KinderCare's "medium-term growth" had been pushed further out, noting "investor skepticism" given that the Company's purported "***conviction on execution has been a consistent message since the IPO, though delivery has lagged expectations***."

### D.    Summary Of The Claims

21.    The claims asserted herein are strict liability claims. The Offering Documents contained material misrepresentations, and this Complaint asserts claims concerning three categories of misstatements and omissions: (i) KinderCare's adherence to health and safety; (ii) KinderCare's investment in its labor force; and (iii) KinderCare's financial and operating conditions.

22.    ***First***, while the Offering Documents told investors that KinderCare held "***sacred***" and prioritized health and safety—and that KinderCare was "***continuing to comply***" with all necessary health and safety state laws and regulations—the Offering Documents failed to disclose the systemic violations of health and safety regulations and the numerous instances of documented, risks and serious harm suffered by enrolled children and infants occurring at the time of the IPO.

23.    ***Second***, while the Offering Documents acknowledged the critical importance of quality childcare employees and assured investors of the Company's success in hiring and retention, the Offering Documents did not disclose that KinderCare systematically alienated quality employees with low wages and untenable workloads and instead hired unqualified and even dangerous staff at the time of the IPO.

24.    ***Third***, while the Offering Documents described KinderCare's financial performance in the years preceding the IPO and cited that performance as the reason that it was "well-positioned" for future growth, the Offering Documents did not disclose the negative impacts to the Company's performance already occurring at the time of the IPO, including stagnating enrollment and materializing risks from underperforming and unsafe centers.

25.    KinderCare's stock has plummeted from its offering price of $24.00 per share (October 9, 2024) to $9.81 per share on August 12, 2025, the day this action was filed, a 59%

decline. KinderCare's stock has continued to fall, closing at $4.62 as of February 5, 2026, ***an over 81% decline from the IPO price***.

26.     By this action, Plaintiffs, on behalf of themselves and other Class Members who acquired the Company's shares pursuant or traceable to the Offering Documents, seek to recover the damages suffered as a result of Defendants' violations of the Securities Act.

## II.    JURISDICTION AND VENUE

27.     The claims alleged herein arise under and pursuant to the Securities Act of 1933. Specifically, this Complaint asserts claims under: (i) Section 11 of the Securities Act, 15 U.S.C. § 77k ("Section 11"); (ii) Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) ("Section 12"); and (iii) Section 15 of the Securities Act, 15 U.S.C. § 77o, ("Section 15").

28.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

29.     This Court has personal jurisdiction over each of the Defendants and venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b). Defendants conducted the IPO in substantial part from this District, drafted the Offering Documents in substantial part in this District, disseminated the statements alleged to be false and misleading herein from this District, and solicited purchasers of KinderCare common stock in and from this District. Additionally, KinderCare conducts substantial business in this District, which is the location of its corporate headquarters, and the Company further operates multiple KinderCare locations throughout the state of Oregon. Substantial acts in furtherance of the alleged violations of the Securities Act or the effects of the violations have occurred in this District, insofar as the shares purchased in KinderCare's IPO were widely held and it is reasonable to infer individuals within this District purchased such securities.

30.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national exchange within the United States.

## III.     PARTIES AND WITNESSES

### A.     Plaintiffs

31.     On November 13, 2025, the Court appointed Dearborn as Lead Plaintiff in this action. ECF No. 43. As set forth in the Certification filed in this Action on October 14, 2025 (ECF No. 23-1), Lead Plaintiff Dearborn purchased KinderCare's common stock pursuant and/or traceable to the Offering Documents. Among its purchases of KinderCare common stock, Dearborn purchased KinderCare common stock directly in the Offering, pursuant and traceable to the Offering Documents, from Underwriter Defendant Morgan Stanley on the day of the Offering at the Offering price of $24.00 per share. Lead Plaintiff's purchases of KinderCare common stock occurred at a time when only shares registered and issued in connection with the Offering Documents were in the market. Lead Plaintiff suffered damages as a result of the violations of the federal securities laws alleged herein.

32.     As set forth in the Certification filed in this Action on August 12, 2025 (ECF No. 1), additional named plaintiff Gollapalli purchased KinderCare common stock pursuant and/or traceable to the Offering Documents. Gollapalli's purchases of KinderCare common stock occurred at a time when only shares registered and issued in connection with the Offering Documents were in the market. Gollapalli suffered damages as a result of the violations of the federal securities laws alleged herein.

B.      **Defendants**

1.      **KinderCare**

33.     Defendant KinderCare is a provider of early childhood and school-age education in the United States. The Company is incorporated in the state of Delaware and headquartered at 5005 Meadows Road, Lake Oswego, Oregon, 97035. Following the October 2024 IPO, KinderCare's common stock trades on the NYSE under the ticker symbol "KLC."

2.      **The Individual Defendants**

34.      Defendant Paul Thompson ("Thompson") served as KinderCare's Chief Executive Officer ("CEO") and President at the time of the IPO. Thompson assumed the role of CEO on June 1, 2024. Before assuming the CEO role, Thompson served as KinderCare's President from August 2021 until June 2024, where he oversaw strategy, center operations, new center growth, IT, marketing and communications, and all the Company's brands. Thompson also served as KinderCare's Chief Operating Officer from 2019 to 2021; as Chief Administrative Officer from 2019 to 2020; and Chief Financial Officer from 2015 to 2019. On December 2, 2025, KinderCare announced that Thompson had resigned from the KinderCare Board and as CEO, and would exit the Company by December 31, 2025. As CEO and President, Thompson reviewed and contributed to the Offering Documents and signed the Company's Registration Statements and Form 8-A, all filed with the SEC.

35.     Defendant Anthony Amandi ("Amandi") has served as KinderCare's Chief Financial Officer since 2019 and at the time of the IPO. From 2015 to 2019, Amandi served as KinderCare's Senior Vice President of Financial Planning & Analysis, and from 2011 to 2015, he served as Corporate Controller. Defendant Amandi reviewed and contributed to the Offering Documents and signed the Company's Registration Statements, both filed with the SEC.

36.     Defendant John T. Wyatt ("Wyatt") has served as a director of KinderCare since 2012 and at the time of the IPO, and has held the role of Chairman of the Board since 2021. Wyatt served as KinderCare's CEO from 2012 through May 2024. On June 1, 2024, Defendant Thompson replaced Wyatt as CEO. On December 3, 2025, KinderCare announced that Thompson was being replaced as CEO by Wyatt, who would resume the role. In his capacity as Chairman of the Board, Wyatt reviewed and contributed to the Offering Documents and signed the Company's Registration Statements, both filed with the SEC.

37.     Defendant Jean Desravines ("Desravines") has served as a director of KinderCare since 2021 and at the time of the IPO. As a member of the Board, Desravines reviewed and contributed to the Offering Documents and signed the Company's Registration Statements, both filed with the SEC.

38.     Defendant Christine Deputy ("Deputy") has served as a director of KinderCare since 2021 and at the time of the IPO. As a member of the Board, Deputy reviewed and contributed to the Offering Documents and signed the Company's Registration Statements, both filed with the SEC.

39.     Defendant Michael Nuzzo ("Nuzzo") has served as a director of KinderCare since 2021 and at the time of the IPO. As a member of the Board, Nuzzo reviewed and contributed to the Offering Documents and signed the Company's Registration Statements, both filed with the SEC.

40.     Defendant Benjamin Russell ("Russell") served as a director of KinderCare since 2018 and at the time of the IPO. At the time of the IPO, Russell also served as a Senior Vice President-Private Equity at Partners Group, where he had been employed since 2017. As a member of the Board, Russell reviewed and contributed to the Offering Documents and signed the

Company's Registration Statements, both filed with the SEC. Russell's membership on the Board expired in 2025.

41.    Defendant Joel Schwartz ("Schwartz") has served as a director of KinderCare since 2015 and at the time of the IPO. At the time of the July 2015 acquisition of KinderCare by Partners Group and at the time of the IPO, Schwartz was a Managing Partner at Partners Group, where he had been employed since 2013. Schwartz is Co-Head of the Private Equity Services business unit for Partners Group as well as a member of Partners Group's Global Investment Committee, the Private Equity Direct Leads Investment Committee, and Co-Chairman of the Private Equity Direct Co-Investments in Services Investment Committee, based in New York. As a member of the Board, Schwartz reviewed and contributed to the Offering Documents and signed the Company's Registration Statements, both filed with the SEC.

42.    Defendant Alyssa Waxenberg ("Waxenberg") has served as a director of KinderCare since 2021 and at the time of the IPO. As a member of the Board, Waxenberg reviewed and contributed to the Offering Documents and signed the Company's Registration Statements, both filed with the SEC.

43.    Defendant Preston Grasty ("Grasty") has served as a director of KinderCare since 2024 and at the time of the IPO. At the time of the IPO, Grasty was also a Senior Investment Leader at Partners Group, where he had been employed since 2018. As a member of the Board, Grasty reviewed and contributed to the Offering Documents and signed the Company's Registration Statements, both filed with the SEC. On June 5, 2025, Preston Grasty resigned from the KinderCare Board of Directors.

44.    Defendants Thompson, Amandi, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty are referred to herein as the "Individual Defendants."

45.     Each of the Individual Defendants participated in the preparation of and signed the Registration Statements, and participated in the making of the materially inaccurate, misleading, and incomplete statements and omissions alleged herein. The Individual Defendants reviewed, edited and approved the Offering Documents, participated in the Offering, and solicited the purchase of KinderCare's common stock sold pursuant and traceable to the Offering Documents.

46.     The Individual Defendants conducted the roadshow along with the Underwriter Defendants (defined herein) to solicit the purchase of KinderCare common stock in the IPO. The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

### 3.    Partners Group

47.     Defendant Partners Group (USA) Inc. ("PGUSA"), a company organized under the laws of Delaware, is 100% owned by Partners Group Holding AG (Switzerland), a publicly-traded company and Swiss private equity firm which is itself a holding company, with no employees or operations of its own. As used herein and unless otherwise indicated, "Partners Group" refers to PGUSA as well as Partners Group Holding AG (Switzerland) and all other affiliates identified in the Offering Documents as holding interests in KinderCare and/or serving as investment manager for entities holding interests in KinderCare. The claims asserted against PGUSA—and liability for such claims—relates to all Partners Group affiliates.[4]

---

[4] By stipulation (ECF No. 67), which the Court so-ordered on January 22, 2026 (ECF No. 74), "Defendant PGUSA agrees that it will not argue that any entity affiliated with PGUSA (including but not limited to [Partners Group Holding AG] or the other PGUSA affiliates identified in the Registration Statement), is in fact the proper party to this lawsuit in lieu of PGUSA and/or should have liability in lieu of PGUSA." ECF No. 74.

48.     In 2015, Partners Group Holding AG purchased KinderCare through investment funds affiliated with, advised by, and/or managed by PGUSA and other affiliates of Partners Group Holding AG.

49.     At the time of the IPO, Partners Group controlled KinderCare and the Board, and had access to all information relevant to KinderCare's business and affairs. At the time of the IPO, Partners Group held a 90% controlling interest in KinderCare, and as reflected in the Offering Documents, Partners Group "currently ***controls the election of our directors*** and ***could exercise a controlling interest over our business, affairs and policies, including the appointment of our management*** and the entering into of business combinations or dispositions and other corporate transactions." Among other things, Partners Group nominated five of the Board's eight directors that signed the Offering Documents, with three of those Board members (Defendants Russell, Schwartz, and Grasty) holding senior positions within Partners Group.

50.     Prior to and in connection with going public, Partners Group earned millions of dollars from KinderCare through a variety of service transactions and other agreements with the Company. For example, in March 2024, prior to the IPO, KinderCare made a $320 million distribution, financed by proceeds from a $265 million incremental term loan and cash on-hand, to its then-parent holding company, KC Parent, which was majority owned by Partners Group. In addition, pursuant to a management services agreement first entered into after Partners Group acquired KinderCare in 2015, PGUSA provided management and advisory services to the Company on an ongoing basis for an annual management fee of $4.9 million payable in equal quarterly installments, as well as reimbursement of out-of-pocket expenses incurred in connection with the services rendered. In correspondence to the SEC prior to the Offering, KinderCare

described the nature of PGUSA's services as including (i) strategic planning services, (ii) board advisory services, and (iii) personnel management services.

51.     The Offering Documents also disclosed that the management services agreement between KinderCare and PGUSA would terminate automatically upon the completion of the Offering, and further that, "[f]ollowing the consummation of this offering, we do not expect that PG or any of its affiliates will provide managerial services to us or KCE," and further that these functions would be performed in-house. However, Partners Group continued to own 68.9% of the Company's shares, making KinderCare a "controlled company" under NYSE standards, i.e. controlled by Partners Group.

### 4.    The Underwriter Defendants

52.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Goldman Sachs acted as one of the lead bookrunning managers for the Offering. Further, Goldman Sachs acted as a representative of all of the Underwriter Defendants. Goldman Sachs was allocated 6,073,679 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

53.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Morgan Stanley acted as one of the lead bookrunning managers for the Offering. Further, Morgan Stanley—along with Goldman Sachs— acted as a representative of all of the Underwriter

Defendants. Morgan Stanley was allocated 6,073,679 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

54.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Barclays acted as one of the lead bookrunning managers for the Offering. Barclays was allocated 3,574,322 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

55.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. J.P. Morgan acted as one of the lead bookrunning managers for the Offering. J.P. Morgan was allocated 3,574,322 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

56.     Defendant UBS Securities LLC ("UBS") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. UBS was allocated 1,389,818 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

57.     Defendant Robert W. Baird & Co. Inc. ("Baird") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Baird

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

was allocated 801,818 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

58.    Defendant BMO Capital Markets Corp. ("BMO") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. BMO was allocated 801,818 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

59.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Deutsche Bank was allocated 801,818 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

60.    Defendant Macquarie Capital (USA) Inc. ("Macquarie") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Macquarie was allocated 801,818 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

61.    Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Loop Capital was allocated 35,636 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

62.     Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Ramirez was allocated 35,636 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

63.     Defendant R. Seelaus & Co., LLC ("Seelaus") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Seelaus was allocated 35,636 shares in the IPO, plus its *pro rata* share of the 3,600,000 additional optioned shares, to sell to the investing public.

64.     Defendants Goldman Sachs, Morgan Stanley, Barclays, J.P. Morgan, UBS, Baird, BMO, Deutsche Bank, Macquarie, Loop Capital, Ramirez, and Seelaus are collectively referred to herein as the "Underwriter Defendants."

65.     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. The Underwriter Defendants were allocated a total of 24,000,000 shares of KinderCare common stock to sell to the investing public, plus an additional allotment of 3,600,000 shares of KinderCare common stock. The Underwriter Defendants' participation in and their solicitation of purchases of KinderCare's common stock in the IPO was motivated by their financial interests. Collectively, the Underwriter Defendants received over $36.4 million in fees and commissions in connection with their sale of KinderCare common stock in the IPO.

66.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering Documents. The Underwriter Defendants' failure to

conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

67.    The Underwriter Defendants determined that in return for their share of the IPO's proceeds, they were willing to merchandise KinderCare's common stock in the IPO. The Underwriter Defendants arranged for the roadshow prior to the IPO during which they, and the Individual Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

68.    The Underwriter Defendants also demanded and obtained an agreement from KinderCare that KinderCare would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that KinderCare had purchased directors' and officers' liability insurance.

69.    The Underwriter Defendants assisted KinderCare and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of KinderCare, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning KinderCare's operations and financial prospects.

70.    In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, and directors and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what

disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents as detailed herein.

71.     Prior to the IPO, the Underwriter Defendants required all existing KinderCare stockholders, including the Company, the Individual Defendants, and Partners Group, to enter into lock-up agreements with them to prohibit the share of KinderCare common stock, other than those issued and sold in the Offering, from being sold in the public market for 180 days from the date of the Prospectus (October 9, 2024). According to the Offering Documents, "[t]he lock-up agreements limit the number of shares of common stock that may be sold immediately following the public offering." These lock-up agreements were not waived by the Underwriter Defendants prior to their expiration.

72.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Lead Plaintiff and other members of the Class.

## C.     Former Employees Of KinderCare

73.     FE-1 worked at KinderCare for a total of approximately 28 years in a variety of roles, including recently as a former Senior District Leader in New Center Growth from mid- 2022 through November 2023. Her role as Senior District Leader involved overseeing KinderCare

facilities, managing profit & loss ("P&L"), talent, and health & safety requirements, including overseeing the hiring and operations of individual schools from pre-open preparations through post-opening. FE-1 was responsible for between 15 to 18 centers nationwide and was not tied to a particular geographic area. As Senior District Leader in New Center Growth, FE-1 reported to Anissa Walker, currently Regional Vice President at the Company; Walker in turn reported to Michael Canavin, President of the KinderCare Learning Centers division of the company ("KCLC"), and Canavin in turn reported to the CEO, including both former CEO Defendant Thompson and the prior (and now current) CEO Defendant Wyatt. Prior to her role as Senior District Leader, FE-1 worked in Center Operations as a Senior Manager from 2018 through 2022, which FE-1 described as a function of KinderCare's corporate office. That role involved communicating initiatives between KinderCare's corporate office and the centers. In her role as Senior Manager for Center Operations, FE-1 reported at times to then-Vice President Center Operations Sarah Redgrave, whose current title at KinderCare is Group Vice President, Operations, and later to Melissa Bauer, currently Senior Financial Analyst at KinderCare.

74.     FE-2 was employed by KinderCare from October 2016 through July 2025. She began her employment as District Manager, was promoted to Client Relations Business Partner – Nationwide, and then to Client Success Manager – Nationwide, which was her title from October 2023 through the end of her employment in July 2025. FE-2 explained that, as Client Success Manager, she worked in the "At Work" division of KinderCare, functioning as a liaison between District Leaders and KinderCare's clients. FE-2 explained that her division of KinderCare provided childcare facilities for client entities, such as corporations, universities, and municipalities, for the dedicated use of those entities' employees' children. FE-2 noted that her work involved negotiating contracts with new clients and re-signing existing clients. FE-2 reported

24

to Jeffery "JT" Talkington, currently Manager, Client Implementation and Adoption, at KinderCare. According to FE-2, Talkington reported to Amy Harmon, former Vice President, Client Success and Senior Director, Implementation at the Company. Harmon, in turn, reported to Joshua Noda, currently Vice President, Operations, at the Company.

75.    FE-3[5] was employed as a Director at three different KinderCare centers from June 2021 through December 2024 in the Virginia and Washington, D.C. metro area. FE-3 explained that, as Director, she was responsible for overseeing the operations of her KinderCare facility, which included enrolling students, hiring and managing staff, tracking KPIs [Key Performance Indicators] for her facility, and managing the facility's budget. During FE-3's tenure, she also from traveled from center to center and oversaw approximately a dozen schools in her area as part of being tasked by the Company with taking over schools that were in crisis. FE-3 explained that Directors reported to KinderCare District Leaders, and that each District Leader supervised a portfolio of approximately 10 to 14 schools. The District Leaders, in turn, reported to the Regional Vice President. It was her understanding that the Regional Vice President reported to KinderCare's President, who until May 2024, was Defendant Paul Thompson. FE-3 recalled that, when she worked in Virginia, she reported to former District Leader Shirley Vandiver; in D.C., she reported to Danni Blake, who is still employed as a District Leader. FE-3 added that Vandiver and Blake reported to current Regional Vice President Anissa Walker.

76.    FE-4 was employed as a Center Director at a KinderCare facility in Texas from approximately January 2022 through August 2025. FE-4 reported to many District Leaders during her tenure. She indicated that there was never any steady leadership, and that there were at least

---

[5] FE-3 explained that teachers and staff communicated internally using texting groups, *Signal*, *WhatsApp*, and email; Directors communicated with District Leaders via email, text, and phone.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

six different District Leaders during her tenure. FE-4 recalled the last District Leader to whom she reported to was Jacian Lewis, who has since been promoted to Regional Manager for KinderCare. According to FE-4, the District Leaders reported to a Regional Director or Regional Manager, and it was her understanding that the Regional Directors reported up to Corporate.

77.    FE-5 was employed as a Director of a KinderCare facility in the Northeast from Fall 2023 through Spring 2025, where she ran the day-to-day operations of the facility, including hiring and training staff and teachers; ensuring compliance with childcare regulations and Company policies; and working with Human Resources in hiring, training, and compliance matters. FE-5 reported to the District Leader, who reported to the Area Vice President, who reported to Michael Canavin, President of KCLC (further defined below).

78.    FE-6[6] was employed by KinderCare as Regional Director of School Partnerships – Midwest from August 2022 through November 2024. FE-6 explained that she worked on the Champions side of KinderCare's business, which is the before- and after-school and summer programs division. She elaborated that her role was primarily a sales position. FE-6 worked with school districts in ten states across the Midwest to establish partnerships and relationships with them to provide before-and-after-school programs for children in their districts. For most of her time at KinderCare, FE-6 reported to Greg Gray, former National Director of Sales and Business Development. FE-6 advised that Gray started after and left before she did. Before and after Gray's employment, FE-6 reported to Rob Magliano, former Vice President of Sales at KinderCare;

---

[6] FE-6 explained that most internal communications at KinderCare were by email and some via text. FE-6 indicated that she took part in weekly meetings with her supervisor, sometimes via *Zoom*, and sometimes by phone. FE-6 also indicated that there were team meetings every two to three weeks and monthly Champions team calls, as well as some in-person corporate meetings; most of the meetings were conducted virtually. FE-6 advised that she used her personal phone for work.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

Magliano was also Gray's immediate supervisor. FE-6's understanding was that Magliano reported to Dan Figurski, currently President at KinderCare Education / Champions.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     KinderCare's Business And Regulatory Requirements

79.     Founded in 1969, KinderCare provides early education and childcare services throughout the United States, operating over 2,400 locations in 40 states and the District of Columbia.

80.     KinderCare operates under three main brands: (i) KinderCare Learning Centers ("KCLC"); (ii) Crème School; and (iii) Champions. KCLC claims to be the largest private provider of early childhood education ("ECE") centers in the United States by center capacity. KCLC is by far KinderCare's most important business segment, driving 88.3% of KinderCare's fiscal 2023 revenues. The Offering Documents stated that as of June 29, 2024, KinderCare operated approximately 1,520 KCLC centers in 40 states as well as in the District of Columbia, and that these centers had capacity to serve over 200,000 children ranging from 6 weeks to 12 years of age.[7]

81.     Per the Offering Documents, increasing weekly, full-time enrollment at KinderCare's facilities "is the key driver of revenue." KinderCare measured enrollment through its "FTE," *i.e.*, KinderCare's full-time enrollment rate, and its "occupancy rate," which the Company calculated as "as the average weekly ECE same-center enrollment divided by the total of the ECE same-centers' capacity during the period." In other words, the higher the enrollment

---

[7] Crème School is the Company's "premium" child care offering. Champions is a provider of before-school and after-school programs onsite at schools in the United States. Crème School represented only 5.2% of KinderCare's revenues in fiscal 2023 and Champions represented only 6.6% of KinderCare's revenues in fiscal 2023.

for a KinderCare center, with capacity for the center remaining constant, the larger the occupancy rate (approaching 100%).

82.     The Company acknowledged that a center's capacity was determined by "regulatory and operational parameters." These parameters referred to various governing laws and regulations that provide guidelines and standards concerning the health and safety of children at KinderCare's facilities. The Offering Documents disclosed that, in the periods prior to the IPO, over one-third of the Company's revenues came from federal subsidies. In 2024, KinderCare received $942.1 million in revenue derived from subsidies, approximately 35% of the Company's $2.66 billion in total revenue. Similarly in 2023, KinderCare received $796 million in subsidy revenue, approximately 32% of the Company's $2.51 billion in total revenue.

83.     These federal childcare subsidies were provided as part of the federal Child Care and Development Block Grant Act of 1990, 42 U.S.C. §§ 9857 et seq. ("CCDBG Act"), which provides funding to state agencies to subsidize the childcare expenses of eligible children. However, to be eligible for these subsidies, each state must have implemented practices and procedures in compliance with child care licensing requirements governing ECE providers such as KinderCare. Among many other requirements, states must define and enforce staff-to-child ratio standards providing for "(I) group size limits for specific age populations, as determined by the State; (II) the appropriate ratio between the number of children and the number of providers, in terms of the age of the children in child care, as determined by the State; and (III) required qualifications for such providers, as determined by the State."

