BALLARD SPAHR LLP
BRUCE H. CAHN, OSB No. 935450
cahnb@ballardspahr.com
RYAN O'HOLLAREN, OSB No. 231160
ohollarenr@ballardspahr.com
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Telephone: 503.778.2100

COOLEY LLP
KOJI F. FUKUMURA, *pro hac vice*
kfukumura@cooley.com
HEATHER M. SPEERS, *pro hac vice*
hspeers@cooley.com
CRISTINA M. FERRUOLO, *pro hac vice pending*
cferruolo@cooley.com
10265 Science Center Drive
San Diego, CA 92121
Telephone: 858.550.6000

TARA E. LEVENS, *pro hac vice*
tlevens@cooley.com
3175 Hanover Street
Palo Alto, CA 94304
Telephone: 650.843.5000

*Attorneys for Defendants KinderCare Learning Companies, Inc.,
Paul Thompson, Anthony Amandi, John T. Wyatt, Jean
Desravines, Christine Deputy, Michael Nuzzo, Benjamin Russell,
Joel Schwartz, Alyssa Waxenberg, and Preston Grasty*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IN RE KINDERCARE LEARNING COMPANIES, INC. SECURITIES LITIGATION | Case No. 3:25-cv-01424-AR<br><br>**KINDERCARE DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**<br><br>**Request for Oral Argument** |

KINDERCARE DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

L.R. 7-1 CERTIFICATION ................................................................................................ 1

MOTION ............................................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

I.     INTRODUCTION ..................................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................................... 3

     A.    KinderCare's Business ................................................................................. 3

     B.    The IPO and Offering Documents ............................................................... 3

     C.    Post-IPO ...................................................................................................... 8

III.    LEGAL STANDARD .............................................................................................. 10

IV.    ARGUMENT ........................................................................................................... 11

     A.    Plaintiffs' Puzzle Pleading Fails to Meet Rule 8's Pleading Standards ............... 11

     B.    Statements about Compliance with Safety Standards and Government Regulations Are Not Actionable ................................................................. 13

          1.    Six challenged statements are inactionable puffery ............................... 13

          2.    No well-pled facts support falsity for any challenged statement ............. 14

     C.    Statements about Employee Engagement and Staffing Are Not Actionable ....... 22

          1.    Every challenged statement is inactionable puffery ............................... 22

          2.    One challenged statement also is an inactionable opinion ...................... 23

          3.    No well-pled facts support falsity for any challenged statement ............. 24

     D.    Statements about KinderCare's Operating Strategy Are Not Actionable ........... 28

          1.    Every challenged statement is inactionable puffery ............................... 28

          2.    Two challenged statements are inactionable opinions ............................ 29

          3.    No well-pled facts support falsity for any challenged statement ............. 29

     E.    KinderCare's Risk Disclosures Were Not Misleading ........................................ 30

     F.    Plaintiffs Fail to Plead an Omission under Items 303 or 105 ............................. 33

     G.    The Section 12(a)(2) Claim Should be Dismissed for All Individual Defendants ............................................................................................... 35

V.    CONCLUSION ........................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
   2017 WL 971846 (S.D. Cal. Jan. 27, 2017)................................................................23

*Abady v. Lipocine Inc.*,
   2023 WL 2938210 (D. Utah Apr. 13, 2023)...............................................................12

*In re American Apparel, Inc. Shareholder Litigation*,
   855 F.Supp.2d 1043 (C.D. Cal. 2012) .......................................................................28

*In re AppHarvest Securities Litigation*,
   684 F.Supp.3d 201 (S.D.N.Y. 2023)..............................................................30, 31, 32

*Applestein v. Medivation, Inc.*,
   861 F.Supp.2d 1030 (N.D. Cal. 2012) .......................................................21, 22, 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).....................................................................................................10

*Baker v. SeaWorld Entertainment, Inc.*,
   423 F.Supp.3d 878 (S.D. Cal. 2019)...........................................................................17

*In re Bare Escentuals, Inc. Securities Litigation*,
   745 F.Supp.2d 1052 (N.D. Cal. 2010) ........................................................................35

*Barilli v. Sky Solar Holdings, Ltd.*,
   389 F.Supp.3d 232 (S.D.N.Y. 2019)...........................................................................28

*Barnes v. Edison International*,
   2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) ............................................................14

*Bhangal v. Hawaiian Electric Industries, Inc.*,
   2024 WL 4505465 (N.D. Cal. Oct. 15, 2024)..............................................................14

*In re BioAge Labs, Inc., Securities Litigation*,
   2025 WL 3038991 (N.D. Cal. Oct. 30, 2025)..............................................................11

*Cao v. Uber Technologies, Inc.*,
   2024 WL 2853968 (N.D. Cal. May 14, 2024).............................................................31

*In re Century Aluminum Co. Securities Litigation*,
   729 F.3d 1104 (9th Cir. 2013) ....................................................................................10

*In re Cisco Systems, Inc. Securities Litigation*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)...................................................................12, 13

*Citiline Holdings, Inc. v. iStar Financial Inc.*,
701 F.Supp.2d 506 (S.D.N.Y. 2010)......................................................................................35

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align*
*Technology, Inc.*,
856 F.3d 605 (9th Cir. 2017) ..................................................................................................23

*City of Royal Oak Retirement System v. Juniper Networks, Inc.*,
880 F.Supp.2d 1045 (N.D. Cal. 2012) ....................................................................................25

*City of Sterling Heights Police & Fire Retirement System v. Reckitt Benckiser*
*Group PLC*,
587 F.Supp.3d 56 (S.D.N.Y. 2022) ........................................................................................23

*In re Cutera Securities Litigation*,
610 F.3d 1103 (9th Cir. 2010) ................................................................................................13

*In re DDi Corp. Securities Litigation*,
2005 WL 3090882 (C.D. Cal. July 21, 2005)........................................................................35

*In re Downey Securities Litigation*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)........................................................................20

*Dresner v. Silverback Therapeutics, Inc.*,
2023 WL 2913755 (W.D. Wash. Apr. 12, 2023).....................................................................21

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ..................................................................................................10

*Elliott v. Edison International*,
2026 WL 636708 (C.D. Cal. Mar. 6, 2026)............................................................................32

*Employees' Retirement System of Rhode Island v. Williams Companies, Inc.*,
889 F.3d 1153 (10th Cir. 2018) .........................................................................................30, 34

*Fadia v. FireEye, Inc.*,
2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ..................................................................20, 29

*Farhar v. Ontrak, Inc.*,
714 F.Supp.3d 1198 (C.D. Cal. 2024) ....................................................................................28

*Fialkov v. Microsoft Corp.*,
72 F.Supp.3d 1220 (W.D. Wash. 2014)..................................................................................19

*Fresno County Employees' Retirement Association v. Alphatec Holdings, Inc.*,
  607 F. App'x 694 (9th Cir. 2015) ...............................................................33, 34

*Gammel v. Hewlett-Packard Co.*,
  905 F.Supp.2d 1052 (C.D. Cal. 2012) ...............................................................29

*Gavaldon v. Standard Chartered Bank International (Americas) Ltd.*,
  2020 WL 835311 (S.D. Cal. Feb. 20, 2020) ....................................................22, 23

*Haping v. 17 Education & Technology Group Inc.*,
  2023 WL 8716895 (S.D.N.Y. July 20, 2023) ............................................................16

*In re Harmonic, Inc. Securities Litigation*,
  163 F.Supp.2d 1079 (N.D. Cal. 2001) ...............................................................35

*Hoang v. ContextLogic, Inc.*,
  2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ................................................20, 29

*HRSA-ILA Funds v. Adidas AG*,
  745 F.Supp.3d 1127 (D. Or. 2024) ...............................................................30

*In re Infonet Services Corp. Securities Litigation*,
  310 F.Supp.2d 1080 (C.D. Cal. 2003) ............................................................23, 35

*In re Intel Corp. Securities Litigation*,
  2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ...............................................................14

*In re Intrexon Corp. Securities Litigation*,
  2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ...............................................................14

*Lamontagne v. Tesla, Inc.*,
  2024 WL 4353010 (N.D. Cal. Sep. 30, 2024) ...............................................................34

*In re LexinFintech Holdings Ltd. Securities Litigation*,
  2021 WL 5530949 (D. Or. Nov. 24, 2021) ...............................................15, 21, 22

*Lilien v. Olaplex Holdings, Inc.*,
  765 F.Supp.3d 993 (C.D. Cal. 2025) ...............................................................33

*Lu v. Align Technology, Inc.*,
  417 F.Supp.3d 1266 (N.D. Cal. 2019) ...............................................................12

*Mazzaferro v. Aruba Networks, Inc.*,
  2015 WL 456534 (N.D. Cal. Feb. 2, 2015) ...............................................................18

*McGovney v. Aerohive Networks Inc.*,
  367 F.Supp.3d 1038 (N.D. Cal. 2019) ...............................................................18

*Mendoza v. HF Foods Group, Inc.*,
2021 WL 3772850 (C.D. Cal. Aug. 25, 2021)..........................................................................11

*In re Metawave Communications Corp. Securities Litigation*,
298 F.Supp.2d 1056 (W.D. Wash. 2003)...............................................................................20

*In re Metawave Communications Corp. Securities Litigation*,
629 F.Supp.2d 1207 (W.D. Wash. 2009).........................................................................18, 27

*Milano v. Perot Systems Corp.*,
2006 WL 929325 (N.D. Tex. Mar. 31, 2006) .........................................................................23

*Ng v. Berkeley Lights, Inc.*,
2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ..........................................................................11

*Norfolk County Retirement System v. Solazyme, Inc.*,
2016 WL 7475555 (N.D. Cal. Dec. 29, 2016)...................................................................18, 27

*In re Norfolk Southern Corp. Bond/Note Securities Litigation*,
2025 WL 641089 (S.D.N.Y. Feb. 27, 2025)................................................................14, 28, 29

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)..................................................................................................... *passim*

*Osher v. JNI Corp.*,
302 F.Supp.2d 1145 (S.D. Cal. 2003)....................................................................................20

*In re PG&E Corp. Securities Litigation*,
806 F.Supp.3d 962 (N.D. Cal. 2025) .....................................................................................16

