**STOLL STOLL BERNE**
**LOKTING & SHLACHTER P.C**
Timothy S. DeJong, OSB No. 940662
Keith A. Ketterling, OSB No. 913368
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: tdejong@stollberne.com
kketterling@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Liaison Counsel for*
*Lead Plaintiff and the Class*

[additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| IN RE KINDERCARE LEARNING COMPANIES, INC. SECURITIES LITIGATION | Case No. 3:25-cv-01424-AR<br>CLASS ACTION ALLEGATION<br>**PLAINTIFFS' OPPOSITION TO DEFENDANT PARTNERS GROUP (USA) INC.'S MOTION TO DISMISS** |

## TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ....................................................................................................1

II. STATEMENT OF RELEVANT FACTS ...............................................................2

III. LEGAL STANDARD...........................................................................................7

IV. ARGUMENT .........................................................................................................9

A. Partners Group Controlled the Board Appointees ..........................................9

B. Partners Group Controlled KinderCare ...........................................................11

1. Partners Group Controlled KinderCare Through Its Position as 90% Shareholder .........................................................................12

2. Partners Group Controlled KinderCare Through Its Power to Elect a Majority of KinderCare Directors ...............................................16

3. Partners Group Controlled Management and Operations ..........................18

4. Partners Group Controlled the Offering ...................................................21

V. CONCLUSION.......................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bao v. SolarCity Corp.*,
2015 WL 1906105 (N.D. Cal. Apr. 27, 2015) ....................14

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)....................10, 17, 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................7

*El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*,
709 F. Supp. 3d 1296 (D. Colo. 2023)....................14, 19, 20

*Fouad v. Isilon Sys., Inc.*,
2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ....................16

*Freeland v. Iridium World Commc'ns, Ltd.*,
2004 WL 7325422 (D.D.C. Sep. 1, 2004) ....................16

*Hemmer Grp. v. SouthWest Water Co.*,
527 F. App'x 623 (9th Cir. 2013) ....................8

*Ho v. Duoyuan Glob. Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012)....................10, 18

*Hollinger v. Titan Cap.*,
914 F.2d 1564 (9th Cir. 1990) ....................7, 20

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ....................8, 9, 18, 20

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 10914316 (C.D. Cal. Aug. 8, 2013)....................17

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ....................18

*In re Appleseed's Intermediate Holdings, LLC*,
470 B.R. 289 (D. Del. 2012)....................4

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)....................20

**TABLE OF AUTHORITIES**

**Page(s)**

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017)....8

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009)....16

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2016 WL 949065 (S.D. Tex. Mar. 14, 2016)....12, 13

*In re Dynegy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004)....18

*In re Friedman's, Inc. Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ga. 2005)....15

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015)....14, 20

*In re Glob. Crossing, Ltd. Sec. Litig.*,
2005 WL 1881514 (S.D.N.Y. Aug. 5, 2005)....10

*In re Glob. Crossing, Ltd. Sec. Litig.*,
2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005)....13

*In re. Glob. Crossing, Ltd. Sec. Litig.*,
471 F. Supp. 2d 338 (S.D.N.Y. 2006)....11

*In re Kosmos Energy Ltd. Sec. Litig.*,
955 F. Supp. 2d 658 (N.D. Tex. 2013)....18

*In re Musicmaker.com Sec. Litig.*,
2001 WL 34062431 (C.D. Cal. June 4, 2001)....12, 15, 20

*In re SemGroup Energy Partners, L.P.*,
729 F. Supp. 2d 1276 (N.D. Okla. 2010)....21, 22

*In re Tezos Sec. Litig.*,
2018 WL 4293341 (N.D. Cal. Aug. 7, 2018)....20

*In re Trados Inc. S'holder Litig.*,
73 A.3d 17 (Del. Ch. 2013)....11

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
259 F.R.D. 490 (W.D. Wash. 2009)....7

**TABLE OF AUTHORITIES**

**Page(s)**


*Lilien v. Olaplex Holdings, Inc.*,
765 F. Supp. 3d 993 (C.D. Cal. 2025) ....................18

*LLDVF, L.P. v. Dinicola*,
2010 WL 3210613 (D.N.J. Aug. 12, 2010) ....................14, 16

*Lozada v. TaskUs, Inc.*,
710 F. Supp. 3d 283 (S.D.N.Y. 2024)....................19

*McKenna v. Smart Techs. Inc.*,
2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012)....................13

*Mingbo Cai v. Switch, Inc.*,
2019 WL 3065591 (D. Nev. July 12, 2019) ....................21

*No. 84 Employer Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .................... *passim*

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
96 F.3d 1151 (9th Cir. 1996) ....................20

*Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367 (N.D. Cal. 2020),
*aff'd*, 13 F.4th 940 (9th Cir. 2021),
*vacated and remanded on other grounds sub nom Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023),
*rev'd and remanded*, 127 F.4th 1183 (9th Cir. 2025) ....................12, 13, 21

*Premier Cap. Mgmt., LLC v. Cohen*,
2008 WL 4378300 (N.D. Ill. Mar. 24, 2008)....................17

*S.E.C. v. Todd*,
642 F.3d 1207 (9th Cir. 2011) ....................17

*Shankar v. Zymergen Inc.*,
2022 WL 17259057 (N.D. Cal. Nov. 29, 2022) ....................16

*State Tchrs. Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*,
2025 WL 3013683 (W.D. Wash. Oct. 28, 2025) ....................14

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ....................13

*Wang v. Zymergen Inc.*,
744 F. Supp. 3d 995 (N. D. Cal. 2024) .................... *passim*

