**STOLL STOLL BERNE**
**LOKTING & SHLACHTER P.C**
Timothy S. DeJong, OSB No. 940662
Keith A. Ketterling, OSB No. 913368
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: tdejong@stollberne.com
kketterling@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Liaison Counsel for*
*Lead Plaintiff and the Class*

[additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| IN RE KINDERCARE LEARNING COMPANIES, INC. SECURITIES LITIGATION | Case No. 3:25-cv-01424-AR<br>CLASS ACTION ALLEGATION<br>**MEMORANDUM OF LAW IN OPPOSITION TO KINDERCARE DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT AND JOINDERS THERETO**<br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 4

A. The IPO Focuses On KinderCare's Safety, Staffing, And Track Record .......... 4

B. The Concealed Reality: Pervasive Health, Safety, and Staffing Failures .......... 5

C. Post-IPO Disclosures And The Collapse Of KinderCare's Share Price .......... 6

III. APPLICABLE LEGAL STANDARDS .......... 7

IV. ARGUMENT .......... 8

A. The AC Satisfies Rule 8 And Is Not A "Puzzle Pleading" .......... 8

B. The Safety Statements Are Materially False .......... 9

1. The AC Pleads Detailed Facts Demonstrating Material Falsity .......... 9

a. Reports establish pervasive, undisclosed non-compliance .......... 12

b. Lawsuits corroborate widespread and undisclosed wrongdoing .......... 14

c. Former Employee accounts further support falsity .......... 14

2. The AC Pleads Concrete And Verifiable Statements—Not "Puffery" .......... 17

C. The Staffing Statements Are Materially False .......... 19

1. The AC Pleads Detailed Facts Demonstrating Material Falsity .......... 19

a. Former Employee accounts demonstrate falsity .......... 20

b. Lawsuits corroborate falsity .......... 22

c. Violations of staffing regulations further support falsity .......... 23

2. The Staffing Statements Are Not Inactionable Puffery or Opinion .......... 23

D. The Operating Strategy Statements Are Materially False .......... 25

1. Plaintiffs Plead Detailed Facts Demonstrating Falsity .......... 25

2. The Statements Are Not Inactionable Puffery or Opinion .......... 27

E. The Risk Disclosures Are Materially False ........ 27

F. The AC Pleads Actionable Item 303 And Item 105 Violations........ 30

G. The AC Pleads Section 12(a)(2) And Section 15 Claims ........ 33

V. CONCLUSION........ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3226701 Can. v. Qualcomm*, 2017 WL 971846 (S.D. Cal. Jan. 27, 2017)....25

*In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021), cert. denied, 142 S. Ct. 1227 (2022)....23, 24, 28, 33

*In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201 (S.D.N.Y. Jul. 31, 2023)....29

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....7, 15

*Baker v. SeaWorld Ent.*, 423 F. Supp. 3d 878 (S.D. Cal. 2019)....12, 19

*Barnes v. Edison Int'l.*, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021)....19

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012)....14, 23

*Bhangal v. Hawaiian Elec.*, 2024 WL 4505465 (N.D. Cal. Oct. 15, 2024)....19

*In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65 (S.D.N.Y. 2017)....18, 19

*Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020).... *passim*

*Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223 (S.D.N.Y. 2012)....19, 24

*Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*, 775 F. Supp. 3d 1275 (N.D. Ga. 2025)....14

*In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104 (9th Cir. 2013)....7

*In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009)....33

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. Mar. 30, 2020)....26

*City of Royal Oak Ret. Sys. v. Juniper Networks*, 880 F.Supp.2d 1045 (N.D. Cal. 2012)....22

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser*, 587 F. Supp. 3d 56 (S.D.N.Y. 2022)....25

*Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*, 166 F.4th 805 (9th Cir. 2026)....28

*Cullen v. Ryvyl Inc.*, 2024 WL 4536471 (S.D. Cal. Oct. 21, 2024)....17

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005), *abrogated on other grounds by In re Genius Brands, Int'l, Inc. Sec. Litig.*, 97 F.4th 1171 (9th Cir. 2024)...........................8

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023), *cert. dismissed as improvidently granted*, 604 U.S. 20 (2024).......................................................12

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014).......................7

*Elliott v. Edison Int'l*, 2026 WL 636708 (C.D. Cal. Mar. 6, 2026)...............................................30

*Emps. Ret. Sys. of Rhode Island v. Williams Cos., Inc.*, 889 F.3d 1153 (10th Cir. 2018)...............................................................................................................27, 32

*In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023).......................................................28

*In re Finjan Holdings, Inc.*, 58 F.4th 1048 (9th Cir. 2023)...........................................................25

*Five Star Gourmet Foods, Inc. v. Fresh Express*, 2020 WL 513287 (N.D. Cal. Jan. 31, 2020)...............................................................................................................30

*Franchi v. SmileDirectClub*, 633 F. Supp. 3d 1046 (M.D. Tenn. 2022)................................12, 31

*Gavaldon v. Standard Chartered Bank Int'l (Americas) Ltd.*, 2020 WL 835311 (S.D. Cal. Feb. 20, 2020).....................................................................................................25

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023)............16, 21, 22

*Green v. Maison Sols. Inc.*, 2025 WL 1009121 (C.D. Cal. Mar. 31, 2025).................................13

*Haping v. 17 Educ. & Tech.,* 2023 WL 8716895 (S.D.N.Y. July 20, 2023)................................14

*Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440 (N.D. Cal. Feb. 23, 2023)..............................9

*In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149 (C.D. Cal. 2022).................................. *passim*

*HRSA-ILA Funds v. Adidas AG*, 745 F.Supp.3d 1127 (D. Or. 2024)..........................................29

*Indiana Pub. Ret. Sys. v. Rivian Auto., Inc.*, 2026 WL 199989 (C.D. Cal. Jan. 22, 2026)...................................................................................................................7

*In re Infonet Servs. Sec. Litig.*, 310 F.Supp.2d 1080 (C.D. Cal. 2003).........................................34

*In re Intel Sec. Litig.*, 2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)...........................................19

*In re Intrexon Sec. Litig.*, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017)........................................19

*In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821 (N.D. Cal. 2014).....................................18

*Joyce v. Amazon.com, Inc.*, 2023 WL 8370101 (W.D. Wash. Dec. 4, 2023)...............................17

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018).....................................12, 22

*Lamontagne v. Tesla*, 2024 WL 4353010 (N.D. Cal. Sept. 30, 2024)....32

*In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949 (D. Or. Nov. 24, 2021)....18

*Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993 (C.D. Cal. 2025)....13

*Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706 (2d Cir. 2011)....13

*Lu v. Align Tech.*, 417 F. Supp. 3d 1266 (N.D. Cal. 2019)....9

*In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758 (N.D. Cal. 2020).... *passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024)....10, 11

*Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169 (S.D. Fla. 2005)....6, 26

*In re Massey Energy*, 883 F. Supp. 2d 597 (S.D.W.Va. Mar. 28, 2012)....18, 19

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)....32

*Mazzaferro v. Aruba Networks, Inc.*, 2015 WL 456534 (N.D. Cal. Feb. 2, 2015)....16

*McGovney v. Aerohive Networks*, 367 F. Supp. 3d 1038 (N.D. Cal. 2019)....16

*Mendoza v. HF Foods Grp., Inc.*, 2021 WL 3772850 (C.D. Cal. Aug. 25, 2021)....9

*In re Metawave Comms. Corp. Sec. Litig.*, 629 F.Supp.2d 1207 (W.D. Wash. 2009)....22

*Milano v. Perot Sys.*, 2006 WL 929325 (N.D. Tex. Mar. 31, 2006)....25

*Miller v. Thane Int'l, Inc.*, 519 F.3d 879 (9th Cir. 2008)....13

*Mirmehdi v. United States*, 689 F.3d 975 (9th Cir. 2012)....34

*Moore v. EO Prods., LLC*, 2023 WL 6391480 (N.D. Cal. Sept. 29, 2023)....30

*Murphy v. Precision Castparts Co.*, 2017 WL 3084274 (D. Or. June 27, 2017)....9

*In re Nat'l Golf Props., Inc.*, 2003 WL 23018761 (C.D. Cal. Mar. 19, 2003)....33

*Navajo Health Found.-Sage Mem'l Hosp. Inc. v. Razaghi Dev. Co. LLC*, 2024 WL 3860919 (D. Ariz. Aug. 19, 2024)....7

*Norfolk Cnty. Ret. Sys. v. Solazyme,* 2016 WL 7475555 (N.D. Cal. Dec. 29, 2016)....14

*In re Norfolk S. Bond/Note Sec. Litig.*, 2025 WL 641089 (S.D.N.Y. Feb. 27, 2025) *aff'd*, 2026 WL 555420 (2d Cir. Feb. 27, 2026)....19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) .....25, 28

*In re ON24, Inc. Sec. Litig.*, 2026 WL 45259 (9th Cir. Jan. 7, 2026) .....7, 16

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012) .....32

*In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962 (N.D. Cal. 2025) .....10, 11, 13

*Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862 (N.D. Ill. 2023) .....20

*Pino v. Cardone Cap., LLC*, 55 F.4th 1253 (9th Cir. 2022) .....33, 34

*Pinter v. Dahl*, 486 U.S. 622 (1988) .....33

*Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021) .....33, 34

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) .....15, 17

*Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) .....10

*Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189 (E.D. Pa. 2021) .....19

*Ret. Sys. v. Teleperformance SE*, 746 F. Supp. 3d 1395 (S.D. Fla. 2024) .....25

*Retail Wholesale & Dep't Store Union v. H.P.*, 845 F.3d 1268 (9th Cir. 2017) .....19

*Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) .....9

*Ryan v. FIGS*, 2024 WL 187001 (C.D. Cal. Jan. 17, 2024) .....18

*Ryan v. FIGS*, 2025 WL 71727 (C.D. Cal. Jan. 10, 2025) .....34

*Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016) .....27

*Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882 (M.D. Tenn. 2013) .....32

*Sherman v. Abengoa, S.A.*, 156 F.4th 152 (2d Cir. 2025) .....14

*Sodha v. Golubowski*, 154 F.4th 1019 (9th Cir. 2025) .....25, 26, 32, 33

*Solar Integrated Roofing v. Massey*, 2024 WL 4152380 (S.D. Cal. Sept. 11, 2024) .....9

*In re Sotera Health Co. Sec. Litig.*, 2025 WL 1648942 (N.D. Ohio Mar. 19, 2025) .....18

*In re Sourcefire, Inc. Sec. Litig.*, 2008 WL 1827484 (D. Md. Apr. 23, 2008) .....30

*Southfield Gen. Emps. Ret. v. Nat'l Vision*, 2024 WL 1376016 (N.D. Ga. Mar. 30, 2024) ....................25

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir. 1998) ....................31

*Sundaram v. Freshworks, Inc.*, 2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) ....................32

*In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042 (N.D. Cal. 2025) ....................28, 29

*In re Talis Biomedical Corp. Securities Litigation*, 2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) ....................21

*Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308 (2007) ....................7

*Thorpe v. Walter Inv. Mgmt., Corp.*, 2014 WL 11961964 (S.D. Fla. Dec. 23, 2014) ....................17

*Turocy v. El Pollo Loco Holdings, Inc.,* 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ....................24

*United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926 (D. Az. 2024) .................... *passim*

*Veal v. LendingClub*, 423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................14

*In Re Violin Memory Sec. Litig.*, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ....................7

*Waswick v. Torrid*, 2024 WL 3740052 (C.D. Cal. July 23, 2024) ....................19

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin.*, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) ....................19

*In re Weight Watchers Sec. Litig.*, 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ....................21

*Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849 (N.D. Cal. 2023) ....................15

*Winter v. Stronghold Digit. Mining, Inc.*, 686 F. Supp. 3d 295 (S.D.N.Y. 2023) ....................8

