**STOLL STOLL BERNE LOKTING & SHLACHTER P.C**
Timothy S. DeJong, OSB No. 940662
Keith A. Ketterling, OSB No. 913368
Cody Berne, OSB No. 142797
Chloe Jasper, OSB No. 253957
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: tdejong@stollberne.com
kketterling@stollberne.com
cberne@stollberne.com
cjasper@stollberne.com

*Liaison Counsel for Lead Plaintiff and the Class*

[additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| IN RE KINDERCARE LEARNING COMPANIES, INC. SECURITIES LITIGATION | Case No. 3:25-cv-01424-AR<br>CLASS ACTION ALLEGATION<br>**DECLARATION OF JESSE JENSEN IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO THE MOTIONS TO DISMISS BY THE KINDERCARE DEFENDANTS AND PARTNERS GROUP** |

I, Jesse Jensen, declare as follows:

1. I am an attorney duly licensed to practice before all of the courts of the State of New York. I am associated with the law firm Labaton Keller Sucharow LLP, appearing *pro hac vice* pursuant to the Court's Order dated January 22, 2026, as counsel of record for Lead Plaintiff City of Dearborn Police & Fire Revised Retirement System ("Lead Plaintiff"), and additional named Plaintiff Venkata Surya Teja Gollapalli (collectively with Lead Plaintiff, "Plaintiffs"). I have personal knowledge of the matters stated herein and, if called upon, could and would competently testify thereto.

2. I make this declaration in support of Plaintiffs' Opposition to Defendant Partners Group (USA) Inc.'s Motion to Dismiss and Memorandum of Law in Opposition to KinderCare Defendants' Motion to Dismiss the Consolidated Amended Complaint and Joinders Thereto filed contemporaneously herewith.

3. Attached hereto are true and correct copies of the following exhibits:

Exhibit A: Registration Rights Agreement by and Among KinderCare Learning Companies, Inc. and the Stockholders Party Hereto, Exhibit 10.1 to Form S-1, dated October 7, 2024;

Exhibit B: Stockholder Agreement by and Among KinderCare Learning Companies, Inc. and the Stockholders Party Hereto, Exhibit 10.26 to Form S-1, dated October 7, 2024; and

Exhibit C: Letter to KinderCare and Partners Group from Senator Jeffrey A. Merkley, Ranking Member of the Senate Committee on the Budget, dated March 23, 2026.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on June 5, 2026, at City of New York, New York.

JESSE L. JENSEN

# EXHIBIT A

EX-10.27 7 d760946dex1027.htm EX-10.27

**Exhibit 10.27**

**REGISTRATION RIGHTS AGREEMENT**

**BY AND AMONG**

**KINDERCARE LEARNING COMPANIES, INC.**

**AND**

**THE STOCKHOLDERS PARTY HERETO**

**DATED AS OF [ ], 2024**

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| Article I EFFECTIVENESS | | 1 |
| Section 1.1. | Effectiveness | 1 |
| Article II DEFINITIONS | | 1 |
| Section 2.1. | Definitions | 1 |
| Section 2.2. | Other Interpretive Provisions | 6 |
| Article III REGISTRATION RIGHTS | | 7 |
| Section 3.1. | Demand Registration | 7 |
| Section 3.2. | Shelf Registration | 10 |
| Section 3.3. | Piggyback Registration | 12 |
| Section 3.4. | Lock-Up Agreements | 14 |
| Section 3.5. | Registration Procedures | 14 |
| Section 3.6. | Underwritten Offerings | 19 |
| Section 3.7. | No Inconsistent Agreements; Additional Rights | 20 |
| Section 3.8. | Registration Expenses | 20 |
| Section 3.9. | Indemnification | 21 |
| Section 3.10. | Rules 144 and 144A and Regulation S | 24 |
| Section 3.11. | Existing Registration Statements | 25 |
| Article IV MISCELLANEOUS | | 25 |
| Section 4.1. | Authority; Effect | 25 |
| Section 4.2. | Notices | 25 |
| Section 4.3. | Termination and Effect of Termination | 27 |
| Section 4.4. | Permitted Transferees | 27 |
| Section 4.5. | Remedies | 27 |
| Section 4.6. | Amendments | 28 |
| Section 4.7. | Governing Law | 28 |
| Section 4.8. | Consent to Jurisdiction | 28 |
| Section 4.9. | WAIVER OF JURY TRIAL | 29 |
| Section 4.10. | Merger; Binding Effect, Etc. | 29 |
| Section 4.11. | Counterparts; Electronic Signatures | 29 |
| Section 4.12. | Severability | 30 |
| Section 4.13. | No Recourse | 30 |

This REGISTRATION RIGHTS AGREEMENT (as it may be amended from time to time in accordance with the terms hereof, the "Agreement"), dated as of [ ], 2024 is made by and among:

A. KinderCare Learning Companies, Inc., a Delaware corporation (the "Company");

B. Partners Group Client Access 13 L.P. Inc., Partners Group Client Access 13A L.P. Inc., Partners Group Barrier Reef L.P., Partners Group Hercules, L.P. Inc., Partners Group Hearst Opportunities Fund L.P., Partners Group Daintree Co-Invest, L.P., Partners Group Access 768 L.P. and Partners Group Direct Investments 2012 (EUR), L.P. Inc. (collectively, with their Permitted Transferees that are Affiliates, the "PG Investor");

C. Thomas Wyatt ("Chair");

D. Paul Thompson (the "Management Holder"); and

E. such other Persons, if any, that from time to time become party hereto as holders of Registrable Securities pursuant to Section 4.4 in their capacity as Permitted Transferees.

**RECITALS**

WHEREAS, on the date hereof, the Company has priced an initial public offering (the "IPO") of shares of its common stock, par value $0.01 per share (the "Common Stock"), pursuant to an Underwriting Agreement dated as of the date hereof (the "Underwriting Agreement"); and

WHEREAS, the parties believe that it is in the best interests of the Company and the other parties hereto to set forth their agreements regarding registration rights and certain other matters following the closing of the IPO.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises, covenants and agreements of the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## EFFECTIVENESS

Section 1.1. Effectiveness. This Agreement shall become effective upon the Closing.

## ARTICLE II

## DEFINITIONS

Section 2.1. Definitions. As used in this Agreement, the following terms shall have the following meanings:

"Adverse Disclosure" means public disclosure of material non-public information that, in the good faith judgment of the Board of Directors of the Company (with the advice of outside counsel): (i) would be required to be made in any Registration Statement filed with the SEC by the Company so that such Registration Statement, from and after its effective date, does not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; (ii) would not be required to be made at such time but for the filing, effectiveness or continued use of such Registration Statement; and (iii) the Company has a bona fide business purpose for not disclosing publicly.

"Affiliate" means, with respect to any specified Person, (a) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such specified Person or (b) in the event that the specified Person is a natural Person, a Member of the Immediate Family of such Person; provided that the Company and each subsidiary of the Company shall be deemed not to be an Affiliate of the PG Investor. "Affiliated" and "Affiliation" shall have correlative meanings. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble.

"Block Trade Offering" means an offering and/or sale of Registrable Securities by one or more of the Holders on a block trade or underwritten basis (whether firm commitment or otherwise) without substantial marketing efforts prior to pricing, including, without limitation, a same day trade, overnight trade or similar transaction.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"Chair" shall have the meaning set forth in the Preamble.

"Closing" shall mean the closing date of the IPO.

"Common Stock" shall have the meaning set forth in the Recitals.

"Company" shall have the meaning set forth in the Preamble.

"Company Indemnitee" or "Company Indemnitees" shall have the meaning set forth in Section 3.9.5.

"Demand Notice" shall have the meaning set forth in Section 3.1.2.

"Demand Registration" shall have the meaning set forth in Section 3.1.1(a).

"Demand Registration Request" shall have the meaning set forth in Section 3.1.1(a).

"Demand Registration Statement" shall have the meaning set forth in Section 3.1.1(c).

"Demand Suspension" shall have the meaning set forth in Section 3.1.5.

"Effective Date" means the date of the Closing.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and any successor thereto, and any rules and regulations promulgated thereunder, all as the same shall be in effect from time to time.

"Excluded Registration" means (i) a registration relating to the sale of securities to employees of the Company or a subsidiary of the Company pursuant to a stock option, stock purchase, or similar plan on Form S-8 or its successor form approved by the Board of Directors of the Company or (ii) a registration statement on Form S-4 or its successor form.

"FINRA" means the Financial Industry Regulatory Authority.

"Holder" means each of the Persons party hereto for so long as such Person holds Registrable Securities.

"IPO" shall have the meaning set forth in the Recitals.

"Issuer Free Writing Prospectus" means an issuer free writing prospectus, as defined in Rule 433 under the Securities Act, relating to an offer of the Registrable Securities.

"Issuer Shares" means the shares of Common Stock or other equity securities of the Company, and any securities into which such shares of Common Stock or other equity securities shall have been changed or any securities resulting from any reclassification or recapitalization of such shares of Common Stock or other equity securities.

"Loss" or "Losses" shall have the meaning set forth in Section 3.9.1.

"Management Holder" shall have the meaning set forth in the Preamble.

"Member of the Immediate Family" means, with respect to an individual, (a) each parent, spouse (but not including a former spouse or a spouse from whom such individual is legally separated) or child (including those adopted) of such individual and (b) each trustee, solely in his or her capacity as trustee and so long as such trustee is reasonably satisfactory to the Company, for a trust naming only one or more of the Persons listed in clause (a) as beneficiaries.

"Participation Conditions" shall have the meaning set forth in Section 3.2.5(b).

"Permitted Transferee" means, with respect to any Holder, any Affiliate of such Holder.

"Person" means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"Piggyback Notice" shall have the meaning set forth in Section 3.3.1.

"Piggyback Registration" shall have the meaning set forth in Section 3.3.1.

"Potential Takedown Participant" shall have the meaning set forth in Section 3.2.5(b).

"Pro Rata Portion" means, with respect to each Holder requesting that its shares be registered or sold in a Public Offering, a number of such shares equal to the aggregate number of Registrable Securities requested to be registered or sold in such Public Offering (excluding any shares to be registered or sold for the account of the Company), subject to any limit specified by the managing underwriter or underwriters pursuant to Section 3.1.6 or Section 3.2.6, as applicable, multiplied by a fraction, the numerator of which is the aggregate number of Registrable Securities held by such Holder immediately following Closing (after giving effect to any exercise by the underwriters of their option to purchase additional shares in connection with the closing of the IPO and any exercise of such option to purchase additional shares by the underwriters), and the denominator of which is the aggregate number of Registrable Securities held by all Holders immediately following Closing (after giving effect to any exercise by the underwriters of their option to purchase additional shares in connection with the closing of the IPO and any exercise of such option to purchase additional shares by the underwriters).

"Prospectus" means (i) the prospectus included in any Registration Statement, all amendments and supplements to such prospectus, including post-effective amendments and supplements, and all other material incorporated by reference in such prospectus, and (ii) any Issuer Free Writing Prospectus.

"Public Offering" means the offer and sale of Registrable Securities for cash pursuant to an effective Registration Statement under the Securities Act (other than a Registration Statement on Form S-4 or Form S-8 or any successor form).

"Registrable Securities" means (i) all shares of Common Stock, and any securities into which such Common Stock shall have been changed, that are not then subject to vesting or forfeiture to the Company, (ii) all shares of Common Stock issuable upon exercise, conversion or exchange of any option, warrant or convertible or other security not then subject to vesting or forfeiture to the Company and (iii) all shares of Common Stock directly or indirectly issued or issuable with respect to the securities referred to in clauses (i) or (ii) above by way of unit or stock dividend or unit or stock split, or in connection with a combination of units or shares, reclassification, recapitalization, merger, consolidation or other reorganization. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities when (w) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been disposed of in accordance with such Registration Statement, (x) such securities shall have been Transferred pursuant to Rule 144, (y) the holder of such securities is able to immediately sell such securities under Rule 144 without any restrictions on transfer (including without application of paragraphs (c), (d), (e), (f) and (h) of Rule 144), as determined in the reasonable judgment of such holder (it being understood that a written opinion of the Company's outside legal counsel to the effect that such securities may be so sold shall be conclusive evidence this clause has been satisfied), or (z) such securities shall have ceased to be outstanding.

"Registration" means registration under the Securities Act of the offer and sale to the public of any Issuer Shares under a Registration Statement. The terms "register," "registered" and "registering" shall have correlative meanings.

"Registration Expenses" shall have the meaning set forth in Section 3.8.

"Registration Statement" means any registration statement of the Company filed with, or to be filed with, the SEC under the Securities Act, including the related Prospectus, amendments and supplements to such registration statement, including pre- and post-effective amendments, and all exhibits and all material incorporated by reference in such registration statement other than a registration statement (and related Prospectus) filed on Form S-4 or Form S-8 or any successor form thereto.

"Relative Ownership Percentage" means, with respect to Shares held by any Holder, a fraction (expressed as a percentage) (i) the numerator of which is the aggregate number of Shares owned by such Stockholder immediately following the effective time of a Transfer and (ii) the denominator of which is the aggregate number of Shares owned by such Stockholder at the time of the IPO (prior to giving effect to any Transfers in connection with the IPO).

"Representatives" means, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, actuaries, consultants, equity financing partners or financial advisors or other Person associated with, or acting on behalf of, such Person.

"Rule 144" means Rule 144 under the Securities Act (or any successor rule).

"SEC" means the Securities and Exchange Commission or any successor agency having jurisdiction under the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, and any successor thereto, and any rules and regulations promulgated thereunder, all as the same shall be in effect from time to time.

"Selling Stockholder Information" shall have the meaning set forth in Section 3.9.1.

"Shelf Period" shall have the meaning set forth in Section 3.2.3.

"Shelf Registration" shall have the meaning set forth in Section 3.2.1(a).

"Shelf Registration Notice" shall have the meaning set forth in Section 3.2.2.

"Shelf Registration Request" shall have the meaning set forth in Section 3.2.1(a).

"Shelf Registration Statement" shall have the meaning set forth in Section 3.2.1(a).

"Shelf Suspension" shall have the meaning set forth in Section 3.2.4.

"Shelf Takedown Notice" shall have the meaning set forth in Section 3.2.5(b).

"Shelf Takedown Request" shall have the meaning set forth in Section 3.2.5(a).

"Stockholders Agreement" means the Stockholders Agreement, dated as of [ ], 2024, made by and between the Company and the PG Investor, as amended from time to time.

"PG Investor" shall have the meaning set forth in the Preamble.

"Transfer" means, with respect to any Registrable Security, any interest therein, or any other securities or equity interests relating thereto, a direct or indirect transfer, sale, exchange, assignment, pledge, hypothecation or other encumbrance or other disposition thereof, including the grant of an option or other right, whether directly or indirectly, whether voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise. "Transferred" shall have a correlative meaning.

"Underwriting Agreement" shall have the meaning set forth in the Recitals.

"Underwritten Public Offering" means an underwritten Public Offering, including any Block Trade Offering.

"Underwritten Shelf Takedown" means an Underwritten Public Offering pursuant to an effective Shelf Registration Statement.

"Vested Equity" means any (1) Shares owned of record by any Holder, *plus* (2) without duplication, Shares issued to any Holder subject to any award agreement that has vested in accordance with the terms thereof and beneficially owned by the Holder or Transferred by such Holder to the Company to generate cash for the payment of taxes, including estimated taxes, due as a result of such vesting.

"WKSI" means any Securities Act registrant that is a well-known seasoned issuer as defined in Rule 405 under the Securities Act (or any successor rule) at the most recent eligibility determination date specified in paragraph (2) of that definition.

Section 2.2. Other Interpretive Provisions.

(a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b) The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement; and any subsection and section references are to this Agreement unless otherwise specified.

(c) The terms "include" and "including" are not limiting and shall be deemed to be followed by the phrase "without limitation."

(d) The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(e) Whenever the context requires, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms.

(f) References to Articles and Sections are to Articles and Sections of this Agreement unless otherwise specified.

(g) References to any agreement or contract are to that agreement or contract as amended, restated, modified or supplemented from time to time in accordance with the terms thereof.

**ARTICLE III**

**REGISTRATION RIGHTS**

The Company will perform and comply, and cause each of its subsidiaries to perform and comply, with such of the following provisions as are applicable to it. Each Holder will perform and comply with such of the following provisions as are applicable to such Holder.

Section 3.1. Demand Registration.

Section 3.1.1. Request for Demand Registration.

(a) Following the Effective Date, the PG Investor shall have the right to make a written request from time to time (a "Demand Registration Request") to the Company for Registration of all or part of the Registrable Securities held by the PG Investor. Any such Registration pursuant to a Demand Registration Request shall hereinafter be referred to as a "Demand Registration." Each such demand shall be required to be in respect of at least $50 million in anticipated aggregate net proceeds from all shares sold pursuant to such Registration (including after giving effect to net proceeds expected to be received by any Holder that participates in such offering after delivering written notice pursuant to Section 3.1.3 or otherwise) unless a lesser amount is then held by the participating Holders, in which case such demand may only be made in respect of all Registrable Securities held by such Holders; provided that a Demand Registration shall not be counted for purposes of the limitation set forth in Section 3.1.1(d) or Section 3.2.5(c) unless and until the Demand Registration has become effective and the PG Investor registers and sells at least 75% of the Registrable Securities requested to be included in such Registration.