84.     The CCDBG Act also mandates that states require providers like KinderCare to perform criminal background checks for all child care staff members, including prospective child care staff members, and implement requirements that prohibit employment of child care staff

members that do not satisfy the specific mandates of the CCDBG Act.[8] The CCDBG Act also conditions the provision of subsidies to the requirement that states comply with child abuse reporting requirements, and that the plan for each state must include "requirements designed to protect the health and safety of children," and include a certification that "procedures are in effect to ensure that child care providers within the State . . . comply with all" such regulations. KinderCare acknowledged these and similar requirements in the Offering Documents, explaining that the Company was "required by state laws to maintain certain prescribed minimum adult-to-child ratios" for its centers, as well as required to obtain "minimum qualifications and background checks for [] center personnel" and "meet certain educational and other minimum requirements" for its "staff members."

85.    The Offering Documents stated that noncompliance with KinderCare's "regulatory and operational parameters" could result in serious consequences, including "sanctions, which can include fines, corrective orders, being placed on probation, loss of accreditation or, in more serious cases, suspension or revocation of the license to operate, inability to open or acquire new centers, or ability to participate in federal, state and local subsidy programs, and could require significant expenditures to bring our centers, sites or programs into compliance or result in the closing of the center, site or program."

86.    The Offering Documents also explained that hiring and retaining qualified staff were essential to maintaining the mandated child center staff personnel to enrolled children ratio imposed by laws. Laws and regulations require strict compliance with staff-to-child ratios at all childcare facilities. National organizations like Head Start, the American Academy of Pediatrics,

---

[8] For example, California requires that daycare center teachers have minimum qualifications such as, *inter alia*, six months work experience in a licensed child care center.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

and the National Association for the Education of Young Children recognize the importance of low ratios in ECE settings, concluding that adequate staff-to-child ratios are essential to protecting young children's health and safety.[9] Indeed, the presence of a second caregiver has been associated with a lower likelihood of child abuse in the child care settings.[10] As the Company acknowledged in the Offering Documents: "If we are unable to hire and retain qualified teachers at a center or site, we could be required to **reduce enrollment or be prevented from accepting additional enrollment in order to comply with such mandated ratios**."

87.    Further, KinderCare emphasized to investors that "[o]ur business depends largely on our ability to hire and retain qualified teachers and maintain strong employee engagement," as the "provision of child care services is personnel-intensive." KinderCare's business operations and revenues were contingent upon the availability, hiring, and retention of its labor. Failure to invest in labor would naturally result in enrollment declines, including because of the mandated staff-to-child ratio requirements, leading to decreased revenues.

88.    KinderCare internally acknowledged that its facilities' noncompliance with mandated safety regulations directly impacted enrollment and thus revenue generation and profitability. For example, in an internal KinderCare document entitled "KinderCare: Teacher's First 100 Days Workbook," produced in discovery and attached as an exhibit to a complaint in a lawsuit pending in Oklahoma (captioned *Herrera v. KinderCare Learning Centers LLC*, District Court of Canadian County in the State of Oklahoma, Case No. CJ-2025-786)—filed *after* the IPO—KinderCare internally highlighted a direct connection between decreased enrollment and

---

[9] Brenda Miranda, *Higher child-to-staff ratios threaten the quality of child care*, CHILD TRENDS (June 15, 2017), https://www.childtrends.org/publications/higher-child-staff-ratios-threaten-quality-child-care (last accessed on Feb. 6, 2025).
[10] *Id.*

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

instances in which a child is left unattended, which is prohibited under state laws. Specifically, KinderCare warned its staff that in 2016, alone, there were a total of 485 child-unattended incidents throughout 390 KinderCare centers, and that as a result of those incidents "**one out of 11 families withdrew their child within two weeks of the incident**."

### B.    Partners Group Acquires KinderCare And Attempts Its First IPO

89.    On or about July 9, 2015, Swiss-based global investment management firm and private equity group Partners Group acquired KinderCare from Oregon-based Knowledge Universe. Using financing from several banks, including Defendant Barclays, Partners Group purchased KinderCare for approximately $1.5 billion, making it Partners Group's "largest private equity transaction in the US on its own," according to reporting in online publication *Private Equity International*. Defendant Schwartz, managing director of Partners Group during the acquisition, told *Private Equity International* in 2015, "We like the fundamentals supporting the early-childhood segment of the education industry in particular. Specifically, in the case of [KinderCare], we believe it has a bright future in a highly fragmented market."

90.    Despite these statements, private equity and childcare industry experts have called into question whether private equity investment and its desire for cost cutting was an appropriate combination with the business of childcare. One child and family policy expert, Elliott Haspel, wrote an article titled entitled "*The End User is a Dollar Sign, It's Not A Child*" in 2024 in which he discussed his view that Partners Group's acquisition had "reshap[ed]" KinderCare by applying the "well established" "**private equity playbook**," where "a top priority, reinforced by pressure from corporate management, is steady revenue via maximized enrollment and minimized operational costs." One of the concerns highlighted by Haspel was that the "inexorable enrollment push [to drive growth] can lead to **risky situations**," warning that private equity involvement in

31

childcare actually raises—not decreases—the likelihood of "systemic" failures leading to significant debt and even bankruptcy. As one KinderCare center director who remained anonymous in the Haspel article opined, the emphasis on enrollment was problematic because "the end user is a dollar sign, it's not a child."

91.    However, as described herein, the Offering Documents dispelled any concerns that Partners Group's private equity backing and ownership had weakened the Company's ability to ensure adequate staffing and health and safety compliance while cutting costs and positioning for growth.

92.    In November 2021, six years after acquiring KinderCare, Partners Group attempted to take KinderCare public. However, the Company abruptly postponed its public offering on the day it was scheduled to occur, citing unexplained "regulatory delays." While the Company remained silent as to the nature of the regulatory delays, local publication *Oregon Business* noted that KinderCare had "disclosed a 'material weakness' in its internal control over financial reporting in its offering prospectus earlier in the fall," and further reported that the Company was "carrying significant debt — $1.4 billion, due by 2025."

93.    In July 2023, as the Company officially withdrew its prior intent to initiate an initial public offering, it was reported that Partners Group was soliciting bids to sell 50% of its interest in KinderCare to another investment firm. However, those efforts seemingly ended.

C.    **KinderCare Goes Public In October 2024**

94.    In late September 2024, the Company stated its intent to revive its attempt to go public. On October 9, 2024, Defendants conducted the Offering, selling a total of 27.6 million shares of KinderCare common stock at $24 per share, including the Underwriter Defendants' exercise of options to sell an additional 3.6 million shares. The Offering raised net proceeds

exceeding $600 million. KinderCare's common stock price surged over 9% on the first official day of trading, reaching a high of $27.70 per share. Following the IPO, KinderCare was valued at approximately $2.8 billion, including the nearly 70% of shares still held by Partners Group.

95.    The Offering Documents stated that the IPO proceeds would "repay amounts outstanding under its existing indebtedness and pay expenses," *i.e.*, to pay down KinderCare's nearly $1.5 billion in debt.[11] Part of the Company's debt was originated to pay Company proceeds to Partners Group; just months before the Offering, in March 2024, KinderCare made a $320 million distribution to its then-parent holding company, which was majority owned by Partners Group, financed in part by a $265 million incremental term loan.

96.    The Offering Documents disclosed that Partners Group would remain KinderCare's controlling shareholder following the Offering, stating that by virtue of Partners Group's remaining 69% ownership interest: "investment funds affiliated with or advised by affiliates of Partners Group Holding AG will continue to own a controlling interest in [KinderCare's] common stock." This meant that KinderCare was a "controlled company" as defined by the NYSE.

97.    KinderCare conducted a roadshow in connection with the IPO. A roadshow is a critical part of the IPO process because it is a principal way that the Company, its executives, and the lead underwriters market the IPO directly to institutional investors, thereby increasing investor demand for the Company's stock.

98.    In the written roadshow presentation for potential investors, KinderCare explained that its nationwide facilities were managed through the Company's "centralized operations."

---

[11] Specifically, the Offering Documents stated: "We intend to use the net proceeds from this offering to (i) repay $527.2 million of loans outstanding under our outstanding First Lien Term Loan Facility (or $608.9 million, if the underwriters exercise in full their option to purchase additional shares of our common stock) and (ii) pay $7.3 million of other expenses."

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

KinderCare also touted to investors that it delivered strong performance "since 2021" across "Key Metrics," including "strategic investments in technology and talent," which "supported same-center occupancy." Additionally, the roadshow presentation represented that its "tangible advantages" over smaller competitors included its "safety and compliance best practices," "better talent attraction and retention," "brand recognition," and "investment in facilities." The roadshow presentation also explained to investors that there was a direct connection between employee & family engagement and the Company's occupancy rates (and thus revenues). Indeed, the presentation stated that KinderCare's purported "relentless focus on driving high employee and family engagement leads to higher occupancy."

99.    Defendants Thompson and Amandi spoke to the press on the day of the highly-publicized IPO. During a public appearance on CNBC, Defendant Thompson called the IPO "perfect timing for us [because] [w]e have been growing as an organization for us to become public now and accelerate growth, getting into more centers, serving more families[.]" Defendant Amandi appeared on the Schwab Network and was asked about KinderCare's ability to retain its workforce:

> **Interviewer**: And then another issue is labor and churn and turnover. How do you find that to be? Do you have any comparisons? Obviously 2020 was a tough time. You have so many employees that you care about at the same time, sometimes there's churn. How are you doing in that?
>
> **Defendant Amandi**: *We're really stable*. I mean, I think it's a great thing because it's so important to us to have high quality teachers, especially lead teachers in the classroom. We focus a lot on engagement and we work with Gallup a lot to focus on that and make sure that we're providing great experiences for our teachers because *we've learned you get high quality teachers, you provide them great experiences, they stay, and they provide great quality care for children. And that's really what we're trying to do in the end*.

100.    As reflected in a statement issued by Partners Group following the KinderCare IPO, Partners Group had supported a "business transformation" through which the Company had "optimize[d] center footprint, dr[o]ve compound same-center revenue growth, and increase[d]

same-center occupancy." Partners Group described how "KinderCare has also invested in its curriculum, human capital, and technology infrastructure to accelerate growth and strengthen its commitment to quality." Defendant Schwartz was quoted in the release, stating: "KinderCare is a leading early childhood education provider with an unwavering focus on delivering the highest quality service."

### D.   The Offering Documents Contained Materially False And Misleading Statements of Fact and Omitted Material Information

101.     The Offering Documents were negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation.

102.     The Securities Act creates liability against KinderCare, the Individual Defendants, and the Underwriter Defendants for each (1) misstatement, (2) omission in contravention of an affirmative legal disclosure obligation, and (3) omission of information that is necessary to prevent existing disclosures from being misleading, in the Offering Documents.

103.     Additionally, SEC Regulation C requires that the Offering Documents disclose material information necessary to ensure that representations in the Offering Documents are not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

104.     Item 303 of Regulation S-K also imposes an affirmative duty to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

17 C.F.R. § 229.303. Moreover, Item 105 of Regulation S-K imposes an additional affirmative duty to provide a "discussion of the material factors that make an investment in the . . . offering speculative or risky" and "concisely explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105.

105.    The Offering Documents instructed investors to rely "***only***" on the information in the Offering Documents and to "***not rely***" on any "additional, different or inconsistent" information from outside the Offering Documents:

> You should rely only on the information included elsewhere in this prospectus . . . Neither we nor the underwriters have authorized anyone to provide you with additional information or information different from that included elsewhere in this prospectus or in any free writing prospectus prepared by or on behalf of us that we have referred to you. If anyone provides you with additional, different or inconsistent information, you should not rely on it.

106.    As described below, and alleged by Plaintiffs, the Offering Documents contained untrue statements and omissions of material fact about: (i) KinderCare's health and safety practices; (ii) KinderCare's childcare staff; and (iii) KinderCare's and operating strategies and risk factors around its financial condition and business prospects.

107.    A comprehensive list of the affirmative misstatements that Plaintiffs allege were materially false or misleading, and omitted facts necessary to make them not materially false and misleading, is attached as Appendix A.

### 1.    The Offering Documents Contained Misstatements And Omissions About KinderCare's Compliance With Rigorous Safety Standards And Government Regulations

108.    The Offering Documents failed to disclose that KinderCare's facilities throughout the U.S. were rife with widespread, documented health and safety violations, and legal proceedings alleging the same, that not only threatened the safety of the children in the Company's care, but

which presented a known trend and posed a material risk to the Company's enrollment, its operations, and its financial success.

109.    In the opening pages of the Registration Statement and Prospectus, Defendant Thompson authored a letter in which, under the heading "Health & Safety," he assured KinderCare investors that: "*[w]e hold sacred our responsibility to protect and nurture the children in our care. Our rigorous safety standards across all classrooms are reinforced by ongoing training and measurement tools*. We build health bodies and minds throughout nutritious meals, and our *dedicated resources support teacher and child mental health and emotional safety*."

110.    The Offering Documents also featured sections addressing KinderCare's focus on one of its operating strategy "Four Pillars": "Health and Safety." Throughout the Offering Documents, Defendants stated in pertinent parts:

- "*We consistently adhere to strict procedures across all of our centers to provide a healthy, safe environment for our children* and our workforce and to deliver confidence and peace of mind to families."

- "*We employ robust practices that support the overall well being of the children we serve, as well as our employees and staff*."

- "*We maintain rigorous health and safety standards within all our classrooms across our over 2,400 centers and sites*."

- "*Center directors regularly provide safety training to their teachers and staff to ensure our employees are updated on our latest protocols and adhere to our safety standards*."

- "*The health and safety of children and our employees continues to be a top priority*."

- "*We make investments in our curriculum and in how we operate our centers to promote safety as well as physical, mental and emotional health*."

- "*Our teachers and center staff undergo extensive training on mental and emotional health and safety practices to provide a safe environment for children and confidence and peace of mind for parents*."

111.    The Offering Documents also described the Company's compliance with pertinent government regulations concerning the health and safety of the children and infants under the Company's care, stating in pertinent part:

**Government Regulation**

Various aspects of our operations are subject to federal, state and local laws, rules and regulations, any of which may change from time to time. Laws and regulations affecting our business may change, sometimes frequently and significantly, as a result of political, economic, social or other events. *We do not expect the costs of continuing to comply with applicable laws and regulations to have a material effect on our business. Some of the federal, state or local laws and regulations that affect us include* but are not limited to . . .

- *licensing and child care specific regulations*; [and]

- environmental, *health and safety laws and regulations*.

112.    The Offering Documents then elaborated further on these regulations with which the Company is "*continuing to comply*," stating:

**Licensing and Child Care Centers**

Laws, regulations and licensing and other requirements impacting education, child care and before- and after-school programs exist at the national, state and local levels, and such laws, regulations and licensing periodically change. *In most jurisdictions where we operate, our child care centers are required by law to meet a variety of operational requirements, including minimum qualifications and background checks for our center personnel as well as teacher-to-child ratios and various employment, facility, and health, fire and safety regulations*.

113.    In addition, the Offering Documents also stated:

*Our teachers and center staff participate in an onboarding program prior to conducting student-facing activities. The program ensures new employees are grounded in our protocols and culture, from safe interactions with children and understanding local licensing regulations* to building relationships with families.

38

114.    Analyst coverage around KinderCare and the IPO demonstrates that the market understood that adherence to health and safety standards—and compliance with all necessary government regulations—was material to a reasonable investor. For example, in its November 4, 2024 analyst report, analysts at Barclays—which was one of the underwriters to the Offering and a named Underwriter Defendant in this action—noted that KinderCare's "business, financial condition, and results of operations" turned significantly on its "reputation as a provider of choice," and took note in particular that "extreme incidents have been very rare for the established child care brands [like KinderCare]."

115.    Similarly, Baird Equity Research explained in its November 4, 2024 analyst report initiating coverage of KinderCare that "[t]here are also various state laws/regulations with which KinderCare must comply including those that require teachers and other staff members to meet certain educational and other minimum requirements as well as certain prescribed minimum adult-to-child ratios. We consider these factors key day-to-day operating risks for KinderCare." Baird further described how adverse publicity and brand risk could "result in decreased enrollment" from "reported incidents or allegations of inappropriate, illegal or harmful acts," but that "we consider the [] high severity risk actually occurring as being low probability."

116.    The statements alleged in paragraphs ¶¶109-113 were materially false and misleading at the time they were made, and omitted facts necessary to make them not materially false and misleading or required to be stated therein,  because the statements misstated and failed to disclose the fact, at the time of the IPO, KinderCare did ***not*** comply with government regulations pertaining to the health and safety of the children under the Company's care and did ***not*** adhere to the rigorous health and safety standards it claimed. As discussed below, evidence establishing the falsity of these statements includes: (1) thousands of violations of mandated health and safety laws

documented by state agencies at KinderCare facilities in just the nine months prior to the IPO, including incidents in which children suffered serious injuries and/or were exposed to grave risk, as well as countless failures by KinderCare to hire and train staff appropriately, *see infra* § IV.D.1.a; (2) lawsuits filed against KinderCare between 2023-2025 that describe child sexual abuse, physical abuse by staff, and physical injuries caused by health and safety failures at KinderCare, including negligent supervision, negligent hiring, negligent training, and negligent retention of employees, *see infra* § IV.D.1.b; and (3) the accounts of former employees of KinderCare corroborating the Company's widespread violations of health and safety regulations, including decisions made by KinderCare management undermined the Company's ability to maintain a safe environment and to comply with safety regulations through intentional understaffing and training not calibrated for the quality of staff KinderCare was willing to hire, *see infra* § IV.D.1.c.

**a.     State Agencies Documented Systemic and Widespread Health and Safety Violations at KinderCare Leading Up To the IPO**

117.   Contrary to Defendants' statements championing KinderCare's adherence to health and safety standards and compliance with government regulations in paragraphs ¶¶109-113, ***thousands*** of incident reports prepared by state authorities documented KinderCare's pervasive and dangerous health and safety violations across the country. These widespread violations occurred across the United States and reflect a severe and systemic issue that posed a risk to KinderCare's enrollment, reputation, and revenues.

118.   Based on an extensive review of records from state agencies, Lead Counsel identified the repository of "Monitoring and Inspection Reports" for each state in which KinderCare operates, which the federal Child Care and Development Block Grant Act requires to be published. These Monitoring and Inspection Reports may vary in format state to state, but each

40

must include, among other things, "major **substantiated** complaints about failure to comply with [the Act] and State child care policies" and failures to comply with "requirements designed to protect the health and safety of children." 42 U.S.C. § 9858c(c)(2)(D), (I). A list of each state database is included in Appendix B.

119.    Lead Counsel searched and reviewed each relevant state database for all Monitoring and Inspection Reports related to KinderCare ECE facilities, focusing on the main KCLC facilities (and not Champions or Crème School). While Lead Counsel found reports describing violations at KinderCare facilities going back years, by way of conservative illustration, Lead Counsel presents here the results of a review of just the nine months before the IPO, from January 1, 2024 through October 9, 2024.

120.    Based on its review, Lead Counsel identified the Monitoring and Inspection Reports describing substantiated violations at KinderCare KCLC facilities and which, in the reviewing attorney's judgment, concerned nontrivial violations of health and safety regulations, as categorized below. Specifically, for each identified Monitoring and Inspection Report, Lead Counsel logged (i) the date of the incident, (ii) the KCLC facility in which the incident occurred, and (iii) prepared a summary of the incident. Lead Counsel then assigned one or more categories to each report based on Lead Counsel's review and assessment of the incidents and violations discussed.[12]

---

[12] Lead Counsel used the following categories: (1) Staff Physical Abuse Of Minor (*i.e.*, staff member physically harmed child); (2) Staff Verbal/Mental Abuse Of Minor (*i.e.*, yelling, cursing, name-calling); (3) Noncompliance with Staff-to-Child Ratios (*i.e.*, insufficient staff for the number of children present, as mandated by applicable law; (4) Child Unattended (*i.e.*, failure to comply with State requirements prohibiting a child from being left unattended leading to either actual harm to child or risk of harm to child); (5) Failure to Hire, Train, or Screen Appropriately Qualified Staff (*i.e.*, staff do not comply with minimum qualifications required by the State, or insufficient training required by the State to supervise children, or the facility did not appropriately conduct a

Footnote continued on next page

121.    The review process described above is conservative in several respects. ***First***, the date range chosen for this review was narrowly targeted to just the nine months before the Offering at issue, in October 2024. ***Second***, as noted above, Lead Counsel applied its judgment in limiting its review to nontrivial violations of health and safety standards; Lead Counsel did not include, for example, recorded violations from the mere failure to comply with building codes or to update feeding logs, absent indication that this violation caused, or posed serious risk of, harm or was otherwise noteworthy. ***Third***, by their nature, the Monitoring and Inspection Reports that the team of attorneys reviewed captured only incidents in which a state regulator substantiated a violation at the facility; thus, such reports do not capture the full extent of violations that actually occur—only instances in which the violation was reported, discovered, and substantiated. ***Fourth***, as described *infra* § IV.D.1.b, information uncovered elsewhere in Lead Counsel's investigation indicates instances in which KinderCare discouraged or even retaliated against staff for reporting violations, limiting further the extent to which violations are captured by Lead Counsel's review.

122.    As a result of this review process, Lead Counsel identified 1,181 reports citing incidents occurring in just the nine-month period prior to the IPO (from January 1, 2024 to October 9, 2024) and uncovered ***nearly 2,000 health and safety violations at 680 KinderCare KCLC facilities*** across the United States, as reflected in the table below. This astounding figure represents violations in ***45%*** of KinderCare's KCLC facilities in the first nine months of 2024 alone,

---

background check of its staff in accordance with State law (or cannot substantiate that it did so)); (6) Medical Attention Required (*i.e.*, an incident at issue in the report required medical attention); and (7) Other Nontrivial Health and Safety Incidents (*i.e.*, reports referring to violations of safety requirements other than those listed above and which posed a nontrivial risk to children. Examples in this category include: failure to maintain facilities in accordance with legal requirements; the presence of unsafe mold, roaches, or other infestation; and exposed hazards such as exposed nails).

reflecting a troubling, documented trend that posed a direct risk to KinderCare's enrollment, revenues, and growth opportunities.

| KinderCare Health & Safety Violations<br>Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — USA | |
| --- | --- |
| **Nature of Health & Safety Violation** | **Incidents** |
| Staff Physical Abuse of Minor | 127 |
| Staff Verbal/Mental Abuse of Minor | 48 |
| Noncompliance with Staff-to-Child Ratios | 243 |
| Child Unattended | 217 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 900 |
| Medical Attention Required | 45 |
| Other Nontrivial Health and Safety Incidents | 402 |
| **TOTAL** | **1,982** |

123.    These violations were not limited to one state, or even to one region of the United States. Plaintiffs present more granular detail on these incidents as broken into four major geographic regions of the United States—the West, Northeast, Midwest, and South, revealing that substantiated and documented state law violations impacted the health and safety of the children in KinderCare's facilities nationwide.

124.    Lead Counsel provides these conservative figures merely by way of illustration; while these results reflect *just* the nine months prior to the IPO, Lead Counsel encountered numerous reports that describe violations at KinderCare facilities extending back for years.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

(1)    **West**

125.    At the time of the IPO, according to the Company website, KinderCare operated approximately 326 facilities in the West, which includes the states of Alaska, Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, and Washington. In just the nine months leading up to the IPO, regulators in these states documented violations of state regulations involving at least *405* substantiated health and safety incidents across *101* different facilities, reflecting nearly *31%* of the facilities in the region at the time of the IPO:

| KinderCare Health & Safety Violations Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — West | |
| --- | --- |
| **Nature of Health & Safety Violation** | **Incidents** |
| Staff Physical Abuse of Minor | 25 |
| Staff Verbal/Mental Abuse of Minor | 7 |
| Noncompliance with Staff-to-Child Ratios | 38 |
| Child Unattended | 40 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 134 |
| Medical Attention Required | 10 |
| Other Nontrivial Health and Safety Incidents | 151 |
| **TOTAL** | **405** |

126.    For example, at the time of the IPO, KinderCare had 14 facilities in Nevada; in the nine months prior to the IPO, state authorities cited *10* KinderCare facilities in Nevada for health and safety violations. Similarly, in New Mexico, state authorities cited 3 KinderCare facilities for violations—and KinderCare only had *4 facilities* in operation in the state at the time of the IPO.