*Pinter v. Dahl*,
486 U.S. 622 (1988)................................................................................................................35

*In re Progenity, Inc. Securities Litigation*,
2023 WL 4498502 (S.D. Cal. July 12, 2023) ........................................................................17

*In re Restoration Robotics Securities Litigation*,
417 F.Supp.3d 1242, 1257 (N.D. Cal. 2019) .........................................................................15

*Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ...............................................................................................14

*Ryan v. FIGS, Inc.*,
2024 WL 187001 (C.D. Cal. Jan. 17, 2024) .........................................................................21

*Ryan v. FIGS, Inc.*,
2025 WL 71727 (C.D. Cal. Jan. 10, 2025) ...........................................................................35

*Sayce v. Forescout Technologies, Inc.*,
  2021 WL 1146031 (N.D. Cal. Mar. 25, 2021)...........................................................................25

*In re Silicon Storage Technology, Inc. Securities Litigation*,
  2007 WL 760535 (N.D. Cal. Mar. 9, 2007)..............................................................................21

*Sneed v. Talphera, Inc.*,
  147 F.4th 1123 (9th Cir. 2025) ........................................................................................11, 16

*Sodha v. Golubowski*,
  154 F.4th 1019 (9th Cir. 2025) ................................................................................................34

*Solar Integrated Roofing Corp. v. Massey*,
  2024 WL 4152380 (S.D. Cal. Sep. 11, 2024).........................................................................12

*In re SolarCity Corp. Securities Litigation*,
  274 F.Supp.3d 972 (N.D. Cal. 2017) .......................................................................................26

*In re Sotera Health Co. Securities Litigation*,
  2025 WL 1648942 (N.D. Ohio Mar. 19, 2025) ......................................................................21

*City of Southfield General Employees' Retirement System v. National Vision
  Holdings, Inc.*,
  2024 WL 1376016 (N.D. Ga. Mar. 30, 2024)..........................................................................23

*In re Talis Biomedical Corp. Securities Litigation*,
  2022 WL 17551984 (N.D. Cal. Dec. 9, 2022).................................................................. *passim*

*Tarapara v. K12, Inc.*,
  2017 WL 3727112 (N.D. Cal. Aug. 30, 2017) ........................................................................22

*Veal v. LendingClub Corp.*,
  423 F.Supp.3d 785 (N.D. Cal. 2019) ..........................................................................17, 18, 27

*In re Verifone Securities Litigation*,
  2016 WL 1213666 (N.D. Cal. Mar. 29, 2016).........................................................................29

*Waswick v. Torrid Holdings, Inc.*,
  2024 WL 3740052 (C.D. Cal. July 23, 2024)..........................................................................14

*Waterford Township General Employees Retirement System v. BankUnited
  Financial Corp.*,
  2010 WL 1332574 (S.D. Fla. Mar. 30, 2010)..........................................................................14

*In re Weight Watchers International, Inc. Securities Litigation*,
  2016 WL 2757760 (S.D.N.Y. May 11, 2016) .........................................................................25

*Weston Family Partnership LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ..................................................................................13

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...........................................................................10, 24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................................................21

**Statutes**

15 U.S.C. §77k(a) ........................................................................................................11

15 U.S.C. §77*l*(a)(2).....................................................................................................11

**Other Authorities**

17 C.F.R. §229.303(b)(2)(ii)........................................................................................33

Federal Rule of Civil Procedure Rule 8 ........................................................11, 12, 13, 18

Federal Rule of Civil Procedure 12(b)(6) ........................................................................1

**L.R. 7-1 CERTIFICATION**

Pursuant to L.R. 7-1, counsel for Defendants KinderCare Learning Companies, Inc. (KinderCare or the Company), Paul Thompson, Anthony Amandi, John T. Wyatt, Jean Desravines, Christine Deputy, Michael Nuzzo, Benjamin Russell, Joel Schwartz, Alyssa Waxenberg, and Preston Grasty (the Individual Defendants, and collectively with KinderCare, KinderCare Defendants) certifies that the parties have made a good faith effort through telephonic conferences to resolve this dispute, but have been unable to do so.

**MOTION**

KinderCare Defendants hereby move to dismiss Plaintiffs' Amended Complaint, ECF 81 (AC), in its entirety and with prejudice under Federal Rule of Civil Procedure 12(b)(6). This motion is based on the Memorandum below and the accompanying Request for Judicial Notice, Declaration of Heather Speers, the exhibits attached thereto, and the pleadings on record in this matter.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

KinderCare operates at a scale unmatched in the early-childhood-education (ECE) industry with more than 2,400 sites across 40 states and the District of Columbia, staffed by approximately 42,000 teachers and employees, serving over 148,000 children every day. At this scale—under the scrutiny of myriad regulators, licensing bodies, and reporting regimes—citations, complaints, and incidents are unavoidable, no matter how rigorous the safeguards. KinderCare acknowledged that reality. When KinderCare conducted its initial public offering (IPO), its Offering Documents[1] noted that it had experienced periods of both increased and decreased enrollment, staffing

---

[1] The Offering Documents include both the Registration Statement and Prospectus. *See* ¶1 n.2 (providing full definition).

challenges, and litigation and regulatory proceedings arising from allegations of misconduct at its centers; that similar incidents may occur again; and that such events could affect its business.

Plaintiffs nevertheless assert claims under the Securities Act of 1933, claiming KinderCare misled investors about its safety practices, employee engagement, regulatory compliance, and business strategies at the time of the IPO. Their theory depends on stitching together isolated regulatory citations, unadjudicated allegations from other lawsuits, and anecdotes from a handful of former employees (FEs) at a handful of centers, then inflating those fragments into a supposed companywide crisis. But when those allegations are placed against the backdrop of KinderCare's scale and public disclosures, Plaintiffs' theory disintegrates. KinderCare's statements that it "hold[s] sacred its responsibility to protect and nurture" children in its care, maintains "rigorous safety standards," and treats "health and safety of children and employees" as "a top priority" are exactly what they appear to be: expressions of commitment, not guarantees of perfection. No reasonable investor would read them as promises that a company of this size would never experience an incident, a regulatory citation, or employee misconduct. That is unrealistic and it is not what KinderCare said in its Offering Documents.

Plaintiffs' attempt to transform innocuous statements into material misstatements of fact is unsupported and implausible given KinderCare's scale and regulatory environment. Securities laws do not demand disclosure of every citation or complaint simply because a company states that it prioritizes health and safety. They require public disclosures free from materially misleading omissions or affirmatively misstated facts—a standard KinderCare met in the Offering Documents.

## II.     FACTUAL BACKGROUND

### A.     KinderCare's Business

Based in Lake Oswego, Oregon, KinderCare provides private, high-quality ECE across the country. ¶2.[2] KinderCare's 2,400 sites serve children from six weeks to 12 years old across 40 states through four brands: ~1,500 ECE centers under the "KinderCare Learning Centers" (KCLC) brand; ~900 before-and-after-school sites under the "Champions" brand; ~70 onsite employer-sponsored centers under the "KCE Education At Work" brand; and ~40 "premium" community-based schools under the "Crème School" brand. Ex. 1 at 12-13. Its mission is to "build confidence for life by providing safe, high-quality early childhood and school-age education and care for families of all backgrounds and means." *Id.* at 12. As of June 29, 2024 (the quarter-end before its IPO), KinderCare employed ~42,000 teachers and staff and had an average of 148,148 kids under care. *Id.* at 74, 119.

KinderCare voluntarily pursues third-party accreditation through multiple accrediting bodies to help parents assess the quality of KinderCare's centers. *Id.* at 116. The accreditation process is rigorous and includes a comprehensive self-assessment; staff and family surveys; evaluation of policies, procedures, and program content; and a site visit by external validators. *Id.* Over 80% of KinderCare's centers and onsite programs are accredited, compared to less than 15% of ECE providers nationwide. *Id.*

### B.     The IPO and Offering Documents

KinderCare went public on October 9, 2024. ¶1. In connection with its IPO, KinderCare filed Offering Documents that included detailed descriptions about the Company, including, *inter*

---

[2] Unless otherwise noted, "¶" refers to the AC, "Ex." refers to Exhibits to the Speers Declaration; emphasis is added; internal quotation marks, citations, and alterations are omitted.

*alia*, the complex regulatory landscape; employee programs, engagement, and retention; operating risks; and historical enrollment rates and growth strategies.

**Regulatory Landscape and Compliance.** The Offering Documents explained that KinderCare operates in a heavily regulated industry, subject to myriad federal, state, and local regulations governing licensing, health, safety, and other childcare-related matters, including staff-to-child ratios, staff qualifications and training, and employee screening. Ex. 1 at 57. They also detailed KinderCare's compliance efforts, including using a "research-based, data-driven selection tool" for hiring, providing regular safety training, running twice-monthly disaster drills, conducting multiple daily "name-to-face roll calls" to ensure children are safe and accounted for, and partnering with medical experts to continually improve health and safety protocols. *Id.* at 109, 123. Based on these efforts and third-party evaluation of its operational policies, maintenance protocols, communications practices, and emergency plans, KinderCare earned the WELL Health-Safety Rating for Facility Operations and Management from the International WELL Building Institute—making it the "largest education provider and ***only national provider of early childhood education and care to receive this distinction***." *Id.* at 123.

The Offering Documents further disclosed that failure to comply with applicable regulations could subject KinderCare and its centers to sanctions, including "fines, corrective orders, being placed on probation, loss of accreditation or, in more serious cases, suspension or revocation of the license to operate, inability to open or acquire new centers, or ability to participate in federal, state and local subsidy programs, and could…result in the closing of the center, site or program." *Id.* at 57. Regulatory violations might also be published by government agencies, leading KinderCare to "suffer adverse publicity, which could result in loss of enrollment[.]" *Id.* In addition, "unforeseen changes in regulations and licensing requirements, such as changes in the

required ratio of child center staff personnel to enrolled children[,] could have an adverse impact" on KinderCare's operations. *Id.* These were not framed solely as future risks. KinderCare disclosed that it "*is* subject to litigation and regulatory proceedings," and "[t]hese proceedings *have included*, and in the future may include…governmental investigations and other proceedings and allegations of inappropriate, illegal or harmful acts to children at our child care centers or sites or through a third-party provider[.]" *Id.* at 40. KinderCare further disclosed that "*[w]e are, have also from time to time been*, and in the future may be, subject to claims and matters alleging negligence, inadequate supervision, illegal, inappropriate, abusive or neglectful behavior, health and safety, or other grounds for liability arising from injuries or other harm to the people we serve, primarily children." *Id.* The disclosures noted these proceedings—past, present, and future—could "damage our reputation, force us to incur significant expenses in defense of such proceeding or action, distract our management, increase our costs of doing business or result in the imposition of financial liability." *Id.* These disclosures were cross-referenced to the discussion of current legal proceedings, where KinderCare stated it was "involved in various litigation matters in the ordinary course of…business" but did not expect any of those matters, "either individually or in the aggregate," to "have a material and adverse effect on our business, financial condition or results of operations." *Id.* at 132.