## TABLE OF AUTHORITIES

**Page(s)**

*Welgus v. TriNet Grp., Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017),
*aff'd*, 765 Fed. Appx. 239 (9th Cir. 2019) ....................20

*Yi v. GTV Media Grp. Inc.*,
2021 WL 3500920 (S.D.N.Y. Aug. 6, 2021) ....................19

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§77k.................... *passim*
§77l ....................7
§77o....................7, 9, 10, 19
§77la(2) ....................1, 9, 10, 22
§78t(a) ....................7, 14, 18
§78t(a)2 ....................22

17 C.F.R.
§230.405....................8
§240.13d-5 ....................15

Federal Rules of Civil Procedure
Rule 8 ....................9
Rule 8(a)....................7
Rule 9 ....................14
Rule 15(a)(2) ....................22

Lead Plaintiff City of Dearborn Police & Fire Revised Retirement System and additional named plaintiff Venkata Surya Teja Gollapalli (collectively, "Plaintiffs"), hereby submit this Opposition to the motion to dismiss filed by Partners Group (USA) Inc. ("Partners Group" or "Defendant").[1]

## I. INTRODUCTION

The Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "AC") (ECF 81) sufficiently pleads that Partners Group controlled the primary violators of §§11 and 12(a)(2), including Individual Defendants Benjamin Russell, Joel Schwartz, Preston Grasty, Christine Deputy, and Michael Nuzzo (collectively, the "Board Appointees"), and Defendant KinderCare Learning Companies, Inc. ("KinderCare" or "Company). Partners Group controlled the Board Appointees and KinderCare through the traditional indicia of control courts consider, including by (a) holding ***90% ownership*** of KinderCare at the time of its IPO; (b) appointing a ***majority of KinderCare's board of directors*** and controlling at least three Board Appointees as their employer; and (c) carrying ***veto power*** over key management decisions.[2] These facts alone

---

[1] As used herein and unless otherwise indicated, "Partners Group" refers to Partners Group (USA) Inc. as well as Partners Group Holding AG (Switzerland) and all other affiliates identified in the Offering Documents as holding interests in KinderCare and/or serving as investment manager for entities holding interests in KinderCare. By stipulation, the claims asserted against PGUSA – and liability for such claims – relate to ***all*** Partners Group affiliates. *See* ¶47; Stipulation and Order Regarding Voluntary Dismissal of Defendant Partners Group Holding AG (ECF 74).

[2] Unless otherwise noted all internal citations are omitted, and emphasis is added; all "¶__" or "¶¶__" references are to the AC; all capitalized terms have the same meaning as defined in the AC; all references to "Defs' Ex. __" are exhibits to the Declaration of Heather M. Speers in Support of KinderCare Defendants' Motion to Dismiss (ECF 100); all references to "Ex.__" or "Exs.__" are to the Declaration of Jesse Jensen in Support of Plaintiffs' Oppositions to the Motions to Dismiss by the KinderCare Defendants and Partners Group filed forthwith.

are sufficient, especially under the Ninth Circuit precedent, where pleading control only requires showing that Defendants had the power to control, ***not*** the actual exercise of power.

But the AC goes further. It alleges additional indicia of control, including that the Offering Documents provided Partners Group consent rights over the appointment of KinderCare's executives, any major acquisitions, the issuance of additional securities, and the assumption of any significant additional debt. ¶49, Defs' Ex. 1 at 53. Moreover, KinderCare used the proceeds of its IPO to pay back debt that it had forced KinderCare to assume, just months earlier, for the express purpose of paying a $320 million dividend to Partners Group. Def.'s Ex. 1 at 64.

In Defendant Partners Group (USA) Inc.'s Motion to Dismiss (ECF 102) ("Motion" or "Mot."), Partners Group seeks to evade liability for securities violations committed by a company in which Partners Group held a 90% controlling interest. ¶49. Defendant does not cite ***any*** authority for dismissing control liability claims against a majority shareholder, let alone one owning 90%. *E.g.*, ¶¶49, 96, 390-93. Partners Group cannot rebut the strong evidence of control it exerted—over KinderCare, the Board Appointees, and the Offering itself—and does not cite any authority compelling dismissal as a matter of law. The Court should deny Partners Group's Motion.

## II. STATEMENT OF RELEVANT FACTS

Plaintiffs incorporate by reference their Memorandum of Law in Opposition to KinderCare Defendants' Motion to Dismiss the Consolidated Amended Complaint and Joinders Thereto ("Plaintiffs' Opp."), filed forthwith, which details the relevant facts regarding the primary violations alleged, including the false and misleading statements in KinderCare's Offering Documents.

Partners Group is a Swiss-based private equity firm. In 2015, Partners Group acquired KinderCare (purportedly the nation's largest private childcare provider) for $1.5 billion, its largest transaction at the time. ¶89. Under its control, Partners Group reshaped KinderCare by applying the standard private equity playbook of slashing operating costs to extract maximum value. ¶¶90, 95. In return for its "management and advisory services," KinderCare agreed to pay a Partners Group entity approximately $4.9 million per year until the IPO. ¶50; Defs' Ex. 1 at 169.

In the ten months leading up to the IPO alone, during which Partners Group owned KinderCare, ***thousands*** of incident reports prepared by state authorities documented KinderCare's pervasive and dangerous health and safety violations across the country. Multiple former employees corroborated KinderCare's repeated violations of health and safety regulations, disregard for regulatory requirements designed to keep children safe (including meeting minimum staff-to-child ratios and minimum background qualifications for staff), and further revealed that the Company engaged in a longstanding pattern and practice of deprioritizing its staff. ¶¶191-240; 250-286. These widespread violations occurred across the United States and reflected severe and systemic issues that posed a risk to KinderCare's enrollment, reputation, and revenues. *See* ¶¶117-163.