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ....................15

**Statutes**

15 U.S.C. §§77k(a), 77l(a)(2) ....................8

## GLOSSARY OF CERTAIN DEFINED TERMS

| | |
|---|---|
| ¶ | Citations to ("¶") are to paragraphs in the AC. |
| AC | Amended Complaint (ECF No. 81). |
| Canavin | Michael Canavin, KCLC President, who reported to former-CEO Defendant Thompson at the time of the Offering. ¶73. |
| D. Ex. | Defendants' Exhibit (identified as the exhibits to the Defendants' declaration). |
| ECE | Early childhood education. KinderCare purports to operate the largest private network of ECE centers in the United States. ¶2. |
| Enrollment | The number of children enrolled in a KinderCare facility, which "is the key driver of revenue" for KinderCare. ¶81. |
| FEs or Former Employees | The former KinderCare employees whose reports are discussed in the AC. Consistent with the AC, in order to preserve the former employees' anonymity while maintaining readability, this brief uses the pronouns "she" and "her" in connection with all the FEs, regardless of actual gender. *See* AC p.1 n.1. |
| FE-1 | "FE-1 worked at KinderCare for a total of approximately 28 years in a variety of roles, including recently as a former Senior District Leader in New Center Growth from mid- 2022 through November 2023. Her role as Senior District Leader involved overseeing KinderCare facilities, managing profit & loss ("P&L"), talent, and health & safety requirements, including overseeing the hiring and operations of individual schools from pre-open preparations through post-opening. FE-1 was responsible for between 15 to 18 centers nationwide and was not tied to a particular geographic area. As Senior District Leader in New Center Growth, FE-1 reported to Anissa Walker, currently Regional Vice President at the Company; Walker in turn reported to Michael Canavin, President of the KinderCare Learning Centers division of the company." ¶73. |
| FE-2 | "FE-2 was employed by KinderCare from October 2016 through July 2025. She began her employment as District Manager, was promoted to Client Relations Business Partner – Nationwide, and then to Client Success Manager – Nationwide, which was her title from October 2023 through the end of her employment in July 2025. FE-2 explained that, as Client Success Manager, she worked in the "At Work" division of KinderCare, functioning as a liaison between District Leaders and KinderCare's clients. FE-2 explained that her division of KinderCare provided childcare facilities for client entities, such as corporations, universities, and municipalities, for the dedicated use of those entities' employees' children. FE-2 noted that her work involved negotiating contracts with new clients and re-signing existing clients. FE-2 reported to Jeffery "JT" Talkington, currently Manager, Client Implementation and Adoption, at KinderCare. According to FE-2, Talkington reported to Amy Harmon, former Vice President, Client Success and Senior Director, Implementation at the Company. Harmon, in turn, reported to Joshua Noda, currently Vice President, Operations, at the Company." ¶74. |
| FE-3 | FE-3 was employed as Director at three different KinderCare centers from June 2021 through December 2024 in the Virginia and Washington, D.C. metro area. "As Director, she was responsible for overseeing the operations of her KinderCare facility, which included enrolling students, |

| | |
|---|---|
| | hiring and managing staff, tracking key performance indicators for her facility, and managing the facility's budget." ¶75. |
| FE-4 | "FE-4 was employed as a Center Director at a KinderCare facility in Texas from approximately January 2022 through August 2025. FE-4 reported to many District Leaders during her tenure." ¶76. "FE-4 recalled the last District Leader to whom she reported to was Jacian Lewis, who has since been promoted to Regional Manager for KinderCare." ¶76. |
| FE-5 | "FE-5 was employed as a Director of a KinderCare facility in the Northeast from Fall 2023 through Spring 2025, where she ran the day-to-day operations of the facility, including hiring and training staff and teachers; ensuring compliance with childcare regulations and Company policies; and working with Human Resources in hiring, training, and compliance matters. FE-5 reported to the District Leader, who reported to the Area Vice President, who reported to Michael Canavin, President of KCLC." ¶77. |
| FE-6 | "FE-6 was employed by KinderCare as Regional Director of School Partnerships – Midwest from August 2022 through November 2024. FE-6 explained that she worked on the Champions side of KinderCare's business, which is the before- and after-school and summer programs division. She elaborated that her role was primarily a sales position. FE-6 worked with school districts in ten states across the Midwest to establish partnerships and relationships with them to provide before-and-after-school programs for children in their districts." ¶78. |
| Individual Defendants | Defendants Paul Thompson, Anthony Amandi, John T. Wyatt, Jean Desravines, Christine Deputy, Michael Nuzzo, Benjamin Russell, Joel Schwartz, Alyssa Waxenberg, and Preston Grasty, each of whom participated in the preparation of and signed the Registration Statements, participated in the Offering, and solicited the purchase of KinderCare common stock sold pursuant to and traceable to the Offering Documents. ¶¶34-46. |
| IPO (or the Offering) | The initial public offering for KinderCare common stock conducted in October 2024. |
| Item 303 | Item 303 of Regulation S-K, 17 CFR §229.303 et. seq. |
| Item 105 | Item 105 of Regulation S-K, 17 CFR §229.305 et. seq. |
| KCLC | KinderCare Learning Centers, KinderCare's most important business segment and provided 88.3% of KinderCare's fiscal 2023 revenues. ¶80. |
| KinderCare Defendants | "KinderCare Defendants" collectively refers to KinderCare and the Individual Defendants. ¶¶34-46. |
| KinderCare (or "Company") | Defendant KinderCare Learning Companies, Inc. |
| Monitoring Reports | Regulatory inspection and monitoring reports of KinderCare facilities that are required by federal law and must include, among other things, "major substantiated complaints about failure to comply with Federal Law and State child care policies" and failures to comply with "requirements designed to protect the health and safety of children." 42 U.S.C. §9858c(c)(2)(D), (I). ¶118. |
| Motion or MTD | KinderCare Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF No. 99) |

| | |
|---|---|
| Occupancy | KinderCare's occupancy (or occupancy rate) is a key performance metric that the Company calculated as "as the average weekly ECE same-center enrollment divided by the total of the ECE same-centers' capacity during the period." In other words, the higher the enrollment for a KinderCare center, with capacity for the center remaining constant, the larger the occupancy rate (approaching 100%). ¶81. |
| Offering Documents | The "Offering Documents" are defined as: (i) the registration statement for the IPO on Form S-1 filed by KinderCare on September 6, 2024, as amended on September 30, 2024 and October 7, 2024, and declared effective on October 8, 2024 (the "S-1 Registration Statement"); (ii) the description of KinderCare's common stock filed by KinderCare on October 9, 2024 on Form 8-A (the "Form 8-A"); (iii) the registration statement filed by KinderCare on Form S-8 for the Amended and Restated 2022 Incentive Award Plan and the 2024 Employee Stock Purchase Plan, which was discussed in the S-1 Registration Statement and incorporated by reference the S-1 Registration Statement, the Form 8-A, and the Prospectus (defined below) (the "S-8 Registration Statement" and together with the S-1 Registration Statement, the "Registration Statements")); and (iv) the prospectus filed by KinderCare on Form 424B4 on October 9, 2024 KinderCare, which was incorporated into and formed part of the Offering Documents (the "Prospectus"). ¶1 n.2. |
| Operating Strategy Statements | The false statements and omissions about KinderCare's operating strategy alleged at ¶¶298-304. |
| Partners Group | "Partners Group" refers to Defendant PGUSA, Partners Group Holding AG (Switzerland), and all other affiliates identified in the Offering Documents as holding interests in KinderCare and/or serving as investment manager for entities holding interests in KinderCare. ¶47. Partners Group has controlled KinderCare since 2015, and continues to control KinderCare. ¶48. By stipulation (ECF No. 67), which the Court so-ordered on January 22, 2026 (ECF No. 74), "Defendant PGUSA agrees that it will not argue that any entity affiliated with PGUSA (including but not limited to [Partners Group Holding AG] or the other PGUSA affiliates identified in the Registration Statement), is in fact the proper party to this lawsuit in lieu of PGUSA and/or should have liability in lieu of PGUSA" (ECF No. 74, ¶47 n.4). Partners Group filed a motion to dismiss and joinder to the MTD (ECF No. 102), to which Plaintiffs respond herein and separately as appropriate. |
| Plaintiffs | Court-appointed Lead Plaintiff City of Dearborn Police & Fire Revised Retirement System ("Dearborn" or "Lead Plaintiff") and additional named plaintiff Venkata Surya Teja Gollapalli ("Gollapalli"). |
| Pl. Ex. | Plaintiffs' Exhibit (identified as the exhibits to the plaintiffs' declaration). |
| Risk Disclosures | The false statements and omissions contained in KinderCare's risk disclosures alleged at ¶¶317-21. |
| Rule 8(a) | Federal Rule of Civil Procedure Rule 8(a). |
| Safety Statements | The false statements and omissions about KinderCare's compliance with rigorous safety standards and government regulations alleged at ¶¶108-113. |
| Section 11 | Section 11 of the Securities Act, 15 U.S.C. §77k et. seq. |

| | |
|---|---|
| Section 12(a)(2) | Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2) et. seq. |
| Section 15 | Section 15 of the Securities Act, 15 U.S.C. §78o et. seq. |
| Securities Act | Securities Act of 1933. |
| Staffing Statements | While the Offering Documents acknowledged the critical importance of quality childcare employees and assured investors of the Company's success in hiring and retention, the Offering Documents did not disclose that KinderCare systematically alienated quality employees with low wages and untenable workloads and instead hired unqualified and even dangerous staff at the time of the IPO. ¶23. Plaintiffs accordingly characterized a category of misstatements as "Employee Engagement and Staffing Statements." |
| Underwriter Defendants | The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities, who received over $36.4 million in fees and commissions in connection with the IPO. ¶¶52-72. The Underwriter Defendants filed a Notice of Joinder to the Motion (ECF No. 103), which Plaintiffs address herein. |

Plaintiffs respectfully submit this memorandum in opposition to the Motion.[1]

## I. INTRODUCTION

This case asserts strict liability Securities Act claims related to KinderCare's October 2024 IPO, through which Defendants raised more than $662 million from sales of KinderCare common stock to public investors. The Offering Documents used to conduct the IPO put forward the investment thesis that KinderCare—the nation's largest private childcare provider—had a "strong track record" and "cultivat[ed] an atmosphere of trust" around the safety and staffing of its childcare facilities. The Offering Documents represented that KinderCare maintained "rigorous safety standards across all classrooms" and was "***continuing to comply*** with applicable laws and regulations," citing specifically "health and safety laws and regulations" and "minimum qualifications and background checks for our center personnel as well as teacher-to-child ratios"—referencing mandatory safeguards widely-understood as critical for child safety. The Offering Documents also warned of serious consequences to enrollment, occupancy, and financial performance from safety and staffing issues—but described these risks merely as hypothetical. These safety and staffing representations materially assured investors because, as a market analyst observed, these were "key day-to-day operating risks" for KinderCare.

In reality, well-pleaded facts—including an extensive review of federally-mandated Monitoring Reports, sworn pleadings in ongoing litigation, and firsthand accounts from six well-placed former KinderCare employees—contradict the affirmative representations in the Offering Documents. These facts further reveal that the risks and contingencies described merely as hypothetical and as-yet-unrealized failed to convey the true magnitude of the risks and that those risks had ***already*** come to fruition and were actively materializing as of the IPO. In the nine months before the IPO, regulators substantiated nearly 2,000 safety violations at 680 KinderCare ECE centers—***nearly 50%*** of the ECE facilities and nearly one-third KinderCare's total facilities. These violations posed ***immediate*** health and safety risks to enrolled children, and many involved mental or physical abuse. These reports also documented hundreds of instances in which KinderCare

[1] Unless noted, emphasis is added, internal citations and quotations are omitted, and terms have the meanings provided to them in the accompanying Glossary, *supra* iv-vii, and/or the AC.

violated required ratios, left children unattended, and failed to hire and screen qualified staff. These widespread violations demonstrate that KinderCare was not "continuing to comply" with safety regulations as represented in the IPO.

The AC further bolsters these findings with allegations based on litigation and well-placed former KinderCare employees, which corroborate KinderCare's systemic safety disregard and also reveal staffing practices that differed dramatically from the representations in the Offering Documents. Among other things, just the year before the IPO, KinderCare settled claims with the Massachusetts Attorney General for "understaffing" and labor violations—but, as the AC alleges, subsequent litigation and independent FE accounts reveal that these practices continued at the time of the IPO and further contributed to unsafe conditions. Still other accounts also reveal a retaliatory culture within KinderCare that actively discouraged employees from raising safety issues.

Defendants' Motion ignores these facts in favor of pleading-stage rhetorical devices that characterize the violations as "isolated" (but also somehow "unavoidable"); discount the corroborating FE accounts as "unreliable" and lawsuits as unproven; attempt to walk away from concrete representations in the Offering Documents about self-identified critical issues by now claiming those assertions were immaterial and mere puffery; and insist that the risk disclosures—no matter how hypothetical—sufficiently warned investors of risks about systemic practices and deficiencies that were undisclosed. As described more fully below, these arguments fail.

***First***, Defendants' attempts to excuse nearly 2,000 substantiated safety violations in nine months before the IPO (across nearly half of KinderCare's ECE facilities) as "isolated" and "unavoidable" (MTD 16–17) replaces legal argument with fuzzy math. Where a company stakes its investment thesis in safety and compliance—as KinderCare did here—allegations of pervasive and undisclosed non-compliance plausibly demonstrate material falsity. *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020).