(b) Each Demand Registration Request shall specify (i) the aggregate amount of Registrable Securities to be registered and (ii) the intended method or methods of disposition thereof.

(c) Upon receipt of a Demand Registration Request, the Company shall as promptly as practicable file a Registration Statement (a "Demand Registration Statement") relating to such Demand Registration, and use its commercially reasonable efforts to cause such Demand Registration Statement to be promptly declared effective under the Securities Act.

(d) The Company shall not be obligated to take any action to effect any Demand Registration if a Demand Registration was declared effective or an Underwritten Shelf Takedown was consummated within the current fiscal quarter of the Company (unless otherwise consented to by the Board of Directors of the Company).

Section 3.1.2. Demand Notice. Promptly upon receipt of a Demand Registration Request pursuant to Section 3.1.1 (but in no event more than one Business Day thereafter), the Company shall deliver a written notice (a "Demand Notice") of any such Demand Registration Request to all other Holders and the Demand Notice shall offer each such Holder the opportunity to include in the Demand Registration that number of Registrable Securities as each such Holder may request in writing. Subject to Section 3.1.6, the Company shall include in the Demand Registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within three Business Days after the date that the Demand Notice was delivered.

Section 3.1.3. Demand Withdrawal. The PG Investor and any other Holder that has requested its Registrable Securities be included in a Demand Registration pursuant to Section 3.1.3 may withdraw all or any portion of its Registrable Securities included in a Demand Registration from such Demand Registration at any time prior to the effectiveness of the applicable Demand Registration and will not be obligated to participate in any Underwritten Public Offering prior to executing the underwriting agreement relating thereto. Upon receipt of a notice to such effect from the PG Investor with respect to all of the Registrable Securities included by the PG Investor in such Demand Registration, the Company shall cease all efforts to secure effectiveness of the applicable Demand Registration Statement. Notwithstanding any withdrawal by the PG Investor of Registrable Securities from a Demand Registration pursuant to this Section 3.1.3, the Demand Registration with respect to which the withdrawal was made shall be counted for purposes of the limit on Demand Registration Requests set forth in Section 3.1.1(d) unless (a) the PG Investor reimburses the Company for all documented out-of-pocket expenses incurred in connection with the Demand Registration with respect to which the withdrawal was made, (b) the withdrawal is made as a result of an event that has had a material adverse effect on the business, assets, condition (financial or otherwise) or results of operations of the Company or (c) the withdrawal is made in response to a Demand Suspension pursuant to Section 3.1.5.

Section 3.1.4. Effective Registration. The Company shall use commercially reasonable efforts to cause the Demand Registration Statement to become effective and remain effective for not less than 180 days plus the duration of any suspension period (or such shorter period as will terminate when all Registrable Securities covered by such Demand Registration Statement have been sold or withdrawn), or, if such Demand Registration Statement relates to an Underwritten Public Offering, such longer period as in the opinion of counsel for the underwriter or underwriters a Prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer.

Section 3.1.5. Delay in Filing; Suspension of Registration. If the filing, initial effectiveness or continued use of a Demand Registration Statement at any time would require the Company to make an Adverse Disclosure, the Company may, upon giving prompt written notice of such action to the Holders (provided that the Company shall not disclose any material non-public information that is the basis for such notice to any Holder without the express written consent of such Holder), delay the filing or initial effectiveness of, or suspend use of, the Demand Registration Statement (a "Demand Suspension"); provided, however, that the Company shall not be permitted to exercise a Demand Suspension (i) more than once during any 12-month period or (ii) for a period exceeding 60 days. In the case of a Demand Suspension, the Holders agree to suspend use of the applicable Prospectus in connection with any sale or purchase, or offer to sell or purchase, Registrable Securities, upon receipt of the notice referred to above. The

Company shall immediately notify the Holders in writing upon (a) the Company's decision to file or seek effectiveness of such Demand Registration Statement following such Demand Suspension and (b) the effectiveness of such Demand Registration Statement. Notwithstanding the provisions of this Section 3.1.5, the Company may not postpone the filing or effectiveness of, or suspend use of, a Demand Registration Statement past the date upon which the applicable Adverse Disclosure is disclosed to the public or otherwise ceases to be Adverse Disclosure. During a Demand Suspension, the Company shall be prohibited from filing a registration statement for its own account or for the account of any other Holder or holder of its securities and, upon termination of any Demand Suspension, the Company shall promptly amend or supplement the applicable Prospectus, if necessary, so it does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and furnish to the Holders such numbers of copies of the Prospectus as so amended or supplemented as the Holders may reasonably request. The Company shall, if necessary, supplement or amend the Demand Registration Statement, if required by the registration form used by the Company for the Demand Registration or by the instructions applicable to such registration form or by the Securities Act or the rules or regulations promulgated thereunder or as may reasonably be requested by the PG Investor.

Section 3.1.6. Priority of Securities Registered Pursuant to Demand Registrations. If the managing underwriter or underwriters of a proposed Underwritten Public Offering of the Registrable Securities included in a Demand Registration advise the Company in writing that, in its or their opinion, the number of securities requested to be included in such Demand Registration exceeds the number that can be sold in such offering without being likely to have an adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, then the securities to be included in such Registration shall be in the case of any Demand Registration (x) first, allocated to the PG Investor in an amount equal to the number of such Registrable Securities requested to be registered or sold, subject to any limit specified by the managing underwriter or underwriters, (y) second, and only if all the securities referred to in clause (x) have been included in such Registration, allocated to each other Holder that has requested to participate in such Demand Registration an amount equal to the lesser of (i) the number of such Registrable Securities requested to be registered or sold by such Holder, and (ii) a number of such shares equal to such Holder's Pro Rata Portion, and (z) third, and only if all the securities referred to in clauses (x) and (y) have been included in such Registration, the number of other securities that, in the opinion of such managing underwriter or underwriters can be sold without having such adverse effect (with such number to be allocated *pro rata* among the remaining requesting Holders that have requested to participate in such Demand Registration in a like manner).

Section 3.2. Shelf Registration.

Section 3.2.1. Request for Shelf Registration.

(a) Upon the written request of the PG Investor from time to time commencing on the one-year anniversary of the IPO (a "Shelf Registration Request"), the Company shall promptly file with the SEC a shelf Registration Statement pursuant to Rule 415 under the Securities Act (or any successor rule) ("Shelf Registration Statement") relating to the offer and sale of Registrable Securities by any Holders thereof from time to time in accordance with the methods of distribution elected by such Holders and the Company shall use its commercially reasonable efforts to cause such Shelf Registration Statement to promptly become effective under the Securities Act. Any such Registration pursuant to a Shelf Registration Request shall hereinafter be referred to as a "Shelf Registration." The Shelf Registration Statement shall be on Form S-3 (or, if Form S-3 is not available to be used by the Company at such time, on Form S-1 or another appropriate form permitting Registration of such Registrable Securities for resale); provided, that, notwithstanding anything to the contrary in this Section 3.2, if the Company is not eligible to use Form S-3 on the date of a Shelf Registration Request, the PG Investor and any other Holders that elect to include Registrable Securities in the Shelf Registration Statement pursuant to Section 3.2.2 may only request to include all Registrable Securities held by such Holder in such Shelf Registration Statement. If the Shelf Registration Statement is initially filed on Form S-1 and thereafter the Company becomes eligible to use Form S-3 for secondary sales, the Company shall, as promptly as reasonably practicable, cause such Shelf Registration Statement to be amended, or shall file a new replacement Shelf Registration Statement, such that the Shelf Registration Statement is on Form S-3.

(b) If on the date of the Shelf Registration Request the Company is a WKSI, then the Shelf Registration Request may request Registration of an unspecified amount of Registrable Securities to be sold by unspecified Holders. If on the date of the Shelf Registration Request the Company is not a WKSI, then the Shelf Registration Request shall specify the aggregate amount of Registrable Securities to be registered. The Company shall provide to the PG Investor the information necessary to determine the Company's status as a WKSI upon request.

Section 3.2.2. Shelf Registration Notice. Promptly upon receipt of a Shelf Registration Request (but in no event more than one Business Day thereafter), the Company shall deliver a written notice (a "Shelf Registration Notice") of any such request to all other Holders, which notice shall specify, if applicable, the amount of Registrable Securities to be registered, and the Shelf Registration Notice shall offer each such Holder the opportunity to include in the Shelf Registration that number of Registrable Securities as each such Holder may request in writing. Subject to Section 3.2.6, the Company shall include in such Shelf Registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within three Business Days (or within one Business Day in the case of a Block Trade Offering) after the date that the Shelf Registration Notice has been delivered to such Holder.

Section 3.2.3. Continued Effectiveness. The Company shall use its commercially reasonable efforts to keep such Shelf Registration Statement continuously effective under the Securities Act in order to permit the Prospectus forming part of the Shelf Registration Statement to be usable by Holders until the earlier of: (i) the date as of which all Registrable Securities have been sold pursuant to the Shelf Registration Statement or another Registration Statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(a)(3) of the Securities Act and Rule 174 thereunder); and (ii) the date as of which no Holder named in such Shelf Registration Statement holds Registrable Securities, or, if the Shelf Registration Statement does not specify Holders, the date as of which no Holder holds Registrable Securities (such period of effectiveness, the "Shelf Period").

Section 3.2.4. Suspension of Registration. If the continued use of such Shelf Registration Statement at any time would require the Company to make an Adverse Disclosure, the Company may, upon giving prompt written notice of such action to the Holders (provided that the Company shall not disclose any material non-public information that is the basis for such notice to any Holder without the express written consent of such Holder), suspend use of the Shelf Registration Statement (a "Shelf Suspension"); provided, however, that the Company shall not be permitted to exercise a Shelf Suspension (i) more than one time during any 12-month period, or (ii) for a period exceeding 60 days. In the case of a Shelf Suspension, the Holders agree to suspend use of the applicable Prospectus in connection with any sale or purchase of, or offer to sell or purchase, Registrable Securities, upon receipt of the notice referred to above. The Company shall immediately notify the Holders in writing upon the termination of any Shelf Suspension, and upon such termination, promptly amend or supplement the applicable Prospectus, if necessary, so it does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and furnish to the Holders such numbers of copies of the Prospectus as so amended or supplemented as the Holders may reasonably request. The Company shall, if necessary, supplement or amend the Shelf Registration Statement, if required by the registration form used by the Company for the Shelf Registration Statement or by the instructions applicable to such registration form or by the Securities Act or the rules or regulations promulgated thereunder or as may reasonably be requested by the Holders of a majority of Registrable Securities that are included in such Shelf Registration Statement.

Section 3.2.5. Shelf Takedown.

(a) At any time during which the Company has an effective Shelf Registration Statement with respect to Registrable Securities held by the PG Investor, by notice to the Company specifying the intended method or methods of disposition thereof, the PG Investor may make a written request (a "Shelf Takedown Request") to the Company to effect a Public Offering, including an Underwritten Shelf Takedown, of all or a portion of the PG Investor's Registrable Securities that are covered by such Shelf Registration Statement, and as soon as practicable the Company shall amend or supplement the Shelf Registration Statement for such purpose; provided that any Shelf Takedown Request to effect an Underwritten Shelf Takedown shall be required to be in respect of at least $50 million in anticipated aggregate net proceeds from all shares sold pursuant to such Registration (including after giving effect to net proceeds expected to be received by any Holder that participates in such offering after delivering written notice pursuant to Section 3.2.5(b) or otherwise) unless a lesser amount is then held by the participating Holders, in which case such request may only be made in respect of all Registrable Securities held by such Holders.

(b) Promptly upon receipt of a Shelf Takedown Request (but in no event more than one Business Day thereafter) for any Underwritten Shelf Takedown, the Company shall deliver a notice (a "Shelf Takedown Notice") to each other Holder with Registrable Securities covered by the applicable Registration Statement, or to all other Holders if such Registration Statement is undesignated (each a "Potential Takedown Participant"). The Shelf Takedown Notice shall offer each such Potential Takedown Participant the opportunity to include in any Underwritten Shelf Takedown such number of Registrable Securities as each such Potential Takedown Participant may request in writing. Subject to Section 3.2.6, the

Company shall include in the Underwritten Shelf Takedown all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within two Business Days after the date that the Shelf Takedown Notice has been delivered to such Holder (or within one Business Day after the date that the Shelf Takedown Notice has been delivered to such Holder if such notice relates to a Block Trade Offering). Any Potential Takedown Participant's request to participate in an Underwritten Shelf Takedown shall be binding on the Potential Takedown Participant; provided that each such Potential Takedown Participant that elects to participate may condition its participation on such Underwritten Shelf Takedown being completed within ten Business Days of its acceptance (the "Participation Conditions"). Notwithstanding the delivery of any Shelf Takedown Notice, but subject to the Participation Conditions in any Block Trade Offering, all determinations as to whether to complete any Underwritten Shelf Takedown and as to the timing, manner, price, size and other terms of any Underwritten Shelf Takedown contemplated by this Section 3.2.5 shall be determined by the PG Investor.

(c) The Company shall not be obligated to take any action to effect any Underwritten Shelf Takedown if a Demand Registration or an Underwritten Shelf Takedown was consummated within the current fiscal quarter of the Company (unless otherwise consented to by the Board of Directors of the Company).

Section 3.2.6. Priority of Securities Sold Pursuant to Shelf Takedowns. If the managing underwriter or underwriters of a proposed Underwritten Shelf Takedown pursuant to Section 3.2.5 advise the Company in writing that, in its or their opinion, the number of securities requested to be included in the proposed Underwritten Shelf Takedown exceeds the number that can be sold in such Underwritten Shelf Takedown without being likely to have an adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, the number of Registrable Securities to be included in such offering shall be (x) first, allocated to the PG Investor in an amount equal to the number of such Registrable Securities requested to be registered or sold, subject to any limit specified by the managing underwriter or underwriters, (y) second, and only if all the securities referred to in clause (x) have been included in such Registration, allocated to each other Holder that has requested to participate in such Underwritten Shelf Takedown an amount equal to the lesser of (i) the number of such Registrable Securities requested to be registered or sold by such Holder, and (ii) a number of such shares equal to such Holder's Pro Rata Portion, and (z) third, and only if all the securities referred to in clauses (x) and (y) have been included in such Registration, the number of other securities that, in the opinion of such managing underwriter or underwriters can be sold without having such adverse effect (with such number to be allocated *pro rata* among the remaining requesting Holders that have requested to participate in such Underwritten Shelf Takedown in a like manner).

Section 3.3. Piggyback Registration.

Section 3.3.1. Participation. If the Company at any time proposes to file a Registration Statement under the Securities Act or to conduct a Public Offering with respect to any offering of its equity securities for its own account or for the account of any other Persons (other than an Excluded Registration or a Registration pursuant to Section 3.1 or Section 3.2), then, as soon as practicable (but in no event less than three Business Days prior to the proposed date of filing of such Registration Statement or, in the case of any such Public Offering under a Shelf Registration Statement, the

anticipated pricing or trade date), the Company shall give written notice (a "Piggyback Notice") of such proposed filing or Public Offering to all Holders, and such Piggyback Notice shall offer the Holders the opportunity to register under such Registration Statement, or to sell in such Public Offering, such number of Registrable Securities as each such Holder may request in writing (a "Piggyback Registration"). Subject to Section 3.3.2, the Company shall include in such Registration Statement or in such Public Offering, as applicable, all such Registrable Securities that are requested to be included therein within three Business Days after the receipt by such Holder of any such notice; provided, however, that if at any time after giving written notice of its intention to register or sell any securities and prior to the effective date of the Registration Statement filed in connection with such Registration, or the pricing or trade date of a Public Offering under a Shelf Registration Statement, the Company shall determine for any reason not to register or sell or to delay Registration or the sale of such securities, the Company shall promptly give written notice of such determination to each Holder and, thereupon, (i) in the case of a determination not to register or sell, the Company shall be relieved of its obligation to register or sell any Registrable Securities in connection with such Registration or Public Offering (but not from its obligation to pay the Registration Expenses in connection therewith), without prejudice, however, to the rights of any Holders entitled to request that such Registration or sale be effected as a Demand Registration under Section 3.1 or an Underwritten Shelf Takedown under Section 3.2, as the case may be, and (ii) in the case of a determination to delay Registration or sale, in the absence of a request for a Demand Registration or an Underwritten Shelf Takedown, as the case may be, the Company shall be permitted to delay registering or selling any Registrable Securities, for the same period as the delay in registering or selling such other securities. If the offering pursuant to such Registration Statement or Public Offering is to be an Underwritten Public Offering, then each Holder making a request for a Piggyback Registration pursuant to this Section 3.3.1 shall, and the Company shall, make such arrangements with the managing underwriter or underwriters so that each such Holder may participate in such underwritten offering. If the offering pursuant to such Registration Statement or Public Offering is to be on any other basis, then each Holder making a request for a Piggyback Registration pursuant to this Section 3.3.1 shall be permitted to, and the Company shall, make such arrangements so that each such Holder may participate in such offering on such basis. Any Holder shall have the right to withdraw all or part of its request for inclusion of its Registrable Securities in a Piggyback Registration by giving written notice to the Company of its request to withdraw; provided that such request must be made in writing prior to the execution of the related underwriting agreement or the effectiveness of the Registration Statement, as applicable.