127.    Multiple Monitoring and Incident Reports detail harrowing incidents of physical harm inflicted by KinderCare staff, or by other children not properly supervised by KinderCare staff. State authorities throughout the West documented and substantiated violations concerning hundreds of instances in which KinderCare facilities violated mandated health and safety requirements enacted to protect children including involving leaving children unattended (which at times led to actual harm), noncompliance with minimum mandated staff-to-child ratios, and inadequately hiring, training, and retaining sufficiently-qualified staff.

128.    These include, for example, at least 13 violations cited by Oregon authorities in the nine months prior to the IPO, at 6 different KinderCare facilities—nearly ***one-third*** of the facilities KinderCare operated in the state at the time of the IPO—including 5 "serious" violations that Oregon regulators substantiated as a "valid finding [that] [c]hildren are in imminent danger." As another example, California authorities cited 14 violations in that same time period, at 16 different KinderCare facilities—including 8 substantiated "Type A" violations, meaning circumstances that regulators determined posed an immediate or substantial threat to the physical health, mental health, or safety of the children.

129.    Lead Counsel provides below further illustrative examples of the hundreds of violations cited by state authorities.

130.    In a March 13, 2024 Monitoring and Incident Report, Washington state authorities cited violations to a KinderCare facility based on "video footage observed by [KinderCare] leadership staff which confirmed inappropriate interactions between staff and children," including an incident in which KinderCare staff picked up a child up by her hand/arm, resulting in recurring injury, and another incident in which KinderCare staff pushed a child off a cot, resulting in the child hitting their head on the floor.

131.    As another example, in September 2024, Oregon state regulators cited a KinderCare facility in Beaverton, Oregon for failing to report a "serious incident involving a child being left unsupervised in their classroom" to either the state authorities or to the child's parents, noting that the KinderCare facility director admitted the violations.

132.    In August 2024, Oregon state regulators cited a KinderCare facility in Portland, Oregon for "serious" violations from operating out of staff-to-child ratio requirements on "multiple occasions," and, in addition, for having failed to notify parents of a serious injury suffered after a child hit their head and had lacerations inside the mouth.

133.    In another instance, regulators in Nevada cited a KinderCare facility on February 20, 2024 for staff physically hitting a child in the face and buttocks. Information in an April 25, 2024 Nevada Monitoring and Incident Report reveals that regulators cited another facility for several violations, including failure to comply with minimum staff-to-child ratios and abuse by KinderCare staff, including pulling students' hair and encouraging student-on-student violence.

134.    In Arizona, authorities issued a Monitoring and Incident Report on June 28, 2024 citing a KinderCare facility for leaving children unattended, with one child ultimately found "outside the front entrance doors."

135.    After a KinderCare facility in Livermore, California self-reported that an infant had crawled into a cabinet and a staff member had "accidentally" shut the door, California authorities issued a report on April 30, 2024 substantiating that—contrary to KinderCare's report—in fact a KinderCare staff member had "allowed [the infant] to crawl into the cabinet," ***"purposely closed the door" and "out of irritation . . . lock[ed] the child inside."***

136.    KinderCare suffered non-hypothetical decreases in enrollment and operational viability from documented violations. For example, a March 5, 2024 Monitoring and Inspection

Report described how California authorities forced a KinderCare facility to "***pause[] enrollment***" as a result of repeated staff-to-child ratio violations, noting that the authorities "conducted interviews, made observations, and reviewed [relevant] documentation" and concluded that facility staff "did not ensure they were in compliance with [California Code of Regulations Title 22, § 101416.5(b)] by not meeting ratio requirements at all times" because the facility had been out of compliance on several occasions "due to staff shortages."

(2)     **Northeast**

137.    At the time of the IPO, according to the Company website, KinderCare operated approximately 231 facilities in the Northeast, which includes the states of Connecticut, Massachusetts, New Hampshire, New Jersey, New York, and Pennsylvania. In just the nine months leading up to the IPO, regulators in these areas documented violations involving at least ***314*** substantiated health and safety incidents across ***108*** different facilities, reflecting nearly ***47%*** of the facilities in the region at the time of the IPO:

| KinderCare Health & Safety Violations |
|---|
| Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — Northeast |

| Nature of Health & Safety Violation | Incidents |
|---|---|
| Staff Physical Abuse of Minor | 29 |
| Staff Verbal/Mental Abuse of Minor | 10 |
| Noncompliance with Staff-to-Child Ratios | 32 |
| Child Unattended | 41 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 137 |
| Medical Attention Required | 7 |
| Other Nontrivial Health and Safety Incidents | 58 |

| KinderCare Health & Safety Violations<br>Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — Northeast | |
|---|---|
| **Nature of Health & Safety Violation** | **Incidents** |
| **TOTAL** | **314** |

138.    For example, in the period prior to the IPO, New Hampshire authorities cited health and safety violations at nearly half the total number of KinderCare facilities operating at the time of the IPO. In New York, state authorities cited violations at *more* than half the facilities in the state at the time of the IPO. Similarly in Pennsylvania, in which state authorities cited violations at 41 facilities, compared to the 76 in the state at the time of the IPO.

139.    State authorities throughout the Northeast documented and substantiated violations concerning hundreds of instances in which KinderCare facilities violated mandated health and safety requirements enacted to protect children including involving leaving children unattended (which at times led to actual harm), noncompliance with minimum mandated staff-to-child ratios, and inadequately hiring, training, and retaining sufficiently-qualified staff. Lead Counsel provides some illustrative examples below of the hundreds of violations leading up to the IPO.

140.    For example, in February 2024, a Monitoring and Incident Report documented how a ***KinderCare staff member bit a child*** in a New Jersey facility. In a separate Monitoring and Incident Report out of Connecticut, a KinderCare staff member injured two children in April 2024 "as a form of punishment" when the staff member pushed one child down and pulled another child's legs out from under them, forcing the child to fall and hit his head. On July 12, 2024, Massachusetts state authorities determined a KinderCare staff member was "***abusive / neglectful***" for dragging a three-year-old child across the floor for 20 feet. On October 1, 2024, a KinderCare

staff member in a Massachusetts facility used inappropriate discipline (*i.e.*, the "educator did not use appropriate behavior management techniques" according to the Report) when they picked up a child, used derogatory remarks, and left the child in time-out for an excessive amount of time.

141.    In these and many other incidents, KinderCare also violated its mandatory reporting obligations by failing to promptly notify the children's parents and/or state agencies. For example, a Monitoring and Incident Report substantiated that KinderCare failed to report to authorities (as required by law) ***multiple*** incidents of child abuse at a Pennsylvania KinderCare facility within three days in May 2024, including that staff members observed another KinderCare staff member: (i) slapping a child while changing his diaper; (ii) pulling a different child away from the sink, causing the child to fall, hit her face on the sink, and sustain bruises on her face; (iii) dragging the bruised child across the floor by the child's arm; (iv) yanking on another child's arm so hard that the child's face slammed to the floor, causing a bruise on the outside of the child's cheek and abrasions to the upper and lower lip; (v) grabbing another child by his ribs and slamming him into the diapering table causing soft tissue swelling of the left thigh; and (vi) yelling at a child, telling them to shut up and then forcefully grabbing them by the neck, pushing the child back and making him fall to the ground. Not only did KinderCare fail to report this abuse, state authorities determined that the Director of the KinderCare facility instructed a staff member to ***falsify*** an incident report for at least one injury inflicted by the KinderCare staff member by stating that the injured child "was participating in circle time and fell thereby bumping their cheek off of the floor leaving a bruise"—which, as authorities noted, "was not an accurate description of the incident."

142.    As another example, in May 2024, at a New Hampshire KinderCare facility, a bigger child picked up and dropped a young child, resulting in the younger child hitting their head

on the concrete. The New Hampshire authorities determined the staff "did not protect younger children from injury caused by older, bigger children," and found that the KinderCare facility violated legal requirements by failing to promptly notify the parents of the injured child or to notify New Hampshire's child protective agency of the injury within 48 hours.

143.    As noted herein, incidents like the illustrative ones described above, were known to lead to reduced enrollment, either voluntarily by parents who would disenroll children in facilities that did not keep their children safe, or in more serious incidents, when state regulators would pause enrollment or revoke a facility's license to operate.

(3)    **Midwest**

144.    At the time of the IPO, according to the Company website, KinderCare operated approximately 481 facilities in the Midwest, which includes the states of Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, Ohio, and Wisconsin. In just the nine months leading up to the IPO, regulators in these states documented violations of state regulations involving at least *635* substantiated health and safety incidents across *257* different facilities, reflecting more than *53%* of the facilities in the region at the time of the IPO:

| KinderCare Health & Safety Violations<br>Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — Midwest ||
|---|---|
| **Nature of Health & Safety Violation** | **Incidents** |
| Staff Physical Abuse of Minor | 33 |
| Staff Verbal/Mental Abuse of Minor | 9 |
| Noncompliance with Staff-to-Child Ratios | 82 |
| Child Unattended | 70 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 314 |

| KinderCare Health & Safety Violations | |
| :---: | :---: |
| Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — Midwest | |
| **Nature of Health & Safety Violation** | **Incidents** |
| Medical Attention Required | 11 |
| Other Nontrivial Health and Safety Incidents | 116 |
| **TOTAL** | **635** |

145.    For example, Missouri state authorities cited 15 KinderCare facilities for safety violations, compared to the 21 facilities at the time of the IPO. Similarly, Illinois authorities cited 63 KinderCare facilities for health and safety violations—***nearly half*** the total number of KinderCare facilities operating in the state when the IPO occurred.

146.    State authorities throughout the Midwest documented and substantiated violations concerning hundreds of instances in which KinderCare facilities violated mandated health and safety requirements enacted to protect children including involving leaving children unattended (which at times led to actual harm), noncompliance with minimum mandated staff-to-child ratios, and inadequately hiring, training, and retaining sufficiently-qualified staff. Lead Counsel provides some illustrative examples below of the hundreds of violations leading up to the IPO.

147.    Particularly of note, state regulators in Wisconsin ***documented over 100 rule violations accumulated from 2021 through January 10, 2024*** at a single facility in Wausau, Wisconsin. The systemic violations in the Wausau KinderCare center included children physically being struck on the head, numerous staff-to-child ratio violations, at least one child being improperly restrained, unsanitary conditions, unsupervised children, floors littered with garbage and food, improper feeding (*e.g.*, a child fed breast milk from another family), and a lack of cots or sleeping arrangements. Importantly, in response to these and other serious health and safety

violations, ***Wisconsin revoked the Wausau KinderCare center's license in January 2024***. This revocation prohibited the center from enrolling any new families without approval from state authorities and from accepting state tuition subsidies. As of the date of this filing, the KinderCare website indicates that this center remains closed.

148.    FE-6 described that as a result of these incidents in Wausau, the Champions division of KinderCare withdrew from a potential partnership with a school district in Wisconsin. FE-6 explained that KinderCare Champions pulled out of the contract with this district in response to the news of the Wausau violations; indeed, after these issues became known, FE-6 and her team chose not to pursue the partnership because FE-6 and her colleagues were uncertain if the state government in Wisconsin would go after the KinderCare Champions program as well as the KCLC side of the business, and higher-ups at KinderCare made the final decision to withdraw from the negotiations. According to FE-6, KinderCare Champions was about halfway to closing the deal before pulling-out, and she was part of the internal discussions with her supervisors surrounding these negotiations. Further, FE-6 explained, in addition to withdrawing from the negotiations with that district, Champions ceased looking at any other prospects in Wisconsin and ceased its marketing efforts in the state.

149.    In May 2024, at a KinderCare facility in Oak Creek, Wisconsin, an 11-month old infant was rushed to the hospital where he ***tested positive for cocaine*** after being picked up ill from the KinderCare facility. The subsequent investigation (as confirmed in local news reports) found that a backpack belonging to a daycare worker contained cocaine and was improperly kept in a closet in the infant room at the KinderCare center. The parents filed a police report, and the staff member later plead guilty to having cocaine at the facility. A local Wisconsin news outlet reported on this incident. Its investigation revealed that the Oak Creek KinderCare has been cited for ***more***

*than two dozen violations* by the Wisconsin Department of Children and Families ("DCF"), violations which included staff being aggressive with infants, undocumented injuries to children, children having access to power tools and toxic chemicals, and cocaine in the infant room. DCF initiated an investigation into the facility and, in October 2024, the same month as the IPO, DCF *suspended and then revoked the Oak Creek KinderCare center's license*. Local news reported that parents and former employees shared concerns about the Oak Creek location on a Facebook post, with one woman who said she used to work writing that she saw "[s]o many violations, but nobody would listen, later adding "it was ran horrible and dishonest." The KinderCare website indicates that this center remains closed.

150.    In just the nine months leading up to the IPO, state authorities in Wisconsin issued at least 12 Monitoring and Incident Reports citing KinderCare facilities for violations involving physical abuse. For example, in a report dated February 28, 2024, Wisconsin authorities cited three violations identified as "serious and [which] directly impacts the health, safety and welfare of children in care," including an incident in which a KinderCare staff member used a broomstick to push a child off a table and roughly grabbed a child's face. Another KinderCare colleague repeatedly yelled at the children to "stop crying." As another example, regulators issued a Monitoring and Incident Report on April 30, 2024 citing KinderCare staff for numerous violations of safety regulations, including two violations identified as "serious and directly impact[ing] the health, safety and welfare of children in care," after a KinderCare staff member injured a child and the facility failed to notify parents and medical authorities as required. And, on July 2, 2024, authorities cited another Wisconsin KinderCare facility for numerous violations (including some repeat violations), including ones classified as "serious and directly impact[ing] the health, safety

and welfare of children in care," including an incident in which a KinderCare staff member improperly restrained a child.

151.    Authorities in Wisconsin determined that KinderCare often failed to report these incidents as required by law. For example, a Monitoring and Incident Report by Wisconsin authorities dated May 15, 2024, cited KinderCare for failing its reporting obligations concerning violations at the facility (including "serious" violations), including failing to notify parents and authorities of an incident in which a KinderCare staff member swung a child by the arm before dropping him, causing a bloody mouth and nose.

152.    As another example of serious safety violations in the Midwest, Indiana authorities sanctioned a Westfield, Indiana KinderCare facility in or around October 9, 2024. The Monitoring and Incident Report and local news describe the abuse of a 3-year-old child by a KinderCare staffer. The abuse was filmed by another staff member in December 2023. According to the child's parent, the employee who filmed the video reported it to a KinderCare supervisor soon after the incident, but neither the staffer, supervisor nor KinderCare reported the abuse to the parents, Department of Child Services or police for over nine months. Indeed, the staffer reported the abuse, not the KinderCare management. State regulators determined that KinderCare violated Indiana laws and regulations by: (1) not immediately reporting the allegations of abuse and neglect from the incident to the Indiana Department of Child Services; (2) failing to notify the parents of the incident; and (3) engaging in inappropriate discipline of a child. Ultimately, the KinderCare staffer was arrested and criminally charged with two felonies, including felony battery on a person less than 14 and neglect of a dependent. The staffer pled guilty to battery in April 2025. According to local news, Indiana's Family and Social Services Administration, which oversees childcare facilities in the state, began an administrative investigation of the KinderCare location in October

after police opened an investigation, and ***placed the facility on probation***. KinderCare was required to file a plan with the state explaining how they intended to correct the violation. KinderCare was also required to ***notify all enrolled kids' caregivers within seven days of the probationary period's start date***. The local news reporting also described how Indiana regulators had pursued two other enforcement actions against the same KinderCare location earlier in 2024 for unsafe sleep practices. One of those infractions, classified as "critical," involved a 4-month-old infant belly-sleeping on the floor.

153.    As another example, in a report dated April 2, 2024, Missouri state authorities substantiated numerous violations by a KinderCare facility in St. Peters, Missouri after a KinderCare employee admitted to sexually assaulting a child younger than 12 at the center and to possessing child sex abuse material on his phone. As uncovered by state authorities in the report, KinderCare knew of an incident months earlier in which the abuser had told a staff member "She said it tickled when I wiped" after being "visibly startled" when the staff member observed him exiting the children's restroom with a 4-year old child. Nonetheless, KinderCare continued to employ the individual—even without completing required background screenings—and even had him cover teachers' breaks, despite several staff members reporting to KinderCare that he made them feel uncomfortable and observing him have children sit on his lap. Authorities only learned of his horrifying crimes and arrested him after child sex abuse task forces tipped off local police.

154.    Finally, Lead Counsel identified several instances in which Michigan state authorities sent "special investigation" findings of violations *directly* to KinderCare in Lake Oswego, Oregon. For example, authorities sent a letter on August 2, 2024 documenting an April 2024 on-site inspection that determined a "repeat violation" for failure to provide appropriate care

and supervision after multiple instances in which children were left unattended. As the report notes, one parent described one of these incidents as the "final straw" and withdrew his child.

155.    This unenrollment tracked with KinderCare's internal understanding of the impact from these sorts of health and safety violations. For example, KinderCare training material produced in separate litigation against the Company ("KinderCare: Teacher's First 100 Days Workbook") stated that "*one out of 11 families withdrew their child within two weeks*" of an incident where a child was left unattended, as happened in the Michigan incident above (*see* ¶¶154; 170). While the Monitoring and Incident Reports would not necessarily capture these impacts, in certain instances the impact is apparent, as state regulators forced a KinderCare facility to pause enrollment, placed the facility on probation, or even revoked the facility's license to operate.

(4)    **South**

156.    At the time of the IPO, according to the Company website, KinderCare operated approximately 470 facilities in the South, which includes the states of Alabama, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Virginia, as well as the District of Columbia. In just the nine months leading up to the IPO, state regulators in these areas documented violations of state regulations involving at least *628* substantiated health and safety incidents across *214* different facilities, reflecting more than *45%* of the facilities in the region at the time of the IPO:

[continued on next page]

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

| KinderCare Health & Safety Violations<br>Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — South ||
|---|---|
| **Nature of Health & Safety Violation** | **Incidents** |
| Staff Physical Abuse of Minor | 40 |
| Staff Verbal/Mental Abuse of Minor | 22 |
| Noncompliance with Staff-to-Child Ratios | 91 |
| Child Unattended | 66 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 315 |
| Medical Attention Required | 17 |
| Other Nontrivial Health and Safety Incidents | 77 |
| **TOTAL** | **628** |

157.    For example, KinderCare had 7 facilities in the District of Columbia at the time of the IPO—exactly how many centers that D.C. regulators had cited for health and safety violations in the period prior to the IPO. In the period prior to the IPO, Florida and Louisiana state authorities cited health and safety violations at nearly half the total number of KinderCare facilities in each state when the IPO occurred. In South Carolina, authorities cited 5 facilities—out of the 6 in operation at the time of the IPO. And Delaware state authorities had cited 6 KinderCare facilities, out of 7 facilities that KinderCare in the state at the IPO.

158.    State authorities throughout the South documented and substantiated violations concerning hundreds of instances in which KinderCare facilities violated mandated health and safety requirements enacted to protect children including involving leaving children unattended (which at times led to actual harm), noncompliance with minimum mandated staff-to-child ratios,

and inadequately hiring, training, and retaining sufficiently-qualified staff. Lead Counsel provides some illustrative examples below of the hundreds of violations leading up to the IPO.

159.     For example, state authorities issued a Monitoring and Incident Report on January 30, 2024, citing violations at a KinderCare facility in Columbia, Maryland related to a staff member pinning and slamming children down in their chairs and for failing to timely notify authorities of the incident as required by law. State authorities determined that the facility violated state regulations because "adequate supervision was not given to the children in care." In a June 10, 2024 Monitoring and Incident Report, state authorities substantiated violations at a different KinderCare facility, in Germantown, Maryland, that failed to supervise children with qualified staff. The report described an incident in which an ***infant suffered a fractured skull*** and the KinderCare facility failed to notify parents or appropriate authorities (as required by law).

160.     In another instance, Kentucky state authorities issued a Monitoring and Incident Report on February 6, 2024 citing violations of safety requirements after two witnesses observed a KinderCare staff member yelling at a child, pushing the child to the ground, and then throwing the child into a wall. Then, in a report dated March 13, 2024, North Carolina authorities cited a KinderCare facility for health and safety violations after a staff member hit a three-year-old with the back of her hand, injuring the child's mouth. Another report issued by Virginia on October 10, 2024, cites several violations at KinderCare facility, including an incident on October 9, 2024— the same day as the Offering—in which a staff member pushed and injured a 17-month-old child, leaving the child's shirt stained with blood.

161.     In July 2024, Georgia state authorities cited violations at a KinderCare facility, including that the facility placed an underage staff member in charge of supervising 14 children, without any other staff present.

162.    In a particularly egregious incident in August 2024, which easily could have led to significant physical injury or death, a North Carolina KinderCare facility—which was operating without sufficient staff to meet staff-to-child ratio requirements—was unable to locate a child for nearly twenty minutes. The 3-year old child was ultimately found by a passing motorist *in the middle of a busy three-lane highway*, demonstrating a severe risk of harm to the child. Local news outlets reported on the incident, including that the child was found in the middle of a busy street that was 423 feet away from the KinderCare facility:



163.    According to the local news, the KinderCare director did not promptly inform the parents of the details of what happened. Indeed, the parents learned of the incident after a family member saw the news and informed them of what happened on Facebook. The police were called, and the state initiated an investigation into KinderCare. Local news reports in October 2024, days after the IPO, revealed that the Norh Carolina Department of Health and Human Services continued to investigate the center, but that "*KinderCare [was] caught again*" as authorities

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

uncovered "*a troubling pattern*" of additional security issues during three unannounced visits between August and October 2024, included finding that the KinderCare's front door and lobby door were left propped open without any supervision, and that a staff member was found sleeping while caring for children.

164.    The above information evidences that the statements alleged in paragraphs ¶¶109-113 were materially false and misleading at the time they were made, and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, because the statements misstated and failed to disclose the fact that, at the time of the IPO, KinderCare did ***not*** comply with government regulations pertaining to the health and safety of the children under the Company's care and did ***not*** adhere to the rigorous health and safety standards it claimed.

### b.    Legal Proceedings Further Detail Widespread Health And Safety Issues At The Time Of The IPO

165.    In addition to the Monitoring and Incident Reports described above, lawsuits filed against KinderCare further corroborate the existence of widespread and systemic health and safety violations at the time of the IPO. These complaints document a disturbing pattern of child sexual abuse, physical abuse by staff, and physical injuries arising from the Company's negligent supervision, negligent hiring, negligent training, and negligent retention of employees. The conduct at issue in these lawsuits further demonstrate the widespread and pervasive nature of KinderCare's safety issues and noncompliance with government requirements designed to protect the health and safety of the children and infants under the Company's care.

166.    These conduct at issue in these cases extends back as far as 2020, though the allegations primarily describe conduct occurring in 2022-2023. Each of these cases named KinderCare as a defendant, including several lawsuits filed before the October 9, 2024 IPO,

meaning that KinderCare received service of—and was on notice of—the serious allegations in the complaints. Nonetheless, KinderCare failed to disclose in the Offering Documents that it was a Defendant in these or other multiple lawsuits throughout the country where it was allegedly negligent, and even grossly negligent, in operating its facilities.

167.    These illustrative lawsuits involve significant harm to children under KinderCare's protection, and include accounts and physical and sexual abuse, allegedly directly resulting from the Company's failure to adequately supervise the children under its care.

168.    One case filed in California in July 2023, *Doe v. KinderCare Learning Centers, LLC*,[13] concerns the sexual assault of a three year-old girl by a KinderCare employee, and the complaint alleges at length KinderCare's numerous failures to provide appropriate supervision. Among other things, the complaint alleges that KinderCare did not "have in place a system or procedure to reasonably investigate, supervise and/or monitor those individuals in direct contact with children, including the Doe Perpetrator, to prevent pre-sexual grooming and/or sexual harassment, molestation and assault of students, nor did they implement a system or procedure to oversee or monitor conduct toward patrons and others in Defendants' care." The Complaint further alleges that KinderCare was on notice that the assailant "had previously engaged and continued to engage in unlawful sexual conduct with patrons and other felonies, for his own personal gratification…" and that "Plaintiff is informed and believes, and on that basis alleges that Defendants were placed on actual and/or constructive notice that the Doe Perpetrator had abused, harassed, molested and/or was molesting minor children, both before his sexual assault,

---

[13] Complaint, *Doe v. KinderCare Learning Ctrs., LLC*, No. 23STCV16614 (Cal. Super. Ct., Los Angeles Cnty.) (filed July 17, 2023). The case is currently pending.

molestation and harassment of the Plaintiff, and during that same period." The *Doe* lawsuit is currently in discovery.