**Employment Matters.** The Offering Documents also discussed that KinderCare's "business depends on [its] ability to attract, train and retain the appropriate mix of qualified employees," *id.* at 35, and highlighted relevant quantifiable successes. For example, KinderCare won the Gallup Exceptional Workplace Award every year from 2017 to 2024—***one of only two companies worldwide to have won the award for eight years in a row***. *Id.* at 119. And as of June 29, 2024, 75% of KinderCare's workforce self-identified as engaged in a 2023 survey—over

double the U.S. average. *Id.* at 110, 119. Tenured-teacher retention also reached a historic high of 85%, partially due to a 2021 wage investment initiative. *Id.* at 121.

Regarding training, the Offering Documents detailed KinderCare's "First 100 Days" program, formalized in 2014 and expanded in 2021 and 2022. *Id.* at 120. And since 2017, KinderCare has partnered with the Child Development Association Certification (CDA) Council for Professional Recognition to offer the latest training to teachers and allow them to earn CDAs— a "predominant credential" in ECE—at no cost. *Id.* at 121. KinderCare also launched a workforce planning system in 2018 and "a balanced scorecard for teachers in 2020" to support "excellence in teaching development." *Id.*

The Offering Documents also highlighted risks to maintaining these successes. For example, they disclosed that due to state-mandated staff-to-child ratios, "[i]f we are unable to hire and retain qualified teachers at a center or site, we could be required to reduce enrollment or be prevented from accepting additional enrollment in order to comply with such mandated ratios." *Id.* at 35. And in certain markets, it may "experience difficulty in attracting, hiring and retaining qualified teachers due to tight labor pools, health concerns and changes in the work environment, which may require us to offer increased salaries, enhanced benefits and institute initiatives to maintain strong employee engagement that could result in increased costs." *Id.* These "[d]ifficulties in attracting, hiring and retaining qualified personnel" could affect KinderCare's "ability to meet growth objectives" or to "take advantage of additional enrollment opportunities," which could negatively impact "business, financial condition and results of operations." *Id.* at 36.

The Offering Documents further noted the risk of employment litigation, including that such risks previously had materialized. For example, they disclosed that KinderCare has faced proceedings which "*have included*, and in the future may include, matters involving personnel and

employment issues." *Id.* at 40. They also disclosed "*historical and current legal proceedings*…with respect to employment-related matters." *Id.*

**Adverse Publicity.** The Offering Documents highlighted the importance of KinderCare's reputation as a "leader in early childhood education" and "provider of choice." *Id.* at 13, 21. The disclosures noted that adverse publicity could tarnish that reputation and impact performance:

- "Because our success depends substantially on the value of our brands and reputation as a provider of choice, adverse publicity could impact the demand for our services." *Id.* at 21.

- "Adverse publicity concerning reported incidents or allegations of inappropriate, illegal or harmful acts to a child at any child care center or site, or through a third-party provider, …could result in decreased enrollment at our child care centers or sites…." *Id.* at 36.

- "Brand value and our reputation can be severely damaged even by isolated incidents, particularly if the incidents receive considerable negative publicity or result in substantial litigation." *Id.* at 36-37.

- "Certain government agencies may publish or publicly report major and/or minor regulatory violations and we may suffer adverse publicity, which could result in loss of enrollment in a center, site, program or market." *Id.* at 57.

**Growth Strategies.** The Offering Documents disclosed that occupancy improvement was a "key growth strategy." *Id.* at 112. From 2013 to 2023, average same-center occupancy grew from 58% to 69%, reflecting a "strong track record of improving occupancy rates across our portfolio." *Id.* But they also explained that, despite this positive trend, occasional occupancy decreases had occurred and may continue to occur. For example, in the first half of 2024, "occupancy *decreased* by 150 basis points" compared to the same period the year before. *Id.* at 75.

The Offering Documents also disclosed KinderCare's method for analyzing growth opportunities: grouping centers into quintiles based on EBITDA (a common profitability metric) to identify those with the greatest growth potential. *Id.* at 112-13. They disclosed that, since 2019, occupancy *decreased* for centers in the bottom two quintiles (*i.e.*, the bottom 40%), even as overall

PAGE 7 - KINDERCARE DEFENDANTS' MOTION TO DISMISS

occupancy increased. *Id.* at 112-13. Accordingly, KinderCare highlighted the "embedded growth potential" of these lower-quintile centers as part of its growth strategy. *Id.*

The Offering Documents further disclosed risks to future occupancy growth, including that KinderCare's "ability to grow in the future will depend upon a number of factors," such as "the ability to develop and expand new and existing client relationships, to continue to provide and expand the high-quality services we offer, to hire and train qualified personnel, to expand and grow in existing and future markets, to develop and operationalize new service offerings, and to sustain our operations, growth and efficiencies." *Id.* at 43.

### C.    Post-IPO

**Q3'24 Results.** On November 20, 2024, KinderCare held its first public earnings call. Anthony Amandi, KinderCare's CFO, highlighted positive quarterly results, including 7.5% revenue growth, 7% adjusted EBITDA growth, and "stable same-center occupancy." Ex. 2 at 7. He also announced that "new centers are performing in line or better than our expectations," there is a "strong pipeline of additional centers set to open over the next 12 to 18 months," and KinderCare would provide 2025 guidance early next year. *Id*.

Analysts responding to this announcement noted that KinderCare's "revenues beat our estimates by ~$1.5M" and total enrollment "increased +1%," but "'flat' same center growth (even though slightly better than expected at +0.7%) does not excite new investors." Ex. 3 at 2.

**Q4'24 Results.** On March 20, 2025, KinderCare shared Q4 and fiscal-year 2024 financial results and provided 2025 financial guidance. Amandi highlighted the 5% increase in revenue and 3% increase in same-center revenue. Ex. 4 at 7.

Regarding occupancy, Paul Thompson, KinderCare's CEO, noted management was "pleased with the performance and expect[ed]…to accelerate occupancy over the long term as our operational initiatives gain momentum." *Id*. Although KinderCare expected "occupancy to be

relatively flat year-over-year" for 2025 "as we manage our portfolio," Thompson highlighted "strong progress on occupancy across the portfolio" in 2024, especially among fourth- and fifth-quintile centers, which "improved occupancy on average by approximately 310 basis points." *Id.* at 8-9. In response to a question about why occupancy was expected "to only be flat," he explained some of KinderCare's tools were "still gaining traction and gaining the adoption across the team, and we see encouraging things from that but until they specifically resonate[,] [w]e're keeping you in line with other occupancy that will remain relatively flat." *Id.* at 14.

KinderCare's stock decreased ~22% following this release, with analysts noting "there were other factors at play" besides results, including political concerns about the continuing availability of federal subsidies. Ex. 5 at 4 & n.2.

**Q1'25 Results.** On May 13, 2025, KinderCare announced Q1'2025 results, which were in line with 2025 guidance and included a "modest 50 basis point year-over-year decline in same center occupancy," due in part to "macro conditions" and political uncertainty that delayed enrollment decisions. Ex. 6 at 5, 11-12. Despite that uncertainty, KinderCare saw "solid improvement in occupancy amongst our lowest quintile centers." *Id.* at 6-7. While some analysts were "skeptical that uncertainty introduced by the new administration had a significant impact on enrollment decisions in the first quarter," they acknowledged that the entire ECE industry was "currently facing challenges to enrollment growth and pricing." Ex. 7 at 2.

**Q2'25 Results.** On August 12, 2025, KinderCare announced Q2'2025 results. Thompson announced enrollment and occupancy "came in below our expectations for the quarter[,]" with same-center occupancy decreasing by 130 basis points, or "roughly 1 to 2 children per center across our portfolio." Ex. 8 at 6. He explained KinderCare "d[id] not believe there is 1 specific headwind or industry dynamic driving this overall, but that the issue is more center level and local

market specific." *Id.* After a first-quarter enrollment decline, KinderCare "initiated course corrective actions" and soon saw "normalization in week-to-week trends[.]" *Id.* at 8. Amandi stated he expected same-center occupancy to be "down year-over-year in both Q3 and Q4" with a full-year decrease of "approximately 1% to 1.5%," and that while KinderCare "d[id] not plan to provide quarterly direction to occupancy regularly," they "felt additional color would be helpful" given "abnormalities we've seen to year-to-date." *Id.* at 9.

## III.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To determine whether allegations are "plausible," a court should first "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," then assume the truth of well-pled allegations and "determine whether they plausibly give rise to an entitlement to relief." *Eclectic Props. v. Marcus & Millichap*, 751 F.3d 990, 995-96 (9th Cir. 2014); *see In re Century Aluminum Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("[P]laintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true in order to render plaintiffs' allegations plausible."). Where a complaint "pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Eclectic Props.*, 751 F.3d at 996. Courts may also consider matters subject to judicial notice and documents incorporated by reference in the complaint. *Wochos v. Tesla*, 985 F.3d 1180 (9th Cir. 2021).