In November 2021, Partners Group attempted to take KinderCare public but postponed its public offering on the day it was scheduled to occur, citing unexplained "regulatory delays." ¶92. While the Company remained silent as to the nature of the regulatory delays, local publication *Oregon Business* noted that KinderCare had "disclosed a 'material weakness' in its internal control over financial reporting in its offering prospectus earlier in the fall," and further reported that the Company was "carrying significant debt – $1.4 billion, due by 2025." ¶92.

Part of this debt was accrued in order to pay Partners Group's massive dividends. In 2017, KinderCare took on a $310 million loan to pay a $300 million dividend to Partners Group. Ex. C at 4, n.13. And in March 2024, just months before its IPO, KinderCare took on another $265 million loan to pay Partners Group a $320 million dividend, driving KinderCare's total debt load to $1.5 billion by the time of the IPO. ¶¶50, 95.[3] Years after its failed first attempt to go public, Partners Group led KinderCare to its IPO in October 2024, through which the Partners Group sold around 20% of its ownership stake. Defs' Ex. 1 at 165. At the time of the IPO, KinderCare admitted in the Registration Statement that it was "controlled by [Partners Group]," and Partners Group was the majority stockholder of KinderCare. ¶51; Defs' Ex. 1 at 52, 165 (table showing Partners Group 90% ownership of stock prior to the IPO, dropping to a possible low of 68.9% after the IPO). The Registration Statement further disclosed that following the IPO, Partners Group would "continue to own a controlling interest" in KinderCare, qualifying it as a "'***controlled company***' within the meaning of the New York Stock Exchange [("NYSE")] corporate governance standards." Defs' Ex. 1 at 53; *see* ¶96.

At the time of the IPO, Defendant also controlled the election of KinderCare's Board of Directors (the "Board"), and designated at least five of the eight directors on the Board. ¶49 (Partners Group "currently controls the election of [KinderCare's] directors"); Defs' Ex. 1 at 53. In addition to designating three of its own employees (as Board Appointees Russell, Schwartz, and Grasty, discussed in further detail below), Partners Group also designated Board Appointees

---

[3] This process – in which a private equity firm pays itself by having its portfolio company take on new debt at the expense of the Company's financial health – is known as dividend recapitalization. *See In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 294 (D. Del. 2012) (recapitalization allows "[private equity] [p]arties to realize an immediate return on investment without selling their equity stake by causing a wholly owned subsidiary to pay a large dividend up the corporate structure").

Christine Deputy and Michael Nuzzo. Ex. B at 8 (KinderCare's Stockholder Agreement incorporated by reference into the Offering Documents). All five Board Appointees held committee positions, furthering Partners Group's influence over the Board and the Company's operations: two Board Appointees sat on the nominating committee; three Board Appointees on the compensation committee, one of whom served as its chair; and one Board Appointee on the audit committee, who served as its chair. Ex. B at 6; Defs' Ex. 1 at 137. The Stockholders Agreement further provided that, following the IPO, Partners Group would maintain the right to elect a majority of the board of directors so long as it continued to be a majority stockholder. Ex. B at 8. Partners Group also controlled its own senior employees and partners whom it placed onto KinderCare's board of directors, including the Individual Defendants Russell, Schwartz, and Grasty. ¶¶40-41, 43, 49. Russell, who served as a Director of KinderCare from 2018 through the IPO, was simultaneously a Senior Vice President-Private Equity at Partners Group. ¶40. Schwartz, who served as a director of KinderCare from 2015 through the IPO, was simultaneously a Managing Partner at Partners Group. Schwartz also served as the co-head of Partners Group's Private Equity Services business unit, and as a member on Partners Group's Global Investment Committee, Private Equity Direct Leads Investment Committee, and Co-Chairman of the Private Equity Direct Co-Investments in Services Investment Committee. ¶41. Grasty, who served as a Director of KinderCare from 2024 through the time of the IPO, was simultaneously a Senior Investment Leader at Partners Group since 2018. ¶43.

All five Board Appointees are Individual Defendants who participated in the preparation of the Offering Documents and signed the Registration Statements, and participated in the making of material false statements and omissions alleged in the AC. ¶45.

The Individual Defendants reviewed, edited, and approved the Offering Documents, participated in the Offering, and solicited the purchase of KinderCare's common stock sold pursuant to and traceable to the Offering Documents, which were filed with the SEC. ¶¶38-46. The Individual Defendants and Partners Group collectively controlled KinderCare, the issuer of the common stock offered pursuant to the Offering Documents. ¶368.

Partners Group structured the IPO such that it would maintain control of KinderCare post-IPO, including by making decisions regarding KinderCare's corporate transactions and agreements, and by owning nearly 70% of the Company. ¶390. Defs' Ex. 1 at 52 ("Because [Defendant] owns a significant percentage of our common stock, it may control major corporate decisions."; "[Partners Group] could exercise a controlling interest over [KinderCare's] business, affairs and policies."). ¶49. Such control included authority over the appointment of KinderCare's management, any corporate mergers or other transactions, and governance rights. *Id.* Moreover, the Registration Statement explicitly stated that Partners Group designated directors also "have the authority to incur additional debt, issue or repurchase stock, declare dividends, and make other decisions that could be detrimental to stockholders." Defs' Ex. 1 at 52.