***Second***, Defendants contend that some—***not*** all—alleged false statements are "puffery" (MTD 13–14, 22–23, 28–29), but fail to establish that any statements were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their

unimportance." *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1154 (C.D. Cal. 2022). To the contrary, each statement concerns material and verifiable representations about the existing state of the Company's compliance, personnel, and operating performance. For example, the Offering Documents described a "strong track record" of occupancy growth driven by "best practices" implemented uniformly across its centers—yet an internal, undisclosed analysis at the time of the IPO identified 150 nonconforming centers. ¶¶19, 305(c). Defendants do not contend otherwise; they instead try to dodge liability by claiming the statements were puffery. Defendants fail to come anywhere near meeting the demanding showing required for dismissal on this factual basis—particularly given that KinderCare itself confirmed the materiality of this information when it later blamed flailing performance on the centers identified by its undisclosed analysis.

***Third***, Defendants' defense of KinderCare's risk disclosures (MTD 30–33) disregards settled law that framing a risk as hypothetical is actionably misleading when the risk has already come to pass, and further that risk disclosures are actionably false where critical facts about the magnitude of the risks are undisclosed. The AC sufficiently alleges falsity in both respects, as the hypothetical and incomplete warnings in the Offering Documents that, e.g., "adverse publicity . . . could result in decreased enrollment" concealed both that such risks had previously materialized and also materially misrepresented the magnitude of the risk, leaving investors unaware of "what might be the worst scandal in America's childcare system."

***Finally***, the AC alleges specific, then-existing, management-known trends and events omitted from the Offering Documents, including pervasive regulatory violations, staffing deficits, and nearly 150 identified underperforming centers. Items 303 and 105 required the Offering Documents to disclose this information, which was reasonably likely to (and did) have a material impact and made investment in KinderCare risky. These violations suffice at this pleading stage, particularly given the subsequent corroboration for these claims from the congressional investigation into KinderCare, which Oregon Senator Jeffrey A. Merkley described as concerning KinderCare's "pattern of safety and compliance issues across multiple states" and "trends [that] raise questions about [] KinderCare's growth strategy"—mirroring the Item 303 violations alleged

here. Pl. Ex. C. Tellingly, while Defendants improperly append and cite extrinsic material throughout their Motion, they conspicuously omitted to mention this material development.

The undisclosed facts impaired KinderCare's performance and continued to do so after the IPO, and its stock price collapsed rapidly—from the $24.00 per share as of the IPO, to just $4.62 by February 5, 2026, an 81% decline. The allegations readily satisfy the Rule 8 notice pleading standards for the strict-liability Securities Act claims asserted, and the Court should reject Defendants' requests to instead credit their counter-narratives and shield them from liability for IPO disclosures that misrepresented the most important aspects of KinderCare's business.

## II. STATEMENT OF FACTS

### A. The IPO Focuses On KinderCare's Safety, Staffing, And Track Record

KinderCare is headquartered in Lake Oswego, Oregon, and operates the largest network of ECE centers in the United States—nearly 1,500 ECE centers and 2,400 childcare centers total as of the IPO. ¶¶2, 33. On October 9, 2024, KinderCare conducted its IPO, raising more than $662 million in gross proceeds. ¶1. The IPO enriched Defendant Partners Group, the private equity firm consortium that has owned and controlled KinderCare since 2015. ¶50.

The Offering Documents did not mention health, safety, and staffing in passing—they made those subjects the centerpiece of KinderCare's investment thesis. For example, the Offering Documents lead with Defendant CEO Thompson writing to investors: "[w]e hold sacred our responsibility to protect and nurture the children in our care." ¶¶3, 109. Elsewhere, the Offering Documents explicitly state that KinderCare's business depends on "***cultivating an atmosphere of trust***." ¶314. The materials also assured investors that KinderCare's "rigorous safety standards across all classrooms are reinforced by ongoing training and measurement tools" and represented that KinderCare was "continuing to comply with applicable laws and regulations," including "minimum qualifications and background checks for our center personnel as well as teacher-to-child ratios and various health [] and safety regulations." ¶¶109-112. The Offering Documents also assured investors that KinderCare paid "competitive compensation" and described the Company's "strong track record of improving occupancy rates" through "best practices" deployed

"across our centers." ¶¶246, 298.

### B. The Concealed Reality: Pervasive Health, Safety, and Staffing Failures

The AC relies extensively on allegations derived from regulatory Monitoring Reports, litigation records, and firsthand accounts of FEs—and reveals a business reality markedly different from the one depicted by the rosy statements in the Offering Documents.

***Health and Safety***. The Offering Documents represented that KinderCare was "continuing to comply" with safety regulations and that it maintained "rigorous health and safety standards" across all its centers. Yet in the nine months before the IPO, state agencies across the country substantiated ***nearly 2,000 health and safety violations at 680 ECE centers—nearly half KinderCare's ECE facilities and one-third its total facilities***. ¶122. These incidents involved serious injuries and exposure to grave risk. A Wisconsin facility had reports of "staff being aggressive with infants," "undocumented injuries," children having "access to power tools and toxic chemicals," and an infant who became ill from exposure to cocaine brought to the facility by staff—leading to the staff member's arrest and revocation of the center's license. ¶¶149, 330. Just days after the IPO, a North Carolina KinderCare was "caught again," with regulators discovering doors propped open and a staff member sleeping while caring for children. ¶163.

These widespread issues correspond with allegations in numerous lawsuits alleging sexual and physical abuse from health and safety failures like negligent supervision, negligent hiring, negligent training, and negligent retention. §IV.D.1b. Among these was *Doe v. KinderCare Learning Centers, LLC,* a 2023 California action involving the sexual assault of a three-year-old by a KinderCare employee. ¶168. Both as to the violations and the lawsuits, KinderCare had actual notice of the underlying incidents and substantiated and/or alleged misconduct. ¶166. FE accounts further corroborate these systemic problems, further revealing how the "tight labor model" implemented by KinderCare (at the behest of its private equity owners at Partners Group) routinely threatened—and in fact impaired—compliance with mandatory staff-to-child ratios, which are widely understood as essential in protecting child safety. ¶86.

***Staffing***. Instead of offering "competitive compensation," KinderCare "frequently

compensat[ed] employees at or below the minimum wages required by law," and used its low wages and untenable workloads to systematically alienate experienced staff—leading the Company to hire "substandard, unqualified, or unvetted staff." §IV.D.1.b.[2] Just one year before the IPO, KinderCare paid over $540,000 in restitution and civil penalties to the Massachusetts Attorney General, who described the violations as "demonstrat[ing] a pattern" and "expressly attributed certain violations to 'understaffing' at KinderCare facilities." ¶289.

***Operating Strategies***. While the Offering Documents touted the Company's track record based on implementing best practices across ***all*** centers, less than a year after the IPO, KinderCare attributed flailing performance to 150 underperforming centers that had been identified "late last year"—i.e., precisely the time of the IPO—that did ***not*** use the "same proven practices and frameworks that have driven strong results in our highest performing centers.'" ¶¶345-47.

**C. Post-IPO Disclosures And The Collapse Of KinderCare's Share Price**

Following the IPO, the stock price soared 9% on the first trading day, and KinderCare was valued at $2.8 billion. ¶94. The true reality began emerging within weeks: in its first public earnings release, on November 20, 2024, KinderCare reported "flat" Q3 2024 enrollment growth and unexpectedly declined to provide guidance, disclosures that one analyst wrote were "viewed . . . as a disaster." ¶¶17, 323. When the Company finally provided guidance months later, in March 2025, it forecast further flat and decelerating enrollment and occupancy growth. ¶¶17, 325-28.

In April 2025, an investigative report described as "damning" and pulling "back the curtain on what might be the worst scandal in America's childcare system at KinderCare," aggregated local news stories and reporting documenting safety incidents and firsthand accounts of regulatory and operational failure at KinderCare. ¶¶329-37. A media outlet wrote that the revelations "***might***

[2] Defendants improperly reference purported third-party "ratings" of KinderCare. MTD 3, 5. These factual assertions from outside the AC are improper at this stage but in any event do not contradict the allegations. For example, the Well Building Standard is a "voluntary" certification purchased by KinderCare and which merely relates to building infrastructure, for which researchers have observed "no improvements in physical health" associated. (Tejas Kokatnur, et. al., *The WELL Building Standard: A literature review and bibliometric analysis of a nascent field*, J. OF BLDG. ENG'G, Vol. 103 (2025). Similarly, the Gallup Exceptional Workplace Award is based on self-assessment surveys about employment, not about how well employees do their job. *See* https://www.gallup.com/workplace/244277/gallup-workplace-awards.aspx.

***be the worst scandal in America's childcare system***," while a U.S. congressperson publicly commented in response to the investigative report: "[i]f you can't keep children safe—and worse, are complicit in their abuse—you do NOT deserve a dime of taxpayer funding." ¶¶337-38.

KinderCare continued to report worsening enrollment, occupancy, and financial performance, and by August 2025, CEO Thompson conceded that "center-level and local market-specific" issues at underperforming centers had been identified "late last year"—i.e., at the time of the IPO. ¶¶345-47. By November 2025, market analysts noted investor skepticism and disappointment that, "since the IPO, . . . delivery has lagged expectations." ¶¶352-54. By the filing of the AC, KinderCare's stock price declined more than 80% from the $24.00 IPO price. ¶25.

## III. APPLICABLE LEGAL STANDARDS

On a Rule 12(b)(6) motion, the Court must "accept all factual allegations . . . as true" and view them in the light most favorable to Plaintiffs. *Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 322 (2007). A complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The parties agree Rule 8(a) applies (MTD at 11), which imposes "not a particularly onerous burden,": "the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Navajo Health Found.-Sage Mem'l Hosp. Inc. v. Razaghi Dev. Co. LLC*, 2024 WL 3860919, at *2 (D. Ariz. Aug. 19, 2024). Rule 8(a) requires that a plaintiff "provide a 'short and plain statement of the claim showing that [he] is entitled to relief.'" *In Re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014); *In re ON24, Inc. Sec. Litig.*, 2026 WL 45259, at *2 (9th Cir. Jan. 7, 2026). "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (emphasis in original).[3]

[3] Defendants wrongly suggest that *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) requires allegations that "tend[] to exclude" possible alternative explanations (MTD 10); to the contrary, as the Ninth Circuit has clarified, *Century Aluminum* applies only to allegations that are "merely *possible* rather than plausible" (emphasis in original). That is not the case here, where the "plausible complaint . . . offer[s] facts that tend[] to exclude the defendant's

Footnote continued on next page

As to KinderCare, Sections 11 and 12(a)(2) impose ***strict liability***. 15 U.S.C. §§77k(a), 77l(a)(2); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027-29 (9th Cir. 2005), *abrogated on other grounds by In re Genius Brands, Int'l, Inc. Sec. Litig.*, 97 F.4th 1171 (9th Cir. 2024). A plaintiff need only allege "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Daou* at 1028; *accord Honest*, 615 F. Supp. 3d at 1153; *Uber*, 2020 WL 4569846, at *4 (Section 12(a)(2) has the "same standard."). As to the Individual Defendants and Underwriter Defendants, Sections 11 and 12(a)(2) impose a negligence standard. *Winter v. Stronghold Digit. Mining, Inc.*, 686 F. Supp. 3d 295, 304 (S.D.N.Y. 2023). In all respects, "[n]o scienter is required" and liability exists "for innocent or negligent material misstatements or omissions." *Daou*, 411 F.3d at 1027. Thus, at this pleading stage, Plaintiffs "need only show a material misstatement or omission to establish [a] prima facie case." *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 768-70 (N.D. Cal. 2020).

## IV. ARGUMENT

### A. The AC Satisfies Rule 8 And Is Not A "Puzzle Pleading"

For its lead defense, KinderCare baselessly argues that the AC is a "puzzle pleading" (MTD 11-13). As the *Uber* court held when rejecting a nearly identical argument, even a complaint that is "long, confusing, and meandering"—which the AC is ***not***—is not a puzzle pleading so long as it "emphasize[s] the portions of [the Registration Statement] that [the plaintiff] allege[s] to be false or misleading" and "set[s] forth the reasons why [the plaintiff] believe[s] each statement to be false or misleading." *Uber*, 2020 WL 4569846, at *5 (rejecting puzzle-pleading challenge).