Section 3.3.2. Priority of Piggyback Registration. If the managing underwriter or underwriters of any proposed offering of Registrable Securities included in a Piggyback Registration informs the Company and the participating Holders in writing that, in its or their opinion, the number of securities that such Holders and any other Persons intend to include in such offering exceeds the number that can be sold in such offering without being likely to have a significant adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, then the securities to be included in such Registration shall be (i) first, 100% of the securities that the Company proposes to sell; (ii) second, and only if all the securities referred to in clause (i) have been included in such Registration, the number of Registrable Securities that, in the opinion of such managing underwriter or underwriters, can be sold without having such adverse effect, with such number to be allocated among the Holders that have requested to participate in such Registration based on an amount equal to the lesser of (A) the number of such Registrable Securities requested to be sold by such Holder, and (B) a number of such shares equal to such Holder's Pro Rata Portion; and (iii) third, and only if all of the Registrable Securities referred to in clause (ii) have been included in such Registration, any other securities eligible for inclusion in such Registration.

Section 3.3.3. No Effect on Other Registrations. No Registration of Registrable Securities effected pursuant to a request under this Section 3.3 shall be deemed to have been effected pursuant to Section 3.1 and Section 3.2 or shall relieve the Company of its obligations under Section 3.1 and Section 3.2.

Section 3.4. Lock-Up Agreements. In connection with each Registration or sale of Registrable Securities pursuant to Section 3.1, Section 3.2 or Section 3.3 conducted as an Underwritten Public Offering, if requested by the underwriters for such Underwritten Public Offering and provided that a similar request is made in accordance with Section 3.6.1, each Holder shall enter into a lock-up agreement with such customary terms (which shall be the same terms for all Holders) as are negotiated among the Company, the underwriters and the PG Investor. The Company and the PG Investor agree to use commercially reasonable efforts to include in any such agreement a lock-up period beginning no earlier than seven days before, and ending no later than 90 days after, the date of the final prospectus in connection with such Registration or Underwritten Public Offering.

Section 3.5. Registration Procedures.

Section 3.5.1. Requirements. In connection with the Company's obligations under Sections Section 3.1, Section 3.2 and Section 3.3, the Company shall use its commercially reasonable efforts to effect any applicable Registration and to facilitate the sale of any applicable Registrable Securities in accordance with the intended method or methods of distribution thereof as expeditiously as reasonably practicable, and in connection therewith the Company shall:

(a) as promptly as is reasonably practicable prepare and file the required Registration Statement, including all exhibits and financial statements required under the Securities Act to be filed therewith, and Prospectus, and, before filing a Registration Statement or Prospectus or any amendments or supplements thereto, (x) furnish to the underwriters, if any, and to the Holders of the Registrable Securities covered by such Registration Statement, copies of all documents prepared to be filed, which documents shall be subject to the review of such underwriters and such Holders and their respective counsel, (y) subject to applicable law, make such changes in such documents concerning the Holders prior to the filing thereof as such Holders, or their counsel, may reasonably request and (z) subject to applicable law, except in the case of a Registration under Section 3.3, not file any Registration Statement or Prospectus or amendments or supplements thereto to which the PG Investor, or the underwriters, if any, shall reasonably object;

(b) as promptly as is reasonably practicable prepare and file with the SEC such amendments and post-effective amendments to such Registration Statement and supplements to the Prospectus as may be (x) reasonably requested by the PG Investor, (y) reasonably requested by any participating Holder (to the extent such request relates to information relating to such Holder), or (z) necessary to keep such Registration Statement effective for the period of time required by this Agreement, and comply with provisions of the applicable securities laws with respect to the sale or other disposition of all securities covered by such Registration Statement during such period in accordance with the intended method or methods of disposition by the sellers thereof set forth in such Registration Statement;

(c) notify the participating Holders and the managing underwriter or underwriters, if any, and (if requested) confirm such notice in writing and provide copies of the relevant documents, as soon as reasonably practicable after notice thereof is received by the Company (i) when the applicable Registration Statement or any amendment thereto has been filed or becomes effective, and when the applicable Prospectus or any amendment or supplement thereto has been filed, (ii) of any written comments by the SEC, or any request by the SEC or other federal or state governmental authority for amendments or supplements to such Registration Statement or such Prospectus, or for additional information (whether before or after the effective date of the Registration Statement) or any other correspondence with the SEC relating to, or which may affect, the Registration, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or any order by the SEC or any other regulatory authority preventing or suspending the use of any preliminary or final Prospectus or the initiation or threatening of any proceedings for such purposes, (iv) if, at any time, the representations and warranties of the Company in any applicable underwriting agreement cease to be true and correct in all material respects and (v) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(d) promptly notify each selling Holder and the managing underwriter or underwriters, if any, when the Company becomes aware of the happening of any event as a result of which the applicable Registration Statement or the Prospectus included in such Registration Statement (as then in effect) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein (in the case of such Prospectus or any preliminary Prospectus, in light of the circumstances under which they were made) not misleading, when any Issuer Free Writing Prospectus includes information that may conflict with the information contained in the Registration Statement, or, if for any other reason it shall be necessary during such time period to amend or supplement such Registration Statement or Prospectus in order to comply with the Securities Act and, as promptly as reasonably practicable thereafter, prepare and file with the SEC, and furnish without charge to the selling Holders and the managing underwriter or underwriters, if any, an amendment or supplement to such Registration Statement or Prospectus, which shall correct such misstatement or omission or effect such compliance;

(e) to the extent the Company is eligible under the relevant provisions of Rule 430B under the Securities Act, if the Company files any Shelf Registration Statement, the Company shall include in such Shelf Registration Statement such disclosures as may be required by Rule 430B under the Securities Act (referring to the unnamed selling security holders in a generic manner by identifying the initial offering of the securities to the Holders) in order to ensure that the Holders may be added to such Shelf Registration Statement at a later time through the filing of a Prospectus supplement rather than a post-effective amendment;

(f) use its commercially reasonable efforts to prevent, or obtain the withdrawal of, any stop order or other order or notice preventing or suspending the use of any preliminary or final Prospectus;

(g) promptly incorporate in a Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment such information as the managing underwriter or underwriters and the Holders of a majority of the Registrable Securities being sold agree should be included therein relating to the plan of distribution with respect to such Registrable Securities; and make all required filings of such Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment as soon as reasonably practicable after being notified of the matters to be incorporated in such Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment;

(h) furnish to each selling Holder and each underwriter, if any, without charge, as many conformed copies as such Holder or underwriter may reasonably request of the applicable Registration Statement and any amendment or post-effective amendment or supplement thereto, including financial statements and schedules, all documents incorporated therein by reference and all exhibits (including those incorporated by reference);

(i) deliver to each selling Holder and each underwriter, if any, without charge, as many copies of the applicable Prospectus (including each preliminary Prospectus) and any amendment or supplement thereto and such other documents as such Holder or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities by such Holder or underwriter (it being understood that the Company shall consent to the use of such Prospectus or any amendment or supplement thereto by each of the selling Holders and the underwriters, if any, in connection with the offering and sale of the Registrable Securities covered by such Prospectus or any amendment or supplement thereto);

(j) on or prior to the date on which the applicable Registration Statement becomes effective, use its commercially reasonable efforts to register or qualify, and cooperate with the selling Holders, the managing underwriter or underwriters, if any, and their respective counsel, in connection with the Registration or qualification of such Registrable Securities for offer and sale under the securities or "Blue Sky" laws of each state and other jurisdiction as any such selling Holder or managing underwriter or underwriters, if any, or their respective counsel reasonably request in writing and do any and all other acts or things reasonably necessary or advisable to keep such Registration or qualification in effect for such period as required by Section 3.1 or Section 3.2, as applicable; provided that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or to take any action which would subject it to taxation or general service of process in any such jurisdiction where it is not then so subject;

(k) cooperate with the selling Holders and the managing underwriter or underwriters, if any, to enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriters may request prior to any sale of Registrable Securities to the underwriters;

(l) use its commercially reasonable efforts to cause the Registrable Securities covered by the applicable Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the seller or sellers thereof or the underwriter or underwriters, if any, to consummate the disposition of such Registrable Securities;

(m) not later than the effective date of the applicable Registration Statement, provide a CUSIP number for all Registrable Securities if other than the CUSIP for the publicly traded Common Stock and if one has then been assigned;

(n) make such representations and warranties to the Holders of Registrable Securities being registered, and the underwriters or agents, if any, in form, substance and scope as are customarily made by issuers in public offerings similar to the offering then being undertaken;

(o) enter into such customary agreements (including underwriting and indemnification agreements) and take all such other actions as the PG Investor or the managing underwriter or underwriters, if any, reasonably request in order to expedite or facilitate the Registration and disposition of such Registrable Securities;

(p) obtain for delivery to the underwriter or underwriters, if any, an opinion or opinions from counsel for the Company dated the most recent effective date of the Registration Statement or, in the event of an Underwritten Public Offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, which opinions shall be reasonably satisfactory to the underwriter or underwriters and its or their counsel;

(q) in the case of an Underwritten Public Offering, obtain for delivery to the Company and the managing underwriter or underwriters, with copies to the Holders included in such Registration or sale, a comfort letter from the Company's independent certified public accountants or independent auditors (and, if necessary, any other independent certified public accountants or independent auditors of any subsidiary of the Company or any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement) in customary form and covering such matters of the type customarily covered by comfort letters as the managing underwriter or underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement;

(r) cooperate with each seller of Registrable Securities and each underwriter, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA;

(s) use its commercially reasonable efforts to comply with all applicable securities laws and, if a Registration Statement was filed, make available, including through the SEC's EDGAR filing system or any successor system, to its security holders, as soon as reasonably practicable, an earnings statement satisfying the provisions of Section 11(a) of the Securities Act and the rules and regulations promulgated thereunder;

(t) provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement;

(u) use its commercially reasonable efforts to cause all Common Stock covered by the applicable Registration Statement to be listed on the securities exchange on which the Company's Common Stock is then listed or quoted and on each inter-dealer quotation system on which the Company's Common Stock is then quoted;

(v) make available upon reasonable notice at reasonable times and for reasonable periods for inspection by any representative appointed by the PG Investor, by any underwriter participating in any disposition to be effected pursuant to such Registration Statement or by any attorney, accountant or other agent retained by such Holders or any such underwriter, all pertinent financial and other records and pertinent corporate documents and properties of the Company, and cause all of the Company's officers, directors and employees and the independent public accountants who have certified its financial statements to make themselves available to discuss the business of the Company and to supply all information reasonably requested by any such Person in connection with such Registration Statement;

(w) in the case of an Underwritten Public Offering, cause the senior executive officers of the Company to participate in the customary "road show" presentations that may be reasonably requested by the managing underwriter or underwriters in any such offering and otherwise to facilitate, cooperate with, and participate in each proposed offering contemplated herein and customary selling efforts related thereto;

(x) take no direct or indirect action prohibited by Regulation M under the Exchange Act;

(y) take all reasonable action to ensure that any Issuer Free Writing Prospectus utilized in connection with any Registration complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related Prospectus, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and

(z) take all such other reasonable actions as are necessary or advisable in order to expedite or facilitate the Registration and disposition of such Registrable Securities in accordance with the terms of this Agreement.

Section 3.5.2. Company Information Requests. The Company may require each seller of Registrable Securities as to which any Registration or sale is being effected to furnish to the Company such information regarding the distribution of such securities and such other information relating to such Holder and its ownership of Registrable Securities as the Company may from time to time reasonably request in writing and the Company may exclude from such Registration or sale the Registrable Securities of any such Holder who unreasonably fails to furnish such information within a reasonable time after receiving such request. Each Holder agrees to furnish such information to the Company and to cooperate with the Company as reasonably necessary to enable the Company to comply with the provisions of this Agreement.

Section 3.5.3. Discontinuing Registration. Each Holder agrees that, as promptly as possible after receipt of any notice from the Company of the happening of any event of the kind described in Section 3.5.1(d), such Holder will forthwith discontinue disposition of Registrable Securities pursuant to such Registration Statement until such Holder's receipt of the copies of the supplemented or amended Prospectus contemplated by Section 3.5.1(d), or until such Holder is advised in writing by the Company that the use of the Prospectus may be resumed, and has received copies of any additional or supplemental filings that are incorporated by reference in the Prospectus, or any amendments or supplements thereto, and if so directed by the Company, such Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Holder's possession, of the Prospectus covering such Registrable Securities current at the time of receipt of such notice. In the event the Company shall give any such notice, the period during which the applicable Registration Statement is required to be maintained effective shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by such Registration Statement either receives the copies of the supplemented or amended Prospectus contemplated by Section 3.5.1(d) or is advised in writing by the Company that the use of the Prospectus may be resumed.

Section 3.6. Underwritten Offerings.

Section 3.6.1. Shelf and Demand Registrations. If requested by the underwriters for any Underwritten Public Offering, pursuant to a Registration or sale under Section 3.1 or Section 3.2, the Company shall enter into an underwriting agreement with such underwriters, such agreement to be reasonably satisfactory in substance and form to each of the Company, the PG Investor and the underwriters, and containing a requirement to obtain lock-up agreements from directors and executive officers of the Company and such other terms as are customary in agreements of that type. The Holders of the Registrable Securities proposed to be distributed by such underwriters shall cooperate with the Company in the negotiation of the underwriting agreement and shall give consideration to the reasonable suggestions of the Company regarding the form thereof. Such Holders shall be parties to such underwriting agreement, which shall contain such agreements on the part of the Company to and for the benefit of such Holders as are customarily made by issuers to selling stockholders in public offerings similar to the applicable offering. Any such Holder shall be required to make representations and warranties and other agreements, deliver an opinion or opinions from its counsel and provide indemnities, in each case as are customarily made by selling stockholders in secondary public offerings.

Section 3.6.2. Piggyback Registrations. If the Company proposes to register or sell any of its securities under the Securities Act as contemplated by Section 3.3 and such securities are to be distributed through one or more underwriters, the Company shall, if requested by any Holder pursuant to Section 3.3 and, subject to the provisions of Section 3.3.2, use its commercially reasonable efforts to arrange for such underwriters to include on the same terms and conditions that apply to the other sellers in such Registration or sale all the Registrable Securities to be offered and sold by such Holder among the securities of the Company to be distributed by such underwriters in such Registration or sale. The Holders of Registrable

Securities to be distributed by such underwriters shall be parties to the underwriting agreement between the Company and such underwriters, which underwriting agreement shall contain such representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such Holders as are customarily made by issuers to selling stockholders in secondary public offerings. Any such Holder shall be required to make representations and warranties and other agreements, deliver an opinion or opinions from its counsel and provide indemnities, in each case as are customarily made by selling stockholders in secondary public offerings.

Section 3.6.3. Participation in Underwritten Registrations. Subject to the provisions of Section 3.6.1 and Section 3.6.2 above, no Person may participate in any Underwritten Public Offering hereunder unless such Person (i) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Persons entitled to approve such arrangements and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements; provided that any such Holder shall not be required to make any representations or warranties to or agreements with the Company other than representations, warranties or agreements regarding such Holder, such Holder's title to the Registrable Securities, such Holder's intended method of distribution and any other representations, warranties or agreements as are customary in agreements of that type, and the aggregate amount of the liability of such Holder shall not exceed such Holder's proceeds from the sale of its Registrable Securities in the offering, net of underwriting discounts and commissions but before expenses.

Section 3.6.4. Selection of Underwriters. In the case of an Underwritten Public Offering under Section 3.1 or Section 3.2, the managing underwriter or underwriters to administer the offering shall be determined by the PG Investor; provided that such managing underwriter or underwriters shall be reasonably acceptable to the Company.

Section 3.7. No Inconsistent Agreements; Additional Rights. Neither the Company nor any of its subsidiaries shall hereafter enter into, and neither the Company nor any of its subsidiaries is currently a party to, any agreement with respect to its securities that is inconsistent with the rights granted to the Holders by this Agreement. Without the prior written consent of the PG Investor, neither the Company nor any of its subsidiaries shall enter into any agreement granting registration or similar rights to any Person that are prior in right, *pari passu* or inconsistent with the rights under this Agreement.