169.    In *Herrera v. KinderCare Learning Centers LLC*,[14] currently pending in Oklahoma state court, the plaintiff alleged that KinderCare's negligent supervision led to an incident in March 2022 in which a four-year-old girl was sexually assaulted by another four-year-old boy while unattended at a KinderCare facility. The *Herrara* complaint included the internal KinderCare report of the incident indicating that KinderCare staff failed to supervise the children, and also attached the Monitoring and Inspection Report issued by state authorities that substantiated violations from "neglect" and "lack of supervision" by KinderCare.

170.    The *Herrera* complaint also included an excerpt from an internal KinderCare training document produced by KinderCare during discovery in the proceedings, which demonstrated that KinderCare internally knew of widespread incidents in which children were left unattended at KinderCare facilities. Further, the training document indicated that KinderCare internally understood that such incidents impacted enrollment, stating that "***one out of 11 families withdrew their child within two weeks***" of an incident in which a child was left unattended.

171.    Another filing related to the *Herrera* proceedings indicated KinderCare's failure to disclose the full extent of its health and safety incidents. After KinderCare provided discovery responses and testified (through its corporate representative) that incidents of the sort that occurred in *Herrera* were "a single occurrence, if it even happened at all," counsel for the plaintiff subsequently learned otherwise from a *Washington Post* reporter, who indicated that such incidents

---

[14] Complaint, *Herrera v. KinderCare Learning Ctrs., LLC*, No. CJ-2025-786 (Okla. Dist. Ct., Canadian Cnty.) (filed Aug. 28, 2025).

were far more widespread than indicated by KinderCare's discovery responses. The plaintiff sought further discovery and trial was postponed, and the *Herrera* case is ongoing.[15]

172.    In an ongoing action filed in Indiana in 2025, *Doe v. KinderCare Learning Companies*,[16] the plaintiff alleges, among other things, that KinderCare "fail[ed] to have an appropriate amount of staff allocated to supervise the premises," and these failures resulted in multiple incidents of sexual abuse by one child of another. Lead Counsel identified in its investigation that a report from Indiana state authorities that corroborated several violations at this KinderCare around the times of the incidents at issue in *Doe*, including that "children were allowed in bathroom together unsupervised" and that the facility was "not in child/staff ratio."

173.    Two cases filed in California in February 2023 and March 2024, respectively, both captioned *Roe v. KinderCare Learning Centers LLC*,[17] allege that KinderCare failed to adequately staff its facilities and to supervise the children in its care, resulting in the sexual abuse of a minor by another minor. Plaintiff further explained that the failure to supervise by the staff occurred even though "[t]he center was on notice prior to the subject abuse, because earlier in the day [a KinderCare staff member] observed the boys in class doing inappropriate gestures to one another. Accordingly [KinderCare staff] should have been paying closer attention to the boys during outdoor playtime."[18]

---

[15] Plaintiff's Motion to Continue Trial, Herrera v. KinderCare Learning Ctrs., LLC, No. CJ-2022-371 (Okla. Dist. Ct., Canadian Cnty. May 17, 2025), ECF No. 86.

[16] Complaint, *Doe v. KinderCare Learning Cos., Inc.*, No. 79D01-2506-CT-000132 (Ind. Super. Ct., Tippecanoe Cnty.) (filed June 27, 2025).

[17] Complaint, *Roe v. KinderCare Learning Ctrs. LLC*, No. 23PSCV00368 (Cal. Super. Ct., Los Angeles Cnty.) (filed Feb. 7, 2023); Complaint, *Roe #2 v. KinderCare Learning Ctrs., LLC*, No. 24PSCV00641 (Cal. Super. Ct., Los Angeles Cnty.) (filed Mar. 1, 2024).

[18] Plaintiff's Motion in Limine No. 3, *Roe v. KinderCare Learning Ctrs. LLC*, No. 23PSCV00368 (Cal. Super. Ct., Los Angeles Cnty.) (filed Mar. 5, 2024), at 3.

174.    An incident report documenting the incident in *Roe*, created by the California Department of Social Services, substantiated the allegations that a "lack of supervision result[ed] in children participating in inappropriate/sexual behavior." In response to its investigation, the California Department of Social Services issued a Type A citation to KinderCare and noted that the Company violated the California Code of Regulations. Additionally, the incident report revealed how KinderCare's own policies ensured that these incidents were reported up to corporate management, detailing that Monitoring and Inspection Reports go to the KinderCare Center Director, then to the KinderCare District Leader and to the KinderCare Risk Department, as well as guidance provided by KinderCare's "Inclusions Center".

175.    The first *Roe* case settled on August 9, 2024 for an undisclosed amount and the second *Roe* case settled almost a year later on July 29, 2025 for an undisclosed amount.

176.    A Texas complaint filed in August 2023, *Whitfield v. KinderCare Education LLC*,[19] concerns an alarming incident in which explicit photographs were taken of a child at the KinderCare facility by a staff member, who then sold the pictures to an unknown individual for money. KinderCare did not notify the child's mother of this abuse; indeed the mother only learned of the incident approximately one week later, when she arrived at KinderCare at pickup and found the police questioning her child without her mother's knowledge or consent. The allegations describe safety violations consistent with the others uncovered in Lead Counsel's investigation, including that KinderCare left the children unattended, failed to timely notify parents and authorities of the issue, and failed to hire, vet, and train qualified staff. Notably, KinderCare's failure to notify parents of incidents of child abuse involving their own children is also reflected

---

[19] Complaint, *Whitfield v. KinderCare Educ. LLC*, No. 2025-29597 (Tex. Dist. Ct., Harris Cnty.) (filed Apr. 28, 2025).

in numerous incident reports noted above, in paragraphs § IV.D.1.a, demonstrating a concerning pattern of misconduct.

177.    Several complaints concern instances of other physical abuse and harm to children by KinderCare employees, echoing the widespread violations uncovered by Lead Counsel's review of state regulatory reports. *Supra* § IV.D.1.a. For example, an action filed in North Carolina in February 2024, *Tucker v. KinderCare Learning Centers, LLC, et al.*[20], alleges that on the morning of November 29, 2023, a 6-month old infant enrolled in a North Carolina KinderCare suffered "***catastrophic and life altering injuries***" while in the care, custody, and control of KinderCare. The alleged injuries include severe head trauma, hypoxic brain injury, multiple cranial fractures, intracranial bleeding, neurological injury, seizures, and stroke, followed by prolonged hospitalization in the NICU and subsequent transfer for continuing treatment and therapies. Plaintiffs contend the injuries have caused permanent impairments requiring ongoing multifaceted therapies and long-term care. Plaintiffs further allege that KinderCare was grossly negligent, and had prior warnings that children's health and safety at the facility were at risk due to unsafe childcare practices by staff, yet failed to take steps to prevent foreseeable harm. Counsel for plaintiff submitted the following statement in response to press outreach: "Like many other co-working parents and families, the [Tuckers] trusted KinderCare with placement of their infant child for daycare. The injuries sustained by their daughter at KinderCare have been a parent's worst nightmare."

---

[20] Third Amended Complaint, *Tucker v. KinderCare Learning Ctrs., LLC, at al.*, 24-CVS-89 (N.C. Super. Ct. Surrey Cnty.) (filed October 15, 2025).

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

178.    In a California case filed in August 2024, *Doe v. Delrio*,[21] the plaintiff alleges that an assault on a 4-year old child by a KinderCare staff member occurred because KinderCare failed to hire qualified staff members. Plaintiff alleges that "KinderCare also knew or should have known that Delrio's issues with patience, frustration, and anger created a particular risk to the preschool students that she taught" and that "KinderCare's negligence in supervising and retaining Delrio was a substantial factor in the intentional battery by Delrio that caused Jane Doe 1's harm." The complaint also claims that KinderCare violated its own policies in failing to timely notify the parents of the injured child. The case was settled on March 12, 2025 for an undisclosed amount.

179.    Another case, *Walker v. KinderCare Learning Centers, LLC*[22]—currently pending in California state court—alleges the abuse of a toddler by a staff member at a KinderCare facility in Roseville, California resulting from negligence by KinderCare in "in hiring, training and supervising" its staff. Lead Counsel identified an inspection report by California state authorities from July 2024 that seemingly substantiates certain of the allegations in *Walker* and cites several violations by the Roseville facility, including that staff had roughly handled children and then failed to appropriately report to state authorities after injuries to those children required medical attention. The report further found that several infants were monitored only by a single, unqualified staff member.

180.    An Illinois complaint, *Rhodes v. KinderCare Learning Cos.*[23]—filed days before the IPO—concerns the abuse of a two-year old boy by a KinderCare staffer, and alleges that

---

[21] Complaint, *Doe v. Delrio*, No. C23-01985 (Cal. Super. Ct., Contra Costa Cnty.) (filed Aug. 23, 2023).

[22] Complaint, *Walker v. KinderCare Learning Ctrs., LLC*, No. S-CV-0056202 (Cal. Super. Ct., Placer Cnty.) (filed Sept. 15, 2025).

[23] Complaint, *Rhodes v. KinderCare Learning Cos.*, No. 2024-LA-001190 (Ill. Cir. Ct., DuPage Cnty.) (filed Oct. 3, 2024).

KinderCare "[c]arelessly and negligently retained employees and/or teachers not qualified to oversee and care for the children," "[f]ailed to provide proper guidelines for its employees and/or teachers to follow while children, including the minor plaintiff, were in their care at the facility;" and "[f]ailed to oversee and/or supervise the employees and/or teachers."

181.    Still other lawsuits further corroborate that injuries resulted from the widespread disregard for health and safety at KinderCare facilities. A Pennsylvania complaint filed in April 2024, *Mock v. KinderCare Learning Centers, LLC*,[24] concerns "sustained serious, severe and permanent burn injuries" suffered by a child younger than two years old as a result of KinderCare's violations of Pennsylvania Administrative Code relating to childcare facilities, including by failing to supervise children entrusted in their care, failing to properly train staff and employees, failing to use due care in the retention of staff members, failing to employ sufficient staff to child ratios in order to properly and safely supervise children, failing to immediately seek medical attention for the injured minor, and failing to immediately notify the child's parents of the incident. In its investigation, Lead Counsel identified an April 2024 report concerning an unannounced inspection conducted by Pennsylvania state authorities apparently in response to the incident at issue in *Mock*, which found several violations at the facility, including a child left unsupervised by a qualified staff person, and authorities admonished that "Conditions at the facility may ***not*** pose a threat to the health or safety of the children."

182.    In another Pennsylvania complaint, *Easly v. KinderCare Education, LLC*[25] plaintiff alleges that multiple serious injuries to a child resulted from KinderCare's failure to maintain its

---

[24] Complaint, *Mock v. KinderCare Learning Ctrs., LLC*, No. 240401269 (Pa. C.P., Philadelphia Cnty.) (filed Apr. 9, 2024).

[25] Complaint, *Easly v. KinderCare Educ., LLC*, No. 25-cv-01551 (W.D. Pa. Oct. 7, 2025), ECF No. 1-2.

facility and to hire and train qualified staff, even after repeated prior violations for the same alleged conduct that caused the injuries at issue. Lead Counsel identified reporting from September 2024 in which Pennsylvania authorities apparently corroborated this incident and required as a correction that "Each staff person shall be assigned the responsibility for supervision of specific children. The staff person shall know the names and whereabouts of the children in his assigned group [and] be physically present with the children in his group." The report also noted that the KinderCare facility planned to maintain compliance by ensuring that "Staff will be able to see, hear, assess and direct children all times."

183.    Multiple other complaints document similar patterns of negligent supervision leading to injuries to children and infants, closely resembling the findings in the incident reports above (*supra* Section IV.D.1.a) and further evidencing a recurring and systemic failure in KinderCare's health and safety at the time of the IPO:

- A Washington state complaint, *Macias v. Hernandez-Arriaga*,[26] concerns burns suffered by an 11-month old after a KinderCare facility staff member "placed a bottle in a baby bottle warmer and walked away leaving [the child] ***unattended and unsupervised***"— contrary to safety standards. Lead Counsel identified a December 2023 inspection report in which Washington state authorities seemed to corroborate these allegations, finding a "serious" violation of the requirement to "take measures intended to prevent . . . hazards to children in care in early learning program space" by failing to make "[e]quipment, materials, or products that may be hot enough to injure a child . . . inaccessible to children."

---

[26] Complaint, *Macias v. Hernandez-Arriaga*, No. 25-2-06774-2 (Wash. Super. Ct., King Cnty.) (filed Feb. 28, 2025).

- *Laverty v. KinderCare Education, LLC*[27]—currently pending in Indiana state court—concerned crushing injuries and deformity to a three-year-old girl that resulted from KinderCare's failure to maintain proper staff-to-child ratios, failure to train qualified staff, and failure to properly maintain safe facilities.

- *Tracey v. Lexington Hills KinderCare*[28]—currently pending in California state court—concerned KinderCare's failure to hire and train quality staff after a child was left unattended and abandoned inside a KinderCare bus for over two hours after a field trip, "strapped to his seat inside a sweltering bus for more than two hours . . . soaked with sweat and distraught, screaming for help."

- A Texas complaint filed in April 2024, *Martinez v. KinderCare Learning Centers LLC*,[29] involved injuries suffered by two minor children in 2023 caused by KinderCare's failure to properly train its staff on administering prescribed medication. This case was settled for an undisclosed amount on August 7, 2025. Lead Counsel identified a monitoring inspection report by Texas authorities from September 2023 that appears to corroborate the allegations in part, noting a "High" risk non-compliance with a "greater risk to . . . health and safety" after the facility failed to store properly and then lost a child's medication.

184.    A response from the Federal Trade Commission ("FTC") to a request under the Freedom of Information Act ("FOIA") concerning consumer complaints that reference KinderCare from January 1, 2023 to March 24, 2025 further corroborates health and safety issues at

---

[27] Complaint, *Laverty v. KinderCare Educ., LLC*, No. 43D04-2411-CT-000112 (Ind. Super. Ct., Kosciusko Cnty.) (filed Nov. 21, 2024).

[28] Complaint, *Tracey v. Lexington Hills KinderCare*, No. 24CV011899 (Cal. Super. Ct., Sacramento Cnty.) (filed June 17, 2024).

[29] Complaint, *Martinez v. KinderCare Learning Ctrs. LLC*, No. 24-cv-00348 (W.D. Tex. Apr. 5, 2024), ECF No. 1-4.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

KinderCare at the time of the IPO. In its response, the FTC noted that it located 103 responsive complaints made to the FTC during that period. In one of the materials produced by the FTC, a parent complains on or around May 19, 2024 that their "ten month old son HAS SEVERAL BRUISES, SCRATCHES AND DEEP CUTS FROM[] Kindercare," and describes further how their child came home from a Gilbert, Arizona KinderCare facility "without any mention of **scratches, cuts, and contusions that were on his arms, shoulders neck and ears**" and began "having nightmares and crying more than usual. He is traumatized. I can[']t imagine the amount of pain and suffering he was put through." Another complaint produced by the FTC, from on or around August 13, 2024, describing that a 13-month old child was bullied for approximately four months after a KinderCare facility put him in a classroom with bigger kids, but KinderCare "took no accountability for their actions. They hired staff that were not qualified to take care of our children. They did not do their due diligence and vet these teachers, nor did they do background checks."

185.    While the state violations and corroborating details described above already support the conclusion that undisclosed and widespread health and safety issues plagued KinderCare, the above accounts likely still understate the true severity and scope of these issues.

186.    For example, in *Gillis v. KinderCare*,[30] a former KinderCare employee alleges she was wrongfully terminated after taking protective action to separate a violent child from other children at her facility, an incident which the plaintiff alleges occurred in part because of a "lack of support provided by KinderCare at the facility regarding the appropriate care and supervision of the children present." Lead Counsel identified in its investigation findings by Massachusetts

---

[30] Complaint, *Gillis v. KinderCare Educ. LLC*, No. 2581CV02808 (Mass. Super. Ct., Middlesex Cnty.) (filed Nov. 10, 2025).

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

state authorities around the incident at issue in *Gillis* and which appear to substantiate fault by the facility, as authorities cited numerous violations with safety regulations, including that "the [childcare] program is not soundly administered" and requiring the facility "to ensure a system is in place to keep all records up to date, ratios are kept, [and] correct certified staff are in each class room."

187.    In *McClain v. KinderCare Education LLC*,[31] the plaintiff alleges that, after working for KinderCare for over a year, KinderCare fired her in September 2023 in retaliation for raising concerns internally and to the California Department of Social Services—which subsequently substantiated her report—"about children being yanked by their arms or being pushed to the ground and being yelled at, and children being left unattended on the changing table." The case is still pending, with a case management conference scheduled for April 3, 2026.

188.    *John v. KinderCare Learning Centers, LLP*,[32] filed one month before the IPO, concerns claims by a former KinderCare employee alleging that, after the employee raised concerns to other KinderCare employees about signs of sexual abuse in a two-year-old child under KinderCare's care, the Company fabricated defamatory statements and filed a false report against her, triggering a police investigation.

189.    KinderCare's retaliatory behavior against employees that raised alarms about unsafe conditions at KinderCare facilities is further corroborated by lawsuits describing that the Company continued such conduct after the IPO. In *Phelan v. KinderCare Learning Companies, Inc.*,[33] a

---

[31] Complaint, *McClain v. KinderCare Educ. LLC*, No. 24-cv-00481 (Cal. Super. Ct., Sacramento Cnty.) (filed on Mar. 13, 2024).

[32] Complaint, *John v. KinderCare Learning Ctrs., LLP*, No. 524718/2024 (N.Y. Sup. Ct., Kings Cnty.) (filed Sept. 9, 2024).

[33] *Phelan v. KinderCare Learning Cos., Inc., et al.*, No. L-003423-25 (N.J. Super. Ct., Camden Cnty.) (filed on Oct. 14, 2025).

former KinderCare center director with over 20 years of experience describes that KinderCare terminated her in retaliation for having closed a KinderCare classroom that did not comply with mandatory staff-to-child ratio requirements. Likewise, *Hardin v. KinderCare Learning Companies LLC*, No. 202566283 (Dist. Ct., Harris Cnty.) (filed Sept. 5, 2025) alleges that, after reporting "serious workplace safety concerns, including a teacher sleeping on duty and unlicensed supervision of children," KinderCare allegedly harassed, fabricated records, and wrongfully terminated a former KinderCare employee.

190.    The information provided by the allegations in the numerous lawsuits filed against KinderCare further evidence that the statements alleged in ¶¶109-113 were materially false and misleading at the time they were made, and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, because the statements misstated and failed to disclose the fact that, at the time of the IPO, KinderCare did ***not*** comply with all government regulations pertaining to the health and safety of the children under the Company's care and did ***not*** adhere to the rigorous health and safety standards it claimed.

### c.    Former Employees Corroborate KinderCare's Systemic Violations Of Health and Safety Practices and Regulations

191.    Lead Counsel's investigation also included multiple interviews with former employees who worked at KinderCare in the months leading up to and, in most instances, during the IPO. These former employees gave corroborating accounts of KinderCare repeatedly violating health and safety regulations, including staff-to-child ratios.

192.    Regarding KinderCare's efforts to comply with ratio requirements, FE-5—a Director of a KinderCare facility in the Northeast from Fall 2023 through Spring 2025—detailed how she witnessed and co-workers told her that they were often out of ratio due to the very tight labor model imposed on the centers by KinderCare management. FE-5 added that a nearby center

was often out of ratio, and she had to send her own center staff over to help. She recalled that one

teacher whom FE-5 had sent informed FE-5 afterward that she (the teacher) was the only one in

the room at the time, in violation of the ratio, which required another staff member to be present.

FE-5 added that the center's Director had scheduled staff breaks during that time, which led to that

class being out of ratio.

193.    FE-5 elaborated that centers would often fall out of ratio if just one person called

out sick. FE-5 stated that the threat of going out of ratio was very common without the Director

going in to help cover a class. FE-5 explained that Directors had to cover classes (to meet the ratio

requirement) while also performing all their normal responsibilities as Director, which led to very

long hours for Directors.

194.    With respect to the labor model, FE-5 explained how at KinderCare, there were two

competing and dual pressures imposed on Directors by KinderCare executive management: (1)

increase enrollment and (2) cut costs, specifically labor costs. FE-5 stated that the Company was

pushing enrollment without providing the tools for enrollment, including labor.

195.    FE-5 explained that this was an "impossible" situation because in order to increase

enrollment, a center needed to hire and retain qualified staff and teachers, and while KinderCare

wanted to increase enrollment, management was not providing the tools to KinderCare Directors

to do so (in the form of hiring and retaining more qualified teachers and staff). FE-5 elaborated

that Directors were not necessarily always prevented from hiring new staff, but rather that

additional enrollments needed to happen *before* Directors could attempt to hire new staff. FE-5

noted that this requirement was discussed in meetings but not put in writing. To that end, FE-5

also confirmed that KinderCare's practice of pushing hard for new enrollment, while

simultaneously not being able to hire new staff or expected cut staff, was "exactly" the problem.

FE-5 described that centers and Directors had to first get enrollment, and then afterwards, "prove" to management why they needed teachers and staff to support enrollment – *i.e.*, a "chicken-and-egg" situation.

196.    FE-5 indicated that District Leaders met with the Directors in their districts weekly. She added that Directors were expected to spend one hour of each workday on growth for their centers; sales activity and enrollment were tracked using Salesforce.

197.    FE-5 further indicated that enrollment and labor costs were assessed for the center in a quarterly "score card." FE-5 explained that all KinderCare centers had to meet certain enrollment goals in order for their Directors to earn bonuses; if the enrollment goals were met, and labor costs were in control, then the bonuses were awarded.

198.    FE-5 explained that it is hard to get more enrollment before a center has the staff on hand to serve those children. FE-5 advised that KinderCare even had coaching sessions on how to "work around" these issues while trying to sell to parents. She noted that parents often asked who the teachers would be, but Directors could not answer them because those teachers had not yet been hired. FE-5 noted further that the law applicable to her center requires that schools have staff on hand before opening new classes. To try to resolve that problem and comply with the law, FE-5 continued, Directors had to have staff working at other locations who would then be available, supposedly, to teach the new classes once they opened up - which would then place the other location at risk of being out of ratio. FE-5 criticized this practice, asking rhetorically how she could have a teacher ready to take over a class "tomorrow" if doing so will put another center out of ratio? She emphasized that she had to navigate these opposing factors, which was "hard."

199.    FE-5 commented that these competing pressures started at the "top," with the area Presidents, and trickled down. She observed that there was a lot of talk from the Company's higher-

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

ups, but little action. She also noted that she tried to support her staff, but KinderCare's policies made it very difficult, and that the centers were always at risk of going out of ratio or actually being out of ratio.

200.    FE-5 elaborated about the financial support she wanted but was not getting from KinderCare for her center. She explained that she wanted more money to hire additional teaching staff, to assist her in maintaining and complying with the ratio regulations and maintain back-up or substitute staff for teachers to cover breaks and sick days, without risking falling out of compliance with ratios. She commented that she wanted to hire two full-time teachers, but that her request was denied, and instead she was permitted only to hire one substitute to have available when one of her regular teachers was absent.

201.    FE-5 also stated that, for example, her center had infants, toddlers, and preschoolers all in the same classroom because there weren't more than 8 children enrolled, which would justify having another room. However, she did not have permission to have typical age groupings for classes due to low enrollment. She noted that this directive came from her direct supervisor.

202.    FE-5 explained that, if a classroom or center faced being out of ratio due to teachers being unavailable, in order to get permission to close the center or to combine classes to comply with ratio requirements, the center Directors would first have to get approval from their boss (the District Leader) and then contact a hotline to get approval for taking corrective action.

203.    FE-5 explained that Directors call the hotline when a class is far outside the ratio, or if the Director knows in advance that the center or class will be out of ratio, or in the case of a weather event such as snow.

204.    FE-5 explained that it was a "huge process" to try to cancel classes when out of ratio; the Director had to call all other centers in the area to try to get extra staff if that Director's

center was falling short. FE-5 noted that, due to the tight labor restrictions imposed by management, the other centers frequently did not have staff which they could afford to send as substitutes. This, she continued, led to problems, because the Directors did not have permission to cancel classes; there were times when classes were forced to go out of ratio just so a teacher or staff member could use a bathroom. FE-5 further explained that, once classes had started and children had been brought to the school, the center could not simply close if it was out of ratio; they had to get approval first.