To state a claim under Sections 11 and 12(a)(2), Plaintiffs must allege the Offering Documents either contained a false statement of material fact or omitted a material fact necessary to make the statements therein not misleading **when made**. 15 U.S.C. §§77k(a), 77*l*(a)(2); *see In re BioAge Labs Sec. Litig.*, 2025 WL 3038991, at *2, 4 (N.D. Cal. Oct. 30, 2025) ("Section 11 does not create liability whenever an issuer withholds material information from the market."). The statements must be "read in light of all the information then available to the market." *Sneed v. Talphera*, 147 F.4th 1123, 1131 (9th Cir. 2025). This includes "all [the] surrounding text, including hedges [and] disclaimers." *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). The statement or omission must also be **material**—*i.e.*, it must have "affirmatively led [p]laintiffs in a wrong direction," rather than "merely omitted to discuss certain matters." *Ng v. Berkeley Lights*, 2024 WL 695699, at *8 (N.D. Cal. Feb. 20, 2024).

## IV.    ARGUMENT

The AC fails to state a claim for multiple reasons. First, it fails to satisfy Rule 8 because it is a puzzle pleading (Section A). Second, it fails to plead any material misstatement or omission for the four challenged categories of statements: health, safety, and regulatory compliance (Section B); employee engagement and staffing (Section C); operating strategies (Section D); and risk disclosures (Section E). Third, there is no omission of required disclosures under Items 303 or 105 of Regulation S-K (Section F). Finally, it fails to plead that the Individual Defendants were statutory sellers (Section G).

### A.    Plaintiffs' Puzzle Pleading Fails to Meet Rule 8's Pleading Standards

Plaintiffs have "the responsibility to craft a clear and concise complaint." *Mendoza v. HF Foods*, 2021 WL 3772850, at *12 (C.D. Cal. Aug. 25, 2021). The AC does the opposite, creating a puzzle of mismatched allegations and challenged statements to piece together.

*First*, Plaintiffs allege all statements within a category are false for the same reasons, without differentiating among statements. For example, the AC lists ten statements about health, safety, and regulatory compliance, ¶¶109-13, followed by a single paragraph alleging all ten were misleading for the exact same reasons. ¶116. But the statements are not uniform. They span a range of distinct topics—from the rigor of KinderCare's safety standards and procedures, to its employee training processes, to its investments in curriculum, to its regulatory compliance. ¶¶109-13. Thus, Plaintiffs' generic and undifferentiated falsity allegations fail to satisfy notice pleading. *Lu v. Align Tech.*, 417 F.Supp.3d 1266, 1274 (N.D. Cal. 2019) (dismissing puzzle-pled complaint that "fail[ed] to comply with Rule 8's requirement of a short and plain statement of the claim"); *Solar Integrated Roofing v. Massey*, 2024 WL 4152380, at *3 (S.D. Cal. Sep. 11, 2024) (complaint puzzle-pled under Rule 8 where it "forc[ed] the defendants and/or court to sort out the alleged statements and match them with the corresponding alleged facts").

*Second*, Plaintiffs fail to match their allegations to the challenged statements. For example, for the first ten challenged statements, Plaintiffs cross-reference three subsections (regulatory violations, other lawsuits, and FE accounts) spanning 124 paragraphs. But Plaintiffs do not explain which allegations from those subsections purportedly render which of the statements false, "plac[ing] the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting plaintiffs' claims," and creating "an unwelcome and wholly unnecessary strain on defendants and the court." *Abady v. Lipocine*, 2023 WL 2938210, at *12-13 (D. Utah Apr. 13, 2023) (noting this failed to comply with both Rule 8 and the PSLRA); *see also In re Cisco Sys. Sec. Litig.*, 2013 WL 1402788, at *6 (N.D. Cal. Mar. 29, 2013)

("[I]t is Plaintiffs', not Defendants' burden, to identify the misleading statement and link each one to the facts that establish that the statement was false or misleading when made.").[3]

This pleading failure, alone, warrants dismissal. However, as discussed below, repacking these same allegations in a more coherent manner will not save Plaintiffs' claims as to any category of challenged statement or omission. *Infra* Parts IV.B-F.

### B.     Statements about Compliance with Safety Standards and Government Regulations Are Not Actionable

Plaintiffs challenge ten statements about KinderCare's compliance with safety standards and government regulations. ¶¶109-13. None is actionable.

#### 1.     Six challenged statements are inactionable puffery

To be misleading, a statement "must be capable of objective verification." *Weston Fam. P'ship v. Twitter*, 29 F.4th 611, 619 (9th Cir. 2022). "[P]uffing—expressing an opinion rather than a knowingly false statement of fact—is not misleading." *Id.* That is because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

Here, six challenged statements are inactionable puffery under the securities laws:

- "We ***hold sacred*** our responsibility to protect and nurture the children in our care. Our ***rigorous safety standards*** across all classrooms are reinforced by ongoing training and measurement tools." ¶109.

- "We maintain ***rigorous health and safety standards*** within all our classrooms across our over 2,400 centers and sites." ¶110.

- "We consistently adhere to ***strict procedures*** across all of our centers to provide a healthy, safe environment for our children and our workforce and to deliver confidence and peace of mind to families." *Id.*

---

[3] Plaintiffs *do* match allegations to specific challenged statements in §IV.D.3.a of the AC, and, in doing so, reveal their allegations address only three of the seven statements they purportedly challenge. *Infra*, Part IV.D.

- "We employ ***robust practices*** that support the overall well being of the children we serve, as well as our employees and staff." *Id.*

- "The health and safety of children and our employees continues to be a ***top priority***." *Id.*

- "Our teachers and center staff undergo ***extensive training*** on mental and emotional health and safety practices to provide a safe environment for children and confidence and peace of mind for parents." *Id.*

The notion that such statements could be "measured for compliance…is simply untenable." *Retail Wholesale & Dep't Store Union v. H.P.*, 845 F.3d 1268, 1276 (9th Cir. 2017). Accordingly, courts routinely hold that such statements are inactionable puffery under the securities laws and dismiss them at the pleading stage. *E.g.*, *Waswick v. Torrid*, 2024 WL 3740052, at \*7 (C.D. Cal. July 23, 2024) ("***rigorous*** discipline" was puffery); *Bhangal v. Hawaiian Elec.*, 2024 WL 4505465, at \*12 (N.D. Cal. Oct. 15, 2024) ("***strong safety culture***" and "***safety is of paramount importance***" were puffery); *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin.*, 2010 WL 1332574, at \*8 (S.D. Fla. Mar. 30, 2010) ("***strict***," "***stringent***," and "***strong***" standards were puffery); *In re Intel Sec. Litig.*, 2019 WL 1427660, at \*9 (N.D. Cal. Mar. 29, 2019) ("***robust***" security measures was puffery); *Barnes v. Edison Int'l*, 2021 WL 2325060, at \*9 (C.D. Cal. Apr. 27, 2021) ("[s]afety is the company's ***top priority***" was puffery); *In re Intrexon Sec. Litig.*, 2017 WL 732952, at \*3 (N.D. Cal. Feb. 24, 2017) ("***extensive***" was puffery); *In re Norfolk S. Bond/Note Sec. Litig.*, 2025 WL 641089, at \*3 (S.D.N.Y. Feb. 27, 2025) ("***safety is a way of life***" and "core to our business strategy" was puffery).

### 2. No well-pled facts support falsity for any challenged statement

Plaintiffs allege no facts that *any* of the ten statements in this category was false or misleading when made, including the statements that "[c]enter directors regularly provide safety training to their teachers and staff," KinderCare "make[s] investments in [its] curriculum," "teachers and center staff participate in an onboarding program," and KinderCare "do[es] not expect the costs of continuing to comply with applicable laws and regulations to have a material

effect on [its] business." ¶¶110, 113. To plead falsity, Plaintiffs must show each statement contained "an omission or misrepresentation…[that] was material, that is, it would have misled a reasonable investor." *In re LexinFintech Sec. Litig.*, 2021 WL 5530949, at *16 (D. Or. Nov. 24, 2021). Yet Plaintiffs fail to meaningfully engage with the substance of the actual statements. Plaintiffs do not allege, for example, that KinderCare lacked regular safety training, did not make investments in curriculum, or did not have an onboarding program.

Moreover, statements "must be read in the context of the whole document and judged based on the facts as they existed when the applicable registration statement became effective." *In re Restoration Robotics Sec. Litig.*, 417 F.Supp.3d 1242, 1257 (N.D. Cal. 2019). An omission that renders a statement misleading "in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Omnicare*, 575 U.S. at 190. And context is critical. KinderCare did not baldly refer to unidentified safety standards or training—it explained precisely what it meant. Take, for example, statements that "[w]e employ robust practices that support the overall well being of the children we serve, as well as our employees and staff," "[w]e maintain rigorous health and safety standards…," and "[c]enter directors regularly provide safety training to their teachers and staff..." ¶110. These are the lead-in to a section detailing specific protocols:

> Twice a month, teachers and children participate in disaster drills, including fire, active threat, earthquake and tornado scenarios among others. Several times daily, we conduct name-to-face roll calls to ensure all children are safe and accounted for and building access is restricted to only authorized family members…New teacher onboarding includes comprehensive safe sleep training and all center teachers attend annual training…Our menus are intentionally designed by a registered dietitian...Additionally, our curriculum includes content on physical or motor development and wellness…Our exclusion for illness policy requires children and employees to remain out of our centers until they are fever free for 24 hours…

Ex. 1 at 123.[4] Plaintiffs do not allege that *any* of those cited practices did not occur. Instead, they suggest that inspection reports, other lawsuits against KinderCare, and anonymous FE accounts show KinderCare was not truly committed to health and safety.[5] But viewed against the "surrounding text," and "tak[ing] into account the customs and practices of the relevant industry," *Omnicare*, 575 U.S. at 190, none of Plaintiffs' allegations shows *any* challenged statement was materially false or misleading when made. *See Sneed*, 147 F.4th at 1131 ("[c]ontext matters" when evaluating potential to mislead).