The Stockholder Agreement further outlined that Partners Group would continue to hold the power to exercise control post-IPO even if its shares fell below 50% of the voting stock. Ex. B at 8. If Partners Group's control fell below 50%, the Partners Group still had the right to appoint a sliding scale number of directors and board committee positions. Ex. B at 8-9. So long as Partners Group retained at least 25% of KinderCare's shares post-IPO, its consent would be required for the termination, hire, or appointment of KinderCare's CEO; the issuance of additional security interests in KinderCare or its subsidiaries; any significant acquisition; or the incurrence of any debt over $100 million. *Id.* at 8-9.

Partners Group is now facing congressional scrutiny of its control over KinderCare's operations. In March 2026, Senator Jeffrey A. Merkley of Oregon, a Ranking Member of the Senate Budget Committee, launched an investigation into whether Partners Group's ownership of KinderCare prioritizes Partners Group's profits over the health, safety, and welfare of children. Ex. C. Senator Merkley wrote to Partners Group expressing concern about KinderCare's "pattern of safety and compliance issues across multiple states," further noting "substantial investor concern about the company's financial outlook" and other "trends [that] raise questions about [] KinderCare's growth strategy." *Id.* The letter specifically ties these concerns to the "role of private equity and other profit-maximizing ownership models in child care centers." The letter requests that Partners Group provide documents related to its role and decision-making authority in the Company's operations, including child care facility acquisition, staffing levels, wages, dividend payments, incurrence of debt, and executive compensation. *Id.*

## III. LEGAL STANDARD

Under §15 of the Securities Act, "[e]very person who . . . controls any person liable under" §§11 or 12(a)(2), is also "liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. §77o. Defendant does not dispute that only "[t]he notice-pleading standard of Rule 8(a) applies to Plaintiffs' claims under Section 15." *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 504 (W.D. Wash. 2009).[4] Accordingly, dismissal is appropriate only where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

[4] In noting "the controlling person analysis is the same" for Section 15 of the Securities Act and Section 20(a) claims under the Exchange Act (*Hollinger v. Titan Cap.*, 914 F.2d 1564, 1578 (9th Cir. 1990), Defendant fails to clarify that the heightened pleading requirements of the PSLRA do not apply to the primary violations here, brought under §§11 and 12.

To allege control person liability, "a plaintiff must prove: (1) 'a primary violation,' and (2) 'that the defendant [controlled a] . . . primary violator." *No. 84 Employer Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003). The "'concept of control . . . should be construed liberally and flexibly.'" *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017).

Control is defined as "'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ***ownership of voting securities***, by contract, or otherwise.'" *Am. W. Holding Corp.*, 320 F.3d at 945 (quoting 17 C.F.R. §230.405) (emphasis in original). The traditional indicia of control include owning stock, having a seat on the board, and maintaining a stockholder relationship. *Id.* at 945-46. "At the pleading stage, Plaintiffs must only show authority to exercise such power, rather than actual exercise of such power." *Hemmer Grp. v. SouthWest Water Co.*, 527 F. App'x 623, 627 (9th Cir. 2013) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000))[5]; *see also Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995, 1011 (N. D. Cal. 2024) ("It is enough to allege at the pleading stage that the defendant ***possessed*** actual power, even if the plaintiff cannot show that the defendant ***used*** that power to cause the underlying violation.") (emphasis in original). Thus, the "[p]laintiff need not show that the defendant was a culpable participant in the violation. . . ." *Howard*, 228 F.3d at 1065.

Defendant wholly mischaracterizes *Howard.* Defendant states that under *Howard*, control requires showing that a defendant "exercised *actual power or control*." Mot. at 3. Defendant cherry-picks its quote from *Howard*, ignoring the court's subsequent lengthy discussion on

---

[5] *Id.*

"whether 'actual power or influence' needs to be exercised to render a defendant a control person." 228 F.3d at 1065. Ultimately, the *Howard* court held the opposite: "in order to make out a prima facie case, it is ***not necessary*** to show actual participation or the exercise of actual power." *Id.*

## IV. ARGUMENT

Partners Group is liable for false and misleading statements in the Offering Documents because Plaintiffs have adequately alleged a primary violation of §§11 and 12(a)(2) of the Securities Act, and because Partners Group controlled the Board Appointees and KinderCare at the time of its IPO through its ownership of KinderCare shares, its appointment of KinderCare executives and members of the Board (including the Board Appointees), its control over the Company through various transactions and agreements with KinderCare, and its historical relationship with the Company and its management. ¶¶390-93; *see Am. W. Holding Corp.*, 320 F.3d at 945.

As detailed in Plaintiffs' Opp., the well-pleaded facts in the AC sufficiently allege, under the notice pleadings requirements of Rule 8, underlying violations of the Securities Act §§11 and 12(a)(2) based on strict liability as to KinderCare and negligence as to the Individual Defendants and the Underwriter Defendants. As discussed herein, the AC also sufficiently alleges that Partners Group possessed actual power or control over these primary violators of the securities law. No more is required to plead control person liability at this stage.

### A. Partners Group Controlled the Board Appointees

Because the five Partners Group Board Appointees are adequately alleged to be primary violators of §§11 and 12(a)(2) (as well as control persons of KinderCare under §15), Plaintiffs' allegations that Partners Group controlled its Board Appointees in order to manage "their investment in [KinderCare] . . . ***are themselves sufficient to plead [Partners Group's] liability***

***under . . . §15***." *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *26 (C.D. Cal. July 1, 2008); *see* Plaintiffs' Opp., generally (showing how KinderCare and the Board are primary violators are primary violators of §§11 and 12a(2)); *see* ¶49 (Partners Group "currently controls the election of [KinderCare's] directors"). Partners Group controlled Board Appointees Russell, Schwartz, and Grasty as their employer. The AC alleges that they simultaneously held senior positions within Partners Group from the time of their appointment as KinderCare Directors through the IPO. ¶¶40-41, 43, 49. *Zymergen*, 744 F. Supp. 3d at 1010-11 (holding allegations of control sufficient against board appointees that investor funds simultaneously employed); *Am. W. Holding Corp.*, 320 F.3d at 946 (same where defendant's own officers were seated on the company's board).