The AC does exactly that. It groups the challenged statements into three clear categories—health and safety (§IV.D.1), staffing and engagement (§IV.D.2), and operating strategy and risk

innocuous alternative explanation." *Eclectic Props.*, 751 F.3d at 996-98. Defendants cite *Sneed v. Talphera* to argue the challenged statements "must be 'read in light of all the information then available to the market.'" MTD 11 (citing 147 F.4th 1123, 1131 (9th Cir. 2025)). To the contrary, *Sneed* addressed heightened pleading standards not present here, and moreover "was based on an allegedly misleading marketing slogan and is therefore distinguishable based on its facts because the instant case . . . does not involve an allegedly misleading marketing slogan." *Indiana Pub. Ret. Sys. v. Rivian Auto., Inc.*, 2026 WL 199989, at *2 (C.D. Cal. Jan. 22, 2026).

factors (§IV.D.3)—and then addresses each through organized subsections (§§IV.D.1.a–c; §IV.D.2.a–b; §IV.D.3.a–b) that explain why the statements are false. Those allegations draw on three principal sources: (i) Monitoring Reports, (ii) contemporaneous lawsuits, and (iii) former-employee accounts. *See, e.g.*, ¶¶165-68, 191-241. The AC also includes Appendix A, which provides "[a] comprehensive list of the affirmative misstatements." ¶107 & AC App. A. Courts routinely find this type of structure sufficient under Rule 8 and reject "puzzle pleading" challenges like asserted here. *See, e.g.*, *Murphy v. Precision Castparts Co.*, 2017 WL 3084274, at *7 (D. Or. June 27, 2017) (holding that listing alleged misstatements by "labeled section" is "sufficiently particularized" to allow the reader to match the challenged statements and omissions with Plaintiffs' explanation).[4] Finally, Defendants' lengthy Motion defeats their own argument, as it facially evidences that they have no difficulty understanding the AC.[5]

**B. The Safety Statements Are Materially False**

**1. The AC Pleads Detailed Facts Demonstrating Material Falsity**

The Safety Statements featured pervasively in the Offering Documents were ***not*** aspirational; they were verifiable representations of fact that KinderCare "maintain[s] rigorous health and safety standards . . . across [its] over 2,400 centers and sites," and was "continuing to comply with applicable laws and regulations," including "minimum qualifications and background checks for our center personnel as well as teacher-to-child ratios and various health [] and safety regulations." ¶¶3-4, 109-13. Extensive and specific allegations contradict these statements, including: (i) the 1,982 health and safety violations across nearly half the KCLC facilities in the nine months preceding the IPO; (ii) litigation concerning abuse and injuries that corroborate

[4] *See also, e.g.*, *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *6 (N.D. Cal. Feb. 23, 2023) (not puzzle pleading where the complaint is "organized in a manner that generally permits the reader to connect the allegedly false or misleading statements with the reasons why Plaintiff challenges those statements"); *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *5 n.1 (S.D. Cal. Sept. 19, 2016) (rejecting puzzle-pleading where "the italicized portions of the quotes and the other allegations of the complaint [make clear] statements . . . allege[d] are misleading and why").

[5] Defendants' cases are inapposite, concerning pleadings that failed to "articulate exactly which statements Plaintiffs assert to be false and misleading" (*Lu v. Align Tech.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019)) or to "map" or "match up" the factual allegations to the "corresponding" statements (*Solar Integrated Roofing v. Massey*, 2024 WL 4152380, at *3 (S.D. Cal. Sept. 11, 2024); *Mendoza v. HF Foods Grp., Inc.*, 2021 WL 3772850, at *12 (C.D. Cal. Aug. 25, 2021)).

similar negligent supervision, hiring, training, and retention failures; (iii) suspensions and license revocations already imposed; (iv) KinderCare's settlement of Massachusetts AG claims attributing wage violations to "understaffing" and continuing litigation alleging similar continuous conduct; and (v) FE accounts describing intentional understaffing, ratio issues, and hiring of unqualified personnel. Further, the AC alleges that this systemic breakdown in health and safety practices and compliance affected enrollment, operations, and financial performance. ¶¶115, 117, 155.

Those allegations readily satisfy the Rule 8 notice pleading standards and establish plausibility. Courts routinely credit far more minimal allegations as sufficient to plead falsity based on undisclosed systemic conduct. *See United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 958 (D. Az. 2024) (allegations of approximately a dozen regulatory violations across nine states constituted "widespread" practices to plead falsity).[6] *See also, e.g.*, *Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) (statements of legal compliance "actionably false" where complaint cited numerous violations of laws and regulations with "detail[s] [as to] specific violations of law").

Independently, the AC also sufficiently alleges the Safety statements as actionable, "half-truth" omissions. Having elected to speak about KinderCare's compliance with enumerated regulatory requirements and its "rigorous" safety practices (¶¶98, 109), the Offering Documents were obligated to disclose the contemporaneous and management-known facts described above, which materially contradicted those representations. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 262 (2024) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth."). The Supreme Court analogized, to do otherwise misleadingly stated only that they "had dessert," without saying that they "ate a whole cake." *Id.*

Despite the sheer volume, scope, and cross-corroborating nature of the allegations, the

---

[6] *See also, e.g.*, *In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962, 994-95 (N.D. Cal. 2025) (statement that company met "all applicable federal and state . . . requirements" actionable based on alleged "thousands of violations per year"); *Uber*, 2020 WL 4569846, at *6 (allegations of systemic "violat[ions] of local laws" pleaded falsity of safety statements); *Lyft*, 484 F. Supp. 3d at 768-70 (finding "relatively minimal" pleading burden satisfied where Offering Documents touted safety but omitted contemporaneous record of assaults and litigation).

Motion nonetheless contends that the AC does not allege "well-pled facts" supporting falsity. MTD 14-22. Specifically referencing statements that Defendants do ***not*** challenge as puffery—concerning safety training, curriculum investment, staff onboarding, and the "expect[ed]" costs of regulatory compliance (¶¶110, 113)—the Motion argues that falsity is not pleaded because (purportedly) the AC does not allege "that KinderCare lacked regular safety training, did not make investments in curriculum, or did not have an onboarding program." MTD 14-15. But the allegations pleaded exactly that: in just the nine months before the IPO, there were 400 substantiated state-agency violations concerned the ***inadequacy of staff training***, and further that there were nearly 300 violations concerning KinderCare's failure to complete required background screenings as part of onboarding and at least 200 violations concerning employees lacking the minimum qualifications KinderCare's onboarding program purportedly verified. ¶¶13, 295. More fundamentally, even if Defendants were correct (they are not) that the AC did not allege that "KinderCare lacked regular safety training, did not make investments in curriculum, or did not have an onboarding program," that ignores that the AC plausibly alleges it was false to state that KinderCare was "continuing to comply" with safety regulations given the allegations demonstrate the Company's pervasive ***non***-compliance with the exact regulations discussed. *See, e.g.*, *PG&E*, 806 F. Supp. 3d at 995 (crediting alleged violations for falsity of statement that company met applicable regulatory requirements); *Carvana Co.*, 759 F. Supp. 3d 926 at 958 (allegations showing systemic violations sufficiently pleaded falsity of safety statements); *Uber*, 2020 WL 4569846, at *6 ; *Lyft*, 484 F. Supp. 3dat 768-70.[7]

Defendants' other arguments turn on a hodgepodge of flawed attempts to mischaracterize substantiated violations using arithmetic sleight of hand; to discount ongoing litigation as merely "unadjudicated"; and to attack the FEs by distorting their accounts. ***All*** these challenges improperly raise "prohibited" factual disputes. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). What's more, given the totality of mutually-corroborating bases for falsity "reach their

[7] Although Defendants refer to the curriculum investment, they ignore the AC's allegation that the rest of the statement is false—namely, that Defendants claimed to operate centers that promoted safety, when they did not.

independent but nearly identical conclusions," none of these isolated attacks provide a basis for the Court to reject falsity in totality.[8] *Accord E. Ohman J:or Fonder AB v. NVIDIA Corp*., 81 F.4th 918, 941-42 (9th Cir. 2023), *cert. dismissed as improvidently granted*, 604 U.S. 20 (2024). In any event, each of Defendants' attacks fail for the reasons discussed below.

**a. Reports establish pervasive, undisclosed non-compliance**

***First***, KinderCare attempts to spin the hundreds of substantiated violations across nearly half its KCLC centers over just nine months as "quite small," based on mathematical sleights of hand. MTD 16-17. Defendants' theoretical "violation[s] per center"[9] and "daily interactions" calculations at best raise factual disputes that do not warrant dismissal here. Even considered, these statistical gymnastics fall flat and improperly attempt to distract the Court from the meaningful metric that is alleged: the ***percentage of centers—nearly half*** the ECE facilities and ***one-third*** the total facilities had substantiated safety violations. Each such violation endangered every child at those facilities and further impacted KinderCare's performance. KinderCare itself acknowledges as such. *See, e.g.*, ¶220 (FE-3 describing internal understanding that safety impacts enrollment).[10] Likewise, Defendants' suggestion to disregard the 900 "hiring, training, and screening violations" (MTD 16-17) asks the Court to ignore common sense: those regulations protect health and safety, and violations thereof precipitate injuries and horrifying incidents. *See, e.g.*, ¶153 (failure to perform background checks linked to alleged sexual assault and abuse). Ultimately, at this pleading

[8] Defendants note that the Court needs to "tak[e] into account the customs and practices of the relevant industry" (MTD 16); the AC does exactly that, including an extensive review of industry regulations and accounts from persons with collectively decades of industry experience.

[9] KinderCare's alternative formulation fails for yet another reason: the AC findings concern only ECE facilities, but Defendants measure the violations against *all* facilities. Properly compared to the ECE facilities indicates 1.3 violations per center in the nine month pre-IPO period.

[10] Defendants wrongly criticize that the AC should have provided even more detail about Plaintiffs' methodology, including information about the reviewing attorneys or "how they uniformly applied their judgment." MTD 17 n.6. In fact, the AC ***does*** set forth the methodology and sources (¶118-24), and Defendants are free to challenge the "analytical foundation" in discovery. At this stage, however, the Ninth Circuit affirmatively credits allegations based on these sorts of "rigorous . . . analyses." *See NVIDIA*, 81 F.4th at 941 (crediting analysis where "its analytic assumptions were carefully disclosed and, more important, were consistently conservative"); *see also, e.g.*, *Franchi v. SmileDirectClub*, 633 F. Supp. 3d 1046, 1067 (M.D. Tenn. 2022) ("It suffices for present purposes that Plaintiffs allege . . . with support from a chart presumably based upon some facts . . . . The details can be fleshed out later.") The sole case cited by Defendants confirms their arguments are misplaced. *Baker v. SeaWorld Ent.*, 423 F. Supp. 3d 878, 910-13 (S.D. Cal. 2019) (addressing sufficiency of expert testimony at summary judgment).

stage, the staggering scale of violations plausibly pleads falsity, *see Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993, 1012-13 (C.D. Cal. 2025), as KinderCare's professed "***rigorous health and safety standards***" and "***continuing [] compl[iance] with applicable [health and safety] laws and regulations***" cannot be reconciled with pervasive non-compliance. ¶¶110-11.

***Second***, Defendants' baselessly suggest that the AC must "provide [] comparable figures for KinderCare's competitors." MTD 17. But whether any specific competitor also violated the law has no bearing on whether KinderCare's statements misrepresented the Company's practices.

***Finally***, Defendants' contention that "KinderCare . . . cannot be liable for failing to disclose the publicly available information in [the inspection reports]" (MTD 16) should be rejected. The "truth-on-the-market" defense "is less applicable to registration statements, IPOs, and Section 11 claims, and, in any event, "***it is not available at the motion to dismiss stage***." *Uber*, 2020 WL 4569846, at *6; *accord Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008) ("investors are not generally required to look beyond a given document to discover what is true and what is not"). KinderCare cannot escape disclosure obligations by pointing to dozens of scattered state-by-state databases no reasonable investor would be expected to locate and aggregate. *See Green v. Maison Sols. Inc.*, 2025 WL 1009121, at 8 (C.D. Cal. Mar. 31, 2025) (finding that a lawsuit's "availab[ility] on a judicial public docket" does not mean it "was so widely available that the market could not have been misled"); *Olaplex*, 765 F. Supp. 3d at 1010 (rejecting same defense as raising impermissible factual questions at the motion to dismiss stage); *see also Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 718-19 (2d Cir. 2011). Defendants' cases are inapposite or, if anything, highlight the weakness in their argument. *See PG&E*, 806 F. Supp. 3d at 1005-06 (issuer had itself "communicated existing safety deficiencies" and publicized the safety reports ***for years***; by contrast, KinderCare did no such thing).[11]

[11] *Haping v. 17 Educ. & Tech.,* 2023 WL 8716895, at *11-12 (S.D.N.Y. July 20, 2023) (MTD 16) is a non-controlling decision that is contrary to Supreme Court and Ninth Circuit precedent that "the truth-on-the-market defense is a method of refuting an alleged misrepresentation's *materiality* . . . a merits issue to be reached at trial or by summary judgment motion." In any event, *Haping* refers only to information that is "***readily accessible***"—there, public comments by politicians, which are a far cry different from the Inspection Reports at issue here.