Section 3.8. Registration Expenses. All expenses incident to the Company's performance of or compliance with this Agreement shall be paid by the Company, including (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with the SEC or FINRA, (ii) all fees and expenses in connection with compliance with any securities or "Blue Sky" laws (including reasonable fees and disbursements of counsel for the underwriters in connection with blue sky qualifications of the Registrable Securities), (iii) all printing, duplicating, word processing, messenger, telephone, facsimile and delivery expenses of the Company (including expenses of printing certificates for the Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing Prospectuses), (iv) all fees and disbursements of counsel for the Company and of all independent certified public accountants or independent auditors of the Company and any subsidiaries of the Company (including the

expenses of any special audit and comfort letters required by or incident to such performance), (v) Securities Act liability insurance or similar insurance if the Company so desires, (vi) all fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange or quotation of the Registrable Securities on any inter-dealer quotation system, (vii) all applicable rating agency fees with respect to the Registrable Securities, (viii) all reasonable fees and disbursements of one counsel for the PG Investor, including all reasonable fees for an opinion from counsel to the PG Investor and any required local counsel opinions, (ix) all fees and expenses of any special experts or other Persons retained by the Company in connection with any Registration or sale, (x) all of the Company's internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties) and (xi) all expenses of the Company related to the "road-show" for any Underwritten Public Offering, except as otherwise may be agreed in any underwriting agreement related to such Underwritten Public Offering. All such expenses are referred to herein as "Registration Expenses." The Company shall not be required to pay any fees and disbursements to underwriters not customarily paid by the issuers of securities in an offering similar to the applicable offering, including underwriting discounts and commissions and transfer taxes, if any, attributable to the sale of Registrable Securities, which shall be paid by the participating Holders in proportion to the number of Registrable Securities offered and sold by or on behalf of each such Holder.

Section 3.9. Indemnification.

Section 3.9.1. Indemnification by the Company. The Company shall indemnify and hold harmless, to the full extent permitted by law, each Holder, each shareholder, member, limited or general partner of such Holder, each shareholder, member, limited or general partner of each such shareholder, member, limited or general partner, each of their respective Affiliates, officers, directors, shareholders, employees, advisors, and agents and each Person who controls (within the meaning of the Securities Act or the Exchange Act) such Persons and each of their respective Representatives from and against any and all losses, penalties, judgments, suits, costs, claims, damages, liabilities and expenses, joint or several (including reasonable costs of investigation and reasonable legal expenses or other reasonable expenses actually incurred thereby in connection with investigating or defending any claim or proceeding resulting therefrom) (each, a "Loss" and collectively "Losses") arising out of or based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which such Registrable Securities are registered or sold under the Securities Act (including any final, preliminary or summary Prospectus contained therein or any amendment thereof or supplement thereto or any documents incorporated by reference therein) or any other disclosure document produced by or on behalf of the Company or any of its subsidiaries including any report or other document filed under the Exchange Act, (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus or preliminary Prospectus, in light of the circumstances under which they were made) not misleading or (iii) any violation or alleged violation by the Company or any of its subsidiaries of any federal, state, foreign or common law rule or regulation applicable to the Company or any of its subsidiaries and relating to action or inaction in connection with any such registration, disclosure document or other document or report; provided that no selling Holder shall be entitled to indemnification pursuant to this Section 3.9.1 in

respect of any untrue statement or omission contained in any information relating to such seller Holder furnished in writing by such selling Holder to the Company specifically for inclusion in a Registration Statement and used by the Company in conformity therewith (such information, "Selling Stockholder Information"). This indemnity shall be in addition to any liability the Company may otherwise have. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Holder or any indemnified party and shall survive the Transfer of such securities by such Holder and regardless of any indemnity agreed to in the underwriting agreement that is less favorable to the Holders.

Section 3.9.2. Indemnification by the Selling Holders. Each selling Holder agrees (severally and not jointly) to indemnify and hold harmless, to the fullest extent permitted by law, the Company, its directors and officers and each Person who controls the Company (within the meaning of the Securities Act or the Exchange Act) from and against any Losses resulting from (i) any untrue statement of a material fact in any Registration Statement under which such Registrable Securities were registered or sold under the Securities Act (including any final, preliminary or summary Prospectus contained therein or any amendment thereof or supplement thereto or any documents incorporated by reference therein) or (ii) any omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus or preliminary Prospectus, in light of the circumstances under which they were made) not misleading, in each case to the extent, but only to the extent, that such untrue statement or omission is contained in such selling Holder's Selling Stockholder Information. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the proceeds from the sale of its Registrable Securities in the offering giving rise to such indemnification obligation, net of underwriting discounts and commissions but before expenses, less any amounts paid by such Holder pursuant to Section 3.9.4 and any amounts paid by such Holder as a result of liabilities incurred under the underwriting agreement, if any, related to such sale.

Section 3.9.3. Conduct of Indemnification Proceedings. Any Person entitled to indemnification hereunder shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that any delay or failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent, if at all, that it forfeits substantive rights by reason of such delay or failure) and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided, however, that any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (i) the indemnifying party has agreed in writing to pay such fees or expenses, (ii) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after receipt of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (iii) the indemnified party has reasonably concluded (based upon advice of its counsel) that there may be legal defenses available to it or other indemnified parties that are different from or in addition to those available to the indemnifying party or (iv) in the reasonable judgment of any such Person (based upon advice of its counsel) a conflict of interest may exist between such Person and the indemnifying party with respect to such claims (in which case, if the Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the

expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person). If the indemnifying party assumes the defense, the indemnifying party shall not have the right to settle such action without the prior written consent of the indemnified party. If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its prior written consent, but such consent may not be unreasonably withheld or delayed. Notwithstanding the foregoing, if at any time an indemnified party shall have requested that an indemnifying party reimburse the indemnified party for reasonable fees and expenses of counsel as contemplated by this paragraph, the indemnifying party shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into in good faith more than 60 days after receipt by the indemnifying party of such request and more than 30 days after receipt of the proposed terms of such settlement and (ii) the indemnifying party shall not have reimbursed the indemnified party in accordance with such request prior to the date of such settlement. It is understood that the indemnifying party or parties shall not, except as specifically set forth in this Section 3.9.3, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees, disbursements or other charges of more than one separate firm (in addition to any local counsel) at any one time unless (x) the employment of more than one counsel has been authorized in writing by the indemnifying party or parties, (y) an indemnified party has reasonably concluded (based on the advice of counsel) that there may be legal defenses available to it that are different from or in addition to those available to the other indemnified parties or (z) a conflict or potential conflict exists or may exist (based upon advice of counsel to an indemnified party) between such indemnified party and the other indemnified parties, in each of which cases the indemnifying party shall be obligated to pay the reasonable fees and expenses of such additional counsel or counsels.

Section 3.9.4. Contribution. If for any reason the indemnification provided for in Section 3.9.1 and Section 3.9.2 is unavailable to an indemnified party (other than as a result of exceptions contained in Section 3.9.1 and Section 3.9.2) or insufficient in respect of any Losses referred to therein, then the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Loss in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and the indemnified party or parties on the other hand in connection with the acts, statements or omissions that resulted in such Losses, as well as any other relevant equitable considerations. In connection with any Registration Statement filed with the SEC by the Company, the relative fault of the indemnifying party on the one hand and the indemnified party on the other hand shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just or equitable if contribution pursuant to this Section 3.9.4 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in this Section 3.9.4. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The amount paid or payable by an indemnified party as a result of the Losses referred to in Section 3.9.1 and Section 3.9.2 shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection

with investigating or defending any such action or claim. If indemnification is available under this Section 3.9, the indemnifying parties shall indemnify each indemnified party to the fullest extent provided in Section 3.9.1 and Section 3.9.2 hereof without regard to the provisions of this Section 3.9.4. The remedies provided for in this Section 3.9 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity. Notwithstanding the provisions of this Section 3.9.4, in connection with any Registration Statement filed by the Company, a selling Holder shall not be required to contribute any amount in excess of the dollar amount of the proceeds from the sale of its Registrable Securities in the offering giving rise to such indemnification obligation, net of underwriting discounts and commissions but before expenses, less any amounts paid by such Holder pursuant to Section 3.9.2 and any amounts paid by such Holder as a result of liabilities incurred under the underwriting agreement, if any, related to such sale.

Section 3.9.5. Indemnification Priority. The Company hereby acknowledges and agrees that any of the Persons entitled to indemnification pursuant to Section 3.9.1 (each, a "Company Indemnitee" and collectively, the " Company Indemnitees") may have certain rights to indemnification, advancement of expenses and/or insurance provided by other sources. The Company hereby acknowledges and agrees (i) that it is the indemnitor of first resort (i.e., its obligations to a Company Indemnitee are primary and any obligation of such other sources to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Company Indemnitee are secondary) and (ii) that it shall be required to advance the full amount of expenses incurred by a Company Indemnitee and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement without regard to any rights a Company Indemnitee may have against such other sources. The Company further agrees that no advancement or payment by such other sources on behalf of a Company Indemnitee with respect to any claim for which such Company Indemnitee has sought indemnification, advancement of expenses or insurance from the Company shall affect the foregoing, and that such other sources shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Company Indemnitee against the Company.

Section 3.10. Rules 144 and 144A and Regulation S. The Company shall file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder (or, if the Company is not required to file such reports, it will, upon the request of any Holder, make publicly available such necessary information for so long as necessary to permit sales that would otherwise be permitted by this Agreement pursuant to Rule 144, Rule 144A or Regulation S under the Securities Act, as such rules may be amended from time to time or any similar rule or regulation hereafter adopted by the SEC), and it will take such further action as any Holder may reasonably request, including any necessary cooperation with the Company's transfer agent and facilitating the delivery of any legal opinions that such transfer agent may require, all to the extent required from time to time to enable such Holder to sell Registrable Securities without Registration under the Securities Act in transactions that would otherwise be permitted by this Agreement and within the limitation of the exemptions provided by (i) Rule 144, Rule 144A or Regulation S under the Securities Act, as such rules may be amended from time to time, or (ii) any similar rule or regulation hereafter adopted by the SEC. Upon the request of any Holder, the Company will deliver to such Holder a written statement as to whether it has complied with such requirements and, if not, the specifics thereof.

Section 3.11. Existing Registration Statements. Notwithstanding anything herein to the contrary and subject to applicable law and regulation, the Company may satisfy any obligation hereunder to file a Registration Statement or to have a Registration Statement become effective by a specified date by designating, by notice to the Holders, a Registration Statement that previously has been filed with the SEC or become effective, as the case may be, as the relevant Registration Statement for purposes of satisfying such obligation, and all references to any such obligation shall be construed accordingly; provided that such previously filed Registration Statement may be, and is, amended or, subject to applicable securities laws, supplemented to add the number of Registrable Securities, and, to the extent necessary, to identify as selling stockholders those Holders demanding the filing of a Registration Statement pursuant to the terms of this Agreement. To the extent this Agreement refers to the filing or effectiveness of other Registration Statements, by or at a specified time and the Company has, in lieu of then filing such Registration Statements or having such Registration Statements become effective, designated a previously filed or effective Registration Statement as the relevant Registration Statement for such purposes, in accordance with the preceding sentence, such references shall be construed to refer to such designated Registration Statement, as amended or supplemented in the manner contemplated by the immediately preceding sentence.

## ARTICLE IV

## MISCELLANEOUS

Section 4.1. Authority; Effect. Each party hereto represents and warrants to and agrees with each other party that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized on behalf of such party and do not violate any agreement or other instrument applicable to such party or by which its assets are bound. This Agreement does not, and shall not be construed to, give rise to the creation of a partnership among any of the parties hereto, or to constitute any of such parties members of a joint venture or other association. The Company and its subsidiaries shall be jointly and severally liable for all obligations of the Company pursuant to this Agreement.

Section 4.2. Notices. Any notices, requests, demands and other communications required or permitted in this Agreement shall be effective if in writing and (i) delivered personally, (ii) sent by facsimile or e-mail or (iii) sent by overnight courier, in each case, addressed as follows:

if to the Company, to:

KinderCare Learning Companies, Inc.
650 NE Holladay, Suite 1400
Portland, OR 97232
Attn: Katie Gallagher
E-mail: GallagherK@LanePowell.com

with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attention: Faiza Rahman
E-mail: Faiza.Rahman@ropesgray.com

if to the PG Investor, to:

c/o Partners Group (USA) Inc.
1200 Entrepreneurial Drive
Broomfield, CO 80221
Attn: Philip Wolf
E-mail: philip.wolf@partnersgroup.com

with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attention: Faiza Rahman
E-mail: Faiza.Rahman@ropesgray.com

if to Chair, to:

KinderCare Learning Companies, Inc.
650 NE Holladay, Suite 1400
Portland, OR 97232
Attn: Thomas Wyatt
E-mail: twyatt@kindercare.com

with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attention: Faiza Rahman
E-mail: Faiza.Rahman@ropesgray.com

if to the Management Holder, to:

KinderCare Learning Companies, Inc.
650 NE Holladay, Suite 1400
Portland, OR 97232
Attn: Paul Thompson
E-mail: pthompson@kc-education.com

with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attention: Faiza Rahman
E-mail: Faiza.Rahman@ropesgray.com

Subject to the foregoing, notice to the holder of record of any Registrable Securities shall be deemed to be notice to the holder of such securities for all purposes hereof.

Unless otherwise specified herein, such notices or other communications shall be deemed effective (i) on the date received, if personally delivered, (ii) on the date received if delivered by facsimile or e-mail on a Business Day, or if not delivered on a Business Day, on the first Business Day thereafter and (iii) one Business Day after being sent by overnight courier. Each of the parties hereto shall be entitled to specify a different address by giving notice as aforesaid to each of the other parties hereto.

Section 4.3. Termination and Effect of Termination. This Agreement shall terminate upon the date on which no Holder holds any Registrable Securities, except for the provisions of Section 3.9, Section 4.2, Section 4.7, Section 4.8, Section 4.9 and Section 4.13 and this Section 4.3, which shall survive any such termination. No termination under this Agreement shall relieve any Person of liability for breach or Registration Expenses incurred prior to termination. In the event this Agreement is terminated, each Person entitled to indemnification or contribution rights pursuant to Section 3.9 hereof shall retain such indemnification or contribution rights with respect to any matter that (i) may be a liability subject to indemnification or contribution thereunder and (ii) occurred prior to such termination.

Section 4.4. Permitted Transferees. The rights of a Holder hereunder may be assigned (but only with all related obligations as set forth below) in connection with a Transfer of Registrable Securities to a Permitted Transferee of that Holder. Without prejudice to any other or similar conditions imposed hereunder with respect to any such Transfer, no assignment permitted under the terms of this Section 4.4 will be effective unless the Permitted Transferee to which the assignment is being made, if not a Holder, has delivered to the Company a written acknowledgment and joinder agreement in form and substance reasonably satisfactory to the Company that the Permitted Transferee will be bound by, and will be a party to, this Agreement (such written joinder agreement to include such Permitted Transferee's contact information for the delivery of notice). A Permitted Transferee to whom rights are transferred pursuant to this Section 4.4 may not again transfer those rights to any other Permitted Transferee, other than as provided in this Section 4.4.

Section 4.5. Remedies. The parties to this Agreement shall have all remedies available at law, in equity or otherwise in the event of any breach or violation of this Agreement or any default hereunder. The parties acknowledge and agree that in the event of any breach of this Agreement, in addition to any other remedies that may be available, each of the parties hereto shall be entitled to specific performance of the obligations of the other parties hereto

and, in addition, to such other equitable remedies (including preliminary or temporary relief) as may be appropriate in the circumstances. No delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any such delay, omission nor waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

Section 4.6. Amendments. This Agreement may not be orally amended, modified, extended or terminated, nor shall any oral waiver of any of its terms be effective. This Agreement may be amended, modified, extended or terminated, and the provisions hereof may be waived, only by an agreement in writing signed by the Company and the PG Investor; provided, however, that any amendment, modification, extension or termination that (a) has a disproportionate and materially adverse effect on any Holder shall require the prior written consent of such Holder and (b) creates a material new obligation of a Holder or further restricts in any material respect the ability of a Holder to Transfer its Shares shall require the prior written consent of such Holder, other than any amendment or modification reasonably required to address a change in applicable law. In addition, each party hereto may waive any right hereunder by an instrument in writing signed by such party.

Section 4.7. Governing Law. This Agreement and all claims arising out of or based upon this Agreement or relating to the subject matter hereof shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

Section 4.8. Consent to Jurisdiction. Each party to this Agreement, by its execution hereof, (i) hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the State of Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof, (ii) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, and agrees not to allow any of its subsidiaries to assert, by way of motion, as a defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such proceeding brought in one of the above-named courts is improper, or that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court and (iii) hereby agrees not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof or thereof other than before one of the above-named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than one of the above-named courts whether on the grounds of inconvenient forum or otherwise. Notwithstanding the foregoing, to the extent that any party hereto is or becomes a party in any litigation in connection with which it may assert indemnification rights set forth in this Agreement, the court in which such litigation is being heard shall be deemed to be included in clause (i) above. Notwithstanding the foregoing, any party to this Agreement may commence and maintain an action to enforce a judgment of any of the above-named courts in any court of competent jurisdiction. Each party hereto hereby consents to service of process in any such proceeding in any manner permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to Section 4.2 hereof is reasonably calculated to give actual notice.

Section 4.9. WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS SECTION 4.9 CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH IT IS RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 4.9 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 4.10. Merger; Binding Effect, Etc. This Agreement (along with the Stockholders Agreement) constitutes the entire agreement of the parties with respect to its subject matter, supersedes all prior or contemporaneous oral or written agreements or discussions with respect to such subject matter, and shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective heirs, representatives, successors and permitted assigns. Except as otherwise expressly provided herein, no Holder or other party hereto may assign any of its respective rights or delegate any of its respective obligations under this Agreement without the prior written consent of the other parties hereto, and any attempted assignment or delegation in violation of the foregoing shall be null and void.