205.    Additionally, FE-5 advised that teachers and staff were expected by KinderCare to do much of the cleaning for the facilities. FE-5 added that cleaning the facility had to be done as soon as possible, which created a delicate balancing game. She noted that cleaning the center is especially important because Directors are measured on center cleanliness. She elaborated that cleanliness is an item in the surveys sent home by KinderCare to the families enrolled, which has an impact on Directors' performance. FE-5 noted that this policy was not typical for the childcare industry. FE-5 added that she is still working in the childcare industry and noted that her current employer (a competitor to KinderCare) does not operate in this way.

206.    FE-5 recalled an incident in Kansas City, Missouri, in approximately June or July 2024, in which a center had unknowingly ***hired a child sex offender***, because that information was not included in the lists checked in KinderCare's background checks in that state. According to FE-5, that individual went on to abuse a child at that facility, and KinderCare's lawyers got involved immediately. FE-5 indicated that KinderCare managed to keep its name out of the news afterwards. FE-5's understanding was that, while background checks are conducted everywhere, certain types of sex offenses can be included on some lists but not all of them. Shockingly, FE-5 added that KinderCare did not change its background check policies after this incident but rather

kept the incident quiet. FE-5 contrasted KinderCare to her current employer, which also experienced a similar incident, but her current employer changed its practices "across the board" to make sure this type of information would be found.[34]

207.    FE-5 understood that by at least summer 2024 an external auditor hired by the Company had begun a review, and that the expectation of FE-5's boss was that the external auditor would help fix the unworkable and unrealistic expectations placed on directors.

208.    FE-4 also indicated that she was generally aware that KinderCare conducted an efficiency audit that occurred in the fall of 2024—according to FE-4, as a result of this specific audit, several centers there were at risk of closing were grouped together. FE-4 confirmed that those groups were called "Opportunity Centers," and that these centers struggled with enrollment.

209.    Other former employees at KinderCare described how poor compensation and KinderCare's inability to retain staff affected the ability to meet health and safety standards at the centers, including staff-to-child ratios.

210.    FE-2—a Nationwide Client Success Manager from October 2023 through July 2025—explained that in her view, the poor compensation and retention rates also affected health and safety at the centers. FE-2 stated bluntly that *she would not put her own children* into a KinderCare center because of these concerns.

211.    Notably, FE-2 also confirmed that KinderCare lost several clients as a result of these problems, triggered by staffing and health and safety issues, and emphasized that it was always a struggle to maintain proper teacher-student ratios. Specifically, FE-2 confirmed that she

---

[34] As detailed above (*supra* ¶153), Lead Counsel identified an incident in Missouri in which, after a KinderCare staff member was arrested for child abuse, state authorities determined that—as in FE-5's account—KinderCare had failed to conduct background checks, yet continued to employ the individual even after staff members internally reported highly disturbing behavior.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

heard complaints from clients when centers had a lot of "callouts," early closures, and/or classes combining age groups to maintain ratios. FE-2 recalled that there were many such problems and complaints from KinderCare's client Los Angeles County.

212.     FE-4—a Center Director at a KinderCare facility in Texas from approximately January 2022 through August 2025—explained that the ratio of staff and teachers to children was an issue, and that this issue was specifically discussed at the last round table meeting she attended, which was in July or August 2025. According to FE-4, these round table meetings were attended by center Directors, District Leaders, Regional Directors, and other Corporate-level employees, such as the Educational Coordinator and the KinderCare employee in charge of subsidies, and occurred periodically (possibly monthly).

213.     FE-4 added that this meeting was conducted in person, in a hotel in Texas, and was attended by all the center Directors, District Leaders, and Regional Directors in the area. Regarding the ratio issue, FE-4 explained that the ratio mandated by Texas regulations is high, meaning a large number of children per staff member is allowed by law, although this caused challenges for the centers. FE-4 indicated that center Directors requested funding to hire more staff to lower the ratios, that is, having more than the minimum number of staff to children allowed by law, so that the centers could provide better childcare. FE-4 recalled that Company leadership did not respond.

214.     In addition, FE-4 noted, it was difficult to maintain even the higher ratios permitted in Texas due to KinderCare's mandated staffing policies. FE-4 advised that the Company's practice was informally called "***the KinderCare shuffle***," in which the Company required centers "move kids around," combining classes and cutting teachers' and staff hours, to reduce staffing costs. FE-4 indicated that every week she and all other center Directors in her district received emails from her District Leader instructing them to combine classes, cut teacher hours, and send

staff home. FE-4 observed that she and other center Directors were already struggling with hiring and retaining teachers and staff due to low pay, and they were already given too few staffing hours in the budget, and this practice made it worse. FE-4 indicated that "everyone" at her level complained about these practices. She confirmed that these practices were Company-wide, not limited to her district, based on her conversations with center Directors in other areas and regions. FE-4 noted that her district was called "Skyrise."

215.    FE-3—a Director at three different KinderCare centers from June 2021 through December 2024 in the Washington D.C. and Virginia area—also discussed issues she observed with health and safety.

216.    In FE-3's view, the Company did not prioritize addressing center-level matters including labor costs and expenditures (*i.e.*, investing in hiring and retaining qualified staff). She saw the Company's lack of prioritization of center-level matters creating specific issues. This was based both on her role as a Director and also based on traveling from center to center and overseeing approximately a dozen schools in her area as part of being tasked by the Company with taking over schools that were in crisis for various reasons, such as low enrollment, parents leaving, financial problems, staffing problems, and/or other issues. In this capacity, she worked from 8 months to a year at these crisis locations to help the center resolve its problems, and then she moved on to the next center in crisis.

217.    FE-3 stated that sometimes she was brought in to assist a center because the existing Director was let go or leaving. In some of those cases, she added, the Director seat was vacant for some time, which she explained was bad for morale for both teachers and families. She also recalled that, at times, new Directors were not vetted appropriately, resulting in people who were not qualified being put in for the role. She observed that it was more common than not that

unqualified people were brought into these roles, which she characterized as a "challenge." According to FE-3, staff quality issues were a "big deal" for a District Leader, but may not have been treated as an important issue by higher-level management at KinderCare, because those higher-level people were focused on opening the next new center.

218.    According to FE-3, meeting state regulations and guidelines **required** that the KinderCare center have a properly qualified Director and teachers. FE-3 explained that, because the Director of a center was responsible for hiring and retaining teachers, unqualified or inexperienced Directors would often hire teachers who were also not properly qualified or experienced—and thus were insufficient and uncapable to meet the various state regulations and guidelines.

219.    FE-3 further explained that there was a connection between the staffing problems and health and safety issues. She explained that it takes qualified, experienced people to know the health and safety guidelines for each state and/or region (such as D.C.), because each state has different regulations. Consequently, when new Directors or teachers are brought in without understanding or being trained on these local licensing rules, their lack of understanding causes immediate health and safety issues. She stated that there were Directors and staff who were brought in and did not know the local licensing rules. She also stated that there were instances in which there were pre-existing problems that the new hires were not informed about. She commented that, when these new Directors and teachers were not taught or willing to learn about these rules, many problems were "***pushed under the rug***." FE-3 explained that Directors are supposed to be jacks of all trades in running their centers, and when KinderCare did not hire the right Directors, or pair new employees with a proper mentor to help them learn the ins and outs of their location, then those new Directors are set up to fail. FE-3 personally observed these sorts of problems during her

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

tenure and stated that the information she provided is based upon her personal experience at KinderCare.

220.    FE-3 stated that she was aware of the "First 100 Days" teacher training program—which is discussed *supra* at ¶88. According to FE-3, "all KinderCare employees" need to go through the "First 100 Days" training handbook, including Directors and teachers. The First 100 Days training includes classroom training, payroll, HR materials, and other processes which are supposed to be completed within the first 100 days of employment. As to disenrollment, FE-3 also confirmed an assertion in an excerpt from the "First 100 Days" training handbook that stated that one out of eleven incidents where a child was left unattended led to disenrollment of that child by the family (*supra* at ¶88). FE-3 further explained that KinderCare instructed its teachers and staff in its child safety training that these sorts of safety issues (e.g., an unattended child incident) affect not just one child, but others, because other parents may also remove their children from a center when they learn of these sorts of safety issues.

221.    FE-3 also discussed staff-to-child ratios, and recalled instances where licensing officials showed up at centers that were out of ratio at the time. FE-3 advised that licensing officials would often visit centers approximately two to three times per year. Her understanding, based on her experience, was that out of ratio incidents are *very common* at KinderCare, and that there were areas around the country where centers needed to move staff around constantly when licensors were coming in, in an attempt to comply with ratio requirements. FE-3 again emphasized that this is why centers need qualified educators who follow licensing guidelines to make sure that all children are safe and healthy at all times.

222.    FE-3 also described the failure to maintain KinderCare's facilities as a systemic problem at KinderCare and which, in FE-3's view, "absolutely" could cause safety issues. She

noted that the roofs of buildings needed updating and furniture was old, out of date, and worn out. She added that KinderCare employed "techs," meaning handymen, to fix and maintain the facilities. She recalled, for example, that Virginia was supposed to have three techs for the region, but centers were lucky to get a tech to respond when they needed service. She described that the shortage of techs led to a pile-up of things that needed to be repaired at the KinderCare facilities. In D.C., she continued, centers could not get their facilities serviced, such as HVAC systems, leaking pipes, or other maintenance and upkeep duties. FE-3 further stated that these systemic upkeep problems were reported at least up to the Regional Vice Presidents.[35]

223.    Regarding the licensing impact from the systemic maintenance problems she described, FE-3 explained that, when a center is on probation after an inspection finds multiple violations, the center is given a period of time to correct the violations. FE-3 noted that the violations leading to probation could be small, such as chipping paint. After the allotted time to correct, the licensing official returns to the center to see if the violations are fixed, and further, if the licensor has a long-term history with the center, that official might ask for pictures to confirm that the violations are corrected.

224.    FE-3 also described that when violations continued to stack up, or when the violations were more serious, such as operating out of ratio or safety issues on the playground, then the center is "out of license," meaning on a restricted license. When that occurs, the center cannot enroll new children and can only have 50% enrollment. Further, when a center is under a restricted license, she added, the licensor will come more often to check the center's progress in

---

[35] Regarding the process of addressing Health & Safety issues, FE-3 explained that they are typically reported up to the District Leader level, who then works with employees at the center in question to resolve the problem. She added that if a problem seems to be "systemic," then it is reported up to the Regional Vice President. More serious problems, she added, may be submitted to Corporate Human Resources for investigation and resolution.

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

fixing violations and complying with the restrictions. FE-3 knew of schools that were put into the probationary period and which had unannounced visits in Virginia, Maryland, and D.C.

225. Separately, FE-3 stated that the Risk Management department within KinderCare was to be contacted for major health and safety issues that were actively occurring. She explained that for such issues (for example, if an ambulance needs to be called), the center Director must contact KinderCare Risk Management in addition to the District Leader and Regional VP. She stated that Risk Management is to be notified once the children and families are taken care of, and that any required paperwork must be completed as soon as possible, preferably the same day as the incident.

226. FE-1—a former Senior District Leader at KinderCare from July or August 2022 through November 2023, and who had worked at KinderCare for a total of approximately 28 years—explained that KinderCare executive management cut down significantly on labor standards during her tenure, and the consequences of such drastic lack of investment led to a myriad of issues that were presented "daily" to KinderCare's management, including specifically KCLC President, Michael Canavin, who reported directly to the CEO. FE-1 stated that Canavin ignored concerns raised to him from people in the field, pushing a compromise in quality in favor of efficiencies in operations—specifically staffing.

227. FE-1 corroborated that the "chicken-and-egg" dynamic (as described by FE-5) "100%" existed at KinderCare. FE-1 described how there was dual pressure on the centers to do more with less; the centers were pushed to increase enrollment, but management did not give those centers the tools needed to achieve those goals, including the approval and the ability to hire qualified teachers and staff.

228.    FE-1 stated that, when KCLC President Canavin visited KinderCare centers, Canavin made the focus of his center visits on enrolling children to fill empty space. FE-1 added that when the Director responded by stating that they were having a hard time in staffing rooms, Canavin's response would be "when can you have a teacher hired by," without considering how the center could hire the teacher. FE-1 cited a specific example in which Canavin ignored these concerns raised to him from the field during a visit to a center in Alexandria, Virginia in approximately April 2023. During that visit, the center Director told Canavin that she wanted to enroll more children but that she could not find the qualified teachers she needed to meet Virginia requirements, noting that Canavin ignored the Director's concern that she could not even get applicants for the position, and simply instructed the Director to work with FE-1, and her supervisor, Walker—both of whom were present at this meeting—to grow enrollment first and then hire a teacher. According to FE-1, Canavin was not focused on fixing these labor issues at the Company and did not actually address the root problems. FE-1 explained that this is part of the reason why she left KinderCare.

229.    FE-1 stated that KinderCare did not spend more to recruit and keep qualified staff, and did not hire teachers with higher-level education and experience. Instead, FE-1 stated, KinderCare lowered the standards of staff, which kept the average hourly wage lower but also resulted in lower quality staff. FE-1 commented that since the Company replaced experienced, qualified, committed employees with those who are only paid minimum wage, then the Company only received minimum wage-level commitment from those hires.

230.    In FE-1's personal experience, centers could "run out of ratio" because there was no money for substitutes if employees call out sick, because substitutes are paid more per day. FE-1 stressed that the Company would not give the centers the resources to fix these problems. FE-1

advised that there was a continuous struggle to get qualified staff and sufficient levels of staffing for the new center locations. She added that some locations had to open without sufficient staff, requiring the existing staff, including the center Directors and Assistant Directors, to fill in the gaps and be stretched thin.

231.    FE-1 stated that KinderCare's labor shortfall made it harder for teachers to use the proper tools to keep the children safe because of time, staffing, and budget constraints imposed on the center. Indeed, FE-1 described how, as a result of these staffing issues, it was not unreasonable to expect that children would then not be properly supervised at all times, that incidents may occur, and that there would be noncompliance with state licensing requirements. FE-1 elaborated that, based off her personal experience at KinderCare, children could not be—***and were not***—properly cared for given the "revolving door" of inexperienced or poor-quality teachers and staff. FE-1 noted that experienced people would not work for the pay rate KinderCare offers and inexperienced staff could not handle normal childcare problems appropriately. FE-1 recalled as an example that a center in Carmel, Indiana, had continuous challenges in this regard; the center could not retain teachers, and the quality of staff were poor, which led to continued issues and licensing getting called. The center was put on a 6-month provisional license because they determined the center was high-risk and needed to be put on a high level of watch.

232.    In FE-1's view, there was definitely an "impactful" correlation between labor and enrollment. In FE-1's experience, the chance that a family would unenroll after an incident in which a child is left unattended was likely ***90%***. FE-1 added that, after a notable incident of a child being left unattended at a center, there is a very high percentage that the center will lose that family and also other families, and she pointed out that the center has to notify the family and licensing authorities in the event of such an incident.

233.    FE-1 further stated that any time a teacher leaves, there is a risk of about four to seven children leaving, even if those children do not follow that teacher to a new facility. FE-1 explained that staffing has a high correlation to enrollment, including that a lack of continuity in staffing negatively affects enrollment.

234.    Allegations in litigation against KinderCare further corroborate these accounts that KinderCare's staffing practices caused safety issues complying with staff-to-child ratios. For example, *Goodwin v. KCE Champions LLC*[36] asserts on behalf of KinderCare employees from August 15, 2021 to the present claims against KinderCare for violations of California wage and labor laws, and alleges that KinderCare "lacked sufficient staff to maintain appropriate student to educator ratios . . ." This case remains pending as of this filing.

235.    Likewise, *Ceasear v. KinderCare Education LLC*[37] alleges claims for wage and labor violations based in part on KinderCare's "***company-wide policy and/or practice of understaffing its jobsites***," alleging among other things that:

> ***Because [KinderCare] did not employ or staff a sufficient number of teachers to supervise the number of students present on any given day,*** there were often not enough teachers available to relieve employees . . . . ***Plaintiff sometimes worked through her meal periods to keep up with the demands of work and to maintain the required ratio of teachers to students at all times.***

KinderCare acknowledged that these claims assert at least $12 million in damages; as of this filing, *Ceasear* is moving forward into discovery.

236.    Additionally, accounts shared in postings online corroborate the experiences and information provided by the former employees described above. An online Reddit user who worked at KinderCare for "five months and [was] going to quit the second I get a new job" stated

---

[36] *Goodwin v. KCE Champions LLC,* No. 25CV019402 (Cal. Super. Ct., Sacramento Cnty.) (filed Aug. 15, 2025).

[37] Complaint, *Ceasear v. KinderCare Educ. LLC*, No. 25-cv-3269 (E.D. Cal.) (filed June 25, 2025).

in a June 8, 2024 post on the Reddit thread "r/ECEProfessionals" that KinderCare was "HORRIBLY understaffed. As in, they wouldn't approve ONE DAY off to freaking get surgery because they would have to literally shut down." This user also confirmed KinderCare's repeated violations of the staff-to-child ratio regulations, stating: "***CONSTANTLY over ratio***, ***I can count on one hand how often I've been within ratio***"; that the pay at KinderCare was "literally minimum wage"; that staff was "***[b]eing told to break the rules*** [including] ***ratios*** [and] ***incident reports***'; and that there existed "***[e]xtremely unqualified teachers***." Given these issues, the user stated that they "reported" to the licensing authorities "like three times," and that authorities were at the facility "just . . . a few days ago."

237.    Another online Reddit user, who also purports to be a former KinderCare employee, stated in a June 9, 2024 posting on the same Reddit thread that "***I watched a teacher dislocate a little girl's elbow with no repercussions***," with another user responding: "The part about a teacher dislocating a girl's elbow and there being no repercussions doesn't surprise me. During my short time at KC [KinderCare], other teachers belittled me for not being 'firm enough' with the children, and there was a teacher who straight up said the words 'You can just grab them.'"

238.    Other Reddit users in the same thread corroborated the "the KinderCare shuffle" that FE-4 explained above. In a June 9, 2024 post, one user stated that: "This is why we swap kids from one room to another to keep bare-bones staff at the expense of quality, we call it ***The KinderCare Shuffle***." Notably, this same user explained that when a center goes out of ratio, "[i]t's your job as a mandated reporter" to "call licensing," "because being over ratio is dangerous for your children."

239.    In the same Reddit thread, a separate user stated: "KinderCare is trash. My local KinderCare is under investigation after 2 toddlers walked out into a busy suburb street and were

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

almost hit by cars. The[] entire staff covered it up and the local PD were actually the ones to come forward about it along with CPS investigating. A week later, a girl came home battered with multiple bruises and bite marks."

240.    Another user purporting to have worked at a KinderCare center in Washington stated in a separate June 10, 2024 post:

> Yep, I worked for Kindercare for 2 years. It was awful . . For so many reasons. KinderCare is one of the main reasons that I will never put my kids in childcare, ever. . . The fact parents paid a relatively high price point to have their child treated like just a number with severely underpaid staff . . . **and SO many laws broken constantly**, but WA state childcare licensor looked the other way because Kindercare pays a pretty penny to license each year . . .

241.    The above information provided by the former KinderCare employees further evidence that the statements alleged in paragraphs ¶¶109-113 were materially false and misleading at the time they were made, and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, because the statements misstated and failed to disclose the fact that, at the time of the IPO, KinderCare did __not__ comply with government regulations pertaining to the health and safety of the children under the Company's care and did __not__ adhere to the rigorous health and safety standards it claimed.

### 2.    The Offering Documents Contained Misstatements And Omissions About KinderCare's Employee Engagement And Staffing

242.    The Offering Documents made several representations concerning KinderCare's hiring and retaining the childcare providers necessary to staff its facilities sufficiently to satisfy mandated staff-to-child ratios and grow KinderCare's occupancy and enrollment metrics. The Offering Documents described "*People & Engagement*" as one of the Company's "Four Pillars" and explained that the Company's "*industry-first talent filter helps us hire the best teachers and*

*center staff who will thrive in our classrooms*" and noted that the Company "utilize[s] a proprietary, data-driven approach *to attract, hire and develop exceptional talent*."

243.    The Offering Documents further described its "People & Engagement" with regards to the Company's "Teacher and Center/Site Staff Compensation Approach," stating that:

> *Ensuring our employees receive competitive pay has long been at the forefront of our retention and engagement strategy, with a special focus on investing in our teachers as they are at the heart of what we do every day.* We believe we will drive better and more consistent experiences for families, as well as foster happier and more fulfilled employees *by providing employees with competitive pay.* With the goal of making KinderCare the best place for teachers to learn and grow as career educators, *we began investing in wages by providing standardized annual merit-related increases in wages in 2015. Since then, we have prioritized investments in center and site staff wages*, including making incremental improvements in wages for our lead teachers and differentiating merit-based increases in wages by performance, tenure and pay as compared to a standard level of merit-based increases. . .
>
> *We continue to honor teacher tenure with significantly higher wage rates starting at their one-year service anniversary.*

244.    The Offering Documents stated further that: "Employee retention in the childhood education space is paramount for fostering a nurturing and stable environment for both educators and children. *We are dedicated to creating a supportive culture for our staff which is driven by our shared values, expansive training and development, and a comprehensive total rewards program including competitive benefits and pay*, as further outlined below."

245.    Similarly, in describing "Our Business," the Offering Documents stated: "*We believe we are particularly well positioned to attract talent due to our ability to offer competitive pay, benefits and training, along with more job flexibility compared to other ECE providers.*"

246.    The Offering Documents discussed the Company's "Growth Strategies" by stating in pertinent part that:

> *We also offer competitive compensation and benefits packages as well as periodic salary increases for our teachers and staff.*

247.    In the section of the Offering Documents entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Offering Documents described purported "Factors Affecting Results of Operations," stating in pertinent part that:

> *We focus on employee engagement by developing a motivated, talented workforce to build a nurturing environment for children and strong relationships with families*.

248.    The market understood that KinderCare's performance depended on the Company's hiring, training, and retaining qualified employees. For example, in its November 4, 2024 analyst report initiating coverage of KinderCare following the IPO, analysts at Deutsche Bank wrote that they "expect[ed] further occupancy improvement . . . [because KinderCare] management executed impressively by improving teacher hiring and retention," and credited that "[m]anagement has indicated that its culture and strategies to hire and retain staff were the differentiating factor in terms of recovery in occupancy levels." Likewise, in the same report, Deutsche Bank positively credited KinderCare's "culture and strategies to hire and retain staff," noting: "The company provided competitive compensation, prioritizing the development and retention of its teaching staff, investing in training and providing career growth opportunities . . . [and] has a centralized recruitment and onboarding process that helps maintain consistency as the company rapidly expands and opens new centers."

249.    The statements alleged in paragraphs ¶¶242-247 were materially false and misleading at the time they were made, and omitted facts necessary to make them not materially false and misleading or required to be stated therein, because they misstated and failed to disclose the fact that, at the time of the Offering, KinderCare did ***not*** hire and retain qualified staff, including because it did not provide competitive wages and engaged in other practices that systematically alienated quality employees—as evidenced by: (1) the accounts of multiple former

employees demonstrate that KinderCare failed to provide competitive wages and lowered its hiring standards (*see infra* § IV.D.2.a); and (2) multiple lawsuits and regulatory violations describing practices by KinderCare contrary to the statements in the Offering Documents (*see infra* § IV.D.2.b).

### a. Former Employees Show That KinderCare Alienated Quality Childcare Providers And Employed Unqualified Staff

250.    Multiple former employees interviewed by Lead Counsel described KinderCare as a Company in which executive management was—contrary to their statements in the Offering Documents—***not*** prioritizing "***employee engagement***" and "***attract[ing], hir[ing] and develop[ing] exceptional talent***" by offering "***competitive wages***." Instead, these former employees describe a longstanding pattern and practice at KinderCare of significant de-prioritization of labor, with disregard as to the Company's ensuing ability to comply with regulatory requirements (including meeting minimum staff-to-child ratios and minimum background qualifications for staff). These former employees further describe that KinderCare executive management, including President of KCLC Michael Canavin and others, knew of the issues related to KinderCare's systemic failure to provide competitive wages and the failure to hire and retain qualified staff—but repeatedly ignored and dismissed the warnings that they received.