    ***Inspection reports.*** Plaintiffs claim they identified a total of 1,982 violations from 1,181 inspection reports over nine months. ¶122. By Plaintiffs' own admission, these reports were publicly available going back years prior to the IPO, ¶119, and KinderCare thus cannot be liable for failing to disclose the publicly available information in them. *See In re PG&E Corp. Sec. Litig.*, 806 F.Supp.3d 962, 1006 (N.D. Cal. 2025); *Haping v. 17 Educ. & Tech.*, 2023 WL 8716895, at *11-12 (S.D.N.Y. July 20, 2023), *report and recommendation adopted on other grounds*, ECF 73 (Nov. 8, 2023) (no material nondisclosure when information was in public domain, even when prospectus urged investors not to consider outside information). Instead, Lead Counsel aggregates these publicly available reports and applies its own "analysis" to suggest that they paint a picture of some larger undisclosed failure at the Company. Far from material, however, this figure is quite small in context: as of the IPO, KinderCare had over 2,400 locations, 42,000 teachers and staff, and 148,000 kids under care. *Supra*, Part II.A. Thus, this amounts to *less than one violation per center* over the nine months preceding the IPO. Drilling deeper, Plaintiffs parse the violations by subcategories, which demonstrates nearly half

---

[4] This same disclosure provides context for the other challenged statements. ¶¶109-13.

[5] Some complaints and opinions refer, instead, to confidential witnesses (CWs) or confidential informants (CIs), which are subject to the same pleading requirements as FEs.

are *unrelated* to health or safety. *See* ¶122 (alleging 900 hiring, training, and screening violations). Thus, Plaintiffs' alleged violations impacting health and safety (the main focus of these challenged statements) drop to 1,082, ***less than one percent*** of kids under care. And when put into perspective against daily interactions (148,000 kids under care on a daily basis over nine months), the percentage of violations drops to 0.004% (meaning ***99.996% of daily interactions resulted in no incidents***). As to training (the other focus of the challenged statements), Plaintiffs identify only 400 violations total, which is ***less than one percent*** of teachers and staff.[6] ¶295. Plus, Plaintiffs provide no comparable figures for KinderCare's competitors—information necessary to assess whether KinderCare's health and safety statements were materially misleading to a reasonable investor, taking into account the industry and scope of operations. *Omnicare*, 575 U.S. at 190. They were not.

**Lawsuits.** Plaintiffs cite 26 lawsuits over seven years that purportedly allege health and safety violations. ¶165. But not one of the cases cited has resulted in a judicial finding. They are only *allegations* of wrongdoing, and "federal securities laws do not impose upon companies a duty to disclose uncharged, unadjudicated wrongdoing." *In re Progenity Sec. Litig.*, 2023 WL 4498502, at *13 (S.D. Cal. July 12, 2023); *see Veal v. LendingClub*, 423 F.Supp.3d 785, 811 (N.D. Cal.

---

[6] Even these contextually immaterial numbers are meaningless without any explanation of what was included in or excluded from the analysis, leaving the Court with unverifiable numbers devoid of analytical foundation. Indeed, Plaintiffs admit the reports contain both trivial and nontrivial violations, yet they left classification of "nontrivial" solely to "the reviewing attorney's judgment." ¶¶120-21. And although Plaintiffs purport to provide an example of "trivial" matters—*i.e.*, "failure to comply with building codes or to update feeding logs"—even that is caveated to note that this trivial matter *was* counted if Lead Counsel deemed it "noteworthy." ¶121. Plaintiffs further concede it was not *one* attorney's judgment, but rather a "team of attorneys." *Id.* Yet they provide no details about this team's expertise (if any) regarding state-specific regulations or how they uniformly applied their judgment across 40 different states with different rules, regulations, and reporting regimes. *See Baker v. SeaWorld Ent.*, 423 F.Supp.3d 878, 910-13 (S.D. Cal. 2019) (rejecting "empirical analysis" based on "evidence hand selected by Plaintiffs' counsel" with no showing they "applied the empirical analysis methodology in an accepted and systematic way").

2019). Plus, half were filed *after* the IPO, so they cannot show any statement was false "*when made.*" *Norfolk Cnty. Ret. Sys. v. Solazyme*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016).

     ***FE accounts and Reddit users.*** The last category of allegations comes from FE accounts and unidentified Reddit users. ¶¶191-241. Before crediting FE allegations, the Court must assess whether the FEs were in a position to have personal knowledge of the facts attributed to them. *See In re Talis Sec. Litig.*, 2022 WL 17551984, at *12 (N.D. Cal. Dec. 9, 2022) (rejecting, under Rule 8, "FE allegations that are conclusory, state opinions without factual support, sometimes based on vague hearsay and rumors, and are often vague or silent as to time period"). None was.

     No FEs held roles that offered insight into companywide operations: FE-1's last position was limited to "15 to 18 centers"; FE-2's pre-IPO role was limited to negotiating and renewing contracts for the At Work division, not managing ECE centers; FE-3's roles were limited to three centers in Virginia and D.C.; FE-4 worked at one unspecified Texas facility; FE-5 worked at one unspecified center in "the Northeast"; and FE-6 worked in "a sales position" in the Midwest, focusing on partnerships with ten local school districts. ¶¶73-78. Courts routinely reject, as a matter of law, such attempts to extrapolate localized observations to nationwide conditions. *See Talis*, 2022 WL 17551984, at *28 (rejecting FE allegations about matters outside role); *Mazzaferro v. Aruba Networks*, 2015 WL 456534, at *2 (N.D. Cal. Feb. 2, 2015) (witness statements were localized, reflecting individual experiences, and "d[id] not support an inference" as to nationwide market); *In re Metawave Sec. Litig.*, 629 F.Supp.2d 1207, 1216 (W.D. Wash. 2009) (discounting FE allegations that provided "no indication as to [FE's] seniority or position in the hierarchy of the company, and thus no confirmation that [FE] was actually in a position to see and evaluate all of the data"); *McGovney v. Aerohive Networks*, 367 F.Supp.3d 1038, 1053 (N.D. Cal. 2019) (isolated and local FE allegations did not support allegations about companywide issues).

Additionally, no FE allegation supports falsity. They focus primarily on what the FEs viewed as unfair budget and hiring constraints, workarounds to comply with ratio requirements, or unrelated job complaints. *E.g.*, ¶¶194-95, 198, 200-01, 213, 216, 227-30 (budget and hiring constraints); ¶¶192-93, 198, 202-04, 214, 221 (workarounds to maintain compliance); ¶196 (complaining directors were expected to spend an hour a day on growth); ¶197 (complaining bonuses were tied to enrollment goals). At most, these allegations demonstrate dissatisfaction with management's policies. But "managerial shortcomings, however costly, do not in themselves amount to actionable fraud under federal securities law." *Fialkov v. Microsoft*, 72 F.Supp.3d 1220, 1234 (W.D. Wash. 2014).

Digging into the FEs' allegations further undercuts their support.

FE-5 complains she was not given funds to hire more teachers but admits her center had only eight kids. ¶201. She also bemoans that her center was rated on cleanliness, as though that somehow undermined health and safety. ¶205. FE-5's only pertinent allegation is that a center in Missouri unknowingly hired a sex offender. ¶206. But FE-5—who worked at an unspecified center "in the Northeast," not Missouri—concedes this was because that information was not included in that state's background check, *not* because KinderCare failed to perform a background check. ¶206. Thus, this unfortunate incident did *not* result from any screening failure by KinderCare. And FE-5 further admits this same situation happened at her current (non-KinderCare) employer. *Id.*

FE-4 criticizes staffing levels but never claims KinderCare violated ratio requirements. ¶¶212-14. Instead, she complains Texas ratios are too lenient and she wanted more teachers than required. *Id.* That does not support falsity.

FE-2 claims "KinderCare lost several clients" because of health and safety problems. ¶211. But she does not say how many, who, when, or what the specific problems were. *See Talis*, 2022

PAGE 19 - KINDERCARE DEFENDANTS' MOTION TO DISMISS

WL 17551984, at *12 (rejecting "conclusory" FE allegations); *Fadia v. FireEye*, 2016 WL 6679806, at *13 (N.D. Cal. Nov. 14, 2016) (rejecting FE allegations with no "concrete and readily verifiable figures or explanations").

FE-3 also claims "there was a connection between the staffing problems and health and safety issues." ¶219. But, like FE-2, she provides no "specific facts." *Talis*, 2022 WL 17551984, at *15; *see also In re Metawave Sec. Litig.*, 298 F.Supp.2d 1056, 1070 (W.D. Wash. 2003) ("[A] shared opinion among confidential witnesses does not necessarily indicate either falsity or scienter if the allegations themselves are not specific enough."). Further reading reveals she is merely speculating: "in FE-3's view," these problems "***could*** cause safety issues." ¶222; *see In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) ("mere rumor and speculation" do not suffice). FE-3 also claims directors and teachers were "not qualified," ¶217, but again provides no facts—did they lack degrees, credentials, experience? And FE-3 contradicts herself, admitting "all KinderCare employees" go through the "First 100 Days" training and "teachers and staff" have "child safety training." ¶220; *see Osher v. JNI*, 302 F.Supp.2d 1145, 1159 (S.D. Cal. 2003) (ignoring "inconsistent allegation[s]"). FE-3 also claims she knew of schools being placed on probation but offers no facts—*i.e.*, which schools, when, or why—and she concedes probation can stem from trivial issues like chipped paint. ¶¶223-24. Thus, even if some unidentified number of schools were placed on probation for unspecified periods for unknown reasons, that says nothing about companywide safety as of the IPO. *Hoang v. ContextLogic*, 2023 WL 6536162, at *17 (N.D. Cal. Mar. 10, 2023) (no falsity where Plaintiffs "d[id] not allege facts" relating to the actual statement).