Partners Group appointed two additional directors, Board Appointees Deputy and Nuzzo. Ex. B at 8. Partners Group further placed all five Board Appointees on board committees. Ex. B at 8.

Partners Group attempts to discount shareholder control by citing out of circuit authority involving minority shareholders who appointed a minority of the board. *See Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 580-81 (S.D.N.Y. 2012) (20% shareholder appointed one board member); *In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 1881514, at *13 (S.D.N.Y. Aug. 5, 2005) (emphasizing that "[t]his is not a situation where one entity was the sole shareholder and controlled the corporation . . . but rather a situation where each of two minority [15.8%] shareholders appointed one outside director to a twelve-director board"). Here, Partners Group's influence over its Board Appointees was compounded because Partners Group's designees constituted a majority of the Board. ¶49.

Partners Group's assertions regarding the Board Appointees' fiduciary duties to KinderCare are an improper factual argument not appropriate at this stage. Moreover, fiduciary duties owed to KinderCare do not defeat sufficient allegations of control by Partners Group. *Zymergen*, 744 F. Supp. 3d at 1012 (factual disputes as to board members' fiduciary duties premature and, "even if the board appointees were entirely faithful to their alleged fiduciary duties to [the company] and its shareholders, it is not clear that a Section 15 claim based on the investors' power to control their appointees would be precluded."); *In re. Glob. Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 353 (S.D.N.Y. 2006) ("[T]he capacity (formal or actual) in which [the defendants] were acting when performing any acts at the behest of [the controlling entity] is a quintessential fact question."). Partners Group does not dispute that it had the power to control the Board Appointees, nor that the Board Appointees Russell, Schwartz, and Grasty simultaneously owed fiduciary duties to Partners Group, who employed them and placed on them duties to represent the Partners Group's interests (and investment) on KinderCare's Board. *Id.* It would defy logic to suggest otherwise. *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 46, 54 (Del. Ch. 2013) (finding that there is "'no dilution'" of fiduciary duties and directors appointed by investment groups have incentives to side with them). These allegations suffice to allege control at this stage.

### B. Partners Group Controlled KinderCare

The well-pleaded facts of the AC readily establish traditional indicia of control, including that Partners Group had the power to, and did, control KinderCare: Partners Group (1) ***owned 90%*** of KinderCare's stock; (2) designated a ***majority of the Board***; and (3) managed the company's operations, including by maintaining ***veto power*** over key management decisions. ¶¶49, 390. *See Am. W. Holding Corp.*, 320 F.3d at 945-46 (holding two minority shareholders liable as control

persons where they together owned 57.4% of voting stock, elected a majority of the board, and had a longstanding shareholder relationship with the company).

**1. Partners Group Controlled KinderCare Through Its Position as 90% Shareholder**

Partners Group possessed and exercised control over KinderCare by virtue of its 90% ownership of KinderCare's shares prior to the IPO, which Partners Group structured to ensure continued control by preserving nearly 70% of its ownership thereafter. ¶49; 51. *In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *17 (C.D. Cal. June 4, 2001) ("a majority or otherwise controlling shareholder is *prima facie* [evidence of] a controlling person of the corporation in which it owns a majority or controlling stake").

Courts have denied motions to dismiss control person claims against private equity shareholders in cases involving far fewer allegations of control than those present here. For example, in *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021), *vacated and remanded on other grounds sub nom Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023), and *rev'd and remanded*, 127 F.4th 1183 (9th Cir. 2025) the court upheld Section 15 claims against three venture capital firms that collectively held only 47% of the company's voting power and each designated one director to the company's board. Likewise, in *Zymergen*, the court upheld allegations against three minority shareholders who, together, held more than half of the company's outstanding shares and each placed a representative on the company's board.

And contrary to Partners Group's assertions, the facts here are stronger than *Am. W. Holding Corp.*, where control allegations were upheld as to two shareholders owning only 57% of the total voting power and together appointed a majority of directors on the board. 320 F.3d at 945-46. *See also In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 949065, *3 (S.D. Tex. Mar. 14, 2016) (sufficient control alleged against four "'private-equity sponsor[s]'" where the

corporation's "'four largest stockholders collectively own approximately 72% of [Cobalt's] outstanding stock'" and "'ha[d] significant influence over all matters that require[d] approval by [the] shareholders, including election of directors and approval of significant corporate transactions'"); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1048-49 (N.D. Cal. 2016) (allegations including "'ab[ility] to control most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions,'" sufficient).

The Offering Documents explicitly state that at the time of the IPO, KinderCare was "controlled by [Partners Group]." The Offering Documents further disclosed the risk to shareholders posed by the concentration of power: "Because PG owns a significant percentage of our common stock, it may control major corporate decisions and its interests may conflict with your interests as an owner of our common stock and our interests." Defs' Ex. 1 at 22. Courts credit such disclosures in finding control adequately alleged. *See McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *20 (S.D.N.Y. Apr. 3, 2012) (concentration of ownership "risk disclosure 'nudge[s]' plaintiff's section 15 claim 'across the line from conceivable to plausible'").