**b. Lawsuits corroborate widespread and undisclosed wrongdoing**

KinderCare contends the ***20+ lawsuits*** cited in the AC cannot support falsity because they involve "unadjudicated wrongdoing" that KinderCare was not required to disclose. MTD 17.[12] But Defendants' contention ignores that AC alleges that these ongoing lawsuits further corroborate systemic safety issues rendering affirmative representations—and the "hypothetical" framing of related risk factors—materially false, and not merely a duty to disclose these lawsuits in particular. ¶¶116, 165, 306–11. *See Lyft*, 484 F. Supp. 3d at 769–70 (pre-IPO sexual-assault litigation supported Section 11 claim where company touted safety); *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 165-66 (2d Cir. 2025) (permitting incorporation of allegations in other complaints, especially where "detailed, independently corroborated, and the product of an independent investigation"); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (crediting other pleadings that "are replete with detailed factual information of obvious relevance to the case at hand").[13] Defendants' own cited case law confirms the AC's approach: *Veal v. LendingClub*, 423 F. Supp. 3d 785, 811-12 (N.D. Cal. 2019) held plaintiffs *could* rely on unadjudicated complaints with "independent corroboration"—exactly what is alleged here.

**c. Former Employee accounts further support falsity**

Defendants' attacks on the FE allegations (MTD 19-22) disregard that, at this pleading stage, the Court must accept the "factual allegations . . . as true." *Iqbal*, 556 U.S. at 678. The Ninth Circuit credits FE allegations that are described "with sufficient particularity to support the

---

[12] *See, e.g.*, *Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*, 775 F. Supp. 3d 1275, 1290 (N.D. Ga. 2025) (holding that where "Defendants' repeated insistence that Norfolk was committed to safety… a reasonable investor could understand Defendants' safety statements to be an integral part of Norfolk's investment thesis."). The conduct in these lawsuits primarily ***occurred*** in 2022-2023 (pre-IPO), and detail abhorrent sexual abuse or sexual assault of children at the hands of KinderCare employees or at KinderCare facilities. E.g., ¶168 (lawsuit concerning the sexual assault of a three year old girl by a KinderCare employee, and where KinderCare was on notice that the perpetrator had previously engaged in unlawful sexual conduct); ¶176 (lawsuit concerning an alarming incident in which explicit photographs were taken of a child at a KinderCare facility by a staff member and then sold); ¶169 (concerning KinderCare's negligent supervision which led to a four-year-old girl being sexually assaulted at a KinderCare facility).

[13] Unlike *Norfolk Cnty. Ret. Sys. v. Solazyme,* 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016), where the court determined that plaintiffs only "generically assert[ed] in an undifferentiated manner that facts occurred 'during the Class Period'," the AC alleges that Defendants knew of the incidents at issue in lawsuits prior by the IPO. ¶166.

probability that a person in the position occupied by the source would possess the information alleged." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 882 (N.D. Cal. 2023) (crediting former employee allegations where the complaint "describe[es] their roles within [the Company], how long they were employed there, the nature of their responsibilities, and, in some circumstances, their exact titles and who they reported to"); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (same). The AC satisfies this requirement by alleging tenure, role, and reporting structure for six FEs (¶¶73–78) who describe in detail contemporaneous, firsthand observations of chronic understaffing, hiring of unqualified personnel, struggles—and failures—to comply with ratios and other safety standards, and management's disregard for safety concerns raised through "round table" meetings (¶¶192–230). For example:

- FE-5, a facility Director from Fall 2023 through Spring 2025, witnessed that centers were often out of ratio due to the labor model imposed by management. ¶192.

- FE-2, a Nationwide Manager from October 2023 through July 2025, explained that poor compensation and retention rates affected health and safety and that KinderCare lost clients from health and safety issues. ¶¶210-211; and

- FE-3, a Director at three different centers from June 2021 through December explained health and safety issues she saw at various facilities, including that management lacked experience and knowledge qualifying them to comply with the regulations and that ratio violations were very common. ¶¶215-221.

Those accounts corroborate the regulatory and litigation allegations and further bolster falsity. *See Honest*, 615 F. Supp. 3d at 1154 (denying motion to dismiss where former-employee accounts corroborated public complaints); *ON24*, 2026 WL 45259, at *2 (Section 11 case crediting "plausible allegations, corroborated by confidential witnesses").

Defendants' criticism that none of the FEs "held roles that offered insight into companywide operations" (MTD 18) is both factually incorrect and misstates the law. The Ninth

Circuit does not require company-wide knowledge: each FE "worked at various KinderCare facilities across the country and speak[s] credibly as to the conditions of those facilities based on [her] direct experience and involvement. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) ("[t]he adequacy [of the complaint] does not depend on each [FE] possessing inside knowledge about corporate-level trends; Plaintiffs need only provide a basis for each [FE's] knowledge about the specific statements he made.").[14] In any case, the FEs satisfy Defendants' erroneous standard: for example, FE-1 was a Senior District Leader responsible for overseeing facilities, managing P&L, talent, and health and safety requirements, including overseeing hiring operations, and FE-3 was a facility Director and hired and managed staff at a portfolio of centers. (¶73, 75).[15] And each FE speaks credibly as to the conditions of the facilities at which they worked based on their direct experience and involvement.

Defendants criticize that the FE allegations "do not in themselves amount to ***actionable fraud***" (MTD 19), but this case does ***not*** assert fraud. The AC alleges strict liability claims for false statements and omissions in the Offering Documents—and the FE allegations appropriately based on these claims. For example, FE-5, a Director of a KinderCare facility, corroborated that centers were often out of ratio due to KinderCare's labor model; that she had to send staff to cover ratio at nearby centers; and that management denied her request for full-time teachers. ¶¶195, 200. Similarly, FE-4, a Center Director in Texas during the IPO, described the "KinderCare shuffle," made complying with staffing lenient ratios challenging, and that ratio issues were discussed internally in meetings attended by corporate. ¶¶212-14. Defendants' requests that this Court look

[14] Defendants' cases are inapposite. *See, e.g.*, *Mazzaferro v. Aruba Networks, Inc.*, 2015 WL 456534 *2 (N.D. Cal. Feb. 2, 2015) ("the unsupported opinion of one territory manager" could not support a "nationwide inference," unlike here, where six FEs, adverse publicity, and lawsuits all corroborate systemic practices); *McGovney v. Aerohive Networks*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. 2019) (unlike here, no allegations as to FE responsibilities).

[15] Defendants also misrepresent the considerable experience of the FEs. For example, Defendants describe FE-3's roles as "limited to" three centers (MTD 18), which discounts that the full extent of FE-3's responsibility as Director included enrollment, staffing, tracking of KPIs, and managing the budget at *three different facilities*. ¶¶75, 215-16. Defendants also describe FE-5 as merely having "worked at one unspecified center in 'the Northeast,'"—omitting that FE-5 was a Center Director for two years, running daily operations by hiring and training teachers and overseeing attempts at compliance with childcare regulations and Company policies. ¶77. And Defendants wrongly state that FE-6 "focus[ed] on partnerships with ten local school districts"—in fact, FE-6 was a Regional Director who worked with districts *in ten states across the Midwest*. ¶78.

the other way and ignore these and the other FE accounts distort both the law and the allegations. For example, Defendants suggest that FE-1—a Senior District Leader for nearly ***three decades***—"lacks reliable insight" because she left 11 months pre-IPO (MTD 20-21), but "there is no rule that confidential witnesses must have been employed during the class period at all, let alone for the whole time." *Cullen v. Ryvyl Inc.*, 2024 WL 4536471, at *9 n.6 (S.D. Cal. Oct. 21, 2024) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017)).[16]

Finally, Defendants ignore altogether well-pleaded accounts describing retaliatory behavior against employes that raised alarms about unsafe conditions at KinderCare facilities, as well as the corroborating accounts of unsafe practices obtained from the Federal Trade Commission. ¶¶184-189. The Court can also credit the similar accounts in online posting, which further corroborate and bolster these allegations of falsity, that KinderCare was "CONSTANTLY over ratio" and that staff was being "told to break the rules," around "ratios" and completing "incident reports." ¶¶236-37. *See Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *7 (W.D. Wash. Dec. 4, 2023) (anonymous sources at the pleading stage need not offer detailed descriptions if corroborated); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2014 WL 11961964, at *13 (S.D. Fla. Dec. 23, 2014) (crediting "anonymous complaints on the internet").[17]

### 2. The AC Pleads Concrete And Verifiable Statements—Not "Puffery"

KinderCare contends that six Safety Statements are non-actionable "puffery." MTD 13–14. At the outset, this necessarily concedes that at least four Safety Statements are *not* puffery, including that KinderCare "make[s] investments in our curriculum and in how we operate;" that

[16]Defendants' argument that FE-1's allegations are "far too vague" simply ignore the pleadings: FE-1 provided numerous specific examples of the staffing issues she experienced firsthand during her tenure. ¶¶227-230. Likewise, contrary to Defendants' characterization, the accounts of FE-2 and FE-3 are not "conclusory" (MTD 18-19), but detail among other things that KinderCare lost clients from safety issues and that inadequate training and staffing qualifications caused immediate health and safety problems. These allegations are sufficiently detailed at this stage. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). And Defendants' assertion that FE-3 "concedes probation can stem from trivial issues like chipped paint" (MTD 20) is a complete fabrication: she did not say chipped paint was "trivial," nor is it.

[17] Defendants' cited cases do not hold otherwise, holding only that online accounts—while still credited—cannot be the *sole* basis for allegations of falsity. *See In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *7-9 (D. Or. Nov. 24, 2021); *In re Sotera Health Co. Sec. Litig.*, 2025 WL 1648942, at *5 n.4 (N.D. Ohio Mar. 19, 2025); *Ryan v. FIGS*, 2024 WL 187001, at *13 (C.D. Cal. Jan. 17, 2024).

the Company was "continuing to comply with applicable laws;" that "center directors regularly provide safety training;" or that staff members "participate in an onboarding program" that "ensures new employees are grounded in...understanding local licensing regulations." ¶¶109-10. Particularly given the robust factual allegations of falsity for these statements as described above, there is no basis for dismissal and this case should move into discovery.

Moreover, Defendants' puffery challenges fail to establish that these statements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [their] unimportance."' *Honest*, 615 F. Supp. 3d at 1154 (finding statements made to describe [the] company's strategy of providing safe and effective products were *not* puffery and were actionable). The Safety Statements are "not mere generalities, but contain quite specific representations or guarantees of 'some concrete fact or outcome.'" *BHP*, 276 F. Supp. 3d at 79.[18] Each of the challenged statements—including that KinderCare "maintain[ed] ***rigorous health and safety standards within all our classrooms across our over 2,400 centers and sites***" (¶¶109-10); "consistently adhere[d] to ***strict procedures across all of our centers***" (¶110); and "employ[ed] ***robust practices***" including extensive training (*id.*)—are capable of objective verification given the documented violations. *See In re Massey Energy*, 883 F. Supp. 2d 597, 617-18 (S.D.W.Va. Mar. 28, 2012) (statements touting safety commitment not puffery where capable of verification through "citations" and "orders"); *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014) (statements touting "safety and efficacy" material where "reasonable investor would find the existence of [] numerous unreported [safety incidents] to significantly alter the total mix of information"). Analysts confirm the materiality of this information, noting that "various state laws/regulations with which KinderCare must comply including those that require teachers and other staff members to meet certain educational and other minimum requirements as well as certain prescribed minimum adult-to-child ratios . . . [are] ***key day-to-day operating risks for KinderCare.***" ¶115. *See Baker*, 423 F. Supp. 3d at 941 (analyst "coverage supports the materiality of the subject [matter]"); *see also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F.

[18] Elsewhere in the Motion Defendants agree, writing that "KinderCare did not baldly refer to unidentified safety standards or training—it ***explained precisely what it meant***." MTD 15.