Section 4.11. Counterparts; Electronic Signatures. This Agreement may be executed in any number of separate counterparts each of which when so executed shall be deemed to be an original and all of which together shall constitute one and the same agreement. Counterpart signature pages to this Agreement may be delivered by facsimile or electronic delivery (i.e., by e-mail of a PDF signature page) and each such counterpart signature page will constitute an original for all purposes. The Company and each Holder hereby agree that this Agreement may be executed by way of electronic signatures and that the electronic signature has the same binding effect as a physical signature. For the avoidance of doubt, the Company and each Holder further agree that this Agreement, or any part hereof, shall not be denied legal effect, validity or enforceability solely on the ground that it is in the form of an electronic record.

Section 4.12. Severability. In the event that any provision hereof would, under applicable law, be invalid, illegal or unenforceable in any respect, such provision shall be construed by modifying or limiting it so as to be valid, legal and enforceable to the maximum extent compatible with, and possible under, applicable law. The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

Section 4.13. No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement, the Company and each Holder covenant, agree and acknowledge that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any current or future director, officer, employee, stockholder, general or limited partner or member of any Holder or of any Affiliate or assignee thereof, as such, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future officer, agent or employee of any Holder or any current or future member of any Holder or any current or future director, officer, employee, stockholder, partner or member of any Holder or of any Affiliate or assignee thereof, as such, for any obligation of any Holder under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

[Signature pages follow]

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement as of the date first above written.

**KINDERCARE LEARNING COMPANIES, INC.**

By: ______________________________
Name:
Tile:

[Signature Page to Registration Rights Agreement]

**PARTNERS GROUP CLIENT ACCESS 13 L.P. INC.**

By: Partners Group Client Access Management Limited, its general partner

By: ________________________
Name:
Title:

**PARTNERS GROUP BARRIER REEF L.P.**

By: Partners Group Management XIII Limited, its general partner

By: ________________________
Name:
Title:

**PARTNERS GROUP HERCULES, L.P., INC.**

By: Partners Group Management X Limited, its general partner

By: ________________________
Name:
Title: Authorized Signatory

By: ________________________
Name:
Title: Authorized Signatory

[Signature Page to Registration Rights Agreement]

**PARTNERS GROUP HEARST OPPORTUNITIES FUND L.P.**

By: Partners Group Cayman Management II Limited, its general partner

By: Partners Group (Guernsey) Limited, under power of attorney

By: ______________________________
Name:
Title:

**PARTNERS GROUP DAINTREE CO-INVEST, L.P.**

By: Partners Group Cayman Management XIII Limited, its general partner

By: ______________________________
Name:
Title:

**PARTNERS GROUP ACCESS 768 L.P.**

By: Partners Group Management (Scots) LLP, its general partner

By: ______________________________
Name:
Title:

[Signature Page to Registration Rights Agreement]

**PARTNERS GROUP DIRECT INVESTMENTS 2012 (EUR), L.P. INC.**

By: Partners Group Management VIII Limited, its general partner

By: ____________________________
Name:
Title:

**PARTNERS GROUP CLIENT ACCESS 13A, L.P. INC.**

By: Partners Group Client Access Management I Limited, its general partner

By: ____________________________
Name:
Title:

[Signature Page to Registration Rights Agreement]

THOMAS WYATT

By: ______________________________

[Signature Page to Registration Rights Agreement]

PAUL THOMPSON

By: ______________________________

[Signature Page to Registration Rights Agreement]

# EXHIBIT B

EX-10.26 6 d760946dex1026.htm EX-10.26

**Exhibit 10.26**

**STOCKHOLDERS AGREEMENT**

**BY AND AMONG**

**KINDERCARE LEARNING COMPANIES, INC.**

**AND**

**THE STOCKHOLDERS PARTY HERETO**

**[ • ], 2024**

---

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| SECTION 1. DEFINITIONS | | 1 |
| 1.1. | Drafting Conventions; No Construction Against Drafter | 1 |
| 1.2. | Defined Terms | 2 |
| SECTION 2. REPRESENTATIONS AND WARRANTIES | | 3 |
| 2.1. | Representations and Warranties of the Initial Stockholders | 3 |
| 2.2. | Representations and Warranties of the Company | 4 |
| SECTION 3. CORPORATE GOVERNANCE | | 4 |
| 3.1. | Board of Directors | 4 |
| 3.2. | Observer Rights | 6 |
| 3.3. | Agreement of Company | 7 |
| SECTION 4. OTHER AGREEMENTS | | 7 |
| 4.1. | Access | 7 |
| 4.2. | Sharing of Information | 8 |
| 4.3. | Pledges or Transfers | 8 |
| 4.4. | Matters Requiring Approval | 8 |
| SECTION 5. MISCELLANEOUS PROVISIONS | | 9 |
| 5.1. | Organizational Documents | 9 |
| 5.2. | Confidentiality | 9 |
| 5.3. | Reliance | 9 |
| 5.4. | Access to Agreement; Amendment and Waiver | 9 |
| 5.5. | Notices | 10 |
| 5.6. | Counterparts; Electronic Delivery | 10 |
| 5.7. | Remedies; Severability | 11 |
| 5.8. | Entire Agreement | 11 |
| 5.9. | Termination | 11 |
| 5.10. | Governing Law | 11 |
| 5.11. | Successors and Assigns | 11 |
| 5.12. | Consent to Jurisdiction; Specific Performance; WAIVER OF JURY TRIAL | 11 |
| 5.13. | Further Assurances; Company Logo | 12 |

| | | |
|---|---|---|
| 5.14. | Regulatory Matters | 12 |
| 5.15. | No Third Party Liability | 12 |
| 5.16. | Effectiveness of Agreement | 12 |
| 5.17. | Removal of Legends | 13 |
| 5.18. | Inconsistent Agreements | 13 |


**EXHIBITS**

Exhibit A: Form of Joinder Agreement

**STOCKHOLDERS AGREEMENT**

This Stockholders Agreement (this "Agreement") is entered into as of [ • ], 2024 by and among (a) KinderCare Learning Companies, Inc., a Delaware corporation (the "Company"), (b) Partners Group Client Access 13 L.P. Inc., Partners Group Client Access 13A L.P. Inc., Partners Group Barrier Reef L.P., Partners Group Hercules, L.P. Inc., Partners Group Hearst Opportunities Fund L.P., Partners Group Daintree Co-Invest, L.P., Partners Group Access 768 L.P. and Partners Group Direct Investments 2012 (EUR), L.P. Inc. (collectively, "PG") and (c) each of the other stockholders who are set forth on the signature pages hereto (together with the PG Stockholders (as defined below), the "Stockholders").

**RECITALS**

A. The Company is proposing to consummate an initial public offering (the "Initial Public Offering") of its common stock, par value $0.01 per share (the "Common Stock"), pursuant to an Underwriting Agreement, dated as of [ • ], 2024 (the "Underwriting Agreement").

B. PG and the Company desire to enter into this Agreement effective upon the Effective Time (as defined herein).

C. The Board of Directors of the Company (the "Board of Directors") has approved this Agreement.

D. The parties to this Agreement desire to agree upon the respective rights and obligations after the Effective Time with respect to the securities of the Company now or hereafter issued and outstanding and held by the parties to this Agreement and certain matters with respect to their investment in the Company.

**AGREEMENT**

Now therefore, in consideration of the foregoing, and the mutual agreements and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement agree as follows:

SECTION 1. DEFINITIONS

1.1. Drafting Conventions; No Construction Against Drafter.

(a) The headings in this Agreement are provided for convenience and do not affect its meaning. The words "include," "includes" and "including" are to be read as if they were followed by the phrase "without limitation." The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms. The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement; and any subsection and section references are to this Agreement unless otherwise specified. The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement. Whenever the context requires, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms. Unless the context otherwise requires, the term "or" is not exclusive and shall have the inclusive meaning of "and/or." Unless specified otherwise, any reference to an agreement means that agreement as amended or supplemented, subject to any restrictions on amendment contained in such agreement. Unless specified otherwise, any reference to a statute or regulation means that statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor statutes or regulations. If any date specified in this Agreement as a date for taking action falls on a day that is not a Business Day, then that action may be taken on the next Business Day. Unless specified otherwise, the words "party" and "parties" refer only to a party named in this Agreement or one who joins this Agreement as a party pursuant to the terms hereof.

(b) The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, this Agreement is to be construed as if drafted jointly by the parties and there is to be no presumption or burden of proof or rule of strict construction favoring or disfavoring any party because of the authorship of any provision of this Agreement.

1.2. Defined Terms. The following capitalized terms, as used in this Agreement, have the meanings set forth below.

"Affiliate" means with respect to any specified Person, any other Person which, directly or indirectly, controls, is controlled by or is under common control with the specified Person, including any partner, officer, director or member of the specified Person and, if the specified Person is a private equity fund, any investment fund now or hereafter managed by, or which is controlled by or is under common control with, one or more general partners of the specified Person. For the purposes of this definition, "control" (including, with its correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct, or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise.

"Audit Committee" has the meaning set forth in Section 3.1(e)(i).

"Beneficially Own" has the meaning set forth in Rule 13d-3 promulgated under the Exchange Act.

"Board of Directors" has the meaning set forth in the recitals.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"Closing" means the closing of the Initial Public Offering.

"Common Stock" has the meaning set forth in the recitals.

"Company" has the meaning set forth in the preamble and shall include any successor thereto.

"Compensation Committee" has the meaning set forth in Section 3.1(e)(i).

"Director" means a member of the Board of Directors.

"Effective Time" has the meaning set forth in Section 5.16.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Independent Director" means a director of the Company who (a) qualifies as independent for purposes of serving on the Board of Directors under the rules of the New York Stock Exchange and (b) satisfies the independence criteria set forth in Rule 10A-3 under the Exchange Act.

"Initial Public Offering" has the meaning set forth in the recitals.

"Joinder Agreement" means the joinder agreement substantially in the form of Exhibit A.

"Necessary Action" means, with respect to a specified result, all commercially reasonable actions required to cause such result that are within the power of a specified Person, including (i) voting or providing a written consent or proxy with respect to the Shares, (ii) causing the adoption of stockholders' resolutions and amendments to the organizational documents of the Company, (iii) executing agreements and instruments, (iv) making, or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result and (v) causing members of the Board of Directors, subject to any fiduciary duties that such members may have as directors of the Company (including pursuant to Section 3.1(d)), to act in a certain manner, including causing members of the Board of Directors or any nominating or similar committee of the Board of Directors to recommend the appointment of any PG Stockholders' Designees as provided by this Agreement.

"Nominating Committee" has the meaning set forth in Section 3.1(c).

"Observer" has the meaning set forth in Section 3.2(a).

"Permitted Transferee" means, (i) with respect to any PG Stockholder, (A) any Affiliate of such PG Stockholder, (B) any director, officer or employee of any Affiliate of such PG Stockholder, (C) any direct or indirect member or general or limited partner of such PG Stockholder that is the transferee of Shares pursuant to a pro rata distribution of Shares by such PG Stockholder to its partners or members, as applicable (or any subsequent transfer of such Shares by the transferee to another Permitted Transferee) and (ii) with respect to any Stockholder, any other Transferee designated as a Permitted Transferee by the PG Majority Interest.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, government (or agency or political subdivision thereof) or any other entity or group (as defined in Section 13(d) of the Exchange Act).

"PG" has the meaning set forth in the preamble.

"PG Director" has the meaning set forth in Section 3.1(a).

"PG Majority Interest" means, at any given time, the PG Stockholders holding a majority of the outstanding Shares held at that specified time by all PG Stockholders.

"PG Stockholders" means (i) PG and any other investment funds affiliated with or managed or advised by Partners Group AG or any of its Affiliates and (ii) any Permitted Transferee or Affiliate of PG (x) which is issued Common Stock or becomes the beneficial owner of any Common Stock or is Transferred any Common Stock by any other Person and (y) which becomes a party hereto by executing a Joinder Agreement.

"PG Stockholders' Designee" has the meaning set forth in Section 3.1(b).

"Shares" means, at any time, (i) shares of Common Stock and (ii) any other equity securities now or hereafter issued by the Company, together with any options thereon and any other shares of stock or other equity securities issued or issuable with respect thereto (whether by way of a stock dividend, stock split or in exchange for or in replacement or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization).

"Stockholders" has the meaning set forth in the preamble.

"Subsidiary" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such Person.

"Total Number of Directors" means the total number of directors comprising the Board of Directors from time to time.

"Transfer" means any direct or indirect transfer, donation, sale, assignment, pledge, hypothecation, grant of a security interest in or other disposal or attempted disposal of all or any portion of a security, any interest or rights in a security, or any rights under this Agreement.

"Transferee" means the recipient of a Transfer.

SECTION 2. REPRESENTATIONS AND WARRANTIES

2.1. Representations and Warranties of the Initial Stockholders. PG has the power and authority to enter into this Agreement and carry out its obligations hereunder. PG hereby represents, warrants and covenants to the Company as follows: (a) this Agreement has been duly authorized, executed and delivered by PG; (b) this Agreement constitutes the valid and binding obligation of PG enforceable against it in accordance with its terms;

and (c) the execution, delivery and performance by PG of this Agreement: (i) does not and will not violate any laws, rules or regulations of the United States or any state or other jurisdiction applicable to PG, or require PG to obtain any approval, consent or waiver of, or to make any filing with, any Person that has not been obtained or made; and (ii) does not constitute a breach of or default under any material agreement to which PG is a party.

2.2. Representations and Warranties of the Company. The Company hereby represents, warrants and covenants to the Stockholders as follows: (a) the Company has full corporate power and authority to enter into this Agreement and perform its obligations hereunder; (b) this Agreement constitutes the valid and binding obligation of the Company enforceable against it in accordance with its terms; and (c) the execution, delivery and performance by the Company of this Agreement: (i) does not and will not violate any laws, rules or regulations of the United States or any state or other jurisdiction applicable to the Company, or require the Company to obtain any approval, consent or waiver of, or to make any filing with, any Person that has not been obtained or made; and (ii) does not and will not result in a breach of, constitute a default under, accelerate any obligation under or give rise to a right of termination of any indenture or loan or credit agreement or any other material agreement, contract, instrument, mortgage, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award to which the Company is a party or by which the property of the Company is bound or affected, or result in the creation or imposition of any mortgage, pledge, lien, security interest or other charge or encumbrance on any of the assets or properties of the Company.

SECTION 3. CORPORATE GOVERNANCE

3.1. Board of Directors.

(a) Composition of Initial Board. As of the Closing, the Board of Directors shall be comprised of eight (8) directors, the following five (5) of whom shall be deemed to have been designated by the PG Stockholders (each, a "PG Director"): Joel Schwartz; Benjamin Russell; Preston Grasty; Michael Nuzzo; and Christine Deputy. The foregoing directors shall be divided into three classes of directors, each of whose members shall serve for staggered three-year terms as follows, and, in each case, in accordance with the Company's certificate of incorporation and bylaws:

(i) the class I directors shall initially include Christine Deputy and Benjamin Russell;

(ii) the class II directors shall initially include Michael Nuzzo, Preston Grasty and John T. Wyatt; and

(iii) the class III directors shall initially include Jean Desravines, Joel Schwartz and Alyssa Waxenberg.

(b) PG Stockholders' Representation. The PG Stockholders shall have the right, but not the obligation, to designate, and the individuals nominated for election as directors by or at the direction of the Board of Directors or a duly authorized committee of the Board of Directors shall include, a number of individuals such that, upon the election of each such individual, and each other individual nominated by or at the direction of the Board of Directors or a duly authorized committee of the Board of Directors, as a director of the Company and taking into account any director continuing to serve without the need for re-election, the number of PG Stockholders' Designees (as defined below) serving as directors of the Company will be equal to: (i) if the PG Stockholders and their Affiliates collectively Beneficially Own 50% or more of the Common Stock as of the record date for such meeting, the lowest whole number that is greater than 50% of the Total Number of Directors; (ii) if the PG Stockholders and their Affiliates collectively Beneficially Own at least 40% (but less than 50%) of the Common Stock as of the record date for such meeting, the lowest whole number that is greater than 40% of the Total Number of Directors; (iii) if the PG Stockholders and their Affiliates collectively Beneficially Own at least 30% (but less than 40%) of the Common Stock as of the

record date for such meeting, the lowest whole number that is greater than 30% of the Total Number of Directors; (iv) if the PG Stockholders and their Affiliates collectively Beneficially Own at least 20% (but less than 30%) of the Common Stock as of the record date for such meeting, the lowest whole number that is greater than 20% of the Total Number of Directors; and (v) if the PG Stockholders and their Affiliates collectively Beneficially Own at least 10% (but less than 20%) of the Common Stock as of the record date for such meeting, the lowest whole number (such number always being equal to or greater than one) that is greater than 10% of the Total Number of Directors (in each case, each such person a "PG Stockholders' Designee"). The PG Stockholders shall have the right, but not the obligation, to designate Independent Directors as one or more PG Stockholders' Designees.