251.    FE-2 was employed by KinderCare from October 2016 through July 2025 in a variety of roles. She began her employment at KinderCare as a District Manager, and was promoted to Client Relations Business Partner – Nationwide, and then to Client Success Manager – Nationwide, which was her title from October 2023 through the end of her employment in July 2025. As Client Success Manager, she worked in the "At Work" Division of KinderCare, functioning as a liaison between District Leaders and KinderCare's clients. FE-2 advised that

KinderCare has long had problems with hiring and retaining qualified teaching staff, dating back to when she began working for the Company as a District Manager (*i.e.*, in 2016).

252.    FE-2 explained that the reason for the difficulty is that KinderCare offers "***subpar***" pay compared to its competitors. She further noted that these problems continued throughout her employment at KinderCare (which ended July 2025), and that she was made aware of these problems through regular communications with the District Leaders who reported to her. FE-2 explained that she had discussions with her District Leaders about KinderCare's pay issues, and that it was "***known in the industry***" that KinderCare paid less than its competitors.

253.    FE-2 further explained that she knew KinderCare's compensation rates were subpar because she was aware of what KinderCare's competitors were paying. Indeed, FE-2 sat on the board of a childcare advocacy group called the Minnesota Child Care Association, or MMCA, with Chad Dunkley—the CEO of New Horizons Academy, a competitor to KinderCare—and learned what New Horizons was paying its staff.

254.    FE-2 indicated that she and her colleagues "***constantly***" raised their concerns about staff compensation, and the problems it was causing for teacher hiring and retention to their supervisors at KinderCare (which included Jeffery "JT" Talkington, current Manager of Client Implementation and Adoption at KinderCare, who reported to Amy Harmon, former Vice President of Client Success and Senior Director of Implementation; and who herself reported to Joshua Noda, currently Vice President of Operations at KinderCare).

255.    FE-2 explained that these concerns were discussed during district meetings as well as "round table" meetings with Michael Canavin, President of KinderCare Learning Centers. According to FE-2, these concerns were "brushed off" by Canavin and other Company leaders. According to FE-2, Company leadership responded by claiming that the issues were simply just

part of "the industry." FE-2 confirmed that these issues were brought up before KinderCare's IPO in October 2024. FE-2 further confirmed that she could see the effect of the poor compensation on teacher retention rates. FE-2 reiterated that KinderCare never increased its compensation rates up to levels that would make them acceptable and competitive.

256.    Other former employees corroborate FE-2's account of KinderCare's lack of employee engagement and refusal to provide competitive pay, and executive management's disregard of employees raising such concerns to them.

257.    FE-1, a former Senior District Leader at KinderCare, explained that KinderCare's focus on reduction in labor costs led to a negative impact on all aspects of quality and leadership at the centers and led to significant operational inefficiencies. FE-1 stated that labor costs were highly scrutinized and marginalized, and in FE-1's view, the Company capped labor costs at the expense of the educational experience for children and potential families. FE-1 added that many issues were mis-prioritized because of the focus on capping labor costs.

258.    FE-1 explained that KinderCare cut costs by insufficiently compensating teachers and staff, and this insufficient compensation led to issues with hiring and retention. FE-1 explained that teacher and staff compensation at KinderCare was below market, a fact that she knew given her role and responsibilities.

259.    FE-1 also explained that another part of KinderCare's pre-IPO strategy was to acquire centers (meaning already existing, competitor centers) and then also slash labor for those new acquisitions. FE-1 noted that the Company would not invest in talent; she explained that after acquiring centers, the Company marginalized the staff by cutting their hours and keeping pay below market rates. The effect of these policies, FE-1 explained, forced KinderCare to hire the

"lowest common denominator" for talent, because the centers could not afford to pay experienced teachers or caregivers.

260.    FE-1 described how the market in Indianapolis during 2021-2023 was, based on her own experience as well as discussions with her peers, a market in which there was a constant struggle, with repeated requests made to management to increase pay to match competitors. FE-1 stated that the market pay for a high-quality teacher there was approximately $15 per hour, but KinderCare leadership (including KCLC President) Canavin pushed to cap the teacher's pay at approximately $14.25 per hour. FE-1 could not get approval to pay what the competition was paying. FE-1 further stated that there was no room to negotiate with management (and no negotiation on that point) and no efforts were made to retain high-value teachers or staff who ultimately left.

261.    FE-1 further stated that Directors, in trying to run their centers, are given labor targets for planning the staff schedule for the upcoming week and are not permitted to schedule over the target, meaning they could not schedule more staff hours than the limits set by the labor target. These caps were set by a labor team within Finance and that labor hours were planned using a tool called *Anaplan*; it was FE-1's understanding that KinderCare's C-suite saw the information from *Anaplan* and used that information to put together the labor hours budgets.

262.    However, FE-1 stated employees naturally call out and there are also frequently unplanned staff absences, which stretch already tight staff and Director schedules. At that point, the Director must personally assist to cover classrooms in order to stay in ratio—all while possibly showing the facility to prospective new families. She commented that, under these circumstances, the Director could not give her full focus to the family for their tour, nor to the children in the

94

classrooms she is covering. She characterized these circumstances existing at KinderCare as a downward spiral in quality and experience.

263.    FE-1 further explained that, due to capping pay at below market rates, KinderCare lost valuable teachers because there was a high level of "churn" of teachers and staff. Further, FE-1 explained that the high level of employee churn and reduced hours stretched thin KinderCare's employees, including the center Directors and Assistant Directors, who had to cover staffing shortfalls in addition to their normal duties, and were required to cover classes and answer phones. This stretched center resources thin and led to reduced quality of care and management.

264.    FE-1 also explained the close relationship between hiring and retaining qualified labor and enrollment: less qualified labor produces less enrollment.

265.    FE-1 stated that she knew of three centers in Indianapolis for which staffing shortages and quality issues caused challenges for enrollment between 2021 and 2023. FE-1 provided an example that a KinderCare center in Indianapolis was struggling to hire anyone to staff the center, including the infant room, because of the low pay. According to FE-1, the infant room requires more experienced staff, but KinderCare could not get qualified individuals. FE-1 explained that the staffing shortage was so severe that the center had to turn families away, not because the center was at capacity, but because the Company could not hire qualified teachers to fill the classes, which FE-1 characterized as a "very challenging" situation. FE-1 added that the same constant struggle around being unable to hire qualified teachers existed, and the same decisions were made, for both new growth centers and KinderCare's existing centers.

266.    FE-1 described that KinderCare held weekly meetings in which President of KCLC, Michael Canavin, met with his direct reports, including FE-1's supervisor Anissa Walker, where issues of staffing, pay, and quality of care were discussed. FE-1 stated that she discussed the issues

of staffing, pay, and quality all the time, and raised labor issues to Walker two to three times a week, and Walker spoke with Canavin regularly. FE-1 explained that there were "always" discussions and "push back" on the issue of hiring and retention of qualified labor, with regular complaints raised to KinderCare management about employee churn and the loss of high value people.

267.    According to FE-1, KCLC President Canavin was presented with issues and concerns involving the quality of staffing and pay rates, but Canavin "would not budge," instead blaming exiting teachers and staff for not being "committed" enough. According to FE-1, Canavin and KinderCare management made no efforts to correct the staffing shortage problem; in fact, the opposite occurred. FE-1 explained that in terms of KinderCare's labor force, Company management required centers to reduce staff hours and keep labor pay within strict budgets. According to FE-1, no solutions were given by Canavin or other management and they provided no help to resolve these problems, and as a result, this affected the quality of care and education at KinderCare centers, because KinderCare could not keep the same people (i.e., high staff turnover), and could not keep more experienced teachers. FE-1 explained that KinderCare management dismissed these problems as a leadership or cultural issue at the center level, but did not provide any resources to make the center leaders successful.

268.    FE-1 met with Walker and her team virtually once a week. She added that the team's HR and Finance partners also attended the weekly virtual meetings, and the team ran through a regular agenda at the meetings. FE-1 further added that these issues of staffing, pay, and quality of care were discussed regularly, if not every week, at these meetings. She characterized these concerns around staffing, pay, and quality of care as a "pinch point" for everyone. She

elaborated that the Regional VP Walker, the HR partner, the Finance Partner, the Quality partner, all Senior District Leaders, and District leaders attended these weekly meetings.

269.    FE-1 further commented that the training tools KinderCare used did not "level" into the types of individuals the Company was hiring. She explained that the Company curated its training to more experienced and higher quality staff than the Company actually hired, so the training tools did not train the staff actually hired appropriately.

270.    FE-1 explained that new families are most "vulnerable," meaning most likely to leave, within the first 90 days of their enrollment. FE-1 stated that poor initial experiences for those families led to their poor retention rate, because families will leave due to poor quality initial interactions with poorly trained or poor-quality staff. As a result, the center could increase enrollment but would not retain the growth.

271.    According to FE-1, all these issues were interrelated and connected: she explained that the rate of pay was the "pinch" part of the problem, which in turn led to poorly qualified and inexperienced teachers and staff, which led to staff not being committed to the difficult job and retention issues, which then led to poor teacher-to-child interactions that would otherwise occur with more qualified staff, which then led to poor enrollment and occupancy.

272.    FE-1 explained how the inadequate pay left KinderCare unable to hire or keep experienced individuals with the ability to lead classrooms, and so the Company was not delivering on high value care of children. FE-1 further added that this problem also applied to the curriculum for the children, as teachers without passion and training—who were the only ones willing to take the job at the rates of pay offered—could not deliver the high-quality childcare that the Company was supposed to be committed to (according to the touted Four Pillars). FE-1 recalled that these changes started in approximately 2019 or 2020 and existed until she left.

273.    Other FEs corroborate both FE-1's and FE-2's account of what occurred at KinderCare prior to the IPO.

274.    FE-3, who was employed as a Director at three different KinderCare centers from June 2021 through December 2024, explained how during her time with the Company, KinderCare was undergoing rapid expansion and pursuing growth without any consideration as to who was working at its locations.

275.    FE-3 described how not every location was fully following the Four Pillars (as discussed *supra* at ¶¶6; 110; 242) and was not adequately supported by Company leadership. FE-3 explained how, based upon her experience, the Company leadership's support was most lacking in the "People & Engagement" pillar. FE-3 stated that there was always a push to "fill more seats" (that is, enroll more students), open more schools, and expand the Company's operations, but Company leadership was not providing the same focus on hiring good educators and paying them well. FE-3 added that there were problems with the quality of people being hired to fill positions as KinderCare grew. Indeed, FE-3 explained that KinderCare paid its educators essentially minimum wage but had significant expectations for their performance. FE-3 further explained that, in the centers that she took over, KinderCare management pushed for increased enrollment but did not provide increased resources for teachers and staff to assist in increasing enrollment.

276.    FE-3 described the poor pay at KinderCare as a "***systemic problem***." Indeed, according to FE-3, a lead teacher at KinderCare made between $9 and $13 an hour, which was not "sustainable" in light of what KinderCare was asking these educators to do, especially teachers who had been with the Company for years. As another example, FE-3 noted that employees were given nominal raises – such as 5 cents per hour – in Virginia, which she described as "ludicrous" given those employees' experience and responsibilities. FE-3 added that for the state of Virginia

as a whole, KinderCare teachers were paid minimum wage, which was very low pay for what is expected of the KinderCare teachers, and FE-3 explained that the low wages were in place from the time she originally joined KinderCare in July 2021.

277.    FE-3 further explained that pay issues were always "stifled" because pay was not prioritized by the Company, and she recalled that the only responses given by Company leadership to these concerns were very "generic" business statements that did not resolve the concerns. FE-3 noted that there were problems hiring qualified candidates in Virginia and Maryland because of the poor pay. FE-3 confirmed that there was also high teacher turnover at KinderCare due to the poor pay.

278.    FE-3 recalled that KinderCare management always asked its center Directors to achieve an 80% occupancy rate. FE-3 characterized this occupancy rate as a "magical number," and stated that the centers were not given the resources and labor budgets needed to support or meet that goal. FE-3 stated that paying teachers and staff more would help alleviate the pressure on centers and help to achieve increased enrollment and occupancy, but that paying teachers and staff more was not a priority for the Company. Instead, FE-3 explained, the Company wanted to achieve 80% occupancy while paying as little as possible, which FE-3 described as unrealistic because centers cannot "expect qualified teachers to fall out of the sky," i.e. KinderCare could not hire qualified staff without paying more in wages.

279.    Additionally, and also based upon her personal experience at KinderCare, FE-3 explained that having vacancies in the Director position (which, as she previously stated, could exist for some period of time) affects morale among staff and families because it leads to poor engagement with families, as parents worry about the leadership of the center and who oversees taking care of their children. She further explained that the longer the Director seat is in a "gray

area" (meaning vacant), the more morale is affected, and that she personally observed this gray area from vacancy *contribute directly to disenrollment* of students from KinderCare.

280.    Importantly, FE-3 stated that Directors were also underpaid by KinderCare. She stated that Directors had to be jacks of all trades; the Company expected Directors to be financially competent, teachers, psychologists, cooks, sales leads, points of contact with parents, and other roles – but did not pay competitive rates. FE-3 stated that people can't do all these responsibilities at the salary they were paid by KinderCare, working 45-60 hours a week, and also covering for missing staff, cooking for the children, managing their normal duties, and growing the business. FE-3 stated that Directors' salary did not reflect all these duties.

281.    FE-3 summarized that *every* KinderCare employee at the center level was underpaid and not getting the resources they needed to meet management's demands; according to FE-3, the wages were not competitive and thus KinderCare's business model was not "sustainable."

282.    FE-4 explained that KinderCare's leadership did not invest in its people, children, staff, or facilities, and only seemed to care about money. FE-4 elaborated that the Company did not give center Director level employees enough money to hire and/or retain teachers and staff needed for high quality schools. In FE-4's view, the Company "did not want to offer anything" to attract and retain high-value teachers.

283.    FE-4 noted that all teachers were hired at the same rate of pay, which she estimated at around $13 per hour, regardless of training, education, or experience. That low rate, she continued, made it very hard to hire and retain staff.

284.    Corroborating the other former employees from KinderCare above, FE-4 indicated that the issue of lack of resources and funding for schools was regularly brought up with District

Leaders, Regional Directors, and other higher-level employees at the Company. In addition to speaking to other center Directors and her District Leaders, FE-4 advised that these concerns were routinely brought up at KinderCare "round table" meetings which were held periodically (possibly monthly).

285.    FE-4 observed that although complaints about budgets and resources were raised during these meetings, the issues were ***never resolved***. FE-4 recalled that center Directors were told only to "bring in more FTEs" (that is, full time enrollments); in other words, FE-4 noted, KinderCare leadership's response to the lack of resources and poor pay for centers and staff was simply to enroll more children. FE-4 confirmed that KinderCare did not appear to understand that the Company needed to invest in its staff, teachers, and facility resources in order to generate more enrollment. FE-4 elaborated that complaints about lack of resources and funding were discussed in smaller meetings with District Leaders and other center Directors, in addition to the larger round table meetings.

286.    Separately, FE-5 explained that if teachers leave, then enrollment declines. FE-5 explained that a former colleague of hers had been promoted to District Leader, who in turn promoted another KinderCare employee to center Director, but these individuals were failing to hold teachers and staff accountable for misconduct. FE-5 recounted how one teacher threw a dirty diaper at another teacher's face, with no repercussions for the bad conduct. According to FE-5, this lack of accountability for misconduct was leading to good teachers leaving the center, and in turn families and children leaving the center given the lack of teachers, leading to a decline in enrollment. FE-5 confirmed that these types of issues were causing problems with both enrollment and teacher retention at KinderCare, although the problems varied by district.

287.    The information provided by the former KinderCare employees discussed above evidence that the statements alleged in paragraphs ¶¶242-247 were materially false and misleading at the time they were made, and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, because the Company misstated and failed to disclose the fact that, at the time of the Offering, KinderCare did ***not*** hire and retain qualified teachers as staff, did not provide competitive wages, and engaged in other practices contrary to the employee engagement touted in the Offering Documents.

> **b.    Litigation And Regulatory Action Further Evidence The Company's Failure to Engage in Appropriate or Compliant Labor Practices At The Time Of The IPO**

288.    Legal actions and regulatory findings further corroborate the accounts of the former employees described above and further evidence that the Offering Documents contained false statements and omissions about KinderCare's employee engagement and competitive wages.

289.    Contrary to assurances in the Offering Document that, *e.g.*, "*[e]nsuring our employees receive competitive pay has long been at the forefront of our retention and engagement strategy*," and that the Company was prioritizing "*employee engagement*," KinderCare had just one year before the IPO, in October 2023, agreed to pay over $540,000 in restitution and civil penalties to the Massachusetts Attorney General ("AG") for violating Massachusetts labor laws, including from failing to fully compensate employees as required by law. The AG described the violations as "*demonstrat[ing] a pattern*" at KinderCare, and expressly attributed certain violations to "understaffing" at KinderCare facilities. In a public response, KinderCare admitted to having "staffing issues," and further admitted that, due to these issues it had "asked teachers to work through their meal breaks to avoid classroom closures and disrupting

care for our families" and "had difficulty proving that teachers had **voluntarily** missed their meal breaks."

290.    Litigation corroborates that KinderCare's consistent refusal to compensate employees continued at the time of the IPO. A California class action, *Atmore v. KinderCare Educational LLC*[38] asserts class claims against KinderCare for widespread labor and wage violations from May 2021 to the present. The *Atmore* plaintiff alleges that KinderCare failed to pay employees for all hours worked and provide meal and rest periods as required by law, among other things. Based on KinderCare's own filings in connection with this action, these claims assert more than $12 million in damages. The action is still pending.

291.    Another California class action lawsuit, *Ceasear v. KinderCare Education LLC*,[39] asserts claims on behalf of KinderCare employees from June 2024 to the present arising from violations of the California Labor Code and California Business and Professions Code, including that KinderCare failed to pay its workers for all time worked and provide legally required overtime compensation. The *Ceasear* complaint states that "[KinderCare] had, and continues to have, **a company-wide policy and/or practice of understaffing its jobsites**," and explains:

> **Because [KinderCare] did not employ or staff a sufficient number of teachers to supervise the number of students present on any given day,** there were often not enough teachers available to relieve employees needing meal period coverage, and Plaintiff and other class members were not always afforded uninterrupted 30-minute meal periods during shifts when they were entitled to receive a meal period. Moreover, [KinderCare] had a practice of failing to schedule meal periods, which further caused Plaintiff and class members to not be relieved of their duties for compliant meal periods. **For example, Plaintiff sometimes worked through her meal periods to keep up with the demands of work and to maintain the required ratio of teachers to students at all times. Thus, Plaintiff and other aggrieved**

---

[38] Complaint, *Atmore v. KinderCare Educ. LLC*, No. 25-cv-08851 (N.D. Cal. Oct. 15, 2025), ECF No. 1-1.
[39] Complaint, *Ceasear v. KinderCare Educ. LLC*, No. 25-cv-3269 (E.D. Cal. June 25, 2025), ECF No. 1-2.

*employees worked through meal periods and/or had meal periods cut short or interrupted in order to handle their workloads*.

KinderCare likewise acknowledged that plaintiffs claim at least $12 million in damages.[40] As of this filing, the *Ceasear* action is moving forward into discovery.

292.    Similarly, *Ashanti Smith v. KCE Education LLC*,[41] asserts claims for violations of California labor laws from the period from July 31, 2021 to the present, alleging that KinderCare failed to compensate employees fully as required by law. This case has been removed to federal court[42] and plaintiff's motion to remand is currently pending.

293.    Former KinderCare employees in *Goodwin v. KCE Champions LLC*[43] likewise assert claims against KinderCare for violations of the California Labor Code, IWC Wage Orders, and the California Business and Professions Code. Plaintiffs in the *Goodwin* case, brought on behalf of KinderCare employees from August 15, 2021, to the present, allege that KinderCare wrongfully deprived staff of compensation and required meal breaks "***because Defendants lacked sufficient staff to maintain appropriate student to educator ratios . . .***" This case remains pending as of this filing.

294.    Further, KinderCare's use of mandatory arbitration to resolve wage and labor disputes further obscures the full extent of staffing issues contrary to the statements in the Offering Documents. As described in *Westmoreland v. Kindercare Educ. LLC*,[44] KinderCare has required

---

[40] Defendants' Notice of Removal of Civil Action to Federal Court, *Ceasear v. KinderCare Educ. LLC*, No. 26-cv-3269 (E.D. Cal. Nov. 10, 2025), ECF No. 1.

[41] Complaint, *Ashanti Smith v. KCE Educ. LLC*, No. 25-cv-05830 (Cal. Super. Ct., San Mateo Cnty.) (filed July 31, 2025).

[42] *Smith v. KCE Champions LLC*, No. 25-cv-10559 (N.D. Cal.).

[43] *Goodwin v. KCE Champions LLC,* No. 25CV019402 (Cal. Super. Ct., Sacramento Cnty.) (filed Aug. 15, 2025).

[44] 90 Cal. App. 5th 967, 971, 307 Cal. Rptr. 3d 554, 557–58 (Cal. Ct. App. 2023).

employees to agree to mandatory, nonpublic arbitration concerning all claims related to "the underpayment, overpayment, or mistimed payment of wages, expenses, loans, reimbursements, bonuses, commissions, advances, or any element of compensation, based on claims for overtime, on-the-clock, off-the-clock or other uncompensated hours worked claims, timing or amount of pay at separation, deduction or fee disputes, travel time claims, meal or rest period claims, overpayment claims, claims of failure to reimburse or repay loans or advances, claims over improper or inaccurate pay statements, claims to fines or penalties, or any other claimed violation of wage-and-hour practices or procedures under local, state or federal statutory or common law." Consequently, the full extent of KinderCare's wage and labor violations remain hidden to the public—albeit known by the Company.

295.    Finally, the extensive and widespread regulatory violations uncovered in Lead Counsel's investigation (as discussed § IV.D.1.a) further corroborate the accounts of the former employees above, including specifically—and contrary to the representations in the Offering Documents—that KinderCare relied extensively on unqualified and untrained staff. By way of illustration, Lead Counsel identified that in just in the nine months prior to the IPO, from January 1, 2024 to October 9, 2024, state regulators cited hundreds of incidents in which KinderCare violated requirements around staff, including at least 200 incidents in which KinderCare employees lacked minimum required qualifications; 400 incidents in which KinderCare staff did not receive appropriate training; and nearly 300 incidents in which KinderCare facilities did not complete background checks for staff. As one egregious example, during just one inspection in May 2024, state authorities cited a single KinderCare facility in Denver, Colorado for **_dozens_** of violations for failures to meet minimum staff qualifications, comply with training requirements, and undertake required background screenings of staff, among other issues.

296.     The information provided by the allegations in the numerous lawsuits filed against KinderCare as well as employment-related regulatory violations discussed above further evidence that the statements alleged in paragraphs ¶¶242-247 were materially false and misleading at the time they were made, and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, because the Company misstated and failed to disclose the fact that, at the time of the Offering, KinderCare did ***not*** hire and retain qualified teachers as staff, did not provide competitive wages, and engaged in other practices contrary to the employee engagement touted in the Offering Documents.

### 3.     The Offering Documents Contained Misstatements And Omissions About KinderCare's Operating Strategies and Risk Factors

297.     The Offering Documents also misstated the Company's financial performance and operating strategies and the risks posed by the above health, safety, and staffing violations and practices.

### a.     The Offering Documents Contained Misstatements and Omissions Concerning the Company's Operating Strategies

298.     The Offering Documents, under the heading "Occupancy Improvement" touted the Company's purportedly "***strong track record of improving occupancy rates across our portfolio***. In the past decade, we increased our average same-center occupancy from 58% in 2013 to 69% in 2023 (or 71% excluding the impact from the acquisition of Crème School) ***through a combination of strategic investments in technology, talent and implementing best practices across our centers***." The Offering documents touted its "strong track record" in several instances.

299.     Similarly, in the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), under the titled "*Occupancy improvement*," the Offering Documents described that: "We aim to improve occupancy rates

across our portfolio. Historically, ***we increased our average occupancy through a combination of strategic investments in technology and talent, as well as implementing best practices at our centers***. We invest significant resources into our technology infrastructure to support our center and site operations and interactions with families. An analysis of occupancy data from across our centers indicates growth potential within our business."

300.    The Offering Documents further stated that: "We leverage quintile analysis to group our centers for evaluation. Quintile analysis ranks our centers by EBITDA levels. Our 4th and 5th quintile centers ***have an embedded growth potential within our portfolio supported by our demonstrated success at driving occupancy improvement***."