FE-1 claims KinderCare did not hire "qualified staff" because it "did not hire teachers with higher-level education and experience." ¶229. But FE-1 left KinderCare 11 months before the IPO

and thus lacks reliable insight into conditions at the relevant time. ¶73; *see Zucco Partners v. Digimarc*, 552 F.3d 981, 997 (9th Cir. 2009) (employee who "may have had some personal knowledge about the inner workings" of a company during tenure cannot reliably speak to conditions after departure); *Talis*, 2022 WL 17551984, at *18 (claims about conditions during FE's tenure did not permit an inference about conditions after FE left). Regardless, FE-1's allegation is far too vague. FE-1 offers no details on what "higher-level" education or experience means, nor does the AC allege any such credentials were required in all states, undercutting the premise that such individuals were not "qualified." *In re Silicon Storage Tech. Sec. Litig.*, 2007 WL 760535, at *26 (N.D. Cal. Mar. 9, 2007) (rejecting FE allegation that CFO was "not qualified" as "vague and conclusory").[7]

The allegations based on Reddit posts are even further afield. ¶¶236-40. The AC contains no "facts supporting the reliability of the postings." *In re Sotera Health Sec. Litig.*, 2025 WL 1648942, at *5 n.4 (N.D. Ohio Mar. 19, 2025) ("heavily discount[ing]" online statements "purportedly made by former employees"); *see LexinFintech*, 2021 WL 5530949, at *7-8 (rejecting anonymous internet customer complaints); *Ryan v. FIGS*, 2024 WL 187001, at *13 (C.D. Cal. Jan. 17, 2024) (discounting anonymous website statements). Plaintiffs cannot even confirm whether the posts are from actual former KinderCare employees, and, if so, their employment dates and roles. *E.g.*, ¶237 (citing a user "who also *purports* to be a former KinderCare employee"); *see Applestein v.*

---

[7] Several FEs purport to provide insight about what KCLC President Michael Canavin and other senior leadership members knew and understood. *E.g.*, ¶¶212, 222 n.35, 255, 267, 285. But none held positions that involved regular contact: FE-1 was two levels below Canavin; FE-2 was at least four levels below Canavin; FE-3, FE-4, and FE-5 were at least three levels below Canavin, and FE-6 was not even in KCLC's reporting structure. ¶¶73-78. *See Dresner v. Silverback Theras.*, 2023 WL 2913755, at *15 (W.D. Wash. Apr. 12, 2023) (court "unwilling to make these inferential leaps" required to find CWs privy to executive knowledge); *Talis*, 2022 WL 17551984, at *28 (rejecting allegations of executive knowledge absent claim executives "accepted those employees' views").

*Medivation*, 861 F.Supp.2d 1030, 1037 (N.D. Cal. 2012) (complaint "fail[ed] to describe the confidential witnesses with sufficient specificity" when it "d[id] not describe the[ir] job responsibilities"). And no post offers any *facts* undermining the challenged statements; they are nothing more than loaded complaints and unsupported accusations. *E.g.*, ¶236 ("HORRIBLY understaffed"); ¶239 ("KinderCare is trash"). That is insufficient as a matter of law to plead falsity. *See LexinFintech*, 2021 WL 5530949, at *8 ("purely anecdotal" anonymous complaints were unreliable, since "every large company can expect to have some consumer complaints"); *Tarapara v. K12*, 2017 WL 3727112, at *21 (N.D. Cal. Aug. 30, 2017) ("[I]solated complaints by anonymous teachers and parents do[] not show that defendants had contemporaneous facts available that contradicted their generalized statements concerning special education.").

Accordingly, all ten challenged statements within this category should be dismissed.

### C.    Statements about Employee Engagement and Staffing Are Not Actionable

Plaintiffs purport to challenge six statements about KinderCare's employee engagement and staffing. ¶¶242-47. None is actionable.

#### 1.    Every challenged statement is inactionable puffery

All six statements are inactionable puffery. They include laudatory descriptions of KinderCare's (i) workforce—*e.g.*, "***the best*** teachers and centers staff," ¶242; "***exceptional*** talent," *id.*; "a ***motivated, talented*** workforce," ¶247; and (ii) compensation—*e.g.*, "our employees receive ***competitive*** pay," ¶243[8]; "***competitive*** benefits and pay," ¶244; "***competitive*** pay, benefits and training," ¶245; "***competitive*** compensation and benefits packages," ¶246. Courts routinely hold such subjective characterizations inactionable as a matter of law. *See Gavaldon v. Standard*

---

[8] This statement includes one verifiable component—"we began investing in wages by providing standardized annual merit-related increases in wages in 2015." ¶242. But there is no well-pled fact contradicting this claim.

*Chartered Bank*, 2020 WL 835311, at *7 (S.D. Cal. Feb. 20, 2020) ("**best in the business**" was puffery); *3226701 Can. v. Qualcomm*, 2017 WL 971846, at *9 (S.D. Cal. Jan. 27, 2017) ("**exceptional**" was puffery); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser*, 587 F.Supp.3d 56, 89 (S.D.N.Y. 2022) ("**very talented**" employees was puffery); *Milano v. Perot Sys.*, 2006 WL 929325, at *6-7 (N.D. Tex. Mar. 31, 2006) (goal to hire "**highly motivated**" employees was puffery); *Southfield Gen. Emps. Ret. v. Nat'l Vision*, 2024 WL 1376016, at *11 (N.D. Ga. Mar. 30, 2024) ("**pay competitively**" and "**competitive rates**" were puffery).

### 2. One challenged statement also is an inactionable opinion

Only statements of fact are actionable; statements of opinion are not, unless they fall within one of the narrow circumstances identified in *Omnicare*. When Plaintiffs challenge an opinion statement, they face a higher hurdle than when challenging a factual statement. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, 856 F.3d 605, 614-15 (9th Cir. 2017). To state an actionable claim for an opinion, Plaintiffs must plausibly allege the statement is false in one of three ways: (i) the speaker did not actually hold the stated belief; (ii) the opinion contained an embedded false statement of material fact; or (iii) the opinion omitted material facts about the issuer's inquiry or knowledge that conflict with what a reasonable investor would understand from the opinion itself. *Omnicare*, 575 U.S. at 184-86, 194.

The statement "*[w]e believe* we are particularly well positioned to attract talent due to our ability to offer competitive pay, benefits and training," is an opinion. ¶245.[9] There is no allegation

---

[9] The Offering Documents explicitly designated this a forward-looking statement and included meaningful cautionary language, thus protecting the statement under the bespeaks-caution doctrine as well. Ex. 1 at 59; *id.* at 33 ("[W]e may experience difficulty in attracting, hiring and retaining qualified teachers…"); *id.* at 34 ("[F]uture success will depend upon our ability to continue to attract, motivate and retain highly-skilled managerial, sales and marketing, regional and child care and early education center and site director personnel…"); *see In re Infonet Sec. Litig.*, 310 F.Supp.2d 1080, 1088 (C.D. Cal. 2003).

any Defendant did not genuinely believe this statement. While Plaintiffs cite several FE anecdotes about labor concerns raised to management—*e.g.*, ¶285 (FE-4: budget issues discussed at round tables); ¶¶254-55 (FE-2: compensation concerns raised with supervisors and at district meetings)—no FE said management shared those opinions. *See Wochos*, 985 F.3d at 1194 (rejecting FE allegations because plaintiffs "failed to plead any facts showing that [defendant] ever accepted those employees' views"); *Talis*, 2022 WL 17551984, at *26 (rejecting FE allegation where no allegation defendant "ever accepted those employees' views").

There is no embedded false fact. At most, there is an embedded *opinion* or *puffing* statement that KinderCare offers competitive pay. That is inactionable. *Supra*, Part IV.C.1.

And Plaintiffs do not allege KinderCare omitted a material fact going to the basis for this opinion. Nor could they. The Offering Documents detailed why KinderCare believed it could attract talented employees, including its recent wage initiative, revised and expanded training programs, and "revamped" benefits package, including the ability to obtain a valuable credential at no cost. Ex. 1 at 121. The AC disputes none of these facts.

### 3.     No well-pled facts support falsity for any challenged statement

To the extent any of the six statements in this category contained factual representations, Plaintiffs fail to plead falsity. The sole reason Plaintiffs allege these statements were false or misleading is because "KinderCare did not hire and retain qualified staff, including because it did not provide competitive wages and engaged in other practices that systematically alienated quality employees." ¶249. But no allegation—FEs, lawsuits, or inspection reports—supports that sweeping claim.

***FE allegations.*** Plaintiffs rely heavily on FE allegations, ¶¶250-87, yet most are personal opinions and conclusory claims. For example, multiple FEs (FE-1, FE-2, FE-3, and FE-5) claim KinderCare had "problems" with hiring, enrollment, and retention, but they offer no facts to

support these conclusions. ¶¶251, 267, 275, 277, 286. Several FEs (FE-1, FE-3, FE-4) offer their "views" about KinderCare's priorities, without any foundation or basis for those opinions. ¶¶257, 259, 277-78, 282. And some (FE-1, FE-2, FE-3, FE-4) opine that KinderCare's pay was "not competitive," "subpar," or "below market rates," and that "every KinderCare employee…was underpaid," without providing any supporting facts or figures. ¶¶252-53, 255, 258-59, 263, 280-81, 283. These vague, unsupported opinions and conclusions fail to plead falsity. *See In re Weight Watchers Sec. Litig.*, 2016 WL 2757760, at *7 (S.D.N.Y. May 11, 2016) ("characterization or opinion of the witness" is not "an objectively testable statement of fact"); *Talis*, 2022 WL 17551984, at *12 (rejecting "FE allegations that are conclusory [and] state opinions without factual support").

To the extent the FEs *do* provide facts, they are inconsistent, anecdotal, and too thin to support falsity. *See Sayce v. Forescout Techs.*, 2021 WL 1146031, at *5 (N.D. Cal. Mar. 25, 2021) (CW statements unreliable due to contradictions). For instance, FE-3 claims KinderCare paid Virginia teachers minimum wage, but then claims they made "between $9 and $13 an hour." ¶¶275-76. But minimum wage is a single number; if everyone earns it, there is no range. And it cannot be chalked up to pay increases over the years. When FE-3 was hired June 2021, Virginia's minimum wage was $9.50, Ex. 10 at 16—so her claim that teachers made $9 per hour cannot be right if they were paid minimum wage. In 2024, minimum wage was $12, *id*., so teachers earning $13 were *above* minimum wage. And FE-3's opinion that KinderCare's wages were not competitive is unsupported by any facts about competitor pay. *See City of Royal Oak Ret. Sys. v. Juniper Networks*, 880 F.Supp.2d 1045, 1064 (N.D. Cal. 2012) ("Plaintiffs fail[ed] to allege facts that provide an analytical link between the particular facts supplied by the confidential witness and the ultimate conclusion" that the statements were false or misleading.).

FE-4 claims "*all teachers* were hired at the same rate…around $13 per hour," ¶283, directly contradict[ing] FE-3's $9-$13 range, ¶276. *See Applestein*, 861 F.Supp.2d at 1038 (discounting CWs that "directly contradicted" one another). Moreover, in 2022, when FE-4 joined KinderCare, the minimum wage in Texas (where FE-4 worked) was $7.25, Ex. 10 at 16, so even accepting her allegations, KinderCare paid almost *twice* minimum wage in that state. And like FE-3, FE-4 provides no facts about competitor pay.