Thus, the AC's allegations far exceed the "naked allegations of control [that] will typically suffice." *See In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 2990646, at *8 n.8 (S.D.N.Y. Nov. 7, 2005); *see also Pirani*, 445 F. Supp. 3d at 372.

Partners Group's authority does not persuade otherwise. Partners Group has not cited a single case in which a court dismissed a control liability claim against a majority shareholder in the securities context, let alone one alleging that the controlling stockholders held 90% of the company at the time of the IPO – as here. To the contrary, several of the cases cited by Partners

Group further confirm the sufficiency of the allegations here. *See* Mot. at 6-7 (citing cases that found shareholder control over primary violators).[6]

Partners Group's assertion that it is a series of seven distinct "affiliated" investment funds with "different outside investors" and "different management structures" does not shield it from liability. Mot. at 5-6.[7] "Th[e] definition [of control]. . . is capacious enough to embrace even the complex ownership structures employed by well-heeled investors. . . ." *El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*, 709 F. Supp. 3d 1296, 1352 (D. Colo. 2023). Here, the Registration Statement itself treats Partners Group as the singular "primary stockholder" of KinderCare, Defs' Ex. 1 at 104, and even cursory inspection reveals that the management structures of each supposedly separate Partners Group entities are all levers of Partners Group's exertion of control: all seven funds are managed by just two investment advisors that are each wholly-owned subsidiaries of Partners Group Holdings AG, which has voting and dispositive power over all seven funds. Defs' Ex. 1 at 166. In addition, the same directors sit on the boards of six of the seven funds. Defs' Ex. 1 at 166. *See also* ¶¶51, 96; Defs' Ex. 1 at 53.

---

[6] *Compare Am. W. Holding Corp.*, 320 F.3d at 945-46 (two shareholders' ownership of "approximately 57.4% of the total voting power" indicative of control), *and LLDVF, L.P. v. Dinicola*, 2010 WL 3210613, at *12 (D.N.J. Aug. 12, 2010) (73% ownership indicating control), *with In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1200-02 (D. Or. 2015) (no single majority shareholder alleged), *State Tchrs. Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*, 2025 WL 3013683, at *28 (W.D. Wash. Oct. 28, 2025) (same), *and Bao v. SolarCity Corp.*, 2015 WL 1906105, at *2, *5 (N.D. Cal. Apr. 27, 2015) (no control found with only 30% ownership; court erroneously applied Rule 9 standard to §20(a) violation).

[7] Partners Group's argument is a red herring because just one of the seven funds accounts for 87% of Partners Group's total holdings. As such, Partners Group could control KinderCare through that one fund alone, which accounted for 78% of KinderCare's total stock at the time of IPO. Defs' Ex. 1 at 166. In any event, Partners Group's argument that the claim against it should be dismissed on the basis of the "different management structures" of the underlying affiliates arguably contradicts its stipulation to appear as a representative party in this suit. ECF 74; ¶47 n.4.

KinderCare admits it is and was "controlled" by Partners Group under NYSE standards. ¶51. *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1376 (N.D. Ga. 2005) (admissions show control). As explained in the Registration Statement, the NYSE designation of a "controlled company" is only afforded to companies "of which more than 50% of the voting power is held by an individual, a group or another company." Defs' Ex. 1 at 53; *see* 17 C.F.R. §240.13d-5 ("group" refers to when "two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer").

This admission of control alone suffices to demonstrate at this pleading stage that the Partners Group is a single entity for the purposes of exercising its control over KinderCare.

Even assuming, *arguendo*, that Plaintiffs must show the individual funds "shared the same investment objectives and acted in concert," Mot. at 6, the AC sufficiently alleges as such: the Partners Group entities acted together when purchasing KinderCare for 1.5 billion in 2015 (¶89); they acted together to designate a majority of KinderCare's directors on the board; and they acted together in "***exercis[ing] a controlling interest over our business, affairs and policies, including the appointment of our management***" (¶49). *See also* ¶¶390-391.

Courts treat such investment funds affiliated with or managed by one firm as one shareholder for the purposes of assessing control person liability. For example, in *Zymergen*, each investor was "composed of management companies and individual funds." 744 F. Supp. 3d at 1002. The *Zymergen* court assessed each management company and its individual funds as one entity. *Id*. Likewise, here, the funds affiliated and managed by Partners Group and its subsidiaries should be assessed as one entity. *See Musicmaker*, 2001 WL 34062431, at *17 (regulations indicate that power can be held indirectly). In any case, Partners Group's factual arguments as to the separateness of its investment funds properly pleaded as "affiliated with, advised by, and/or

managed by [Partners Group]" are inappropriate at the pleading stage. ¶¶48, 96; *see In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) (whether "fund is 'completely separate'" from parent entity is a "factual rebuttal inappropriate [at] motion to dismiss").

Partners Group's cited authority is inapposite because each case involves multiple investment firms that held minority stakes, not investment funds managed by the same firm constituting a majority stake in the company undergoing an IPO. *See Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *13 (W.D. Wash. Dec. 29, 2008) (plaintiff could not plead facts uniting the ownership stakes of three venture capital firms that together held 69.8% of the company); *LLDVF*, 2010 WL 3210613, at *12 (same where two investment firms together owned just 30% of the company, but upholding allegations against firm with 69.7% ownership); *Shankar v. Zymergen Inc.*, 2022 WL 17259057, at *3 (N.D. Cal. Nov. 29, 2022) (dismissing Section 15 claim where no allegations three venture capitalists worked in concert).[8]

At the pleading stage, Plaintiffs are not required to provide any further evidence of Partners Group operating as a single entity to control KinderCare in order to plausibly allege control liability.