Supp. 3d 189, 217-18 (E.D. Pa. 2021) (safety statements material "in industries carrying high safety risks."); *Massey Energy*, 883 F. Supp. 2d 597, 618 (S.D. W.Va. 2012); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017); *Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). The cases cited by Defendants do not hold otherwise, instead concerning, e.g., an "inherently aspirational" "code of conduct" that was necessarily incapable of verification—unlike the statements here. *Retail Wholesale & Dep't Store Union v. H.P.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (MTD 14).[19]

### C. The Staffing Statements Are Materially False

#### 1. The AC Pleads Detailed Facts Demonstrating Material Falsity

The Offering Documents falsely stated that KinderCare "offer[s] competitive compensation" (¶246) and that KinderCare maintained a "focus on employee engagement." ¶247. *See also* ¶243, 245. The AC sufficiently alleges the falsity of these and related statements based on well-pleaded FE accounts that are further corroborated by legal proceedings and hundreds of substantiated regulatory violations. ¶¶122, 191-235, 250-94. Courts sustain such claims. *See Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 878 (N.D. Ill. 2023) (ruling actionable statements communicating that "a core metric of business performance—retention…is strong… [with employees] delivering the company's core service"). Defendants argue that the Court should disregard the allegations and instead resolve improper factual disputes in Defendants' favor. MTD 24-28. Defendants' challenges fail.

[19] The additional cases cited by Defendants (MTD at 14) are inapposite. *See Waswick v. Torrid*, 2024 WL 3740052, at *7 (C.D. Cal. July 23, 2024) (challenged statements concerned "inventory management"); *Bhangal v. Hawaiian Elec.*, 2024 WL 4505465, at *13 (N.D. Cal. Oct. 15, 2024) (no underlying safety violations or reports demonstrating defendant's statements were capable of "objective verification"); *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin.*, 2010 WL 1332574, at *8 (S.D. Fla. Mar. 30, 2010) (plaintiffs failed to tie the statements to certain concrete practices, unlike here); *In re Intel Sec. Litig.*, 2019 WL 1427660, at *9 (N.D. Cal. Mar. 29, 2019) (unlike here, statements were merely "marketing statements" intended to promote defendant's products); *Barnes v. Edison Int'l.*, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021) (unlike here, plaintiffs failed to demonstrate underlying facts of omission related to safety); *In re Intrexon Sec. Litig.*, 2017 WL 732952, at *3 (N.D. Cal. Feb. 24, 2017) (unlike here, where Plaintiffs pleaded statements with particularity, the court found statements about an unquantifiable "technology suite" too broad); *In re Norfolk S. Bond/Note Sec. Litig.*, 2025 WL 641089, at *3 (S.D.N.Y. Feb. 27, 2025) (statement that "safety is a way of life", is materially distinguishable from statements in the AC.) *aff'd*, 2026 WL 555420 (2d Cir. Feb. 27, 2026). *E.g.*, ¶110.

### a. Former Employee accounts demonstrate falsity

The AC includes several, mutually-corroborating FE accounts that contradict the statements as to, e.g., KinderCare's practices in "***attract*[*ing*]***, hir*[*ing*] ***and develop*[*ing*] ***exceptional talent***" through "***competitive wages***." *See, e.g.*, ¶252 (former Nationwide Manager stating that KinderCare wages were "subpar" compared to competitors); ¶¶257-263 (former Senior District Leader explaining that KinderCare's reduction of labor costs led to a negative impact on all aspects of quality and leadership and significant operational inefficiencies, including the loss of valuable teachers and a high level of "churn"), ¶276 (Director overseeing three different KinderCare centers described the poor pay at KinderCare as a "***systemic problem***;" and that Virginia teachers were paid "minimum wage"). Further, FEs describe that executive management, including KCLC President Canavin and others, knew of KinderCare's systemic failure to provide competitive wages and to hire and retain qualified staff—but repeatedly ignored and dismissed the warnings they received about these practices. ¶¶226; 255; 284 (Center Director in Texas stated she routinely raised staffing concerns with District Leaders, and concerns were brought up at "round table" meetings).[20] Likewise the assertion that KinderCare "provid[es] standardized annual merit-related increases in wages" (¶243)—which Defendants expressly concede is ***not*** puffery (MTD 22 n.8)—misrepresents that, in reality, KinderCare kept pay below market rates (¶259); never increased compensation to competitive levels (¶255); made no efforts to retain high-value staff (¶260) and could not keep more experienced teachers (¶267); and that these issues of staffing, pay,

[20] Defendants also grossly misrepresent FE-5's account concerning child abuse at a KinderCare facility that employed a known sex offender, falsely claiming that FE-5 "concedes" that the sex offender status "was not included in that state's background check" (MTD 19). FE-5 conceded ***no such thing***—she stated only that the status "was not included in the lists checked" by KinderCare. ¶206. Defendants also claim that FE-5 "admits this same situation happened at her current (non-KinderCare) employer" (MTD 19)—misleadingly omitting that FE-5's current employer "***changed its practices 'across the board'***", while KinderCare did ***not***. Lastly, Defendants claim that the sexual abuse was as merely an "unfortunate incident" that "did *not* result from any screening failure by KinderCare" (emphasis in original), conspicuously ignores the allegations that describe a substantiated violation that seemingly corroborates FE-5's account—including that authorities determined that KinderCare continued to employ the offender despite having failed to conduct background checks and even after staff members internally reported disturbing behavior.

and quality of care were a "pinch point" and discussed regularly at weekly meetings. ¶268.[21]

Defendants' contention that some—not all—of these reliable accounts are "vague, unsupported opinions and conclusions" (MTD 25) turn on grossly distorting the allegations. For example, the AC appropriately alleges the FE accounts as to KinderCare's below market pay based on the FE's ***own "personal knowledge" and experience***, which must be credited at this stage (*Glazer*, 63 F.4th at 771); and the FEs provided concrete factual allegations concerning the underlying staffing practices at KinderCare, that must be credited. *Id.*[22]

What's more, Defendants concede that numerous FE allegations "*do* provide facts," and yet argue that these accounts should nevertheless be ignored as "inconsistent, anecdotal, and too thin." MTD 25. Their attacks fall flat. For example, there is no inconsistency between FE-3's testimony that Virginia teachers were paid "between $9 and $13 an hour" and the state minimum wage in the exhibit they improperly cite,[23] which states there was a $9.50 minimum wage—this ***corroborates***, rather than contradicts, her account. Def. Ex. 10. Defendants' other quibbles—e.g., faulting the FE accounts for citing a "range" rather than a "single [wage] number" and as purportedly "isolated, inconsistent, local" (MTD 25)—ignore that the totality of these mutually-corroborating independent accounts plausibly support falsity at this stage; Defendant's nitpicks at most raise factual disputes for a later stage. ¶¶252, 253, 260.[24]

---

[21] Likewise, these FE accounts plead that the assertion just following, that "We continue to honor teacher tenure with significantly higher wage rates starting at their one-year service anniversary" (¶243), is an actionable half-truth, given KinderCare refused to provide competitive wages and alienated (and could not keep) experienced employees.

[22] Defendants' cases do not hold otherwise. For example, unlike *In re Weight Watchers Sec. Litig.*, 2016 WL 2757760, at *7 (S.D.N.Y. May 11, 2016), the FEs here do not make "grandiose and hyperbolic assertion[s]" about how executives managed issues and instead provide details about their own experiences including their compensation rates and that of their centers. (¶¶260, 276, 283). And unlike *In re Talis Biomedical Corp. Securities Litigation*, 2022 WL 17551984 *12 (N.D. Cal. Dec. 9, 2022), the AC does not solely rely on FE accounts to demonstrate falsity.

[23] *See* Plaintiffs' RJN Opposition, filed concurrently herewith.

[24] Defendants' contention that the FEs provide "no source for [their] purported knowledge," (MTD at 26) is based on an incorrect premise that FEs are required to provide evidentiary proof for their allegations concerning their own personal experience before they must be credited. *See Glazer*, 63 F.4th 747, 769 (crediting FE allegations; "[r]equiring more detail than those presently alleged would transform the [] pleading requirement into an impossible one."). Finally, *City of Royal Oak Ret. Sys. v. Juniper Networks*, 880 F.Supp.2d 1045, 1064 (N.D. Cal. 2012) does not help Defendants: there, the court ruled that FE accounts did not connect alleged training issues to missed

Footnote continued on next page

Finally, beyond these misguided attacks as to the FE accounts around KinderCare's compensation, Defendants offer essentially ***no*** challenge to the other FE allegations also establishing falsity of the Staffing statements. At most, Defendants fault the FEs for not "dispute[ing] the Offering Documents' statistics that KinderCare's tenured-teacher retention rate was 85%" (MTD 26), but the allegations in the AC do not concern (much less rise or fall on) this self-defined "tenured" subset, and this alternative factual narrative is irrelevant and improper at this stage.[25] *Orexigen Therapeutics*, 899 F.3d at 1003.

**b. Lawsuits corroborate falsity**

Lawsuits and other legal proceedings further evidence the falsity of the statements. These allegations include details from a lawsuit from the Massachusetts AG in which KinderCare agreed to pay over $540,000 in restitution and civil penalties for violating state labor laws—including the failure to fully compensate employees—and which the AG described as "***demonstrat[ing] a pattern***" within KinderCare. ¶289. The AC plausibly alleges that these practices continued at the time of the IPO, including as based on the sworn pleadings in ongoing actions. *See also* ¶¶290-93 (citing multiple lawsuits asserting widespread labor and wage violations from at least May 2021 to the present, including failure to pay employees; "company-wide policy and/or practice of understaffing its jobsites;" and that "Defendants lacked sufficient staff to maintain appropriate student to educator ratios"). While Defendants resort to tepid mischaracterizations of these lawsuits as "missed meal breaks" or "recordkeeping lapses" (MTD 27), the wage and hour claims detail and further corroborate systemic compensation practices that contradict the "impression of a state of affairs" given by the Offering Documents. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687,

sales projections because the accounts did not include facts around, e.g., how far below target sales were and why that type of sale was significant to overall revenue. By contrast, the FE accounts provide detailed information about staffing deficiencies (*e.g.*, low compensation between $9 to $13 an hour; competitors paid $15 an hour; nominal raises like five cents an hour).

[25] Further, contrary to Defendants' criticism that no FEs "attended" meetings in which issues were raised to KCLC President Canavin (MTD 27), courts routinely credit allegations around escalation of issues even without firsthand knowledge; regardless, this has no impact on the rest of the FEs' accounts. And unlike the case cited by Defendants the AC alleges each FEs' basis for knowledge, including roles, tenure, reporting structures, and responsibilities. *In re Metawave Comms. Corp. Sec. Litig.*, 629 F.Supp.2d 1207, 1215 (W.D. Wash. 2009).

700 (9th Cir. 2021), cert. denied, 142 S. Ct. 1227 (2022).[26]

**c. Violations of staffing regulations further support falsity**

The AC further bolsters and corroborates falsity based on nearly 900 substantiated violations of staffing-related regulations just prior to the IPO, which further contradict the statements in the Offering Documents that, e.g., "[c]enter directors regularly provide safety training to their teachers and staff" and that "staff participate in an onboarding program prior to conducting student-facing activities." ¶110, 113. While Defendants contend that this is "contextually small number of violations [that] cannot render the challenged statements ***materially*** false or misleading" (MTD 27 (emphasis in original)), these mathematical games again fall flat: among other things, Defendants improperly assume that a violation concerns only one staff member, despite allegations showing otherwise. ¶295 (during just one inspection in May 2024, state authorities cited a single KinderCare facility in Colorado for dozens of violations for failures to meet minimum staff qualifications, comply with training requirements, and undertake required background screenings of staff, among other issues). In reality, these violations concern facility-wide failures—reflecting KinderCare's systemic practices. *See Carvana*, 759 F. Supp. 3d at 953-54 (crediting allegations that defendants "systemically" violated regulations based on six FEs and incident reports from nine states).

Finally, Defendants' characterization of their violations as trivial paperwork issues and empty speculation that KinderCare might in fact have been "up to date" (MTD 27) lack any merit: the substantiated violations for failure to "properly document background checks or training" necessarily involve KinderCare's inability to ***confirm that "the underlying checks and training were up to date***" (MTD 27), and the mere suggestion otherwise does not warrant dismissal.

**2. The Staffing Statements Are Not Inactionable Puffery or Opinion**

The false and misleading statements about hiring "the best teachers and center staff," providing "competitive pay" and using an "industry-first talent filter" are specific and not puffery.

---

[26] Defendants' attack that the lawsuits were filed post-IPO and are still ongoing (MTD 27) misses that lawsuits describe *pre*-IPO practices, and disregards that courts credit allegations around "unadjudicated" pleadings. *See In re Bear Stearns*, 851 F. Supp. 2d at 768 n.24.