Upon any decrease in the number of directors that the PG Stockholders are entitled to designate for election to the Board of Directors, the PG Stockholders shall, upon request from the Company, use their commercially reasonable efforts to cause the appropriate number of PG Stockholders' Designees (which may include any Independent Directors who have been designated as PG Stockholders' Designees) to offer to tender his or her resignation. If such resignation is then accepted by the Board of Directors, the Company shall cause the size of the Board of Directors to be reduced accordingly unless the Company, with the approval of a majority of the remaining Directors, determines not to reduce the authorized size of the Board of Directors, in which case the Board of Directors shall act in accordance with the bylaws of the Company then in effect to appoint or nominate a new director to the Board of Directors.

(c) Additional Obligations. An individual designated by the PG Stockholders for election (including pursuant to Section 3.1(b)) as a director shall comply with any applicable requirements of the charter for, and related guidelines of, any committee of the Board of Directors responsible for nominating directors (such committee, the "Nominating Committee"). Notwithstanding anything to the contrary in this Section 3, in the event that the Board of Directors determines in good faith, after consultation with outside legal counsel, that its nomination, appointment or election of a particular PG Stockholders' Designee pursuant to this Section 3.1 would constitute a breach of its fiduciary duties to the Company's stockholders or does not otherwise comply with any requirements of the charter for, or related guidelines of, the Nominating Committee, then the Board of Directors shall inform the PG Stockholders of such determination in writing and explain in reasonable detail the basis for such determination and shall designate another individual designated for nomination, election or appointment to the Board of Directors by the PG Stockholders (subject in each case to this Section 3.1(c)), and the Board of Directors and the Company shall take all of the actions required by this Section 3 with respect to the election of such substitute PG Stockholders' Designee. It is hereby acknowledged and agreed that the fact that a particular PG Stockholders' Designee is an Affiliate, director, professional, partner, member, manager, employee or agent of the PG Stockholders or is not an Independent Director shall not in and of itself constitute an acceptable basis for such determination by the Board of Directors.

(d) Removal; Vacancies. Except as provided in Section 3.1(b) with respect to decreases in ownership of the PG Stockholders, (i) the PG Stockholders shall have the exclusive right to request the removal of PG Stockholders' Designees from the Board of Directors in accordance with the bylaws of the Company then in effect, and the Company shall take all Necessary Action to cause the removal (whether for or without cause) of any such PG Stockholders' Designee at the request of the PG Stockholders, provided that PG Stockholders' Designees may be removed from the Board of Directors in accordance with the bylaws of the Company then in effect other than at the request of the PG Stockholders only for cause and only by the affirmative vote of the holders of two-thirds of the voting power of the outstanding Shares entitled to vote in the election and removal of directors, and (ii) the PG Stockholders shall have the exclusive right to designate directors for election to the Board of Directors to fill vacancies (for the remainder of the then current term) created by reason of death, disability, removal or resignation of PG Stockholders' Designees to the Board of Directors, and the Company shall take all Necessary Action to cause any such vacancies to be filled by replacement directors designated by the PG Stockholders as promptly as reasonably practicable.

(e) Committees.

(i) In accordance with the Company's certificate of incorporation and bylaws, (A) the Board of Directors shall establish at the Closing (if not already established at such time) and maintain an audit committee of the Board of Directors (the "Audit Committee"), the Nominating Committee and a compensation committee of the Board of Directors (the "Compensation Committee"), each

consisting of three (3) individuals, and (B) the Board of Directors may from time to time by resolution establish and maintain other committees of the Board of Directors. Subject to applicable laws and stock exchange regulations, and subject to requisite independence requirements applicable to such committees, the PG Stockholders shall have the right to have (I) two (2) PG Directors appointed to serve on the Nominating Committee, (II) one (1) PG Director appointed to serve on each of the Compensation Committee and Audit Committee and (III) one (1) PG Director to serve on each other committee of the Board of Directors. In furtherance of the foregoing, the Company agrees to take all Necessary Action to have two (2) PG Directors appointed to serve on the Nominating Committee and one (1) PG Director designated by the PG Stockholders appointed to serve on each of the Compensation Committee, the Audit Committee and each other committee of the Board of Directors (to the extent not prohibited by applicable Law or applicable stock exchange regulations).

(ii) At the Closing, (A) Benjamin Russell and Christine Deputy shall be deemed to have been designated by the PG Stockholders to serve on the Nominating Committee, (B) Joel Schwartz shall be deemed to have been designated by the PG Stockholders to serve on the Compensation Committee and (C) Michael Nuzzo shall be deemed to have been designated by the PG Stockholders to serve on the Audit Committee.

(iii) The number of PG Directors that the PG Stockholders are entitled to have appointed to the Nominating Committee, the Compensation Committee, the Audit Committee and each other committee of the Board of Directors pursuant to Section 3.1(e)(i) shall be decreased to the extent that the number of directors that the PG Stockholders are entitled to designate for election to the Board of Directors is decreased to less than two (2) PG Stockholders' Designees pursuant Section 3.1(b), such that if the PG Stockholders cease to have the right to designate two (2) directors but retain the right to designate one (1) director for election to the Board of Directors pursuant to Section 3.1(b), then the PG Stockholders shall have the right to have one (1) PG Director appointed to each of the Nominating Committee, the Compensation Committee, the Audit Committee and each other committee of the Board of Directors pursuant to Section 3.1(e)(i), and if the PG Stockholders cease to have the right to designate at least one (1) director for election to the Board of Directors pursuant to Section 3.1(b), then the PG Stockholders shall cease to have the right to have an individual appointed to the Nominating Committee, the Compensation Committee, the Audit Committee or any other committee of the Board of Directors pursuant to Section 3.1(e)(i).

(f) Indemnification. For so long as the PG Stockholders have the right to designate a PG Stockholders' Designee for election to the Board of Directors pursuant to Section 3.1(b) or any PG Director is serving on the Board of Directors, (i) the Company shall take all Necessary Actions to maintain in effect at all times directors and officers indemnity insurance coverage reasonably satisfactory to the PG Stockholders and (ii) the Company's organizational documents shall at all times provide for indemnification, exculpation and advancement of expenses with respect to the PG Directors to the fullest extent permitted under applicable law.

3.2. Observer Rights.

(a) The PG Stockholders shall have the right to designate and remove, and the Company shall take all Necessary Action to appoint or remove, as applicable, one (1) or more non-voting observers (each, an "Observer") to the Board of Directors (or any committees thereof) or any board of directors or equivalent governing body of any Subsidiary of the Company (or any committees thereof). Each Observer shall, at the same time and in

the same manner provided to the directors of the Board of Directors (or members of any applicable committee thereof) or directors or members of the board of directors or equivalent governing body of any Subsidiary of the Company (or members of any applicable committee thereof), as applicable, be entitled to (i) be given notice of all meetings (whether in person, telephonic or otherwise) of the Board of Directors (or any applicable committee) or the board of directors or equivalent governing body of any Subsidiary of the Company (or any applicable committee thereof), as applicable, (ii) receive copies of all notices, agendas, consents, minutes and other materials distributed to the Board of Directors (or any committee thereof) or the board of directors or equivalent governing body of any Subsidiary of the Company (or any applicable committee thereof), as applicable, whether provided to such directors or members in advance, during or after any meeting, regardless of whether such Observer shall be in attendance at such meeting and (iii) participate in (but not vote on) all discussions conducted at meetings of the Board of Directors (or any applicable committee thereof) or the board of directors or equivalent governing body of any Subsidiary of the Company (or any applicable committee thereof), as applicable, except, in the case of clauses (ii) and (iii), to the extent an Observer has been excluded from such meeting pursuant to Section 3.2(b); provided that such Observer shall have executed a non-disclosure agreement reasonably satisfactory to the PG Stockholders; provided, further, that such Observer shall (A) not be counted for purposes of determining whether there is a sufficient quorum for the Board of Directors (or any applicable committee thereof) or the board of directors or equivalent governing body of any Subsidiary of the Company (or any applicable committee thereof), as applicable, to conduct its business and (B) shall be subject to all rules governing the Board of Directors (or any applicable committee thereof) or the board of directors or equivalent governing body of any Subsidiary of the Company (or any applicable committee thereof), as applicable.

(b) Notwithstanding the foregoing, the Company or any Subsidiary of the Company, as applicable, may exclude an Observer from access to any material or meeting or portion thereof if: (i) the Board of Directors (or any applicable committee thereof) or the board of directors or equivalent governing body of any Subsidiary of the Company (or any applicable committee thereof), as applicable, concludes in good faith, upon advice of outside legal counsel, that (A) such exclusion is reasonably necessary to preserve the attorney-client privilege between the Company or such Subsidiary, as applicable, and its counselor or (B) such Observer has a conflict of interest; provided, however, that any such exclusion shall apply only to such portion of the material or such portion of the meeting which would be required to preserve such privilege and not to any other portion thereof; or (ii) such portion of a meeting is an executive session limited solely to Independent Directors (or an applicable committee thereof), independent auditors and/or legal counsel, as the Board of Directors (or such applicable committee thereof) may designate, and an Observer (assuming such Observer were a member of the Board of Directors) would not meet the then-applicable standards for independence adopted by the New York Stock Exchange.

3.3. Agreement of Company. The Company hereby agrees that it will take all Necessary Actions to cause the matters addressed by this Section 3 to be carried out in accordance with the provisions thereof. Without limiting the foregoing, the Secretary of the Company or such other officer or employee of the Company who may be fulfilling the duties of the Secretary, shall not record any vote or consent or other action contrary to the terms of this Section 3.

SECTION 4. OTHER AGREEMENTS

4.1. Access. For so long as (x) no PG Stockholders' Designee is then serving on the Board of Directors and (y) the PG Stockholders Beneficially Own, in the aggregate, at least five (5%) of the outstanding shares of Common Stock, the Company shall, and shall cause its Subsidiaries to, (a) afford the PG Stockholders and their designated representatives, at reasonable times and upon reasonable notice, access to the Company's and its Subsidiaries' offices, plants and other facilities and to all books and records of the Company and its Subsidiaries and (b) afford the PG Stockholders and their designated representatives the opportunity to discuss the affairs, finances and accounts of the Company and its Subsidiaries with their respective officers from time to time as each such PG Stockholder may reasonably request. For so long as (x) no PG Stockholders' Designee is then serving on the Board of Directors and (y) the PG Stockholders Beneficially Own, in the aggregate, at least three percent (3%) of the outstanding shares of Common Stock, the Company, upon the written request of the PG Stockholders shall, and shall cause its Subsidiaries to, provide the PG Stockholders, in addition to other information that may be reasonably requested by the PG Stockholders from time to time, (i) direct access to the Company's auditors and officers, (ii) the

ability to link the PG Stockholders' systems into the Company's general ledger and other systems in order to enable the PG Stockholders to retrieve data on a "real-time" basis, (iii) quarter-end reports, in a format to be prescribed by the PG Stockholders and provided upon request by the PG Stockholders, (iv) access to appropriate officers and directors of the Company and its Subsidiaries at such times as may be requested by the PG Stockholders for consultation with the PG Stockholders with respect to matters relating to the business and affairs of the Company and its Subsidiaries and (v) information in advance with respect to any significant corporate actions, including extraordinary dividends, stock redemptions or repurchases, mergers, acquisitions or dispositions of assets, issuances of significant amounts of debt or equity securities and material amendments, restatements or modifications to or of the certificate of incorporation, bylaws or other organizational documents of the Company or any of its Subsidiaries, and to provide the PG Stockholders the right to consult with the Company and its Subsidiaries in good faith with respect to such actions.

4.2. Sharing of Information. Individuals associated with the PG Stockholders may from time to time serve on the Board of Directors or the board of directors or equivalent governing body of the Company's Subsidiaries. The Company recognizes that such individuals (a) may from time to time receive non-public information concerning the Company and its Subsidiaries and (b) may share such information with the PG Stockholders, their direct and indirect investors and other Persons associated with the PG Stockholders, subject to the obligation to maintain the confidentiality of such information in accordance with Section 5.2 and subject to compliance with applicable laws, and the Company hereby irrevocably consents to such sharing of such information.

4.3. Pledges or Transfers. Upon the request of any PG Stockholder that wishes to (x) pledge, hypothecate or grant security interests in any or all of the shares of Common Stock held by it including to banks or financial institutions as collateral or security for loans, advances or extensions of credit or (y) transfer any or all of the shares of Common Stock held by it, including to third party investors, the Company agrees to cooperate with such PG Stockholder in taking any action reasonably necessary to consummate any such pledge, hypothecation, grant or transfer, including without limitation, delivery of letter agreements to lenders in form and substance reasonably satisfactory to such lenders (which may include agreements by the Company in respect of the exercise of remedies by such lenders), instructing the transfer agent to transfer any such shares of Common Stock subject to the pledge, hypothecation or grant into the facilities of The Depository Trust Company without restricted legends and cooperating in diligence or other matters as may reasonably be requested by any PG Stockholder in connection with a proposed transfer.

4.4. Matters Requiring Approval. Notwithstanding any provision of this Agreement to the contrary, for so long as the PG Stockholders and their Affiliates collectively Beneficially Own at least twenty-five (25)% of the then outstanding shares of Common Stock and are entitled to designate at least one director of the Company pursuant to Section 3.1(b) (or such earlier date that the PG Stockholders request their approval rights to be terminated), the Company shall not take, and shall cause its Subsidiaries not to take, any of the following actions without the prior written consent of the PG Stockholders:

(i) terminate, hire or appoint a chief executive officer (or other person performing the duties of principal executive officer) of the Company;

(ii) issue additional equity interests of the Company or any of its Subsidiaries, other than (A) any award under any stockholder-approved equity compensation plan, (B) any award under an equity compensation plan approved by a majority of the PG Designees or (C) any intra-company issuance among the Company and its wholly-owned Subsidiaries;

(iii) other than in the ordinary course of business with vendors, customers and suppliers, enter into or effect any acquisition by the Company or any Subsidiary of the equity interests or assets of any Person, or the acquisition by the Company or any Subsidiary of any business, properties, assets, or Persons, in one transaction or a series of related transactions that would require the filing of financial statements pursuant to Rule 3-05 of Regulation S-X; or

(iv) incur indebtedness for borrowed money, in a single transaction or a series of related transactions, aggregating to more than $100 million, except for (A) borrowings under a revolving credit facility that has previously been approved or is in existence (with no increase in maximum availability) on the date of closing of the Company's Initial Public Offering and (B) intercompany indebtedness.

SECTION 5. MISCELLANEOUS PROVISIONS

5.1. Organizational Documents. The provisions of this Agreement shall be controlling if any such provisions or the operation thereof conflict with the provisions of the organizational documents of the Company. The Company and the PG Stockholders agree to take all Necessary Actions to amend the organizational documents of the Company so as to avoid any conflict with the provisions hereof.

5.2. Confidentiality. Each Stockholder agrees that it will keep confidential and will not disclose, divulge or use for any purpose, other than to monitor its investment in the Company and its Subsidiaries, any confidential information obtained from the Company pursuant to Section 4.1, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of any confidentiality obligation by such Stockholder or its Affiliates), (b) is or has been independently developed or conceived by such Stockholder without use of or reliance on the Company's confidential information or (c) is or has been made known or disclosed to such Stockholder by a third party (other than an Affiliate of such Stockholder) without a breach of any confidentiality obligations such third party may have to the Company that is known to such Stockholder; provided that a Stockholder may disclose confidential information (i) to its attorneys, accountants, consultants and other professional advisors to the extent necessary to obtain their services in connection with monitoring its investment in the Company, (ii) to any prospective purchaser of any Shares from such Stockholder as long as such prospective purchaser executes a confidentiality agreement with the Company, in form and substance reasonably satisfactory to the Company, (iii) to any Affiliate, member, partner or prospective partner of such Stockholder and their respective directors, employees, consultants and representatives, in each case in the ordinary course of business (provided that such Stockholder will remain liable to the Company for any breaches of confidentiality and nondisclosure obligations by such Persons), (iv) in the case of any PG Stockholder that is a fund, to any Person that administers, advises, underwrites or manages such fund, or any of its directors, employees, consultants and representatives, any of such PG Stockholder's Affiliates, limited partners, prospective limited partners or direct or indirect investors or other Persons associated with such PG Stockholder, or (iv) as may otherwise be required by law or legal, judicial or regulatory process.

5.3. Reliance. Each covenant and agreement made by a party in this Agreement or in any certificate, instrument or other document delivered pursuant to this Agreement is material, shall be deemed to have been relied upon by the other parties and shall remain operative and in full force and effect after the Effective Time regardless of any investigation. This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties hereto and their respective successors and permitted assigns.

5.4. Access to Agreement; Amendment and Waiver. For so long as this Agreement shall be in effect, this Agreement shall be made available for inspection by any Stockholder at the principal executive offices of the Company. Any party may waive in writing any provision hereof intended for its benefit, provided, that, in the case of any waiver by the Company, such waiver is consented to in writing by the PG Majority Interest. No failure or delay on the part of any party in exercising any right, power or remedy hereunder shall operate as a waiver thereof. The remedies provided for herein are

cumulative and are not exclusive of any remedies that may be available to any party at law or in equity or otherwise. This Agreement may be amended only with the prior written consent of the PG Majority Interest and the Company; provided that any amendment to this Agreement that materially and adversely affects any Stockholder (other than any PG Stockholder) in a disproportionate manner shall not be effective against such Stockholder without the prior written consent of such Stockholder. Any consent given as provided in the preceding sentence shall be binding on all parties.