301.    The Offering Documents also stated that: "Given our scale and operational expertise and resources, ***we possess the ability to serve families supported by public subsidy funding and the agility to meet evolving family preferences toward flexible and accredited providers***. In 2023, 9.0% of our same-center revenue increase was driven by centers that were classified as same-centers as of both fiscal 2023 and fiscal 2022. ***We believe we are well positioned to continue to increase same-center revenues through our multi-pronged strategy of occupancy improvement*** and tuition rate increases."

302.    Elsewhere in the MD&A, the Offering Documents, under the heading "***Increase revenues through occupancy and consistent price increases***," stated that: "[o]ur future revenue growth is in part dependent on us continuing to grow revenues across our portfolio of centers. . . . ***We focus on employee engagement by developing a motivated, talented workforce to build a nurturing environment for children and strong relationships with families***. . . . We help families access public subsidies, where appropriate, to make attendance at our centers more affordable. ***The differentiation of our offerings provides us an opportunity to attract new families and drive***

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

*enrollment and occupancy growth at our centers*. Although we expect these marketing activities will increase our cost of services, we expect it to positively impact our results of operations in the future. ***General economic conditions, shifts in workforce demographics, and local market competition are our largest challenges in terms of future revenue growth.***"

303.    In both the Prospectus Summary and in the section entitled "Our Business," the Offering Documents described the Company's "Competitive Strengths" by stating in part:

> We believe the following are our core strengths that differentiate us from our competition:
>
> *****
>
> We believe our scale creates a sustainable competitive advantage, enabling us to (i) ***identify best practices within our network and apply them across all of our centers and onsite programs***, (ii) ***consistently invest in our curriculum to produce tangible student outcomes***, (iii) ***attract and retain high-quality talent with a broad benefits package and career development opportunities***, . . .
>
> *****
>
> ***Strong workforce engagement drives robust operational performance***. ***We utilize a holistic approach to attract, train, develop and retain a talented workforce, at scale, and drive workforce engagement***. Our approach fosters stronger connections with families and better center financial performance. ***Our workforce culture is a fundamental driver of employee engagement as we strive to maintain a culture that is mission-driven, inclusive and values the input of each of our employees***. ***We measure success of our workforce engagement by our ability to provide continuity of care***.

304.    Similarly, in a section concerning the "Operations & Growth" pillar of the Company's operating strategy, the Offering Documents stated that the Company uses its "proprietary center management platform, OneCMS . . . across our entire organization . . . [to] promote[] ***uniformity across centers . . . [and] accelerate[] the rapid adoption of KinderCare policies and processes for new center additions***."

305. The statements above (¶¶298-304) in the Offering Documents were false and misleading as of the time of the Offering, and omitted facts necessary to make them not materially false and misleading or required to be stated therein, because:

(a) The Company did ***not*** have a "demonstrated success" or a "***strong track record***" of improving occupancy rates across our portfolio," and thus the Company was ***not*** "well positioned" to increase revenues based on its "multi-pronged strategy of occupancy improvement." To the contrary, as the Company stated in its first public earnings release, the Company actually had "***relatively flat***" enrollment and occupancy for 3Q 2024, *i.e.* the period that concluded just days before the Offering was conducted.

(b) In fact, the Company's "***strong track record***" and "***strategy of occupancy improvement***" turned on forcing centers to pursue "magical" occupancy rates (*supra* ¶278) while refusing to provide the labor and resources needed to sustainably and safely maintain operations and comply with state regulations. As evidenced above, these practices caused undisclosed, widespread health and safety violations and unsustainable enrollment, occupancy, and financial performance, including: (1) the findings of Lead Counsel's investigation that KinderCare engaged in widespread violations of safety regulations that impacted enrollment and occupancy at the time of the IPO; and (2) the accounts of former KinderCare employees, including that KinderCare management required centers to increase enrollment and occupancy without providing the resources to hire and retain qualified staff, leading to safety issues, impacting enrollment, and making any growth unsustainable at the time of the IPO (*see* § IV.D.1.c; § IV.D.2.a). By way of example, state regulators cited violations at KinderCare facilities involving at least 200 instances of leaving children unattended in just the nine months prior to the IPO, which the Company knew—based on its internal documents and corroborated by the experience of former employees—

directly impacted enrollment, with at least "one out of 11 families withdrew their child within two weeks of the incident." *See supra* at ¶88.

(c)    Additionally, the statements stating that the "***[quintile] analysis of occupancy data from across our centers indicates growth potential within our business***" and that the lowest quintiles "***have an embedded growth potential***" falsely omitted the material information that, as the Company admitted months later and corroborated by former employees, it conducted an analysis and identified "late last year"—i.e. right around the time of the Offering— approximately 150 underperforming centers that did ***not*** yet use the "same proven practices and frameworks that have driven strong results in our highest performing centers." *See* ¶¶207-208; 345-346.

> **b.    The Offering Documents Contained Misstatements and Omissions About The Risks At The Time Of The IPO Around Noncompliance With Safety Laws, Adverse Publicity, and Staff**

306.    The Offering Documents also contained materially misleading risk factors that failed to warn of the significant risks posed by KinderCare and its undisclosed, widespread health and safety issues and violations, and falsely created an impression of a state of affairs that differed in a material way from the one that actually existed.

307.    These risk disclosures inaccurately described as potential and purely hypothetical risks that "could" or "may" impact the Company in the future—including that compliance with health and safety regulations "could" impact its ability to conduct business; that "adverse publicity" "could" impact demand; and that failing to hire, retain, and train qualified teachers "may" affect its operations and prevent the Company from achieving its business objectives— rather than disclosing the actual, known events, trends, and uncertainties that had already transpired, including:

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR

- That sanctions from KinderCare's failures to comply with state safety regulations had already impacted its ability to conduct business and would continue to do so, including corrective orders and license revocations that prevented KinderCare from enrolling new students, opening new centers, and participating in state "subsidy programs";

- That "adverse publicity" had already impacted demand and would continue to do so given the widespread and systemic violations of health and safety regulations, including more than 1,982 incidents cited by state authorities across 680 KinderCare facilities throughout the country (45% of the total KCLC facilities at the time of the IPO) in just the nine months prior to the IPO; and

- That KinderCare's operations and business objectives had already been impacted and would continue to be impacted because, rather than pay competitive wages, KinderCare relied extensively on lower quality employees—oftentimes in violation of state minimum qualifications, training, and background checks—causing safety issues and hurting enrollment.

308.    This state of affairs is sufficiently distinct from the impressions given to investors and the risk disclosures in the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

309.    For example, the Offering Documents disclosed as a "Risk Factor":

***General Risks – Compliance with existing and new laws and regulations could impact the way we conduct business***.

Laws, regulations and licensing, and other requirements impacting education, child care and before- and after-school programs at the national, state and local levels periodically change, and the ultimate cost of compliance cannot be precisely estimated. Although these regulations and requirements vary greatly from jurisdiction to jurisdiction, government agencies and accreditation organizations

generally review, among other things, the adequacy of buildings and equipment, minimum square footage, ***ratio of staff to children, educational qualifications and training of staff, record keeping, nutrition requirements, curriculum, employee screening, compliance with health and safety standards***, data privacy and security requirements, and program quality. ***Failure of a center, site or program to comply with applicable regulations and requirements could subject it to sanctions, which can include fines, corrective orders, being placed on probation, loss of accreditation or, in more serious cases, suspension or revocation of the license to operate, inability to open or acquire new centers, or ability to participate in federal, state and local subsidy programs, and could require significant expenditures to bring our centers, sites or programs into compliance or result in the closing of the center, site or program. Certain government agencies may publish or publicly report major and/or minor regulatory violations and we may suffer adverse publicity, which could result in loss of enrollment in a center, site, program or market***. In addition, there may be unforeseen changes in regulations and licensing requirements, such as changes in the required ratio of child center staff personnel to enrolled children that could have an adverse impact on our operations.

310.    These statements were false and misleading at the time they were made because the Offering Documents inaccurately described only as ***potential*** certain material risks associated with KinderCare's ability to comply with all government regulations (including "ratio of staff to children"), including that failure to comply with such regulations "***could***" subject the Company to "sanctions, which can include fines, corrective orders, being placed on probation, loss of accreditation or, in more serious cases, suspension or revocation of the license to operate, inability to open or acquire new centers," and which could have an adverse effect on KinderCare's business, financial condition, and results of operation. However, as discussed *supra* § IV.D.1, at the time of the IPO, these risks had ***already materialized*** and ***were materializing*** at the time of the IPO. At the time of the IPO, the Company had already violated and was continuing to violate a plethora of health and safety regulatory violations around the country, which had already resulted sanctions for non-compliance, including corrective orders, license revocation, prevention of opening up new centers, and inability to participate in state subsidy programs (*e.g.*, ¶147). Statements throughout the Offering Documents underscore the false nature of this risk disclosure as mere hypothetical and

potential, including that KinderCare was "continuing to comply with applicable laws and regulations," including "minimum qualifications and background checks for our center personnel as well as teacher-to-child ratios and various health [] and safety regulations" (*see* § IV.D.1; § IV.D.2.a-b). This state of affairs is sufficiently distinct from the impression given to investors by the risk disclosures as to the compliance with laws at KinderCare facilities.

311.    Further, the above statements were false and misleading at the time they were made because, the Offering Documents inaccurately described as ***potential*** certain material risks concerning the publication of reports, including by stating that "Certain government agencies ***may*** publish or publicly repot major and/or minor regulatory violations," and that KinderCare "***may suffer adverse publicity***," which "***could*** result in loss of enrollment in a center, site, program or market." However, as discussed *supra, e.g.*, § IV.D.1.a, at the time of the IPO these risks had ***already materialized*** and ***were materializing***, as in the nine months leading up to the IPO, government agencies across the country had already published and filed ***2,000*** Monitoring and Inspection Reports against KinderCare concerning numerous regulatory health and safety violations. This state of affairs is sufficiently distinct from the impression given to investors by the risk disclosures as to the reporting of regulatory violations by government agencies.

312.    The Offering Documents stated as one of the "Risks Related to our Business" in the "Summary Risk Factors" that damage to its reputation "***may prevent us from achieving our business objectives or that may adversely affect our business, financial condition and results of operations***." The risk disclosures stated further:

> ***Because our success depends substantially on the value of our brands and reputation as a provider of choice, adverse publicity could impact the demand for our services.***
>
> ***Our reputation and brand are critical to our business***. *Adverse publicity concerning reported incidents or allegations of inappropriate, illegal or harmful*

*acts to a child at any child care center or site, or through a third-party provider, whether or not directly related to or involving us, could result in decreased enrollment at our child care centers or sites, the termination of existing corporate relationships, our inability to attract new corporate relationships or increased insurance costs, all of which could adversely affect our operations*. Brand value and our reputation can be severely damaged even by isolated incidents, particularly if the incidents receive considerable negative publicity or result in substantial litigation. These incidents may arise from events that are beyond our ability to control, such as instances of abuse or actions taken (or not taken) by one or more center or site managers or teachers relating to the health, safety or welfare of children in our care. In addition, from time to time, clients and others make claims and take legal action against us. Whether or not claims have merit, they may adversely affect our reputation and the demand for our services. Such demand could also diminish significantly if any such incidents or other matters erode general confidence in us or our services, which would likely result in lower revenues and could materially and adversely affect our business, financial condition and results of operations. Any reputational damage could have a material adverse effect on our brand value and our business, which, in turn, could have a material adverse effect on our business, financial condition and results of operations.

313.    This statement was false and misleading at the time made because the Offering Documents inaccurately described only as ***potential*** certain material risks associated with "adverse publicity" that "***could*** impact the demand for our services," and that such adverse publicity "***could*** result in decreased enrollment" and the "***inability to attract new corporate relationships***." However, as discussed *supra, e.g.*, § IV.D.1.a, these risks, and the impact of these risks to the Company, had ***already materialized*** and were ***already materializing*** at the time of the IPO. For example, local news outlets in a few states reported on KinderCare safety failings, including that KinderCare facilities had licenses revoked and had been placed on probation. As former employees explained and KinderCare itself acknowledged in internal materials, KinderCare's health and safety failures negatively impacted enrollment and financial performance (*see supra* § IV.D.1.c; § IV.D.2.a). It was misleading to describe the impacts that "adverse publicity ***could***" cause as merely hypothetical while omitting the volume of widespread, systemic violations of health and safety regulations across the country—events and trends known to Defendants and which had and

114

would impact the Company's operations, but which were not disclosed in the Offering Documents. This state of affairs is sufficiently distinct from the impression given to investors by the risk disclosures as to the risks and incidents of harm at KinderCare facilities.

314.    Finally, the Offering Documents stated as one of the "Risks Related to our Business" in the "Summary Risk Factors" that challenges in hiring and retraining quality staff "*may prevent us from achieving our business objectives or that may adversely affect our business, financial condition and results of operations*." The risk disclosures stated further:

> *Our business depends largely on our ability to hire and retain qualified teachers and maintain strong employee engagement*.
>
> The provision of child care services is personnel-intensive. *Our business depends on our ability to attract, train and retain the appropriate mix of qualified employees and on effectively implementing and maintaining strong employee engagement, cultivating an atmosphere of trust, and effectively communicating the value proposition of working for us*. The child care industry traditionally has experienced high turnover rates. In addition, *state laws require our teachers and other staff members to meet certain educational and other minimum requirements, and we often require that teachers and staff at our centers and sites have additional qualifications*. We are also required by state laws to maintain certain prescribed minimum adult-to-child ratios. *If we are unable to hire and retain qualified teachers at a center or site, we could be required to reduce enrollment or be prevented from accepting additional enrollment in order to comply with such mandated ratios. In certain markets, we may experience difficulty in attracting, hiring and retaining qualified teachers due to tight labor pools, health concerns and changes in the work environment*, which may require us to offer increased salaries, enhanced benefits and institute initiatives to maintain strong employee engagement that could result in increased costs.

315.    As alleged in detail above in *supra* § IV.D.2, these statements were false and misleading at the time they were made because the Offering Documents inaccurately described only as *potential*, certain material risks associated with KinderCare's ability to "hire and retain qualified teachers and maintain strong employee engagement," which "*may adversely affect*" KinderCare's business, financial condition, and results of operation. However, at the time of the IPO, these risks

had *already materialized* and *were materializing* at the time of the IPO, as the Company severely understaffed its facilities and did not appropriately hire and retain the number and quality of staff necessary to sustainably maintain business operations and a safe environment for the children enrolled. This state of affairs is sufficiently distinct from the impression given to investors by the risk disclosures about the Company's employee engagement.

316.    Additionally, the statements above were false and misleading at the time they were made, and omitted facts necessary to make them not materially false and misleading or required to be stated therein, because, as discussed in detail *supra* § IV.D.2—and contrary to Defendants' hypothetical language that KinderCare "*may*" be experiencing "difficulty in attracting, hiring, and retaining qualified teachers due to tight labor pools"— KinderCare was *already* experiencing such difficulty as of the time of the IPO, as evidenced by FE accounts of KinderCare being unable to hire and retain qualified staff due to noncompetitive wages. This state of affairs is sufficiently distinct from the impression given by the risk disclosure as to KinderCare's staffing.

### 4.    The Offering Documents Failed To Disclose Material Information Required To Be Disclosed By Regulation S-K

317.    The Offering Documents violated SEC Regulation S-K, Item 303, because they failed to disclose known trends, events, and uncertainties that had and were reasonably expected to have a material adverse impact on KinderCare's revenues, income, and operating performance.

318.    Item 303 requires an issuer to provide a discussion and analysis that "must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations." 17 C.F.R. § 229.303(a).

Further, Item 303 requires an issuer to "[d]escribe any known **trends or uncertainties** that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). This disclosure obligation is affirmative: once management is aware of a trend or uncertainty reasonably likely to materially affect financial results, the issuer must disclose it.

319.    In negligent violation of Item 303, the Offering Documents failed to disclose the following **then-existing** material events and adverse trends or uncertainties at the time of the IPO, including that:

(a)    KinderCare's facilities routinely violated and disregarded safety laws and standards, resulting in substantiated citations from state authorities citing at least nearly 2,000 violations in **just** the nine months before the IPO. Legal claims against KinderCare and the accounts of former employees further corroborate these widespread and systemic issues, and these issues had a material impact on reported operations and were reasonably likely to have a material unfavorable impact on the Company's net sales, revenues, and income from continuing operations because, e.g.: these issues: (i) resulted in the revocation or suspension of some KinderCare facility licenses (and otherwise posed a material risk of revocation and suspension of licenses); (ii) resulted in and posed a significant material risk of further adverse local publicity around KinderCare's failure to ensure the health and safety of its enrolled children that directly impacted enrollment and occupancy at KinderCare facilities; and (iii) created substantial and materializing risks from KinderCare's failure to hire and retain sufficiently qualified staff. KinderCare and KinderCare management knew these events, trends, and uncertainties, as evidenced by, among other things: the monitoring and reporting processes existing within KinderCare; the Monitoring and Incident Reports issued by state authorities and communicated to KinderCare, including in instances sent

directly to KinderCare headquarters in Oregon; legal proceedings against KinderCare; and the accounts of former KinderCare employees, who stated among other things that these issues were discussed regularly in internal meetings. Further, KinderCare knew internally that these known events, trends, and uncertainties "had" and were "reasonably likely to have a material . . . unfavorable impact on net sales or revenues or income from continuing operations," as evidenced by, among other things, the accounts of former employees described above as well as an internal KinderCare training document admitting that nearly 10% of families disenroll their child within two weeks of an incident in which the child is left unattended (which is one of several categories of violations catalogued in the Monitoring and Incident Reports reviewed by Lead Counsel). There is no reason to believe that that disenrollment percentage would not be comparable or materially greater where there are incidents of physical or mental abuse, and other harm resulting in medical attention, and thus the impact described in the internal training material is likely extremely conservative; indeed, in FE-1's experience, the chance that a family would unenroll after an incident in which a child is left unattended was likely **90%**, and further that, after a notable incident of a child being left unattended at a center, there is a very high percentage that the center will lose that family and also other families.

(b)     KinderCare relied on staff that violated minimum qualifications, training, and background check requirements in light of its refusal to provide competitive pay, violations of wage laws, and prioritizing profit margins over the quality of its labor and the quality of its care. In accordance with Item 303, the Offering Documents were required—but failed—to disclose these omitted facts, which had a material impact on reported operations and were reasonably likely to have a material unfavorable impact on the Company's net sales, revenues, and income from continuing operations. Defendants knew of the widespread staffing issues, including the violations

of minimum staff requirements, from their own monitoring and reporting processes, as well as from the Monitoring and Incident Reports issued by state authorities. Defendants further knew—but omitted—that these staffing issues impacted the Company's operations and were reasonably likely to cause reported financial information not to be necessarily indicative of future operating results, including because these issues and impacts were raised regularly within KinderCare. Further, in light of this omission of information required to be disclosed by Item 303, the disclosure in the MD&A (the section in which the information required by Item 303 is to be disclosed) is a misleading half-truth: "We focus on employee engagement by developing a motivated, talented workforce to build a nurturing environment for children and strong relationships with families[.]"

(c)    By the time of the Offering, KinderCare either already had performed or was performing an internal analysis that identified approximately 150 underperforming centers in their bottom performing quintiles that needed "additional support and focus [to] help to unlock their potential" and for which KinderCare had not yet implemented "the same proven practices and frameworks that have driven strong results in [KinderCare's] highest performing centers." In accordance with Item 303, the Offering Documents were required—but failed—to disclose its analysis and identification of these underperforming centers and that KinderCare had not in fact implemented best practices on all those centers, as these facts were known and would (and did) have an unfavorable impact on the Company's financial performance. Further, in light of this omission of information required to be disclosed by Item 303, the disclosure in the MD&A (the section in which the information required by Item 303 is to be disclosed) is a misleading half-truth: "Historically, we increased our average occupancy through a combination of strategic investments in technology and talent, *as well as implementing best practices at our centers. . . . An analysis of occupancy data from across our centers indicates growth potential within our business*."

320.    These omissions rendered the Offering Documents materially misleading and noncompliant with Item 303, which required KinderCare to disclose these known events, trends, and uncertainties at the time of the IPO. As a result, the Offering Documents overstated KinderCare's business prospects, revenue trajectory, and financial stability, and failed to alert investors to known trends and uncertainties that were reasonably likely to materially impact future revenue, income, and profit.

321.    In addition, Item 105 of SEC Regulation S-K (17 C.F.R. § 229.105) required "discussion of the material factors that make an investment in the . . . offering speculative or risky" and to "adequately describe[] the risk" for each risk factor. The Offering Documents likewise violated these disclosure requirements under Item 105 by omitting the above information, even though they were some of the most significant factors that made an investment in KinderCare securities speculative or risky. Indeed, as alleged above, the risk factor disclosures that were provided in the Offering Documents were false and misleading when made (*supra* § IV.D.3.b).

**E.    Post-IPO Events Demonstrate That The Offering Documents Were Materially False And Misleading At The Time of the IPO**

**1.    Q3 2024 Earnings (November 20, 2024)**

322.    After the close of the market on November 20, 2024, just over a month after the IPO, KinderCare issued a press release stating $671.5 million of revenue for third fiscal quarter 2024 ("Q3 2024"). On the same day, KinderCare also held its first earnings conference call as a public company, announcing its performance for the quarter. Defendants reported that "same center enrollment growth" was "***relatively flat***." Despite having stated in the Offering Documents that it had "demonstrated success at driving occupancy improvement," KinderCare also declined during on November 20, 2025 to give revenue guidance for 2025.

323.     In a report issued November 21, 2024 entitled "*KinderCare: A mixed start to public life*," analysts at Barclays stated that the Company's disclosures "will be disappointing" to investors given "suspect[ed] expectations were for a cleaner Q . . . coupled with minimal disclosures or insights and no guide [i.e. guidance]." In a separate report months later (on April 10, 2025), Barclays characterized the reaction even more dramatically, writing that the "[f]irst quarter after the IPO was at best a mixed start to public life – ***most investors viewed the call as a disaster***."

324.     On this news, the price of KinderCare common stock declined more than 15%, from $22.80 at the close on November 20, 2024 to $19.37 on November 21, 2024.

## 2.    Q4 2024 Earnings (March 30, 2025)

325.     The next quarter, on March 20, 2025 after the close of the market, KinderCare released its financial results for the fourth quarter 2024 ("Q4 2024") and full year 2024. On the same day, during the earnings call to discuss the results, KinderCare provided 2025 guidance of $2.75-$2.85 billion in full year 2025 revenue, adding that the Company it anticipated "occupancy to be relatively ***flat*** year-over-year."

326.     One analyst asked Defendant Thompson: "is there a reason why you're expecting it to only be flat? I ask from the perspective that it looks like you had really good momentum in like the lower quintiles in 2024. I'd expect that to continue in addition to various other initiatives. I think I would expect it to go higher." Thompson responded that while "the team is working hard on elevating our operational practices across those centers that have opportunity to further supercharge the enrollment within them," until those practices and tools "specifically resonate," "we're keeping you in line with an occupancy that will remain relatively flat."

327.   The guidance differed materially with the picture painted by the Offering Documents that the Company was "well-positioned" for growth in enrollment and occupancy. As analysts at Goldman Sachs wrote in in their March 21, 2025 report, the guidance "implies a *deceleration* [in revenue] at the midpoint despite an extra 53rd week this year," causing the firm to lower its 2025 and 2026 revenue estimates "to reflect *lower assumptions for occupancy rates*, tuition rate increases and new center openings." Likewise, Barclays wrote in its April 10, 2025 report that the guidance was "again below the guidance they had provided during the roadshow" conducted in connection with the Offering.

328.   The market reacted, with the price of KinderCare common stock declining more than 22% in a single day, from a closing price of $17.68 per share on March 20, 2025 to $13.76 per share on March 21, 2025.

### 3.    The Bear Cave Report (April 3, 2025)

329.   On April 3, 2025, research analyst Edwin Dorsey published a report to the market about KinderCare, titled "Problems at KinderCare Learning Companies (KLC)" in a newsletter known as "The Bear Cave" (the "Bear Cave Report"). The Bear Cave Report summarized the results of its investigation into KinderCare as follows:

> Today's investigation from The Bear Cave finds that *KinderCare often fails to deliver the safe and nurturing environment it promises parents and taxpayers*. The Bear Cave finds that toddlers escape from the KinderCare daycares onto busy roads, are left alone locked inside KinderCare buildings and buses, and are physically, verbally, and sexually abused, with many cases going unreported until bystanders raise alarm or video evidence circulates. In sum, *The Bear Cave believes KinderCare is a broken business that harms the children and families it claims to help*.