FE-1 creates more inconsistency. She addresses the Indianapolis market for 2021-2023, ¶260—though the AC never alleges she worked there. ¶73. In any event, Indiana's minimum wage during that time was $7.25, Ex. 10 at 14, yet FE-1 claims KinderCare paid at least one teacher $14.25 per hour.[10] ¶260. FE-1 claims this was not competitive because "market pay for a high-quality teacher there was approximately $15 per hour." *Id*. But FE-1 provides no source for this purported knowledge. Nor does FE-1 state that the teacher who made $14.25 was "high-quality"—whatever that means. *In re SolarCity Sec. Litig.*, 274 F.Supp.3d 972, 999 (N.D. Cal. 2017) (dismissing complaint where CWs offered no "allegations as to what 'low quality' means").

None of these isolated, inconsistent, local anecdotes demonstrates that KinderCare's nationwide compensation was not competitive.

The FEs' other "factual" allegations fare no better and, in any event, are unrelated to the challenged statements. For example, FE-1, FE-2, FE-3, and FE-5 complain about "problems" with teacher turnover and retention. ¶¶255, 258, 277, 286. But none disputes the Offering Documents' statistics that KinderCare's tenured-teacher retention rate was 85% as of June 29, 2024, and had increased by 21% since 2021. Ex. 1 at 121. Similarly, FE-1, FE-2, and FE-4 describe "round table"

---

[10] The allegation is not clear as to whether FE-1 is addressing a cap on teacher pay generally, or on a specific teacher's pay—the AC suggests the latter ("pushed to cap *the teacher's* pay"). ¶260.

meetings where issues purportedly were raised to Canavin. ¶¶251, 254-55, 266, 284. But no FE claims to have attended these meetings, and thus they lack firsthand knowledge. *See Metawave*, 629 F.Supp.2d at 1215 ("Plaintiffs must still provide details on each [FE's] basis for knowledge of the facts.").

*Lawsuits.* Plaintiffs rely on an October 2023 settlement with the Massachusetts Attorney General and four lawsuits alleging labor code violations. ¶¶289-93. None supports falsity. The settlement concerned missed meal breaks, recordkeeping lapses, and staffing ratios at some Massachusetts centers, not KinderCare's wages relative to competitors, hiring strategy, or culture. Ex. 9 at 2-3. The lawsuits also do not address those issues. Plus, all four were filed after the IPO, and none has been adjudicated. ¶¶289-93; *Solazyme*, 2016 WL 7475555, at *3; *Veal*, 423 F.Supp.3d at 811.

*Inspection reports.* Plaintiffs again cite inspection reports without proper context. They tally 400 violations related to training, 300 related to background checks, and 200 related to qualifications. ¶295. When measured against KinderCare's 42,000 teachers and staff, however, these incidents involved *0.95%*, *0.7%*, and *0.5%* of personnel, respectively. While KinderCare strives to ensure perfect compliance and documentation, this contextually small number of violations cannot render the challenged statements *materially* false or misleading.

The lack of substance about these incidents further strips them of utility. Plaintiffs never explain what they deem "appropriate training," what renders a background check "incomplete," or which qualifications were missing. That is fatal, as the very databases Plaintiffs cite show regulatory violations can arise from failure to properly document background checks or training, or even from not having the relevant documents "on site" and available for inspection—even if the underlying checks and training were up to date. *See, e.g.*, 606 CMR §7.04(4)-(5), (18)(d) (MA).

Thus, Plaintiffs' mere "count" of violations cannot show any challenged statement was materially false or misleading.

Accordingly, all six challenged statements within this category should be dismissed.

**D.      Statements about KinderCare's Operating Strategy Are Not Actionable**

Plaintiffs purport to challenge seven statements about KinderCare's operating strategy. ¶¶298-304. But their own paragraph identifying the reasons for falsity, ¶305, addresses only three: (i) "We have a strong track record of improving occupancy rates across our portfolio," ¶298; (ii) "We believe we are well positioned to continue to increase same-center revenues through our multi-pronged strategy of occupancy improvement," ¶301; and (iii) "Our 4th and 5th quintile centers have an embedded growth potential within our portfolio supported by our demonstrated success at driving occupancy improvement," ¶300. None is actionable.

**1.      Every challenged statement is inactionable puffery**

Every challenged statement in this category—including those Plaintiffs omit from their falsity allegations—is inactionable puffery. They include, for example, statements that KinderCare has "***robust*** operational performance," ¶303; is "***well positioned***" to increase same-center revenues, ¶301; implements "***best practices***," ¶¶299, 303; has a "***strong track record*** of improving occupancy rates across [its] portfolio," ¶298; has "embedded ***growth potential***" in lower-performing centers, ¶300; and that OneCMS "***accelerate[s] the rapid adoption***" of KinderCare policies at newly acquired centers. ¶304. None is a verifiable statement of fact. Rather, they are vague, subjective, and optimistic characterizations that courts routinely dismiss at the pleading stage. *See Farhar v. Ontrak*, 714 F.Supp.3d 1198, 1209-10 (C.D. Cal. 2024) ("***robust*** pipeline" and "***well positioned***" were puffery); *In re Am. Apparel S'holder Litig.*, 855 F.Supp.2d 1043, 1072-73 (C.D. Cal. 2012) ("maintaining ***best practices***" was puffery); *Barilli v. Sky Solar*, 389 F.Supp.3d 232, 244, 250-51 (S.D.N.Y. 2019) ("***proven track record***" was puffery); *Norfolk S.*, 2025 WL

641089, at *7 ("*sustainable*" improvements was puffery); *Gammel v. H.P.*, 905 F.Supp.2d 1052, 1071 (C.D. Cal. 2012) ("*accelerate the long-term growth*" was puffery); *Fadia*, 2016 WL 6679806, at *7 ("integration is progressing *rapidly*" was puffery); *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *5 (N.D. Cal. Mar. 29, 2016) ("*rapidly* integrate" was puffery).

### 2.    Two challenged statements are inactionable opinions

Two statements—including one omitted from Plaintiffs' falsity allegations—are also inactionable opinions, reflecting KinderCare Defendants' subjective beliefs about KinderCare's positioning and strengths. ¶301 ("*We believe* we are well positioned…"); ¶303 ("*We believe* the following are our core strengths…"). Plaintiffs fail to plead falsity under any prong of *Omnicare*: They identify no facts suggesting that KinderCare Defendants did not sincerely hold these beliefs (prong one), no embedded false facts (prong two), and no omissions about the basis for KinderCare Defendants' beliefs that would render these opinions misleading in context (prong three).

### 3.    No well-pled facts support falsity for any challenged statement

Even assuming any statement could be construed as a factual representation, Plaintiffs fail to show any such representation was false or misleading when made.

*First*, Plaintiffs contend statements about "demonstrated success" and a "strong track record" of occupancy growth were misleading because KinderCare had "relatively flat" enrollment and occupancy for Q3'24. ¶305(a). But Q3 was still in progress when the Offering Documents were issued, so KinderCare could not have disclosed these results at that time. The Offering Documents did, however, disclose that same-center occupancy for the first half of 2024 *decreased* by 1.5% compared to the same period the year before, and that occupancy at the lowest performing centers decreased over the past five years. Ex. 1 at 75. Thus, there was no omission. *Hoang*, 2023 WL 6536162, at *11 (no falsity where "Registration Statement disclosed the information Plaintiffs claim was omitted").

*Second*, Plaintiffs claim statements about KinderCare's "strong track record" and "strategy of occupancy improvement" were misleading because KinderCare pursued occupancy growth without regard for safe operations. ¶305(b) (citing FE allegations, inspection reports, and a training document). As discussed above, neither the FE anecdotes nor inspection-report "analysis" establishes falsity. *Supra* Part IV.B.2. And Plaintiffs' reliance on the statement in KinderCare's "First 100 Days" training material—that "one out of 11 families withdrew their child within two weeks" of a child-unattended incident—fares no better. Using Plaintiffs' own analysis, the 217 child-unattended incidents identified translates to under 20 withdrawals—a 0.014% (***14 one-thousandths of 1 percent***) decrease in enrollment. ¶13. That figure hardly renders statements about KinderCare's "strong track record" and growth "strategy" *materially* false or misleading.

*Third*, Plaintiffs' claim that KinderCare identified "approximately 150 underperforming centers" only reinforces the statement that lower-quintile centers had "embedded growth potential." ¶305(c). Recognizing and improving such centers is what the Offering Documents described. *See* Ex. 1 at 101-02; *Emps.' Ret. Sys. v. Williams Cos.*, 889 F.3d 1153, 1165 (10th Cir. 2018) (affirming dismissal where conduct was "entirely consistent" with representations).

Accordingly, all seven challenged statements within this category should be dismissed.

### E.     KinderCare's Risk Disclosures Were Not Misleading

Plaintiffs allege three risk disclosures addressing noncompliance with safety regulations, adverse publicity, and hiring and training staff were misleading because the risks had already materialized. ¶¶306-16. This claim also fails.

*First*, "not every…risk disclosure necessarily implies that the event which could create a risk has not occurred to any extent." *In re AppHarvest Sec. Litig.*, 684 F.Supp.3d 201, 267 (S.D.N.Y. 2023); *accord HRSA-ILA Funds v. Adidas*, 745 F.Supp.3d 1127, 1141 (D. Or. 2024) (risk disclosure not misleading where it "did not contain language implying" risk had not

occurred), *aff'd*, 2025 WL 3471703 (9th Cir. Dec. 3, 2025). "A risk disclosure may just be what it purports to be—an identification by the issuer of the type of facts and events that could make the investment risky and not necessarily a representation one way or the other regarding whether the event has occurred to the extent that it presents a risk." *AppHarvest*, 684 F.Supp.3d at 267-68. Furthermore, the reasonable investor "takes into account the customs and practices of the relevant industry." *Omnicare*, 575 U.S. at 190.