### 2. Partners Group Controlled KinderCare Through Its Power to Elect a Majority of KinderCare Directors

Partners Group did not just possess the power to control KinderCare, it exercised that power in part by appointing ***five members of the eight-member*** board. *See Am. W. Holding Corp.*, 320 F.3d at 945 ("having a seat on the board" is "'the traditional indicia of control'"); *Freeland v.*

[8] Further, in citing *Shankar*, Partners Group omits that control liability was ultimately adequately pleaded following the amendment. *See Zymergen*, 744 F. Supp. 3d at 1011 (finding control by a group of minority stockholders acting together who exhibited additional indicia of control).

*Iridium World Commc'ns, Ltd.*, 2004 WL 7325422, at *7 (D.D.C. Sep. 1, 2004) (right to appoint a quarter of company's board of directors, along with other indicators of control, sufficient to survive a motion to dismiss). The Registration Statement acknowledged, as it must, that KinderCare's "business and affairs are managed under the direction of the board of directors." Defs' Ex. 1 at 135. The Registration Statement further disclosed that Partners Group designated directors "have the authority to incur additional debt, issue or repurchase stock, declare dividends, and make other decisions that could be detrimental to stockholders." Defs' Ex. 1 at 52.

Partners Group's control is also evidenced by its representation on all three board committees including two Board Appointees on the Nominating Committee; three Board Appointees on the Compensation Committee, one of whom served as its chair; and one Board Appointee on the Audit Committee, who served as its chair. Defs' Ex. 1 at 137; Ex. B at 8-10. *Batwin*, 2008 WL 2676364, at *25 (control of Audit Committee shows control). Board Appointees Schwartz and Russell served on KinderCare's Board as of 2015 and 2017, respectively, further indicating control in the lead-up to the IPO. *Premier Cap. Mgmt., LLC v. Cohen*, 2008 WL 4378300, at *8 (N.D. Ill. Mar. 24, 2008) (control supported by investor with "'tenured' status" who could influence "other Board members").

Moreover, the AC alleges all five Partners Group Board Appointees were "involved in the formulation of financial statements" at issue here. *S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (at summary judgment, facts showing defendant assisted in preparing press release evidence control). Each Board Appointee reviewed and contributed to the Offering Documents, including signing the Registration Statements. ¶¶34, 36-43, 49. This allegation alone sufficiently pleads control. *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *36 (C.D. Cal. Aug. 8, 2013) ("[T]he presence of Lion Capital designees on the American Apparel board, coupled with

those directors' signatures on the 2009 annual report, is sufficient at the pleading stage to state a claim. . . ."); *see also Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993 (C.D. Cal. 2025) ("'[T]he act of signing a registration statement . . . is a manifestation of the signer's responsibility for the information contained in the document and, therefore, sufficient to establish control person status.'"); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) (public statements and signing SEC filings show control under Section 20(a)).[9]

### 3. Partners Group Controlled Management and Operations

Plaintiffs have adequately alleged that Partners Group held the power to control KinderCare's management and operations. *See Howard*, 228 F.3d at 1065 (pleading control only requires showing the defendant had the power to control, not the actual exercise of control). Indeed, Plaintiffs allege that, in the time leading up to the IPO, Partners Group wielded its control to "support[] a 'business transformation'" at KinderCare through which the Company '"optimize[d] center footprint, dr[o]ve compound same-center revenue growth, and increase[d] same-center occupancy.'" ¶100. Partners Group exercised its control over KinderCare's pre-IPO operations, in part, through its agreement with KinderCare to provide "management and advisory services," including strategic planning, board advisory, and personnel management, for $4.9 million per year. ¶49; *see In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004) (control can also be established by "business relationships, interlocking directors, family relations, or the power to influence and control the activities of another."). These facts go to the heart of

---

[9] Partners Group's authority is out of circuit and inapposite – they involve minority shareholders and the appointment of only a minority of directors. *See In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 674, 676 (N.D. Tex. 2013) (two shareholder groups controlled 45% and 37% of the company's stock, respectively, with bare and conclusory allegations as to how the two acted together); *Duoyuan*, 887 F. Supp. 2d at 580-81 (shareholder with only 20% stake that appointed only one director).

Plaintiffs' claims that Partners Group's ownership of KinderCare prioritized growth at the expense of child safety.

Partners Group ensured its continued rights to control KinderCare post-IPO in the Offering Documents, including the Registration Rights Agreement and Stockholders Agreement. 15 U.S.C §77o (control can be "pursuant to or in connection with an agreement or understanding"); *see, e.g.*, *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 317 (S.D.N.Y. 2024) (rights gained through "contractual arrangement with the company" showed investors' control). KinderCare itself disclosed that Partners Group "***could exercise a controlling interest over our business, affairs and policies, including the appointment of our management*** and the entering into of business combinations or dispositions and other corporate transactions." ¶49; Defs' Ex. 1 at 137. The Offering Documents further provided for Partners Group's control over the board (*see supra* III.A; III.B.2), including representation on each board committee. ¶49. *See Batwin*, 2008 WL 2676364, at *25 (control of Audit Committee shows control). Ex. B at 9-10; Defs' Ex. 1 at 52.

Additionally, Partners Group required KinderCare to obtain its consent for key management decisions, including for the Company to: 1) terminate, hire, or appoint KinderCare's CEO; 2) issue additional equity interests; 3) enter into any significant acquisition; or 4) incur more than $100 million in additional debt. Defs' Ex. 1 at 53; *see Yi v. GTV Media Grp. Inc.*, 2021 WL 3500920, at *3 (S.D.N.Y. Aug. 6, 2021) ("[a]bility to influence an entity's hiring decision" supports inference of control); *InnovAge*, 709 F. Supp. 3d at 1352 ("veto power" showed control).