¶¶5, 242-45.; *see infra* §IV.B.2. Each statement asserts verifiable and contextually meaningful information regarding KinderCare's existing labor practices and emphasized the centrality of—and assured investors as to—qualified staffing in KinderCare's operations. As discussed above, the AC alleges detailed, contradictory facts, including that KinderCare paid wages "at or below the minimum wages required by law" (¶11); FE accounts of below-market pay, including e.g. FE-1's testimony about Indianapolis pay caps below local market rates (¶¶252-83); KinderCare's settlement with the Massachusetts AG concerning wage violations from "understaffing" (¶289); and ongoing lawsuits that allege similar conduct continued around the time of the IPO. KinderCare's response—that the allegations concern practices forcing "missed meal breaks" and threatening "staffing ratios" (MTD 27)—proves Plaintiffs' point: those are precisely the practices belying the Company's "competitive pay" and "competitive benefits and pay" representations.

Particularly given the emphasis on staffing in the Offering Documents, Defendants' puffery argument fails, and courts routinely reject these sorts of challenges. *See, e.g.*, *Alphabet*, 1 F.4th at 703 (finding that defendant's "risk disclosures" that warned of certain harms demonstrated the importance of the topic)[27]; *Transocean*, 866 F.Supp.2d at 243-44 (rejecting argument that statements about "extensive" training were puffery); *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 746 F. Supp. 3d 1395, 1407 (S.D. Fla. 2024) (statements regarding "hiring practices" are not puffery). The cases cited by Defendants do not hold otherwise, and focus myopically on particular words like "competitive" or "exceptional"—stripping them of their relevant context here.[28]

[27] Analyst commentary further demonstrates materiality and contradicts the puffery challenge; for example, analysts stated (following the IPO) that the Company "expect[ed] further occupancy improvement . . . [because KinderCare] management executed impressively by improving teacher hiring and retention," and credited that "[m]anagement has indicated that its culture and strategies to hire and retain staff were the differentiating factor in terms of recovery in occupancy levels." ¶248. *See Turocy v. El Pollo Loco Holdings, Inc.,* 2017 WL 3328543, at *14 (C.D. Cal. Aug. 4, 2017) (analyst commentary evidenced "a key factor used to determine the health of the Company").

[28] *See, e.g.*, *Gavaldon v. Standard Chartered Bank Int'l (Americas) Ltd.*, 2020 WL 835311, at *7 (S.D. Cal. Feb. 20, 2020) (describing singular terms such as "best in the business" as puffery but directing parties to look at the context to make such a determination); *3226701 Can. v. Qualcomm*, 2017 WL 971846, at *9 (S.D. Cal. Jan. 27, 2017) (unlike here, no specificity in the statements); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser*, 587 F. Supp. 3d 56, 89

Footnote continued on next page

Finally, Defendants' challenge that one statement is an inactionable opinion fails. MTD 23; ¶245. Even an opinion is actionable where it "omits material facts about the issuer's . . . knowledge that conflict with what a reasonable investor would understand from the opinion itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). The AC alleges precisely such omissions. §IV.D.2.a-b; *see Uber*, 2020 WL 4569846, at *8 (denying motion to dismiss where allegations "call into question the issuer's basis for offering the opinion"); *see also In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1055-56 (9th Cir. 2023).

### D. The Operating Strategy Statements Are Materially False

#### 1. Plaintiffs Plead Detailed Facts Demonstrating Falsity

The AC sufficiently pleads the falsity of the representations in the Offering Documents as to KinderCare's operating strategies in at least three respects.[29]

***First***, despite discussing the Company's "***strong track record of improving occupancy rates***" and "***demonstrated success at driving occupancy improvement***," the Offering Documents misleadingly omitted that enrollment and occupancy had been "relatively flat" during the period just prior to the IPO. ¶¶298, 300, 305(a), 322. *See Sodha v. Golubowski*, 154 F.4th 1019, 1033 (9th Cir. 2025) (positive statements about a prior period must disclose negative intra-quarter financial results known and material at the time a registration statement is filed). Defendants wrongly claim that "Q3 was still in progress when the Offering Documents were issued" (MTD at 29), when in fact the quarter had closed over a week before the IPO but in either event, the statements are misleading under *Sodha*. And ***none*** of the other disclosures cited "disclosed the information" at issue (MTD 29); if anything, those disclosures of prior negative performance further heighten, not contradict, the falsity in touting "strong track record" and "demonstrated success."

***Second***, the Operating Documents purported to describe the Company's "strategy of

---

(S.D.N.Y. 2022) (statements were "self-congratulatory remarks"); *Milano v. Perot Sys.*, 2006 WL 929325, at *6-7 (N.D. Tex. Mar. 31, 2006) (statements merely that the employees were "highly motivated"); *Southfield Gen. Emps. Ret. v. Nat'l Vision*, 2024 WL 1376016, at *9, *11 (N.D. Ga. Mar. 30, 2024) (assertions about "competitive rates" were puffery when there were no confidential witnesses to corroborate, unlike here).

[29] Defendants' assertion that the AC does not identify reasons for falsity for each challenged statement (MTD 28) is simply wrong. ¶¶116, 241, 249, 287, 296, 310-11, 315-316.

occupancy improvement," including "***a combination of strategic investments in technology, talent, as well as implementing best practices across [the] centers***." ¶298. In reality, the Company imposed "magical" occupancy rates on center directors and refused the labor and resources needed to obtain these rates sustainably and safely maintain operations. ¶¶278-83. Courts sustain claims based on similar misrepresentations about business models and growth strategy. *See Uber*, 2020 WL 4569846, at *6 (registration statement actionable for failure to disclose defective operational model involving regulatory violations); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 404-05, 409-10 (S.D.N.Y. Mar. 30, 2020); *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1177-79 (S.D. Fla. 2005).

In responding to these allegations, Defendants again resort to fuzzy math, asserting that the hundreds of substantiated child-unattended violations in fact translated to an immaterial amount of unenrollment; again, these assertions at most raise factual disputes that cannot be credited at this stage over the well-pleaded allegations, particularly given Defendants' factual assertion contradicts the FE accounts concerning the full scope of unenrollment caused by these violations. ¶232. Defendants' math also ignores the plain reality that, since the IPO, Defendants' enrollment stagnated and even declined—entirely consistent with, and corroborating, the allegations in the AC that these and other safety violations impaired KinderCare's performance. And in any event, Defendants ignore the other bases for falsity, including that the Company's true occupancy strategy set unrealistic occupancy rates on centers without providing labor and much-needed resources to attract and retain high-value teachers and leadership positions. ¶¶278-85.

***Third***, the Offering Documents advised that a "[quintile] analysis of occupancy data from across our centers indicates growth potential within our business," with even the lowest-performing quintiles having an "embedded growth potential." ¶299-300. As the Company later admitted—and corroborated by allegations from FEs—an analysis conducted by the Company at the time of the IPO identified 150 centers in its lowest-performing quintiles for which the Company had ***not*** implemented best practices, contrary to the assurances in the Offering Documents that the Company had "***uniformity across centers***" and "***identif[ied] best practices within our network***

***and appl[ied] them across all of our centers and onsite programs***." *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016) ("'[O]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against positive information."). Defendants respond to these allegations entirely with the nonsensical retort that "[r]ecognizing and improving such centers is what the Offering Documents described" (MTD 30), which at most suggests factual issues not appropriate for dismissal (to the extent it suggests anything at all).[30]

### 2. The Statements Are Not Inactionable Puffery or Opinion

These statements are not puffery, but instead quantitatively grounded representations about historical occupancy (e.g. 58% in 2013 to 69% in 2023 (¶298) and about specific "***strateg[ies] of occupancy improvement,***" including "***developing a motivated, talented workforce***" ¶¶298-304. The AC alleges facts that contradict these assertions, including the admission by KinderCare that underwhelming performance came from approximately 150 centers had been identified "late last year"—i.e. the time of the IPO—and that did *not* employ the "same proven practices and frameworks" claimed to have been uniformly deployed. ¶¶345-46. Courts sustain claims for these sorts of factual representations when made in the face of contradicting facts at the IPO. *See Uber*, 2020 WL 4569846, at *7. And Defendants' attempt to recast their statements as immaterial puffery simply is not credible given their later attributions of significant negative performance by the company to the very issues misrepresented here.

Finally, as to the two purported opinions (MTD 29), even statements "that begin with opinion words like 'I believe'" are actionable when they have embedded statements of fact and/or separate and distinct false portions—as here. *See Omnicare*, 575 U.S. at 175, 188-89; ¶¶301, 303.

## E. The Risk Disclosures Are Materially False

The Ninth Circuit Court of Appeals has consistently ruled that risk disclosures that "speak [] entirely of as-yet-unrealized risks" and do not "alert[] the ready that some of those risks may

---

[30] The sole case cited by Defendants merely concerned merger disclosures and—not, as here, contemporaneous analysis contradicting public offering documents. *Emps. Ret. Sys. of Rhode Island v. Williams Cos., Inc.*, 889 F.3d 1153, 1165 (10th Cir. 2018).

have already come to fruition" are actionably false and misleading. *Alphabet*, 1 F.4th at 703; *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023) (holding that a risk disclosure was plausibly materially misleading where the issuer " represented the risk . . . as purely hypothetical when that exact risk had already transpired" even if the issuer "did not yet know the extent of the reputational harm it would suffer . . . . [and] even if the magnitude of the ensuing harm was still unknown."); *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*, 166 F.4th 805, 825 (9th Cir. 2026) (risk disclosures that "suggests that the circumstance posing the risk has not yet occurred" are misleading). Here, KinderCare's risk disclosures merely addressed as hypothetical that the Company "may suffer adverse publicity," that "[c]ertain government agencies may publish or publicly report major and/or minor regulatory violations," and that hiring and staffing difficulties "may" occur—omitting that the risks had already materialized and were materializing. ¶¶306-16. *See In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042, 1055-56 (N.D. Cal. 2025) (risk disclosures "superficially warning of possible risks while failing to disclose critical facts" are actionable because they are similar to "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"). Defendants' challenges fail.

***First,*** Defendants argue that each risk disclosure is not a "representation regarding whether the event has occurred to the extent that it presents a risk." MTD 31 (quoting *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 267-68 (S.D.N.Y. Jul. 31, 2023). But the cases cited by Defendants defeat their own argument. Unlike the disclosures that the *AppHarvest* court ruled too general to be misleading (e.g. "there is no guarantee that we will be able to retain [ ] employees" (*id.*)), the risk disclosures here warned about specific circumstances, such as compliance with "state laws [that] require our teachers and other staff members to meet certain educational and other minimum requirements." ¶314. And unlike in *HRSA-ILA Funds v. Adidas AG*, 745 F.Supp.3d 1127, 1140 (D. Or. 2024) (MTD 30-31), the Offering Documents ***did*** condition the risks as hypotheticals, e.g. that the "[f]ailure of a center, site or program to comply with applicable regulations and requirements could subject it to sanctions … and could require significant expenditures to bring

our centers, sites or programs into compliance or result in the closing of the center, site or program." ¶¶309, 311-13. *See Carvana*, 759 F. Supp. 3d at 953 ("Defendants characterized the risk of harm—i.e., the harm to Carvana's business and reputation if it violated state laws and regulations—as purely hypothetical, but in fact, these 'harms had already materialized because states had begun investigating and penalizing Carvana for its… noncompliance.'").

Defendants also argue that given its size, "[n]o reasonable investor would believe" KinderCare had never experienced regulatory violations or adverse publicity. MTD 31. But the AC makes no such allegation. Yet Defendants double down on this irrelevant attack by bizarrely analogizing KinderCare—a childcare provider—to the fast-food chain McDonald's. MTD 31. Ex. 11 at 4-5. Comparing disclosures from an unrelated corporation in an unrelated industry is irrelevant and an improper use of judicial notice.[31] But even considered, the comparison only confirms the issue: The Offering Documents are ***not*** warning about "adverse commentary" from making burgers, they are purporting to describe to investors the heightened risks involved in running for-profit childcare centers for tens of thousands of children nationwide. ¶309. Particularly in this context, no reasonable investor would find omissions regarding child safety risks to be immaterial; to the contrary, analysts considered these to be "***key day-to-day operating risk[] for KinderCare.***" ¶115. And the suggestion that KinderCare's size alone means, as a matter of law, that reasonable investors ***expect*** such safety issues improperly ignores that the Offering Documents expressly (and falsely) reassured ***exactly to the contrary***: e.g. that "continuing to comply" with safety regulations posed no risk, when in reality they were not complying.

***Second,*** Defendants claim that the Offering Documents "specifically alerted investors" that "the company had faced" the risks at issue in the past. But the nonspecific past incidents are far too generic to "specifically alert[] investors" to the fact that the risks described had already materialized and were presently materializing at the time of the IPO. *E.g.*, ¶147 (state regulators in Wisconsin documented over 100 violations in a KinderCare facility, leading the state of Wisconsin to revoke the center's license in January 2024). *Carvana*, 759 F. Supp. 3d at 952

---

[31] *See* Plaintiffs' RJN Opposition, filed concurrently herewith.