5.5. Notices. All notices, requests, demands and other communications provided for hereunder shall be in writing and mailed (by first class registered or certified mail, electronic mail, facsimile or postage prepaid), sent by express overnight courier service, or delivered to the applicable party at the respective address indicated below:

*If to the Company:*
KinderCare Learning Companies, Inc.
5005 Meadows Road, Suite 200
Lake Oswego, OR 97035
Attn: Katie Gallagher
E-mail: GallagherK@LanePowell.com

*With a copy (which shall not constitute notice):*
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attention: David Blittner and Faiza Rahman
E-mail: David.Blittner@ropesgray.com and Faiza.Rahman@ropesgray.com

*If to the PG Stockholders:*
c/o Partners Group (USA) Inc.
1200 Entrepreneurial Drive
Broomfield, CO 80221
Attn: Philip Wolf
E-mail: philip.wolf@partnersgroup.com

*With a copy (which shall not constitute notice):*
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attention: David Blittner and Faiza Rahman
E-mail: David.Blittner@ropesgray.com and Faiza.Rahman@ropesgray.com

*If to any other Stockholder:*

At such Person's address for notice as set forth in the books and records of the Company, or, as to each of the foregoing, at such other address as shall be designated by a party in a written notice to other parties complying as to delivery with the terms of this Section 5.5. All such notices, requests, demands and other communications shall, when mailed, telegraphed or sent, respectively, be effective (i) two days after being deposited in the mail or (ii) one day after being deposited with the express overnight courier service, respectively, addressed as aforesaid.

5.6. Counterparts; Electronic Delivery. This Agreement may be executed in two or more counterparts, and delivered via facsimile, .pdf or other electronic transmission, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent executed and delivered by means of a photographic, photostatic, facsimile or

similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

5.7. Remedies; Severability. It is specifically understood and agreed that any breach of the provisions of this Agreement by any party will result in irreparable injury to the other parties, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other legal or equitable remedies which they may have, such other parties may enforce their respective rights by actions for specific performance or injunctive relief (to the extent permitted at law or in equity). If any one or more of the provisions of this Agreement, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein are not to be in any way impaired thereby, it being intended that all of the rights and privileges of the parties be enforceable to the fullest extent permitted by law.

5.8. Entire Agreement. This Agreement constitutes the entire agreement and supersedes all other prior agreements, both written and oral, among the parties hereto with respect to the subject matter hereof, including that certain Third Amended and Restated Limited Liability Company Agreement of KC Parent, LLC, dated July 6, 2020, as amended from time to time, by and among PG and the other parties thereto.

5.9. Termination. This Agreement shall terminate at the election of the PG Majority Interest, or, with respect to each PG Stockholder, such date as such PG Stockholder ceases to hold any Shares, except, in each case, for the provisions of Sections 5.3, 5.5, 5.6, 5.7, 5.10, 5.11, 5.12 and 5.15 and this Section 5.9, which shall survive any such termination. No termination under this Agreement shall relieve any Person of liability for breach or registration expenses incurred prior to termination.

5.10. Governing Law. This Agreement is to be construed and enforced in accordance with the laws of the State of Delaware, without giving effect to its principles or rules of conflict of laws to the extent such principles or rules are not mandatorily applicable by statute and would require or permit the application of the laws of another jurisdiction.

5.11. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and the respective successors and permitted assigns of the parties as contemplated herein. The rights and obligations hereunder shall not be assignable without the prior written consent of the PG Majority Interest and the Company; provided that any Stockholder may assign its rights and obligations hereunder without such prior written consent to such Stockholder's Permitted Transferees; provided, however, that no such assignment shall be effective unless the Permitted Transferee to which the assignment is being made, if not already a party hereto, is made a party hereto, with any such additional party being treated as a "Stockholder" for all purposes hereunder, by executing a counterpart signature page in the form attached as Exhibit A hereto, which signature page shall be attached to this Agreement and become a part hereof without any further action of any other party hereto. A Permitted Transferee to whom rights are transferred pursuant to this Section 5.11 may not again transfer those rights to any other Permitted Transferee, other than as provided in this Section 5.11. Any attempted assignment of rights or obligations in violation of this Section 5.11 shall be null and void. Any successor to the Company by way of merger or otherwise must specifically agree to be bound by the terms hereof as a condition of such succession.

5.12. Consent to Jurisdiction; Specific Performance; WAIVER OF JURY TRIAL.

(a) Each of the parties hereto irrevocably and unconditionally consents to the sole and exclusive jurisdiction of the state and federal courts located in Wilmington, Delaware to resolve all disputes, claims or controversies arising out of or relating to this Agreement or any other agreement executed and delivered pursuant to or in connection with this Agreement or the negotiation, breach, validity, termination or performance hereof and thereof or the transactions contemplated hereby and thereby and agrees that it will not bring any such action in any court other than the federal or state

courts located in Wilmington, Delaware. Each party further irrevocably waives any objection to proceeding in such courts based upon lack of personal jurisdiction or to the laying of venue in such courts and further irrevocably and unconditionally waives and agrees not to make a claim that such courts are an inconvenient forum. Each of the parties hereto hereby consents to service of process by registered mail at the address to which notices are to be given as provided in Section 5.5. Each of the parties hereto agrees that such party's submission to jurisdiction and such party's consent to service of process by mail is made for the express benefit of the other parties hereto. The choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment of a Delaware federal or state court, or the taking of any action under this Agreement to enforce such a judgment, in any other appropriate jurisdiction.

(b) The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which such party is entitled at law or in equity.

(c) EACH PARTY TO THIS AGREEMENT WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THEM AGAINST THE OTHER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR ANY OTHER AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO OR IN CONNECTION HEREWITH OR THE NEGOTIATION, BREACH, VALIDITY, TERMINATION OR PERFORMANCE HEREOF AND THEREOF OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. FURTHER, (I) NO PARTY TO THIS AGREEMENT SHALL SEEK A JURY TRIAL IN ANY SUCH ACTION AND (II) NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EACH PARTY TO THIS AGREEMENT CERTIFIES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT OR INSTRUMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS SET FORTH ABOVE IN THIS SECTION 5.12. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

5.13. Further Assurances; Company Logo. At any time or from time to time after the Effective Time, the parties hereto agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as any other party may reasonably request in order to evidence or effectuate the provisions of this Agreement and to otherwise carry out the intent of the parties hereunder. The Company hereby grants the PG Stockholders and their respective Affiliates permission to use the Company's and its subsidiaries' name and logo in marketing materials.

5.14. Regulatory Matters. The Company shall and shall cause its subsidiaries to keep the PG Stockholders informed, on a current basis, of any events, discussions, notices or changes with respect to any criminal or regulatory investigation or action involving the Company or any of its subsidiaries, so that the PG Stockholders and their respective Affiliates will have the opportunity to take appropriate steps to avoid or mitigate any regulatory consequences to them that might arise from such investigation or action.

5.15. No Third Party Liability. This Agreement may only be enforced against the named parties hereto. All claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the entities that are expressly identified as parties hereto.

5.16. Effectiveness of Agreement. This Agreement shall become effective (such time, the "Effective Time") immediately prior to the effectiveness of the Company's registration statement on Form S-1 related to the Initial Public Offering. However, to the extent the Closing does not occur, the provisions of this Agreement shall be without any force or effect.

5.17. Removal of Legends. The Company shall remove any restrictive legends on any Shares held by any Stockholder promptly upon request by such Stockholder if such legend is not, in the reasonable determination of the Company upon the advice of legal counsel, required to comply with applicable securities laws; provided that the Company may require an opinion of legal counsel reasonably acceptable to the Company prior to any such removal other than in connection with a transfer made pursuant to an effective registration statement.

5.18. Inconsistent Agreements. Neither the Company nor any Stockholder shall enter into any agreement or side letter with, or grant any proxy to, any Stockholder, the Company or any other Person (whether or not such proxy, agreements or side letters are with other Stockholders, holders of Shares that are not parties to this Agreement or otherwise) that conflicts with the provisions of this Agreement or which would obligate such Person to breach any provision of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties are signing this Stockholders Agreement as of the date first set forth above.

**KINDERCARE LEARNING COMPANIES, INC.**

By: ______________________________
Name:
Tile:

**PG STOCKHOLDERS**

**PARTNERS GROUP CLIENT ACCESS 13 L.P. INC.**

By: Partners Group Client Access Management Limited, its general partner

By: ______________________________
Name:
Title: Authorized Signatory

By: ______________________________
Name:
Title: Authorized Signatory

**PARTNERS GROUP BARRIER REEF L.P.**

By: Partners Group Management XIII Limited, its general partner

By: ______________________________
Name:
Title: Authorized Signatory

By: ______________________________
Name:
Title: Authorized Signatory

[*Signature Page to Stockholders Agreement*]

**PARTNERS GROUP HERCULES, L.P., INC.**

By: Partners Group Management X Limited,
its general partner

By: ____________________
Name:
Title: Authorized Signatory

By: ____________________
Name:
Title: Authorized Signatory

**PARTNERS GROUP HEARST OPPORTUNITIES FUND L.P.**

By: Partners Group Cayman Management II Limited,
tts general partner

By: Partners Group (Guernsey) Limited,
under power of attorney

By: ____________________
Name:
Title: Authorized Signatory

By: ____________________
Name:
Title: Authorized Signatory

**PARTNERS GROUP DAINTREE CO-INVEST, L.P.**

By: Partners Group Cayman Management XIII Limited,
its general partner

By: ____________________
Name:
Title: Authorized Signatory

[*Signature Page to Stockholders Agreement*]

By: ____________________________
Name:
Title: Authorized Signatory

**PARTNERS GROUP ACCESS 768 L.P.**

By: Partners Group Management (Scots) LLP, its general partner

By: ____________________________
Name:
Title: Authorized Signatory

By: ____________________________
Name:
Title: Authorized Signatory

**PARTNERS GROUP DIRECT INVESTMENTS 2012 (EUR), L.P. INC.**

By: Partners Group Management VIII Limited, its general partner

By: ____________________________
Name:
Title: Authorized Signatory

By: ____________________________
Name:
Title: Authorized Signatory

[*Signature Page to Stockholders Agreement*]

**PARTNERS GROUP CLIENT ACCESS 13A, L.P. INC.**

By: Partners Group Client Access Management I Limited,
its general partner

By: ______________________________
Name:
Title: Authorized Signatory

By: ______________________________
Name:
Title: Authorized Signatory

[*Signature Page to Stockholders Agreement*]

**EXHIBIT A**

Joinder Agreement

By execution of this signature page, [_______________] hereby agrees to become a party to, and to be bound by the obligations of, and receive the benefits of, that certain Stockholders Agreement, dated as of [ • ], 2024, by and among KinderCare Learning Companies, Inc., a Delaware corporation, [ • ], and certain other parties named therein, as amended from time to time thereafter.

[NAME]

By: ______________________________
Name:
Title:
Notice Address:

ACCEPTED
:

KINDERCARE LEARNING COMPANIES, INC.

By: ______________________________
Name:
Title:

[*Signature Page to Stockholders Agreement*]

# EXHIBIT C

LINDSEY O. GRAHAM, SOUTH CAROLINA, CHAIRMAN

CHARLES E. GRASSLEY, IOWA
MIKE CRAPO, IDAHO
RON JOHNSON, WISCONSIN
ROGER MARSHALL, KANSAS
JOHN CORNYN, TEXAS
MIKE LEE, UTAH
JOHN KENNEDY, LOUISIANA
PETE RICKETTS, NEBRASKA
BERNIE MORENO, OHIO
RICK SCOTT, FLORIDA

JEFFREY A. MERKLEY, OREGON
PATTY MURRAY, WASHINGTON
RON WYDEN, OREGON
BERNARD SANDERS, VERMONT
SHELDON WHITEHOUSE, RHODE ISLAND
MARK R. WARNER, VIRGINIA
TIM KAINE, VIRGINIA
CHRIS VAN HOLLEN, MARYLAND
BEN RAY LUJÁN, NEW MEXICO
ALEX PADILLA, CALIFORNIA

NICK MYERS, MAJORITY STAFF DIRECTOR
BEN WARD, MINORITY STAFF DIRECTOR

United States Senate
COMMITTEE ON THE BUDGET
WASHINGTON, DC 20510–6100
TELEPHONE: (202) 224–0642 FAX: (202) 224–4835

March 23, 2026

Mr. Tom Wyatt
CEO
KinderCare Learning Companies, Inc.
5005 Meadows Road #200
Lake Oswego, OR 97035

Mr. David Layton
Partner, CEO
Partners Group (U.S. Headquarters)
1200 Entrepreneurial Drive
Broomfield, CO 80021

Dear Mr. Wyatt and Mr. Layton:

As Ranking Member of the Senate Committee on the Budget, I write to request information and documents regarding the effects of private equity ownership in the child care sector, with a particular focus on the two largest private-equity-controlled child care organizations in the United States, which include KinderCare Learning Companies, Inc. ("KinderCare") and its private equity owner, Partners Group, as well as Learning Care Group and its private equity owner, American Securities.

Some analysts suggest that the growing role of private equity and other profit-maximizing ownership models in child care centers increase challenges related to affordability, staffing, and access—particularly where investor strategies increase financial pressure to raise prices, constrain labor costs, or concentrate capacity in higher-revenue markets. A 2024 analysis reports that eight of the ten largest U.S. child care companies are currently owned by private equity.[1]

Some studies have found that for-profit child care providers are more likely to have staffing and operational problems that can affect the quality of care children receive. For-profit centers exhibited lower caregiver wages and education, and worse outcomes on multiple quality-related measures than nonprofit centers, including staff turnover and caregiver practices for

[1] CONG. RSCH. SERV., R48252, *Private Equity Investments in Large For-Profit Child Care Organizations: In Brief* (Oct. 30, 2024) https://www.congress.gov/crs_external_products/R/PDF/R48252/R48252.3.pdf; Audrey Stienon & Melissa Boteach, *Children Before Profits: Constraining Private Equity Profiteering to Advance Child Care as a Public Good*, OPEN MKTS. INST. & NAT'L WOMEN'S L. CTR., (June 2024) https://nwlc.org/wp-content/uploads/2024/05/Children-Before-Profits-Exec-Summary-WEB.pdf.

toddlers and preschoolers.[2] In addition, emerging research finds that private equity ownership in child care can be associated with higher prices and other market effects.[3]

***Background, Ownership Structure, and Dividends***

KinderCare is the largest child care and early childhood education provider in the United States. In 2024, it served more than 200,000 children across approximately 1,500 child care centers in 40 states.[4] The company operates a national network of centers, including the consumer-facing brands of KCLC, Crème School, and Champions.[5] In fiscal year 2024 KinderCare reported $2.66 billion in revenue.[6]

In 2015, Partners Group—a private equity firm headquartered in Switzerland—acquired a controlling ownership interest in KinderCare.[7] Partners Group has continued to exercise control even after KinderCare's October 2024 initial public offering (IPO).[8] Prior to the IPO, Partners Group owned approximately 90 percent of KinderCare; following the IPO, it retained a controlling stake of approximately 69 percent.[9] As long as Partners Group maintains majority ownership, it retains the ability to nominate more than half of KinderCare's board of directors and to exercise consent rights over key corporate decisions, including executive leadership changes, major acquisitions, equity issuances, and the incurrence of significant new debt.[10]

KinderCare has issued large dividends and acquired substantial debt during its period of private equity ownership.[11] As of June 29, 2024, KinderCare reported approximately $1.5 billion

---

[2] Laura S. Sosinsky, Heather Lord & Edward Zigler, *For-Profit/Nonprofit Differences in Center-Based Child Care Quality: Results from the National Institute of Child Health and Human Development Study of Early Child Care and Youth Development*, 28 J. APPLIED DEV. PSYCH. 390, 392 (2007) https://www.sciencedirect.com/science/article/abs/pii/S019339730700072X.

[3] Dyaran S. Bansraj & Dong Xu, *How Does Private Equity Shape Childcare? Implications for Competition, Pricing, and Quality* (SSRN Working Paper) (last revised Nov. 25, 2025), https://ssrn.com/abstract=5045089.

[4] KinderCare Learning Companies, Inc., (Form S-1) 91, 108 (Oct. 7, 2024), http://pdf.secdatabase.com/2073/0001193125-24-233295.pdf [hereinafter IPO Prospectus]; KinderCare Learning Companies, Inc., (Form 10-K) 8 (Mar. 21, 2025), https://www.sec.gov/Archives/edgar/data/1873529/000095017025043210/klc-20241228.htm.

[5] IPO Prospectus, *supra* note 4, at 2.

[6] KinderCare Learning Companies, Inc., (Form 10-K) 65 (Mar. 21, 2025), https://www.sec.gov/Archives/edgar/data/1873529/000095017025043210/klc-20241228.htm.