330.   The Bear Cave Report described several incidents in which children suffered harm in KinderCare's custody, many of which occurred in the period prior to the IPO. For example, the Bear Cave Report described an incident in Wisconsin in which *an 11-month-old child became ill*

*from exposure to cocaine*, which was later found in a worker's backpack in the infant room. The Bear Cave Report detailed that the facility in question had numerous prior safety violations, which included "***staff being aggressive with infants***," "***undocumented injuries***," and "***access to power tools and toxic chemicals***."

331.    As another example, the Bear Cave Report detailed an incident in North Carolina in which a three-year-old toddler was found roaming the streets outside a KinderCare center—notwithstanding that the same center had previously received citations for numerous violations related to health and safety.

332.    Disturbingly, Lead Counsel's independent investigation uncovered ***two*** similar such incidents occurring at two different KinderCare facilities in North Carolina, both in 2024—*i.e.* the year of the Offering:

- On January 31, 2024, at a KinderCare facility in Raleigh, North Carolina, inadequate supervision led to a three-year-old child walking into a parking lot and then a busy street before the child was located and retrieved.

- On August 13, 2024, at a KinderCare facility in Charlotte, North Carolina, a three-year-old child was found by a passing motorist in the middle of a busy three-lane highway after exiting an unsecured gate on the playground.

333.    The Bear Cave Report further presented numerous incidents and examples of physical abuse of children that occurred in KinderCare facilities across the country. The Bear Cave Report detailed one incident in Florida in which KinderCare personnel locked a 2-year-old alone inside a facility after the child's mother was late to retrieve her (the child was only released after the mother called the police, who pried the door open), and yet another incident in Florida in which police arrested a KinderCare staff member for child abuse after reportedly "'***yelling at the victim***

*and repeatedly punching the child with both an open and closed fist to the back and side of the head*.'" The Bear Cave Report additionally described an incident in Washington in which a KinderCare staff member repeatedly poured water on a sleeping child, while another KinderCare employee filmed the abuse for social media consumption.

334.    In addition to these and other alarming incidents at KinderCare facilities, the Bear Cave Report published information provided by "former KinderCare employees" stating that KinderCare "didn't always follow licensing." And with respect to both KinderCare's licensure procedures, and the quality of the staff that the Company hired, the Bear Cave Report described several related incidents over the prior two years (*i.e.* including before the time of the Offering), including:

- a KinderCare director "charged with 89 counts of child endangerment;"

- a KinderCare staff member "fired after an apparent drug overdose;"

- a KinderCare facility losing its license after "three dozen violations in the span of a few months;"

- a KinderCare facility that did not properly conduct "criminal history record checks;"

- a KinderCare staff member "put on leave after a minor was allegedly injured;"

- a staff member at KinderCare who was arrested for "aggravated battery to a child under the age of 13;"

- a KinderCare center facing license revocation on "numerous violations for corporal punishment, isolating children, not letting them play outdoors, lack of supervision, and a serious injury;"

- an abuse allegation leading to a criminal investigation at a KinderCare facility, concerning in which the "parent only learned *after* police called her;" and

- a KinderCare employee arrested last month [March 2025] for "for slapping a toddler."

335.    In response to the Bear Cave Report, KinderCare provided a response to news outlets on April 3, 2025, stating in part:

> We are aware of this report [i.e., the Bear Cave Report]. These were isolated incidents and not reflective of KinderCare's values and the high standards we set for ourselves. In the event that incidents do happen in our centers, we have a **strict protocol** to promptly notify families and licensing agencies. **We also work quickly to resolve issues directly with families by taking accountability and addressing what went wrong**. To that end, in each of these referenced incidents, **we conducted an investigation and have taken all actions necessary** to ensure the safety of the children in our care, including **the termination of teachers who were at fault**.

336.    KinderCare's stock price fell on release of the Bear Cave Report. The Bear Cave Report released at 10:30am ET on April 3, 2025, and by the close of trading, the price of KinderCare common stock had fallen from $12.78 per share at the prior close (April 2, 2025) to $11.19 per share, a 12.4% decline.

337.    On April 25, 2025, online magazine *Evie* published an article discussing the Bear Cave Report, entitled "Why Are Babies Testing Positive For Cocaine At The Nation's Biggest Daycare Chain?" The publication described the Bear Cave Report as a "**damning new investigative report [that] has pulled back the curtain on what might be the worst scandal in America's childcare system at KinderCare**." The article further noted that the "long list of scandals begs the question: How many isolated incidents does it take before it starts to become a pattern?"

338.    Later, on May 6, 2025, U.S. Representative Anna Paulina Luna published a post on "X" discussing the Bear Cave Report and indicated that she was investigating federal subsidies to KinderCare based on its findings, stating: "**We'll be writing to House leadership and DOGE to address this disgusting report. If you can't keep children safe – and worse, are complicit in their abuse – you do NOT deserve a dime of taxpayer funding.**"



(May 6, 2025 tweet from Representative Anna Paulina Luna. Congresswoman Luna
shared a screenshot of another tweet about KinderCare abuse from Ms. Allie Beth
Stuckey.)

339.    The public continued to take note of the Bear Cave Report over the coming months.

On June 5, 2025, Edwin Dorsey published another article on the Bear Cave, entitled "More

Problems at KinderCare (KLC)," that discussed and cited commentary on the continuing impact

from the conduct exposed in the Bear Cave Report, writing: "concerns are entering the mainstream,

allegations against the company are growing, [and] lawmakers are demanding accountability."

Thereafter, on June 24, 2025, *Yahoo Finance* published an article by *Insider Monkey* (a finance and investment related publication) that stated "[w]e came across a bearish thesis on KinderCare Learning Companies, Inc.," describing further:

> . . . an investigation by the Bear Cave ***reveals a stark disconnect between KinderCare's public image and its operational reality***. . . . While KinderCare pursue public market expansion, ***these <u>systemic failures raise grave concerns about the company's foundational promise</u>***. Rather than offering safety and early education, the investigation suggests ***KinderCare's model may be fundamentally broken***—leaving children, families, and taxpayers at risk.

340.    This article further elaborated that its "***concern is not business model obsolescence but <u>systemic operational failure</u>. . . . KLC's risk is reputational implosion from documented safety violations***."

### 4.    Q1 2025 Earnings (May 13, 2025)

341.    After the close of the market on May 13, 2025, KinderCare issued its Q1 2025 earnings and conducted its earnings call, disclosing among other things a decline in same-center occupancy "predominantly driven by lower enrollment at same-centers." During the earnings call that day, Defendant Thompson stated that, while the Company "believe[s] the fundamentals underpinning our business are unchanged and remain confident in our long-term growth algorithm for the years ahead," there is a "macro situation that we're experiencing" and "macro conditions [that] are more specific to enrollment and occupancy."

342.    Also during the earnings call that day, Defendant Thompson stated:

[W]e employ robust protocols and practices that support the overall well-being of our employees and the children in our care. Our commitment to this belief is resolute and unwavering. When issues arise, we quickly assess the situation, initiate transparency with parents and local regulators, self-report even minor infractions to licensing bodies, and take immediate corrective actions as warranted. ***Over the past quarter, we have fielded a number of questions on potential impacts of federal funding changes or efficiency efforts by the current administration on our business.***

343.    In its analyst report dated May 14, 2025, J.P. Morgan wrote specifically that Defendants' discussion around the enrollment and occupancy "weakness raises more questions than it answers," noting further "[o]n the macro [explanation], we are skeptical . . ."

344.    In the day following the Q1 2025 earnings release, the price of KinderCare common stock declined by $1.15, from a closing price of $13.46 per share as of May 13, 2025 to a closing price of $12.31 per share as of May 14, 2025, a decline of 8.5%.

**5.    Q2 2025 Earnings (August 12, 2025)**

345.    After the close of the market on August 12, 2025, KinderCare released its Q2 2025 earnings, admitting to ongoing "enrollment challenges" and that "enrollment and occupancy . . . came in below our expectations for the quarter," with a decrease in same center occupancy of "roughly one to two children per center across our portfolio." During the earnings call that day, KinderCare executives divulged that the issue was not macro, as they previously suggested (*supra* at ¶341), but instead that "***the issue is more center-level and local market-specific***." Expanding further, Defendant Thompson stated:

> As part of our performance benchmarking process, we regularly assess center-level trends to identify both strengths and areas of opportunity. ***Late last year, that analysis surfaced a number of centers with growth opportunities where additional support and focus will help to unlock their potential. We have since aligned these centers into what we call our opportunity region***.

346.    While the Offering Documents had expressly told investors that KinderCare had already implemented "***best practices . . . across all of [their] centers***" (*supra* at ¶303; *see also* ¶¶298-299), Defendant Thompson now admitted that these underperforming centers are only "***now*** benefiting from the same proven practices and frameworks that have driven strong results in our highest performing centers."

347.    In the earnings call, Defendant Thompson also indicated that "teacher turnover" could be contributing to center-specific declines.

348.    In its August 13, 2025 report, Barclays downgraded its rating, writing that "KLC's poor start as a public company is evident in its -45% YTD performance (vs. SPX/BFAM +10%/+7%); and unfortunately 2Q25 last night was no different. Further weakness in enrollment and utilization (in the core ECE business) . . . hasn't inspired confidence." The report noted further that the Company had "also guided down FY25E . . . this even after starting the year a bit lower than expected, yet, KLC had initially characterized it as 'expected' and at 2Q said it was tracking well and cited being very confident in key components." Similarly, analysts at UBS wrote in their August 13, 2025 report, "KLC shares down 22% on Wednesday trading after a disappointing Q2 miss and 2025 guidance cut, creating a recent pattern of growth challenges since IPO . . . We're clearly disappointed by the growth challenges."

349.    Another analyst at Briefing.com noted that KinderCare "is facing a sharp sell-off, with its stock plunging to record lows following a disappointing Q2 earnings report . . . . The primary headwind driving the market's reaction was enrollment and occupancy softness, with Q2 same-center occupancy declining 130bp yr/yr, as management noted that enrollment trends weakened unexpectedly late in the quarter. . . . KLC's persistent enrollment and occupancy challenges, underscored by a 130 bps drop in Q2 occupancy and a lowered FY25 revenue outlook, are the primary catalysts behind the stock's record-low plunge, reflecting investor skepticism about near-term recovery."

350.    Within a single day, the price of KinderCare common stock fell more than 22%, from $9.81 at the close on August 12, 2025, to $7.62 at the close on August 13, 2025.

### 6. Goldman Sachs Communacopia And Technology Conference (September 8, 2025)

351. After the close of the market on September 8, 2025, KinderCare executives participated in the Goldman Sachs Communacopia and Technology Conference, during which Defendant Amandi stressed that KinderCare had granular insight into issues at its facilities and again affirmed that the Company's performance was *not* macro-related, but rather in part because the Company did not hire and retain exceptional talent, as the Offering Documents had touted:

> Yeah. So, look, we see at each one of our centers, *we're able to diagnose what's happening there and what we can do about it*. And so, you've heard us say, George, obviously, referencing it's at a local level rather than macro across the board. And as we look at some of the items that might be macro as far as job rates or pricing or anything like that, we're not seeing anything that's impacting all our centers. *And we do have the tools to look at it at a center level and diagnose what's going on.*
>
> *The most often things are something related to teacher turnover. So we're still able to get all the teachers we need, but we got to make sure we keep especially the lead teachers in place.* And so, if teacher turnover spikes, it usually has some *impacts on the amount of children we can serve because families want to see that stability*. So, that's something we can lean in with the center directors and make sure we lean into our engagement and we're doing what we need to keep those teachers around.

### 7. Q3 2025 Earnings (November 12, 2025)

352. After the close of the market on November 12, 2025, Defendants released the Company's Q3 2025 earnings, announcing still further disappointing results and significantly reducing still lower the guidance for the remaining year. During the earnings call that same day, Defendant Amandi stated that "it's clear the recovery in enrollment occupancy is going to take longer than we expected."

353. The market reacted negatively to this latest disclosure, which concluded the Company's first full year of reporting as a public company. In a report issued November 13, 2025, analysts at Barclays wrote, "we sense some investor skepticism and see the road to rebuild as a

tough one. Notably, [management] conviction on execution has been a consistent message *since the IPO, though delivery has lagged expectations*."

354.    The price of KinderCare common stock, which had already collapsed to $5.00 per share as of the close on November 12, 2025, fell to $4.04 by the close of November 13, 2025 before falling even further to $3.95 per share at the close of November 14, 2025—a decline of nearly 21% in just two trading days.

## V.    DEFENDANTS DID NOT CONDUCT A REASONABLE INVESTIGATION OR POSSESS REASONABLE GROUNDS TO BELIEVE THE ACCURACY OF THE STATEMENTS IN THE OFFERING DOCUMENTS

355.    The Securities Act imposes strict liability on the issuer, KinderCare. *See* 15 U.S.C. § 77k. Neither the Individual Defendants nor the Underwriter Defendants named herein made a "reasonable investigation" or had "reasonable ground to believe and did believe, at the time [of the IPO], that the statements [in the Offering Documents] were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3).

356.    The Individual Defendants include both executives of KinderCare—namely, the Chief Executive Officer and Chief Financial Officer—as well as members of the Company's Board of Directors, which was specially charged with overseeing KinderCare's management and guiding the Company's direction. According to the Company's Corporate Governance Guidelines, the Board of Directors had "ultimate oversight responsibility for the [Company's] risk management process," including "complete access to Company management." The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants each had a duty to ensure that such statements were true and accurate and that there were no omissions of material

fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Offering Documents contained misstatements of material facts and omissions of material facts required to be stated therein or necessary to make the statements therein not misleading.

357.    The Underwriter Defendants were the underwriters for the Offering, and each had obligations to independently operate as a check on management as well as responsibility for ensuring the accuracy and truthfulness of the Offering Documents and ensuring that relevant information was brought to the attention of investors purchasing securities in connection with the IPO. As such, the Underwriter Defendants each needed to conduct a "reasonable investigation" and have a "reasonable ground for belief" equal to the reasonable care "required of a prudent man in the management of his own property." *See* 15 U.S.C. § 77k(c). Underwriters are not permitted to rely exclusively on management's representations; rather, they must verify the information they are given. Underwriters have access to the same raw facts, analyses, and documents to which a Board of Directors has access, and reasonable investigation and due diligence for every public offering should include, among other things: (1) interviews of upper and mid-level management; (2) a critical review of the Company's financial statements; (3) a review of the Company's internal controls; (4) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (5) a review of critical non-public documents forming the basis for the company's assets, liabilities, and earnings. Throughout this process, red flags uncovered must be investigated, and the Company's officers must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process as the issuer's ultimate governing body.

358.    The Underwriter Defendants each had a duty to ensure that the Offering Documents' statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts required to be stated therein or necessary to make the statements therein not misleading.

## VI.    CLASS ACTION ALLEGATIONS

359.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of: all persons and entities that purchased KinderCare publicly traded common stock pursuant, or traceable, or both, to the Offering Documents issued in connection with the Offering, which commenced on or about October 9, 2024, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of KinderCare at all relevant times, and members of their immediate family; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) KinderCare's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

360.    The members of the Class are so numerous that joinder of all members is impracticable. KinderCare common stock is actively traded on the NYSE and millions of shares were sold in the IPO. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by KinderCare or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

361.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' violations of federal law as complained of herein.

362.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

363.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Securities Act;

(b)    whether statements made by Defendants to the investing public in the Offering Documents contained material misstatements and omissions of material facts about the business, operations, and risks of investing in KinderCare; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages as prescribed by the Securities Act (*see* 15 U.S.C. §§ 77k(e), 77l(a)).

364.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.  CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT I

**For Violation of §11 of the Securities Act
Against KinderCare, the Individual Defendants, and the Underwriter Defendants**

365.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

366.    This Count is brought on behalf of Plaintiffs and the Class pursuant to §11 of the Securities Act, 15 U.S.C. § 77k, in connection with the Offering Documents, against KinderCare, the Individual Defendants, and the Underwriter Defendants.

367.    This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based solely on strict liability as to KinderCare and negligence as to the Individual Defendants and the Underwriter Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this non-fraud claim except that any challenged statement of opinion of belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

368.    KinderCare is the registrant and issuer of the common stock offered pursuant to the Offering Documents. As such, KinderCare is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate. By virtue of the Offering Documents containing material misstatements and omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading, KinderCare is liable under §11 of the Securities Act to Plaintiffs and the Class.

135

369.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading.

370.    The Individual Defendants each signed the Offering Documents and caused their issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading. By virtue of each of the Individual Defendants and their failure to exercise reasonable care, the Offering Documents contained material misstatements and omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading. As such, each of the Individual Defendants is liable under §11 of the Securities Act to Plaintiffs and the Class.

371.    Each of the Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in § 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, the Underwriter Defendants participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants, as an underwriter of the KinderCare common stock offered in the IPO, had a duty to make a reasonable and diligent investigation of the truthfulness, accuracy, and completeness of the statements contained in the Offering Documents. By virtue of the Underwriter Defendants' failure to exercise reasonable care, the Offering Documents contained material misstatements and omissions of material fact required to be stated therein or necessary to make

the statements therein not false and misleading. As such, each of the Underwriter Defendants is liable under §11 of the Securities Act to Plaintiffs and the Class.

372.    None of the untrue statements or omissions of material facts in the Offering Documents alleged herein were forward-looking statements. Rather, each such statement or omission concerned existing facts. Moreover, the Offering Documents did not properly identify any of the alleged false or misleading statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

373.    Each of the Defendants alleged in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Offering Documents, respectively, which misstated and failed to disclose, *inter alia*, the facts set forth in § IV.D. By reason of the conduct alleged herein, each of the Defendants violated §11 of the Securities Act.

374.    Plaintiffs and other members of the Class purchased or otherwise acquired KinderCare publicly traded common stock pursuant and/or traceable to the Offering Documents.

375.    Plaintiffs and other members of the Class have sustained damages. The value of KinderCare's common stock has declined substantially subsequent to, and due to, the violation of §11 by KinderCare, the Individual Defendants, and the Underwriter Defendants.

376.    At the time of their purchases, Plaintiffs and members of the Class were without knowledge of the facts concerning the omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

377.    Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based and the time that this action commenced.

Less than three years elapsed between the time that the securities upon which this claim is brought were offered to the public and the time that this action commenced.

## COUNT II

### For Violation of §12(a)(2) of the Securities Act
### Against KinderCare, the Individual Defendants, and the Underwriter Defendants

378.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

379.    This Count is brought on behalf of Plaintiffs and the Class pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), in connection with the Prospectus, against KinderCare, each of Individual Defendants, and each of the Underwriter Defendants.

380.    This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based solely on strict liability as to KinderCare and negligence as to the Individual Defendants and the Underwriter Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this non-fraud claim except that any challenged statement of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinions or belief when made.

381.    Each of the Defendants alleged in this Count were sellers, offerors, and/or solicitors of purchasers of the Company's common stock pursuant to the defective Prospectus. Each of the Defendants alleged in this Count passed title to the Class, solicited the Class's purchases of KinderCare's common stock for gain, or both. The actions of solicitation by the Defendants alleged in this Count included participating in the preparation of the false and misleading Prospectus, roadshow, and marketing of KinderCare common stock to investors, such as Plaintiffs and other members of the Class. Each of the Defendants alleged in this Count solicited the purchase of

KinderCare common stock and were motivated in part by a desire to serve their own financial interests and those of the Company. In the absence of KinderCare's, the Individual Defendants', and the Underwriter Defendants' efforts to publicize the IPO and solicit common stock purchasers, the IPO could not have occurred.

382.    KinderCare also qualifies as a statutory seller under SEC Rule 159A, 17 C.F.R. § 230.159A, because, among other things, the common stock offered in the IPO was sold by means of a prospectus. The Prospectus contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

383.    None of the untrue statements or omissions of material facts in the Prospectus alleged herein were forward-looking statements. Rather, each such statement or omission concerned existing facts. Moreover, the Prospectus did not properly identify any of the alleged false or misleading statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

384.    Each of the Defendants alleged in this Count owed to the purchasers of KinderCare common stock, including Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements made therein not misleading and no omission of material fact required by the rules and regulations governing the Prospectus's preparation. By virtue of the failure of each of the Defendants alleged in this Count to exercise reasonable care, the Prospectus, respectively, contained material misstatements of fact, omitted material facts necessary to make the statements

therein not misleading, and omitted material facts required to be stated therein. As such, each of these Defendants are liable under §12(a)(2) of the Securities Act to Plaintiffs and the Class.

385.    Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based and the time this action was commenced. Less than three years elapsed between the time the securities upon which this claim is brought were offered to the public and the time that this action was commenced.

386.    By reason of the conduct alleged herein, the Defendants alleged in this Count violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased KinderCare common stock pursuant to the Prospectus sustained substantial damages. Accordingly, Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their common stock with the interest thereon or damages as allowed by law or in equity. Class members who have sold their KinderCare common stock seek damages to the extent permitted by law.

### COUNT III

### For Violation of §15 of the Securities Act
### Against Partners Group and the Individual Defendants

387.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

388.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. § 77o, against Partners Group and the Individual Defendants, on behalf of Plaintiffs and the Class.

389.    This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Securities Act Defendants committed intentional or reckless misconduct or that any of the Securities Act Defendants acted with scienter or fraudulent intent. This claim is

based on control person liability. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statement of opinion or belief made in connection with the Offering Documents are alleged to have been materially misstated statements of opinion or belief when made.

390.    Partners Group controlled KinderCare at the time of the IPO through Partner Group's ownership of KinderCare shares, its appointment of KinderCare executives and members of the Board (including several of the Individual Defendants), its control over the Company through various transactions and agreements with KinderCare, and its historical relationship with the Company and its management.

391.    Each of the Individual Defendants were control persons of KinderCare, and controlled KinderCare at the time of the Offering, by virtue of their positions as directors, senior officers, and/or controlling or significant stockholders of KinderCare. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders, including Partners Group.

392.    Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the IPO. Because of their positions of control and authority as senior officers and/or directors, each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, respectively, which contained material misstatements of fact, omitted material facts necessary to make the statements therein not misleading, and omitted material facts required to be stated therein.

393.    As control persons of KinderCare, each of the Individual Defendants is liable jointly and severally with and to the same extent as KinderCare for its violations of §11 and §12(a)(2) of the Securities Act with respect to the IPO and the Offering Documents

394.    As a control person of KinderCare, Partners Group is liable jointly and severally with and to the same extent as KinderCare for its violations of §11 and §12(a)(2) of the Securities Act with respect to the IPO and the Offering Documents.

## VIII.    PRAYER FOR RELIEF

Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Counsel as Class Counsel pursuant to Rule 23(g);

B.    Awarding Plaintiffs and the Class compensatory or rescissory damages against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.    Granting such other and further relief as this Court may deem just and proper.

Plaintiffs expressly preserve all remedies at law and equity and do not elect among them herein. The precise forms of legal and equitable relief will be determined upon further factual development, and Plaintiffs reserve the right to seek all remedies authorized under the Securities Act and federal common law principles governing remedies.

## IX.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: February 6, 2026

/s/ Lauren A. Ormsbee

Lauren A. Ormsbee (admitted *pro hac vice*)
Jesse L. Jensen (admitted *pro hac vice*)
David Saldamando (admitted *pro hac vice*)
Alexandra E. Forgione (*pro hac vice* pending)
Jacqueline E. Lacovara (admitted *pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: lormsbee@labaton.com
jjensen@labaton.com
dsaldamando@labaton.com
aforgione@labaton.com
jlacovara@labaton.com

*Lead Counsel for Lead Plaintiff and the Class*

**STOLL STOLL BERNE LOKTING &
SHLACHTER P.C**
Keith A. Ketterling, OSB No. 913368
Timothy S. DeJong, OSB No. 940662
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: kketterling@stollberne.com
tdejong@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Liaison Counsel for Lead Plaintiff and the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
TAEVA C. SHEFLER (admitted *pro hac vice*)
SNEHEE KHANDESHI (admitted *pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800

143

San Francisco, CA  94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534

*Attorneys for Additional Named Plaintiff*
*Venkata Surya Teja Gollapalli*

CONSOLIDATED AMENDED COMPLAINT | CASE NO. 3:25-cv-01424-AR