That principle is dispositive here. As of the IPO, KinderCare employed 42,000 staff and teachers and served more than 148,000 kids across 2,400 centers in 40 states, each with its own regulatory scheme. No reasonable investor would believe a company operating at this scale for over 50 years had never faced a regulatory violation, negative publicity, or staffing challenges. *See Cao v. Uber Techs.*, 2024 WL 2853968, at *2 (N.D. Cal. May 14, 2024) (a statement that "itself presumed" a factual predicate was true could not be misleading). Indeed, this is exactly how similarly situated companies disclose risk. For example, McDonald's warns "[c]onsumer perceptions may [] be affected by adverse commentary," it is "subject to legal proceedings that may adversely affect our business," and "business could also be impacted by business incidents or practices…if they receive considerable publicity or result in litigation or governmental investigations or proceedings." Ex. 11 at 4-5. No reasonable investor would read these disclosures and believe that McDonald's has never had regulatory citations or lawsuits; they understand that such occurrences are inherent in operating a sprawling, heavily regulated business, and only those events that are material need to be disclosed.

*Second*, contrary to Plaintiffs' claims, the Offering Documents **did** disclose that certain risks had occurred in the past. They stated KinderCare has been "subject to litigation and regulatory proceedings"; that "[t]hese proceedings **have included**…governmental investigations and other

proceedings and allegations of inappropriate, illegal or harmful acts to children at our child care centers or sites or through a third-party provider"; that "*[w]e are [and] have also from time to time been*…subject to claims and matters alleging negligence, inadequate supervision, illegal, inappropriate, abusive or neglectful behavior, health and safety, or other grounds for liability"; and that "[a]ny such proceeding could damage our reputation," including by causing "adverse publicity, which could result in loss of enrollment[.]" Ex. 1 at 40, 57. Thus, "the risk disclosures did not falsely portray" regulatory violations and claims "as merely a risk rather than something that had already happened"; instead, KinderCare "specifically alerted investors" that "the company had faced" these risks in the past. *AppHarvest*, 684 F.Supp.3d at 269.

*Third*, despite sweeping rhetoric, the AC identifies *only three* instances—across over 50 years and 2,400 facilities—of license revocations, suspensions, or probation, ¶¶147, 149, 152, and only *three* specific examples of adverse press, two of which overlap with centers suspended or on probation, ¶¶149, 152, 162. Plaintiffs plead no facts suggesting that the omission of those four events (even assuming additional instances exist) would render the risk disclosures materially misleading. *See Elliott v. Edison Int'l*, 2026 WL 636708, at *8 (C.D. Cal. Mar. 6, 2026) (failure to disclose that safety measure could not be used on 5 out of 38 transmission lines would not "significantly alter[] the total mix of information made available"). Instead, KinderCare was generally disclosing "the types of risks inherent to businesses similar to [KinderCare] and in generic term." *AppHarvest*, 684 F.Supp.3d at 268-69.

*Finally*, Plaintiffs claim risk disclosures related to KinderCare's "ability to hire and retain qualified teachers and maintain strong employee engagement" were misleading because KinderCare "severely understaffed its facilities" and "did not appropriately hire and retain" staff. ¶¶314-15. Their only support is "FE accounts of KinderCare being unable to hire and retain

qualified staff due to noncompetitive wages." ¶316. No particular FE allegation is cited, with good reason—no FE's allegations are credible or well-founded on this point. *See* Part IV.C.3. Moreover, the Offering Documents' undisputed facts contradict this allegation: KinderCare uses a "research-based, data-driven selection tool" developed in partnership with Gallup to "assess[] candidates for the core traits of [its] highest-performing teachers" and has invested in a wage initiative across the country. As a result of these and other efforts, tenured-teacher retention increased "21% between 2021 and June 29, 2024…reaching *85%* as of June 29, 2024." Ex. 1 at 120-21.

Accordingly, all three challenged statements within this category should be dismissed.

### F.    Plaintiffs Fail to Plead an Omission under Items 303 or 105

Unable to plead any misleading statements, Plaintiffs attempt to repackage their deficient theories as omissions under Items 303 and 105.[11] This, too, fails.

*No Item 303 violation.* Item 303 requires disclosure of "known trends or uncertainties" reasonably expected to "have a material…unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). Plaintiffs claim the Offering Documents failed to disclose trends in regulatory violations, staffing deficiencies, and underperforming centers. ¶319. But the AC pleads no facts to support that any such trends existed.

As to regulatory violations, even taking Lead Counsel's subjective categorizations at face value, *supra* n.6, citations dispersed across hundreds of facilities in dozens of jurisdictions—amounting to less than one report per center in the nine months preceding the IPO—do not establish a recognized, companywide adverse trend, let alone one that would "have a

---

[11] To the extent Plaintiffs rely on alleged Item 303 and 105 omissions to support their §12 claim, that fails as a matter of law. Pure omissions are not actionable under §12. *See Lilien v. Olaplex*, 765 F.Supp.3d 993, 1020 (C.D. Cal. 2025) ("omitting a material fact…in a prospectus does not violate Section 12").

*material*…unfavorable impact" on KinderCare's business. *Fresno Cnty. Emps.' v. Alphatec*, 607 F. App'x 694, 695 (9th Cir. 2015). And Plaintiffs allege nothing about incidents outside that time period—*i.e.*, no baseline to measure the cited incidents against—making it impossible to suggest this reflected a developing adverse trend rather than ordinary compliance issues. *See Lamontagne v. Tesla*, 2024 WL 4353010, at *16 (N.D. Cal. Sep. 30, 2024) (accidents over a four-year period did not sufficiently allege a "pattern or trend requiring disclosure as opposed to isolated incidents").

The same deficiency infects the staffing allegations. Plaintiffs quote FE snippets about hiring and training at particular centers, but these anecdotal, center-specific accounts do not establish that management identified staffing deficiencies as a known, companywide trend.

Finally, the bare allegation that, around the time of the IPO, KinderCare identified "approximately 150 underperforming centers," without more, does not amount to a known adverse trend. ¶319(c). Plaintiffs offer no facts indicating this was anything more than a company continually trying to improve its operations. *Williams*, 889 F.3d at 1165.

***No Item 105 violation.*** Plaintiffs assert in a single paragraph that the Offering Documents omitted information about risks from regulatory violations, staffing deficiencies, and underperforming centers that were "already in existence" at the IPO. ¶321. This fails for the same reasons that Plaintiffs' challenge to the risk disclosures fails. *Supra*, Part IV.E. It also fails because "mischaracterizing a past harm as a future risk cannot, standing alone, violate Item 105." *Sodha v. Golubowski*, 154 F.4th 1019, 1042 (9th Cir. 2025). Here, the Offering Documents disclosed the risks regarding compliance with health and safety standards, employee engagement and staffing, and operating strategies that Plaintiffs claim were omitted. *Supra*, Part II.B. Thus, even if KinderCare had not adequately disclosed past events (it did), it "adequately disclosed the factors making the investment speculative or risky" and thus did not violate Item 105. *Sodha*, 154 F.4th at 1042.

**G.    The Section 12(a)(2) Claim Should be Dismissed for All Individual Defendants**

Section 12 liability extends only to "statutory sellers"—those who either directly passed title to the securities, or directly and actively solicited the purchase out of a desire to serve their own financial interests or the interests of the securities' owner. *Pinter v. Dahl*, 486 U.S. 622, 642, 647, 650 (1988). "Mere participation" by those "collateral to the offer or sale" is insufficient. *Id.* at 650.

Plaintiffs have not met these standards. There is no allegation that *any* Individual Defendant's involvement exceeded mere participation in the IPO roadshow, statements to the press, or simply signing the Registration Statements. ¶¶3, 36-43, 46, 99, 109; *see In re Infonet Servs. Sec. Litig.*, 310 F.Supp.2d 1080, 1101 (C.D. Cal. 2003) (dismissing claim absent allegations that defendants personally or directly solicited plaintiffs); *Ryan v. FIGS*, 2025 WL 71727, at *12 (C.D. Cal. Jan. 10, 2025) ("participating in the preparation of or signing the Registration Statements" insufficient); *Citiline v. iStar*, 701 F.Supp.2d 506, 510, 512 (S.D.N.Y. 2010) (corporate officers who allegedly made false statements directly to investors were not statutory sellers); *In re Bare Escentuals Sec. Litig.*, 745 F.Supp.2d 1052, 1073 (N.D. Cal. 2010) (allegations failed "to set forth with any degree of detail the means by which defendants actively solicited plaintiffs' purchase of securities"). Nor is there any allegation that the Defendants were acting for their own financial gain. *In re DDi Sec. Litig.*, 2005 WL 3090882, at *21 (C.D. Cal. July 21, 2005) (solicitation must be for defendants' own financial gain).[12]

**V.    CONCLUSION**

For the reasons above, the Court should dismiss the AC in its entirety, with prejudice.

---

[12] Because Plaintiffs fail to state a claim under §§11 and 12, their §15 claim must be dismissed. *See In re Harmonic Sec. Litig.*, 163 F.Supp.2d 1079, 1090 (N.D. Cal. 2001).

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,914 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated:  April 7, 2026

/s/ *Koji F. Fukumura*
COOLEY LLP
KOJI F. FUKUMURA, *pro hac vice*
kfukumura@cooley.com
HEATHER M. SPEERS, *pro hac vice*
hspeers@cooley.com
CRISTINA M. FERRUOLO, *pro hac vice*
pending
cferruolo@cooley.com
10265 Science Center Drive
San Diego, CA 92121
Telephone: 858.550.6000

TARA E. LEVENS, *pro hac vice*
tlevens@cooley.com
3175 Hanover Street
Palo Alto, CA 94304
Telephone: 650.843.5000

BALLARD SPAHR LLP
BRUCE H. CAHN, OSB No. 935450
cahnb@ballardspahr.com
RYAN O'HOLLAREN, OSB No. 231160
ohollarenr@ballardspahr.com
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Telephone: 503.778.2100

*Attorneys for Defendants KinderCare Learning Companies, Inc., Paul Thompson, Anthony Amandi, John T. Wyatt, Jean Desravines, Christine Deputy, Michael Nuzzo, Benjamin Russell, Joel Schwartz, Alyssa Waxenberg, and Preston Grasty*