The Registration Rights Agreement details multiple other ways that Partners Group retained control over KinderCare's finances and operations, especially in relationship to the future offer and sale of KinderCare securities, including that Partners Group has the power to effect a public offering of securities (Ex. A 10, 13), Partners Group has the power to prevent KinderCare

from filing registration statements or prospectuses to which Partners Group objects (Ex. A at 17), Partners Group has the power to inspect all pertinent financial records and corporate documents at its request (Ex. A at 21), and Partners Group determines which underwriters will administer the offering (Ex. A at 23).

Unable to rebut these facts, Partners Group asks the Court instead to raise the bar for pleading control, contending that Plaintiffs are required to plead control over day-to-day operations.[10] The weight of Ninth Circuit authority rejects Partners Group's contention, holding instead that "'it is ***not necessary*** to show actual participation or the exercise of power.'" *Am. W. Holding Corp.*, 320 F.3d at 945; *InnovAge*, 709 F. Supp. 3d at 1352 (rejecting "Defendants' attempt to narrow the scope of control person liability by requiring an additional 'day-to-day operations' element"); *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *29 (N.D. Cal. Dec. 18, 2017) (day-to-day operations not required to establish control), *aff'd*, 765 Fed. Appx. 239 (9th Cir. 2019). Partners Group ignores that courts have "shifted the burden to the defendant" to show they were not involved in the violations as part of an affirmative defense. *Hollinger*, 914 F.2d at 1578 (en banc); *see Howard*, 228 F.3d at 1065; *Musicmaker.com*, 2001 WL 34062431, at *16 ("[L]ack of participation is an affirmative defense."). Thus, even though not required, the allegations readily establish day-to-day control over management.

---

[10] Partners Group's cases do not warrant a different result. *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151 (9th Cir. 1996) (inapposite because it pre-dates the Ninth Circuit's holding in *Howard*); *Galena*, 117 F. Supp. 3d at 1201 (no control where, unlike here, there were no allegations of control over "management and policies," nor over "the SEC filings at issue"); *In re Tezos Sec. Litig.*, 2018 WL 4293341, at *10 (N.D. Cal. Aug. 7, 2018) (no control where, unlike here, there were no additional facts beyond minority ownership and timing of purchase); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740-42 (S.D.N.Y. 2015) (shareholder with only 26% stake appointed only two directors, unlike here, no additional facts showing control over management).

**4. Partners Group Controlled the Offering**

Leading up to the IPO, Partners Group controlled KinderCare's borrowing and caused it to take on debt to directly benefit Partners Group. Under Partners Group's control, KinderCare distributed a total of $620 million to Partners Group across two dividends financed largely by debt. Ex. C at 4. Shortly after the second distribution, KinderCare then went public for the express purpose of paying down nearly the same amount in debt. ¶95, n.11. Specifically, KinderCare paid two large dividends to its owners, significantly benefiting Partners Group as the 90% stockholder while leaving KinderCare in debt: the first in 2017 for $300 million, financed by a $310 million loan, (Ex. C at 4, n.13), and the second in March 2024 for $320 million, financed in part with another $265 million loan. ¶¶50, 95. Just months later, in October 2024, Partners Group led KinderCare to its IPO to raise $662.4 million, which the Company then used to pay off $608 million of its outstanding debt.

Partners Group used dividend recapitalization to enrich itself while maintaining its 90% control over the company, all at the expense of KinderCare, which was driven deep into debt – $1.5 billion at the time of the IPO. ¶89. The uneven benefit Partners Group derived from this maneuver further demonstrates its control over the Company in the time leading up to and surrounding the IPO. *Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *4 (D. Nev. July 12, 2019) (upholding Section 15 claim against defendant who structured IPO for his benefit). Courts have held that an offering which enables an investor defendant to cash out its shares, along with the traditional indicia of control, plausibly alleges control, particularly given these sorts of financial dealings. *Pirani*, 445 F. Supp. 3d at 392-93; *see also In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1303 (N.D. Okla. 2010) (control plausibly alleged where investor defendants "reaped distributions from the IPO").

## V. CONCLUSION

For the reasons stated above, Partners Group's Motion must be denied. Through its power to control primary violator Board Appointees and KinderCare and the exercise of that control, Partners Group is liable for the underlying §§11 and 12(a)(2) violations alleged in the AC. If the Court is inclined to grant any part of Partners Group's Motion, Plaintiffs respectfully request that any such order be without prejudice to Plaintiffs' ability to seek to cure any defects via amendment. *See* Federal Rules of Civil Procedure 15(a)(2) (leave to amend should be "freely" given).

DATED: June 5, 2026

Lauren A. Ormsbee
Lauren A. Ormsbee (admitted *pro hac vice*)
Jesse L. Jensen (admitted *pro hac vice*)
Alexandra E. Forgione (admitted *pro hac vice*)
Jacqueline E. Lacovara (admitted *pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: lormsbee@labaton.com
jjensen@labaton.com
aforgione@labaton.com
jlacovara@labaton.com

*Lead Counsel for Lead Plaintiff and the Class*

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C**
Keith A. Ketterling, OSB No. 913368
Timothy S. DeJong, OSB No. 940662
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: kketterling@stollberne.com
tdejong@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Liaison Counsel for Lead Plaintiff and the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**

TAEVA C. SHEFLER (admitted *pro hac vice*)
SNEHEE KHANDESHI (admitted *pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534

*Attorneys for Additional Named Plaintiff*
*Venkata Surya Teja Gollapalli*