(finding risk disclosures such as "our failure to comply [] could have a material adverse effect on our business" actionable for failure to disclose widespread practice).

***Third***, Defendants yet again quibble with their preferred metrics instead of the violations and adverse press alleged, this time faulting that the AC does not plead claims based on the omission of "four events" of license revocations. MTD 32-33. This strawman fails: the AC turns on the material omissions in the risk disclosures regarding the materialized and materializing risks from Defendants' systemic and widespread practices—not on any single event.[32]

***Finally***, Defendants' suggestion that this Court credit as a matter of law their assertion that a third-party "tool" used by KinderCare purportedly increased teacher retention (MTD at 33) does not defeat the well-pled allegations of systemic and widespread disregard for employee engagement, including the FE accounts. §IV.D.2.a. *Five Star Gourmet Foods, Inc. v. Fresh Express*, 2020 WL 513287, at *4 n.3 (N.D. Cal. Jan. 31, 2020) ("[T]he court cannot dismiss plaintiffs' claim based on defendant's alternative characterization of events"); *Moore v. EO Prods., LLC*, 2023 WL 6391480, at *8 (N.D. Cal. Sept. 29, 2023) (discrediting even "plausible interpretation" that "merely creates a factual dispute that the Court cannot resolve"). [33]

**F. The AC Pleads Actionable Item 303 And Item 105 Violations**

Items 303 and 105 of Regulation S-K impose affirmative disclosure obligations on issuers of securities. Item 303 requires disclosure of "known trends or uncertainties" reasonably likely to "have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). Item 105 requires disclosure of "the material factors that make an investment . . . speculative or risky." 17 C.F.R. §229.105(a). As the Ninth

[32] Defendants misplace their reliance on *Elliott v. Edison Int'l*, 2026 WL 636708, at *8 (C.D. Cal. Mar. 6, 2026), in which the challenged statements were statements about "probabilities" that could not leave a false or misleading impression, not the sorts of risk disclosures at issue here.

[33] Defendants also argue that the statement "We believe we are particularly well positioned to attract talent due to our ability to offer competitive pay, benefits and training" is independently protected by the bespeaks caution doctrine. MTD 31. The bespeaks caution doctrine does not apply here because the challenged statement is not genuinely forward-looking—it describes KinderCare's present competitive positioning at the time of the IPO ("we are particularly well positioned"), not a prediction about future performance. *See In re Sourcefire, Inc. Sec. Litig.*, 2008 WL 1827484, at *5 (D. Md. Apr. 23, 2008) ("cautionary language cannot be used as a shield against all liability").

Circuit has held, "any omission of facts "required to be stated" under Item 303 will produce liability under Section 11." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

The AC sufficiently alleges the Offering Documents omitted known trends and uncertainties and risks in violation of Item 303. ***First***, nearly 2,000 violations substantiated by regulators nationwide across nearly half of KinderCare's ECE centers in nine months constitutes a known trend that was reasonably likely to materially impact future revenue and operations. Indeed, by KinderCare's own admission, certain centers were placed on probation, had licenses revoked, and were barred from state-subsidy programs. ¶¶147, 310, 319(a). ***Second***, below-market wages, understaffing, and other staffing deficits were known at the time of the IPO as KinderCare management round-table sessions surfaced these issues to senior leadership repeatedly. ¶¶251, 254-55, 266, 284. ***Third***, KinderCare internal analysis at the same time as the IPO identified 150 centers that KinderCare later blamed for material underperformance. ¶¶ 319(c), 320.

Courts routinely sustain Securities Act claims based on these sorts of Item 303 violations. *See Lyft*, 484 F. Supp. 3d at 758. (Item 303 adequately alleged from sexual assaults in Lyft vehicles prior to IPO); *SmileDirectClub, Inc.*, 633 F. Supp. 3d at 1046 (Item 303 violation where metrics were declining at the time of the IPO). Nonetheless, Defendants ask this Court to dismiss these claims based on threadbare semantics inappropriate at this stage, such as whether nearly 2,000 violations in nine months is a "trend" (MTD 33–34). [34] These quibbles fail: as *Honest* held, where allegations that "management knew of . . . specific issues . . . and that product demand was declining," the Item 303 claim survives. *Honest*, 615 F. Supp. 3d at 1158.[35] The same is true here.

---

[34] Defendants mislead the Court by omitting that the "handful of crashes" found insufficient in *Lamontagne v. Tesla*, 2024 WL 4353010, at *16 (N.D. Cal. Sept. 30, 2024) occurred "***over a four-year period***"—far different from the substantiated violations at ***45%*** of KinderCare's facilities in just nine months. Furthermore, Defendants' thinly veiled assertion that more statistical information is needed outside that nine-month time frame because there is "no baseline to measure the cited incidents against" (MTD 34) disregards the allegations in the AC, *see* n. 3, and is legally groundless. Nothing in the language of Item 303 or in Ninth Circuit precedent requires plaintiffs to provide benchmark reference points to adequately demonstrate a trend at the pleading stage. *See Sodha*, 154 F.4th at 1038 (explaining Item 303's disclosure obligations do not turn on restrictive quantitative inquiries); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (same); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40 (2011) (cautioning against bright-line, quantitative rules that "artificially exclude" material information).

[35] *See also Sodha*, 154 F. 4th at 1039 (explaining Item 303 "covers more than just trends").

Further, the congressional investigation into KinderCare's "***pattern*** of safety and compliance issues" since 2023—announced after the AC was filed—independently corroborates and further strengthens the alleged falsity generally. *See* Pl. Ex. C (Sen. Merkley March 23, 2026 Letter to KinderCare and Partners Group); *compare, e.g.*, *Sundaram v. Freshworks, Inc.*, 2023 WL 6390622, at *7 (N.D. Cal. Sept. 28, 2023) (Item 303 trend is an "observed business ***pattern***").

Defendants' attempts to discredit the other alleged Item 303 violations fail. Defendants mischaracterize well-pleaded staffing allegations as limited or anecdotal (MTD 34), but ignore the lawsuits alleging KinderCare's understaffing and wage violations and hundreds of substantiated staffing violations—all bolstered and further corroborated by the accounts from well-placed FEs that the retention of unqualified staff continued at the time of the IPO. *See*, *e.g.*, ¶¶168-174. And Defendants' attempt to recast the 150 centers driving down the Company's performance that they had identified at the time of the IPO as nothing "more than a company continually trying to improve its operations," (MTD 34) at best concedes a disputed factual argument improper at this stage, and in any event, is entirely irrelevant to the disclosure requirements of Item 303. The single, out-of-circuit authority Defendants rely on does not hold otherwise. *Williams*, 889 F.3d 1153 (not addressing Item 303); *see also Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882 (M.D. Tenn. 2013) (revenue declines in nine weeks before IPO was a trend that required disclosure).

Finally, Defendants improperly rely on *Sodha*, 154 F.4th at 1042 , for the proposition that "mischaracterizing a past harm as a future risk cannot, standing alone, violate Item 105." MTD 34. The AC does not rest on bare mischaracterization; in fact, the allegations accord with the ruling in *Sodha* that failing to "adequately disclose[] the factors making the investment speculative or risky" violates Item 105. *Sodha*, 154 F.4th at 1042. The risk disclosures did not adequately disclose those factors; they spoke in the hypothetical voice—e.g. "may" and "could"—about events that had already materialized and were materializing at scale. ¶¶307–32; *see Alphabet*, 1 F.4th at 703. Meanwhile, the Bear Cave Report detailed numerous violations occurring at the time of the IPO when KinderCare was positing such risks as merely hypothetical. ¶332.

### G. The AC Pleads Section 12(a)(2) And Section 15 Claims

Section 12(a)(2) liability extends to "statutory sellers"—those who either directly "passed title, or other interest in the security" or directly and actively solicited the purchase out of a desire to serve their own financial interests. *Pinter v. Dahl*, 486 U.S. 622, 642, 647, 650 (1988). While KinderCare and the Underwriter Defendants concede the AC sufficiently alleges that they are statutory sellers, the Individual Defendants challenge their involvement as "statutory sellers" in the IPO. MTD 35. Not so. The AC alleges that each Individual Defendant signed the Registration Statement,[36] participated in the IPO roadshow that actively solicited investor purchases, and stood to benefit financially from the success of the Offering.[37] ¶¶3, 36-43, 46, 99, 109. CEO Thompson personally authored an investor letter in the Offering Documents. ¶3. These allegations suffice.

A recent controlling decision by the Ninth Circuit—conspicuously omitted by Defendants—addressed this issue, noting that allegations that a defendant "successfully solicit[ed] the purchase" of securities motivated by "his own financial interests or those of the securities owner" suffice. *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1258 (9th Cir. 2022). As in *Pino*, there is likewise "no question that [the Individual Defendants] had financial interests tied to" the Offering here (*id.*), and Defendants do not contend otherwise. Rather, the Individual Defendants argue only that their "mere participation in the IPO roadshow, statements to the press, [and] simply signing the registration statements" excuse them from liability here. MTD at 35. As courts have acknowledged, these arguments raise factual questions that should generally be left to the jury. *See, e.g.*, *Pirani*, 445 F. Supp. 3d at 384. The conduct by the Individual Defendants here—which included direct communications both in roadshows ***and*** publicized media appearances—easily qualifies as "mass communication" sufficient under *Pino*. The cases cited by Defendants do not

[36] While Defendants minimize this act, courts credit the act of signing as "at least suggestive of solicitation activity." *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549-50 (N.D. Cal. 2009); *see also In re Nat'l Golf Props., Inc.*, 2003 WL 23018761, at *3 (C.D. Cal. Mar. 19, 2003) ("that an issuer signed a registration statement is sufficient to allege active solicitation").

[37] *See, e.g.*, *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 384-85 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021) (defendants signed materials and solicited at an "Investor Day").

hold otherwise; indeed, Defendants omit *Pino* altogether.[38]

Finally, the Complaint also sufficiently alleges control person liability under Section 15 against the Individual Defendants. ¶¶387-394. The Individual Defendants' challenge turns entirely on other their challenges (MTD at 35 n.12), which fail for the reasons described above.

## V. CONCLUSION

The AC asserts straightforward strict-liability claims under the Securities Act: an issuer staked its IPO on representations while concealing pervasive problems and materialized risks. KinderCare asks the Court to dismiss these well-pleaded allegations in favor of alternative narratives and inferences construed in its favor—paradigmatically improper bases for dismissal. The Motion should be denied in entirety. If the Court grants any part of the Motion, Plaintiffs respectfully request leave to amend. *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012).

DATED: June 5, 2026

*/s/ Jesse L. Jensen*
Lauren A. Ormsbee (admitted *pro hac vice*)
Jesse L. Jensen (admitted *pro hac vice*)
Alexandra E. Forgione (admitted *pro hac vice*)
Jacqueline E. Lacovara (admitted *pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: lormsbee@labaton.com
jjensen@labaton.com
aforgione@labaton.com
jlacovara@labaton.com

*Lead Counsel for Lead Plaintiff and the Class*

[38] *See, e.g.*, *In re Infonet Servs. Sec. Litig.*, 310 F.Supp.2d 1080, 1102 (C.D. Cal. 2003) (finding no solicitation where the defendants did not "personally or directly solicit" purchases from the named plaintiffs—contrary to *Pino*'s ruling that "§12 contains no requirement that a solicitation be directed or targeted to a particular plaintiff" and crediting "mass communication[s]" as sufficient); *Ryan v. FIGS*, 2025 WL 71727, at *2, 12 (C.D. Cal. Jan. 10, 2025) (the defendants were an "venture capital investment firm that owned a substantial percentage of" the shares sold in the offerings at issue or otherwise mere "participants ***collateral*** to the offer or sale," rather than (as here) insiders controlling the Company that actively participated in roadshows and media appearances as part of an effort to solicit sales in the Offering). Finally, the assertion that pure omissions are not actionable under Section 12(a)(2) (MTD at 33) misstates law and in any event is irrelevant given the AC alleges liability based on affirmative false statements and actionable half-truths.

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C**
Keith A. Ketterling, OSB No. 913368
Timothy S. DeJong, OSB No. 940662
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: kketterling@stollberne.com
tdejong@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Liaison Counsel for Lead Plaintiff and the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
TAEVA C. SHEFLER (admitted *pro hac vice*)
SNEHEE KHANDESHI (admitted *pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534

*Attorneys for Additional Named Plaintiff Venkata Surya Teja Gollapalli*