[7] *Partners Group to acquire Knowledge Universe's US early-childhood educational business*, PARTNERS GRP. (July 9, 2015), https://www.partnersgroup.com/news-and-views/press-releases/investment-news/detail?news_id=a6e1a2d8-69bd-4ec6-999b-33374c32b653.

[8] IPO Prospectus, *supra* note 4, at 41.

[9] *Id;* KinderCare Learning Companies, Inc., (Form 10-K) 31 (Mar. 21, 2025), https://www.sec.gov/Archives/edgar/data/1873529/000095017025043210/klc-20241228.htm.

[10] IPO Prospectus, *supra* note 4, at 42.

[11] *Id.* at 30.

in outstanding debt.[12] Despite this leverage, KinderCare executed at least two large dividend payments to its owners, including Partners Group, financed by taking on additional debt: a $300 million dividend in August 2017 and a $320 million dividend in March 2024, shortly before the IPO.[13] Following its October 2024 IPO, KinderCare's stock price declined by more than 80 percent within a relatively short period, reflecting substantial investor concern about the company's financial outlook.[14]

Further increasing concerns is that KinderCare is a significant recipient of public child care funding. According to the company's 2024 IPO filings, KinderCare received approximately $457 million in government subsidies during the first six months of 2024, reflecting substantial reliance on taxpayer-supported child care programs, including the Child Care and Development Fund.[15]

***Tuition, Staffing, and Safety Violations***

KinderCare's financial and growth strategies appear to coincide with rising tuition costs, workforce strain, and a pattern of safety and compliance issues across multiple states. The company's business strategy includes recurring tuition increases, reported to range from approximately 4 to 7 percent annually over the past three years—rates that in many years exceeded general inflation and wage growth for families.[16] At the same time, KinderCare closed 380 "underperforming" child care centers between 2012 and 2017, while opening 108 new locations and acquiring 256 centers between 2018 and mid-2024.[17] Taken together, these trends raise questions about whether KinderCare's growth strategy has meaningfully expanded child care capacity or instead reflected consolidation and selective market participation—resulting in reduced access for certain communities.

Since 2023, state regulators in several states have cited KinderCare facilities for inadequate supervision, staff-to-child ratio violations, unsafe or unsanitary conditions, and failures to report or respond appropriately to alleged abuse. These enforcement actions have

---

[12] *Id.*

[13] *Id*. at 158; *see Rating Action: Moody's changes KinderCare Education's outlook to stable from positive upon a dividend recap transaction*, MOODY'S (Aug. 2, 2017), https://www.moodys.com/research/Moodys-changes-KinderCare-Educations-outlook-to-stable-from-positive-upon-Rating-Action--PR_370373 ("In a proposed transaction, the proceeds from KinderCare Education's new $260 million second lien term loan and $50 million first lien term loan add-on will be used to fund a shareholder distribution.").

[14] *Tom Wyatt returns as KinderCare CEO, replacing Paul Thompson*, INVESTING.COM (Dec. 3, 2025, at 08:07 ET) https://www.investing.com/news/company-news/tom-wyatt-returns-as-kindercare-ceo-replacing-paul-thompson-93CH-4388397.

[15] IPO Prospectus, *supra* note 4, at 65.

[16] *Id.* at 102; *see Consumer Price Index – CPI*, U.S. BUREAU OF LAB. STAT., https://www.bls.gov/cpi/ (last visited Jan. 22, 2026) (showing overall CPI increases near 2.9 percent in 2024 and similar moderate inflation in 2025); *Are Wages Keeping Up with Inflation?*, USAFACTS https://usafacts.org/answers/are-wages-keeping-up-with-inflation/country/united-states/ (last visited Jan. 22, 2026) (showing nominal wage growth of approximately 3.8 percent from December 2024 to December 2025).

[17] IPO Prospectus, *supra* note 4, at 97.

included license revocation, probationary status, pending revocation, and repeated citations across multiple facilities.[18]

KinderCare has also faced enforcement actions related to workforce practices. In Massachusetts, state authorities assessed significant penalties after finding that chronic understaffing prevented compliance with labor laws.[19] In addition, reporting has noted that KinderCare pays comparatively low wages in some markets, a level that former child care directors say makes it difficult to recruit and retain qualified staff and can result in centers operating at the minimum staffing ratios permitted by law.[20]

KinderCare's size, market influence, business practices, and reliance on taxpayer-supported child care funding carry a clear responsibility to ensure that financial and management decisions do not come at the expense of child safety or access to affordable child care for families. Therefore, I request the information and documents below to understand how these decisions were made and to determine whether additional oversight or legislative action is necessary.

***Request for Information and Documents***

Please provide the following information and documents by April 7, 2026. Unless otherwise specified, all requests apply to the period January 1, 2015, to the present. For purposes of this request, references to "KinderCare" include KinderCare Learning Companies, Inc. and any parent entities, sponsors, subsidiaries, or affiliated investment vehicles with decision-making authority over KinderCare or its subsidiaries, including but not limited to, operating, real estate, foreign, and commercial mortgage-backed securities subsidiaries. "KinderCare facility[ies]" means any child care center or site that is owned, operated, managed, branded, franchised,

---

[18] Ella Rhoades, *Indiana FSSA Report Reveals Plainfield KinderCare Violated Health and Safety Regulations*, WTHR (Aug. 13, 2025, at 07:20 EDT), https://www.wthr.com/article/news/local/indiana-fssa-report-reveals-plainfield-kindercare-violated-health-and-safety-regulations/531-19d90dda-592d-4059-9b65-80326db615aa; Emily Davies & Dominique O'Neill, *Some Families Have to Find Different Child Care Following State Revoking Schofield Center's License*, WSAW (Jan. 29, 2024, at 08:53 EDT), https://www.wsaw.com/2024/01/30/some-families-have-find-different-child-care-following-state-revoking-schofield-centers-license/; *see also KinderCare, Provider #43619*, SC CHILD CARE, https://www.scchildcare.org/provider/43619/kindercare/ (listing supervision, ratio, and background check deficiencies); *Negative and Disciplinary Actions Against Child Care Providers*, NEBRASKA DEP'T OF HEALTH & HUMAN SERVS. (Feb. 5, 2025), https://dhhs.ne.gov/licensure/Documents/Feb15-25ccnegactions.pdf (listing KinderCare learning center entries); *Kindercare Learning Centers LLC, License Profile #719531*, N.Y. ST. OFF. OF CHILDREN & FAMILY SERVS., https://hs.ocfs.ny.gov/DCFS/Profile/Index/719531 (showing suspension action); Jenna DeAngelis, *Long Island Day Care Under Fire for Abruptly Suspending Service to Dozens of Families*, CBS NEWS (Feb. 5, 2024), https://www.cbsnews.com/newyork/news/long-island-day-care-under-fire-for-abruptly-suspending-service-to-dozens-of-families/ (showing another example of suspension).

[19] MASS. OFF. OF THE ATT'Y GEN., *AG Campbell Announces Over $540,000 in Citations Against KinderCare Learning Centers for Wage, Sick Time, and Meal Break Violations*, MASS.GOV (Oct. 18, 2023), https://www.mass.gov/news/ag-campbell-announces-over-540000-in-citations-against-kindercare-learning-centers-for-wage-sick-time-and-meal-break-violations ("KinderCare was found to have violated wage laws by deducting breaks that were 20 minutes or less from employees' paychecks … [but] [t]hese short breaks are considered compensable time and therefore must be paid.").

[20] *Private Equity Is Reshaping American Child Care*, ECONOMIST (Nov. 20, 2025), https://www.economist.com/business/2025/11/20/private-equity-is-reshaping-american-child-care.

licensed, or otherwise controlled, directly or indirectly, by KinderCare Learning Companies, Inc. or any of its subsidiaries or affiliates.

<u>Requests for KinderCare and Partners Group</u>

1. Describe the respective roles, decision-making authority, and formal or informal involvement of KinderCare management and Partners Group, and produce documents sufficient to reflect those roles—including board materials, internal analyses, and communications—in connection with decisions regarding:
    a. child care facility acquisition, closure, or expansion, including consideration of public funding availability, household income levels, or other demographic factors;
    b. staffing levels, wage and benefit policies;
    c. capital investment budgets;
    d. dividend payments or other distributions;
    e. the incurrence of debt, refinancing transactions, or other changes to KinderCare's capital structure; and
    f. executive compensation and incentive plans.

2. Provide company-wide, state-level, and metropolitan area-level totals since 2015 for all federal, state, and local child care subsidies received, by program and year, and outline how the funds were allocated and used.

3. Produce board and board-committee minutes, materials, and presentations reflecting deliberations, oversight, or approvals concerning KinderCare facilities' health and safety compliance, abuse or neglect allegations, licensing actions, labor-law enforcement actions, or related legal proceedings, including matters escalated to the board or a board committee under KinderCare's governing documents, internal policies, or customary practices.

4. Describe how tuition increases at KinderCare facilities are determined and whether financial obligations to lenders or owners are considered in pricing decisions.

5. Produce merger and acquisition documents related to Partners Group acquisition of a majority stake in KinderCare including, but not limited to, letters of intent (LOIs), term sheets, merger agreements, stock or asset purchase agreements, amendments, and closing documents.

6. Produce the limited partnership agreements, distribution policies, shareholder agreements, and related governing documents for any Partners Group–managed fund or vehicle that held a direct or indirect ownership interest in KinderCare, to the extent such documents govern voting rights or the timing, priority, and allocation of distributions to investors, including distribution waterfalls, preferred return provisions, and carried interest arrangements.

7. Produce all management services agreements or similar arrangements in effect at any time since 2015 between KinderCare and any parent entity, affiliate, or Partners Group–managed fund or vehicle, and produce documents sufficient to reflect the services provided, fees charged, and the basis for those fees.

8. Produce organizational charts in effect at any time identifying KinderCare's ownership structure, including managers, directors, officers, members, and other individuals with management or governance authority, including the identity of any Partners Group–affiliated personnel serving in such roles.

9. List all members of KinderCare's board of directors and board committees from 2015 to present and provide short biographies for each.

10. Produce board and board-committee minutes, materials, and presentations reflecting deliberations, consideration, and approvals of financial transactions since 2015 that required board or board-committee approval or consent under KinderCare's governing documents, including dividend payments, distributions, recapitalizations, refinancings, reorganizations, or other changes to KinderCare's capital structure.

11. Produce KinderCare's annual financial reports or equivalent annual financial statements prepared since 2015, including audited and unaudited financial statements, management financial reports, and any annual summaries of financial performance provided to the board, investors, or lenders.

12. Describe KinderCare's financial strategy since 2015, including how leverage levels, borrowing, refinancing, and debt service obligations were evaluated in relation to acquisitions, center openings or closures, dividend payments or distributions, and investments in staffing, safety, and facility conditions, and produce documents sufficient to reflect that strategy.

13. Provide a summary, by year and by individual since 2015, of cash bonuses, equity awards, and other incentive compensation paid to KinderCare senior executives and key management personnel, including the performance metrics or benchmarks used to determine such compensation, and produce documents sufficient to reflect how those metrics were established and evaluated.

14. Describe how the proceeds from KinderCare's October 2024 IPO were allocated and used, including amounts applied to debt repayment, refinancing, distributions, bonuses, capital expenditures, staffing or wage investments, safety or compliance initiatives, and other corporate purposes, and produce documents sufficient to reflect those allocations.

<u>Requests for KinderCare</u>

15. Describe KinderCare's organizational and operating structure, including the extent to which KinderCare exercises control or oversight over individual child care centers with

respect to staffing, wages, training, safety protocols, budgeting, capital expenditures, and compliance with licensing requirements. In addition, describe KinderCare's real estate arrangements for its child care facilities, including whether facilities are owned, leased, or operated under other arrangements.

16. Provide annual data since 2015—by state and metropolitan area—on tuition rates charged by KinderCare facilities.

17. Provide a summary, by year, of:
    a. the number and geographic location (by state and metropolitan area) of KinderCare facility openings, closures, acquisitions, and capacity reductions;
    b. the stated reasons for each facility closure or capacity reduction; and
    c. for each year, the number of licensed child care slots and the number of filled slots at KinderCare facilities, aggregated by state and metropolitan area.

18. Provide annual, aggregated workforce data for KinderCare facilities since 2015, disaggregated by state and metropolitan area, including:
    a. average staffing levels by job classification;
    b. staff turnover rates by job classification;
    c. vacancy rates by job classification;
    d. average staff-to-child ratios;
    e. wage ranges by job classification;
    f. use of overtime or temporary staffing; and
    g. any internal targets, benchmarks, or policies governing staffing levels.

19. Produce all company-wide policies, manuals, and guidance in effect at any time since 2015 governing KinderCare employee qualifications (including minimum education, credentials, and experience), employee screening and background checks, training and certification requirements, employee discipline, suspension, termination, and procedures for responding to allegations or incidents of child abuse, neglect, or unsafe conduct for employees with direct responsibility for the care or supervision of children, including requirements for reporting to state authorities and for removing employees from contact with children pending investigation.

20. Describe how KinderCare ensures compliance with employee qualification, background check, and training requirements for KinderCare employees with direct responsibility for the care or supervision of children.

21. Provide annual, aggregate data—by state and metropolitan area—since 2015 regarding disciplinary actions involving employees with direct responsibility for the care or supervision of children at KinderCare facilities, including the number of suspensions, terminations, and other corrective actions, broken out by category of conduct, including safety violations, supervision failures, and allegations or findings of child abuse or neglect, and indicate how many such matters were reported to state or local authorities.

22. Describe and produce documents sufficient to reflect any internal audits, compliance reviews, or assessments conducted since 2015 evaluating adherence to qualification, background check, training, supervision, or disciplinary policies for child-facing employees, and provide aggregate data—broken out by state and metropolitan area—on any deviations or exceptions to those policies attributable to staffing shortages, operational disruptions, or other constraints.

23. Provide a summary—by year, state, and metropolitan area—of:
    a. citations issued for health and safety violations; and
    b. enforcement actions, including license revocations, probationary statuses, or pending revocations.

24. Identify the subset of KinderCare facilities since 2015 that:
    a. experienced license revocation, probation, or pending revocation; or
    b. were cited more than once in a three-year span for staffing, supervision, abuse, or neglect violations.

    For this subset only, produce representative inspection reports and corrective action plans regarding remediation.

25. Identify all enforcement actions or litigation involving KinderCare since 2015 and provide summary descriptions of the allegations and outcomes.

26. Provide a list and brief summary of any federal or state investigations since January 1, 2015, involving KinderCare, and produce copies of any civil investigative demands, subpoenas, or similar compulsory process issued in connection with those matters.

<u>Requests for Partners Group</u>

27. Identify all Partners Group funds, co-investment vehicles, and affiliated entities that have held a direct or indirect ownership interest in KinderCare, including the percentage ownership held by each entity over time.

28. For each dividend, distribution, or other payment received by Partners Group or its affiliated funds from KinderCare, identify:
    a. the amount received;
    b. the date of payment;
    c. the entity receiving the payment; and
    d. whether the payment was funded through borrowing at the KinderCare level.

29. Produce the private placement memorandum, offering memorandum, investment strategy memorandum, or equivalent documents provided to current or prospective investors for any Partners Group fund that held a direct or indirect ownership interest in KinderCare, including all sections describing investment strategy, use of leverage, return targets, dividend or distribution strategy, and risk factors.

30. Describe how Partners Group evaluated the impact of dividend payments, distributions, or refinancing on KinderCare's leverage, liquidity, and ability to invest in staffing, safety, training, or facility improvements.

31. Produce investment committee memoranda, deal theses, and similar materials prepared by or for Partners Group in connection with the acquisition, ownership, and monetization of KinderCare, including analyses of leverage, operational changes, staffing, regulatory risk, and exit strategy.

32. Describe Partners Group's policies and practices for monitoring health, safety, licensing, labor compliance, and legal risk at KinderCare facilities.

33. Provide a list and brief summary of any federal or state investigations or enforcement actions since January 1, 2015, involving Partners Group, any Partners Group–managed fund or affiliate, or any portfolio company over which Partners Group exercised ownership, control, or oversight, that relate to (i) child care operations, health or safety, licensing, or labor practices; (ii) the use of public funds or government subsidies; (iii) financial disclosures, governance, or fiduciary obligations; or (iv) leverage, dividend payments, or other financial practices. For each such matter, produce copies of any civil investigative demands, subpoenas, or similar compulsory process issued in connection with the matter.

The Senate Committee on the Budget has broad jurisdiction to review matters related to the federal budget, including the Budget Act and the impact of federal spending, tax policy, and economic activity on the long-term fiscal health of the United States. In carrying out its responsibilities, the Committee has broad authority to investigate the budgetary effects of existing and proposed legislation, as well as matters—whether arising within or outside the federal government—that may affect the content, execution, or fiscal consequences of federal law, including the inclusion, exclusion, or calculation of amounts in the congressional budget. If you have any questions regarding this request, please contact staff at (202) 224-0642. Thank you for your prompt attention to this important matter.

Sincerely,



Jeffrey A. Merkley
Ranking Member
Senate Committee on the Budget