BALLARD SPAHR LLP
BRUCE H. CAHN, OSB No. 935450
cahnb@ballardspahr.com
RYAN O'HOLLAREN, OSB No. 231160
ohollarenr@ballardspahr.com
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Telephone: 503.778.2100

COOLEY LLP
KOJI F. FUKUMURA, *pro hac vice*
kfukumura@cooley.com
HEATHER M. SPEERS, *pro hac vice*
hspeers@cooley.com
CRISTINA M. FERRUOLO, *pro hac vice*
cferruolo@cooley.com
10265 Science Center Drive
San Diego, CA 92121
Telephone: 858.550.6000

TARA E. LEVENS, *pro hac vice*
tlevens@cooley.com
3175 Hanover Street
Palo Alto, CA 94304
Telephone: 650.843.5000

*Attorneys for Defendants KinderCare Learning Companies, Inc., Paul Thompson, Anthony Amandi, John T. Wyatt, Jean Desravines, Christine Deputy, Michael Nuzzo, Benjamin Russell, Joel Schwartz, Alyssa Waxenberg, and Preston Grasty*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| IN RE KINDERCARE LEARNING COMPANIES, INC. SECURITIES LITIGATION | Case No. 3:25-cv-01424-AR<br><br>**KINDERCARE DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**<br><br>**Request for Oral Argument** |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........................................................ 1

II. ARGUMENT ........................................................ 2

A. Plaintiffs' Puzzle Pleading Fails to Meet Rule 8's Pleading Standards................ 2

B. Plaintiffs Fail to Plead Any Challenged Statement Is Materially False or Misleading........................................................ 4

1. Nineteen Challenged Statements Should Be Dismissed Because They Are Inactionable Puffery........................................................ 5

2. Three Challenged Statements Should Be Dismissed Because They Are Inactionable Opinions. ........................................................ 9

3. Every Challenged Statement Should Be Dismissed Because None Is Supported by Well-Pled Facts Demonstrating Falsity. ........................ 10

a. Safety statements were not materially false or misleading. ......... 13

b. Staffing statements were not materially false or misleading. ...... 22

c. Operating strategy statements were not materially false or misleading. ........................................................ 26

d. Risk disclosures were not materially false or misleading. ........... 28

C. Plaintiffs Fail to Plead an Omission Under Item 303 or Item 105. .................... 31

D. Plaintiffs' Section 12 Claim Should Be Dismissed for All Individual Defendants. ........................................................ 33

III. CONCLUSION ........................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny County Employees' Retirement System v. Energy Transfer LP*,
532 F.Supp.3d 189 (E.D. Pa. 2021) ....8

*In re Alphabet, Inc. Securities Litigation*,
1 F.4th 687 (9th Cir. 2021) ....8

*In re AppHarvest Securities Litigation*,
684 F.Supp.3d 201 (S.D.N.Y. 2023) ....29

*Applestein v. Medivation, Inc.*,
861 F.Supp.2d 1030 (N.D. Cal. 2012) ....25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....4, 10

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983) ....34

*Baker v. SeaWorld Entertainment, Inc.*,
423 F.Supp.3d 878 (S.D. Cal. 2019) ....9

*Barnes v. Edison International*,
2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) ....5, 6

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ....20

*In re Bear Stearns Mortgage Pass-Through Certificates Litigation*,
851 F.Supp.2d 746 (S.D.N.Y. 2012) ....17

*In re BHP Billiton Limited Securities Litigation*,
276 F.Supp.3d 65 (S.D.N.Y. 2017) ....7, 8

*Bondali v. Yum! Brands, Inc.*,
620 F.App'x 483 (6th Cir. 2015) ....3, 4

*Boston Retirement System v. Uber Technologies, Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ....3, 7, 13

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean*,
866 F.Supp.2d 223 (S.D.N.Y. 2012) ....8

*Bridges v. Geringer*,
2015 WL 2438227 (N.D. Cal. May 21, 2015) ....23

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Cai v. Eargo, Inc.*,
2025 WL 66041 (9th Cir. Jan. 10, 2025) ....................6

*Callan v. Motricity Inc.*,
2013 WL 195194 (W.D. Wash. Jan. 17, 2013)....................7

*In re Cisco Systems Securities Litigation*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)....................3

*City of Warren General Employees' Retirement System v. Teleperformance SE*,
746 F.Supp.3d 1395 (S.D. Fla. 2024) ....................7

*Construction Laborers Pension Trust of Greater St. Louis v. Funko Inc.*,
166 F.4th 805 (9th Cir. 2026) ....................31

*Crews v. Rivian Automotive, Inc.*,
2023 WL 3050081 (C.D. Cal. Feb. 16, 2023)....................11

*In re Cutera, Inc. Securities Litigation.*,
2025 WL 2782916 (N.D. Cal. Sep. 30, 2025) ....................5

*D & D Greek Restaurant, Inc. v. Great Greek Franchising, LLC*,
2021 WL 4459063 (C.D. Cal. May 19, 2021) ....................32

*De Piero v. Pennsylvania State University*,
769 F.Supp.3d 329 (E.D. Pa. 2025) ....................15

*In re Dexcom, Inc. Securities Litigation*,
2026 WL 1948526 (S.D. Cal. Jan. 7, 2026)....................14

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ....................16

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ....................35

*In re Eventbrite, Inc. Securities Litigation*,
2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ....................3

*In re Facebook, Inc. Securities Litigation*,
87 F.4th 934 (9th Cir. 2023) ....................30, 31

*In re Facebook, Inc. Shareholder Derivative Privacy Litigation*,
411 F.Supp.3d 649 (N.D. Cal. 2019) ....................7

*Ferreira v. Funko Inc.*,
2021 WL 880400 (C.D. Cal. Feb. 25, 2021)....................19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**


*Franchi v. SmileDirectClub, Inc.*,
633 F.Supp.3d 1046 (M.D. Tenn. 2022) .....31

*Garcia v. J2 Global, Inc.*,
2022 WL 22717936 (C.D. Cal. Aug. 8, 2022) .....19

*Garden City Employees' Retirement System v. Anixter Intern, Inc.*,
2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) .....27

*Gavaldon v. Standard Chartered Bank International (Americas) Ltd.*,
2020 WL 835311 (S.D. Fal. Feb. 20, 2020) .....6, 7

*Gipaya v. Department of the Air Force*,
345 F.Supp.3d 1286 (D. Haw. 2018) .....15

*Glazer Capital Management, LP v. Forescout Technologies, Inc*,
63 F.4th 747 (9th Cir. 2023) .....19

*Habelt v. iRhythm Technologies, Inc.*,
2022 WL 971580 (N.D. Cal. Mar. 31, 2022) .....7

*Hadley v. Kellogg Sales Co.*,
243 F.Supp.3d 1074 (N.D. Cal. 2017) .....10

*Homyk v. ChemoCentryx, Inc.*,
2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) .....3

*HRSA-ILA Funds v. Adidas AG*,
745 F.Supp.3d 1127 (D. Or. 2024) .....29

*In re Intel Corp. Securities Litigation*,
2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) .....6

*Irving Firemen's Relief & Retirement Fund v. Uber Technologies*,
2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) .....6

*Johnson v. Costco Wholesale Corp.*,
2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) .....25

*Joyce v. Amazon.com, Inc.*,
2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) .....21

*Kipling v. Flex Ltd.*,
2020 WL 2793463 (N.D. Cal. May 29, 2020) .....27

*Landucci v. State Farm Insurance Co.*,
65 F.Supp.3d 694 (N.D. Cal. 2014) .....15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Lew v. ON Semiconductor Corp.*,
2025 WL 1918543 (D. Ariz. July 11, 2025) ....6

*In re LifeLock, Inc. Securities Litigation*,
690 F.App'x 947 (9th Cir. 2017) ....30

*Lilien v. Olaplex Holdings, Inc.*,
765 F.Supp.3d 993 (C.D. Cal. 2025) ....33

*In re Lyft Inc. Securities Litigation*,
484 F.Supp.3d 758 (N.D. Cal. 2020) ....17, 32

*Lyons v. Benson Industries, Inc.*,
2025 WL 908525 (N.D. Cal. Mar. 17, 2025) ....25

*In re Massey Energy Co. Securities Litigation*,
883 F.Supp.2d 597 (S.D.W. Va. 2012) ....8

*Mazzaferro v. Aruba Networks Inc.*,
2015 WL 456534 (N.D. Cal. Feb. 2, 2015) ....18

*McGovney v. Aerohive Networks Inc.*,
2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ....18

*Murphy v. Precision Castparts Corp.*,
2017 WL 3084274 (D. Or. June 27, 2017) ....3

*Ng v. Berkeley Lights, Inc.*,
2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ....12

*Norfolk County Retirement System v. Solazyme, Inc.*,
2018 WL 3126393 (N.D. Cal. June 26, 2018) ....5

*Omnicare v. Laborers District Council Construction. Indus. Pension Fund*,
575 U.S. 175 (2015) ....9, 14, 16

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
774 F.3d 598 (9th Cir. 2014) ....5, 6

*In re Overstock Securities Litigation,*
2020 WL 5775845 (D. Utah Sep. 28, 2020) ....24

*Panelli v. First American Title Insurance Co.*,
704 F.Supp.2d 1016 (D. Nev. 2010) ....15

*In re PG&E Corp. Securities Litigation*,
806 F.Supp.3d 962 (N.D. Cal. 2025) ....13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Phoenix Insurance Co., Ltd. v. ATI Physical Therapy, Inc.*,
690 F.Supp.3d 862 (N.D. Ill. 2023) ....................22

*Pino v. Cardone Capital, LLC*,
55 F.4th 1253 (9th Cir. 2022) ....................33, 34

*In re Pivotal Securities Litigation*,
2020 WL 4193384 (N.D. Cal. July 21, 2020)....................32, 33

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2017) ....................6

*Premca Extra Income Fund LP v. Angle*,
2026 WL 1622808 (1st Cir. June 5, 2026)....................3

*In re Progenity, Inc. Securities Litigation*,
2023 WL 4498502 (S.D. Cal. July 12, 2023) ....................23, 26

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ....................13

*Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ....................6

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
697 F.3d 869 (9th Cir. 2012) ....................4

*Rihn v. Acadia Pharmaceuticals Inc.*,
2016 WL 5076147 (S.D. Cal. Sep. 19, 2016)....................3

*Ryan v. FIGS, Inc.*,
2025 WL 71727 (C.D. Cal. Jan. 10, 2025) ....................3

*Sayce v. Forescout Technologies, Inc.*,
2021 WL 1146031 (N.D. Cal. Mar. 25, 2021)....................25

*Score Right Publishing LLC v. National Junior Basketball League*,
2020 WL 2510515 (C.D. Cal. Jan. 7, 2020) ....................26

*Sherman v. Abengoa, S.A.*,
156 F.4th 152 (2d Cir. 2025) ....................17

*In re Silver Lake Group, LLC Securities Litigation*,
108 F.4th 1178 (9th Cir. 2024) ....................24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sodha v. Golubowski*,
154 F.4th 1019 (9th Cir. 2025) ....................33

*In re SunPower Corp. Securities Litigation*,
769 F.Supp.3d 1042 (N.D. Cal. 2025) ....................31

*Thorpe v. Walter Investment Management, Corp.*,
2014 WL 11961964 (S.D. Fla. Dec. 23, 2014) ....................21

*In re Trader Joe's Dark Chocolate Litigation*,
726 F.Supp.3d 1150 (S.D. Cal. 2024) ....................14

*TSC Industries, Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ....................20

*Turocy v. El Pollo Loco Holdings, Inc.*,
2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ....................9

*United Association National Pension Fund v. Carvana Co.*,
759 F.Supp.3d 926 (D. Ariz. 2024) ....................13, 23

*VanHorn v. Hana Group, Inc.*,
979 F.Supp.2d 1083 (D. Haw. 2013) ....................15

*Waswick v. Torrid Holdings, Inc.*,
2024 WL 3740052 (C.D. Cal. July 23, 2024) ....................6

*Weir v. Allianz SE*,
2025 WL 1792516 (9th Cir. June 27, 2025) ....................6

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ....................12

*Zhou v. Desktop Metal, Inc.*,
120 F.4th 278 (1st Cir. 2024) ....................3

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ....................18

**Statutes**

15 U.S.C. § 12(a)(2) ....................2, 34

17 C.F.R. § 229.103(b)(1)-(2) ....................17, 23

## I. INTRODUCTION[1]

Plaintiffs' Opposition to KinderCare's Motion to Dismiss ("Opposition" or "Opp.") does not meaningfully engage with the arguments in the Motion to Dismiss, let alone save the AC from dismissal. Plaintiffs resort to three recurring tactics that pervade the Opposition, each of which reveals a different aspect of the AC's fundamental pleading failures.

***First***, Plaintiffs' treatment of the case law confirms their claims lack legal support. When confronted with Defendants' on-point authorities, Plaintiffs do not engage; they evade. They identify no relevant distinctions, engage in no meaningful analysis, and offer no on-point contrary authority to support their arguments, often citing outdated and out-of-circuit case law.

***Second***, Plaintiffs ignore necessary context about the scale of KinderCare's operations. Accepting every well-pled fact as true, the AC does not demonstrate any widespread, pervasive breakdown in safety, staffing, or operations. The 1,982 total violations in the nine months before the IPO sounds large in isolation. But they reduce to ***0.004%*** when put in context of KinderCare's 2,400 centers, 42,000 teachers and staff, and 148,000 kids under care. Plaintiffs cannot dispute that, so they resort to *ad hominem* attacks, claiming Defendants engage in "fuzzy math." But Plaintiffs do not (and cannot) dispute the simple arithmetic based on numbers they themselves allege. The same goes for the FEs. Plaintiffs' own allegations make clear that the FEs' knowledge is temporally and geographically limited such that none of them—individually or collectively—has insight into nationwide operations.

---

[1] Unless otherwise noted, terms not defined herein have the same meaning as in KinderCare's Motion to Dismiss (ECF No. 99, "MTD"); ¶ refers to the AC; "Opp." refers to Plaintiffs' Opposition (ECF No. 118); "Ex." refers to Exhibits to the Speers Declaration; emphasis is added; internal quotation marks, citations, and alterations are omitted.

***Third***, because Plaintiffs have no cogent rebuttal to Defendants' arguments, they repeatedly resort to the same refrain that the issue presents a factual dispute that cannot be resolved at this stage. That is a dodge, not a defense. None of Defendants' arguments raises factual disputes; they provide missing context (both as to the challenged statements themselves and KinderCare's operations more broadly) and highlight Plaintiffs' failure to plead *facts* to support their claims. Both are proper bases for dismissal under the Rule 8 pleading standard, which requires more than mere labels and conclusory allegations.

These defects show that the AC fails on five grounds. ***First***, the entire AC is an impermissible puzzle pleading that fails to identify *why* each challenged statement was false or misleading, warranting dismissal in full. ***Second***, 19 of the 25 challenged statements are inactionable puffery or opinion, warranting dismissal of those statements with prejudice. ***Third***, the AC pleads no facts that any challenged statement was materially false or misleading when made—a defect permeating all four categories of challenged statements (safety, staffing, operating strategy, and risk disclosures) and warranting dismissal in full. ***Fourth***, the AC pleads no omission of information required by Items 303 or 105 of Regulation S-K. ***Fifth***, the AC fails to plead that any Individual Defendant actively solicited purchases for his or her own financial gain, warranting dismissal of the Section 12(a)(2) claim as to those Defendants.

## II. ARGUMENT

### A. Plaintiffs' Puzzle Pleading Fails to Meet Rule 8's Pleading Standards.

Plaintiffs insist the AC is not an impermissible puzzle pleading under Rule 8 because it groups the challenged statements into three categories and provides an Appendix identifying each one. Opp. 8. But Defendants' puzzle-pleading argument does not rest on any failure to *identify* the challenged statements; rather, Plaintiffs failed to identify *why* each of those statements is misleading. MTD 12-13. Instead, they put the burden on the Court to sort through 50+ unspecified

paragraphs about (i) inspection reports, (ii) unadjudicated lawsuits, and (iii) FE accounts and match up those allegations to each challenged statement. Opp. 9. Every case Plaintiffs cite confirms this is not enough. *Id.* at 8.[2] Failure to allege the requisite explanation requires dismissal under Rule 8. *See, e.g.*, *Ryan v. FIGS*, 2025 WL 71727, at *9 (C.D. Cal. Jan. 10, 2025) ("As pleaded, the Court cannot discern ***which fact*** makes ***which part*** of specific statements false or misleading. The FAC thus ***fails to comply with Rule 8's requirement*** of a short and plain statement."); *In re Cisco Sys. Sec. Litig.*, 2013 WL 1402788, at *6 (N.D. Cal. Mar. 29, 2013) (dismissing under Rule 8 because plaintiffs made "no meaningful effort…to link the [challenged] statements to any of the voluminous facts alleged throughout the Amended Complaint's 376 paragraphs, many of which are lengthy and repetitive").

Plaintiffs' puzzle pleading also hinders the Court's ability to conduct the statement-by-statement analysis required to evaluate falsity in securities cases. *E.g.*, *In re Eventbrite Sec. Litig.*, 2020 WL 2042078, at *10 (N.D. Cal. Apr. 28, 2020) ("[F]or falsity, the Court must do a statement-by-statement analysis."); *Premca Extra Income Fund v. Angle*, 2026 WL 1622808, at *9 (1st Cir. June 5, 2026) ("[W]e proceed statement by statement."); *Zhou v. Desktop Metal*, 120 F.4th 278, 293 (1st Cir. 2024) ("When a plaintiff alleges multiple false or misleading statements, we perform our analysis statement by statement, considering each statement in turn."); *Bondali v. Yum!*

---

[2] *See Bos. Ret. Sys. v. Uber Techs.*, 2020 WL 4569846, at *5 (N.D. Cal. Aug. 7, 2020) (plaintiff "set forth the ***reasons why*** it believes ***each*** statement to be false or misleading"); *Murphy v. Precision Castparts*, 2017 WL 3084274, at *7 (D. Or. June 27, 2017) (noting the "reader can match the alleged misstatements and omissions with Plaintiffs' explanation of ***why each statement*** is misleading"); *Homyk v. ChemoCentryx*, 2023 WL 3579440, at *6 (N.D. Cal. Feb. 23, 2023) (noting the reader was able to connect the misstatements "with the ***reasons why*** Plaintiff challenges those statements"); *Rihn v. Acadia Pharms.*, 2016 WL 5076147, at *5 n.1 (S.D. Cal. Sep. 19, 2016) (noting it was "clear…what statements Plaintiff alleges are misleading and ***why***").

*Brands*, 620 F.App'x 483, 491 (6th Cir. 2015) ("[O]ther circuits, like this circuit, undertake a statement-by-statement analysis.").

The AC should be dismissed on this threshold pleading failure alone.

### B. Plaintiffs Fail to Plead Any Challenged Statement Is Materially False or Misleading.

Unable to defend their pleading deficiencies, Plaintiffs insist Rule 8 imposes only a minimal pleading burden and they have satisfied it. Opp. 8-9. They are wrong on both points. While not as demanding as Rule 9(b), Rule 8 still requires Plaintiffs to allege sufficient factual matter to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[L]abels and conclusions" or allegations that are merely "consistent with" liability do not suffice and are "not entitled to the assumption of truth." *Id.* at 678-79. Allegations must also be detailed enough "to raise a right to relief above the speculative level." *In re Rigel Pharms. Sec. Litig.*, 697 F.3d 869, 875 (9th Cir. 2012). Plaintiffs fail to meet this burden at every turn.

The AC challenges 25 statements: 10 about safety, six about staffing, seven about operational strategy, and two risk disclosures. *See* App'x. A (chart prepared by Plaintiffs cataloguing statements by category). Defendants' Opening Brief was organized around those four categories. Plaintiffs' Opposition is too, but it repeats many of the same arguments across categories. Accordingly, to streamline and offer a clearer picture on the multiple, independent bases for dismissal on each challenged statement, Defendants have organized this reply by legal argument: **(1)** 19 statements are inactionable as a matter of law because they are puffery (Part B.1); **(2)** of those, three are inactionable opinions (Part B.2); and **(3)** for all 25, no well-pled facts support falsity (Part B.3).

**1. Nineteen Challenged Statements Should Be Dismissed Because They Are Inactionable Puffery.**

Nineteen challenged statements are too vague and subjective as a matter of law to be actionable under the securities laws. They include statements about safety (MTD 13-14; ¶¶109-110), staffing (MTD 22-23; ¶¶242-47), and operational strategy (MTD 28-29; ¶¶298-304). And though the subject matter differs, the reason the statements are inactionable is the same: they are "mildly optimistic, subjective assessment[s]" that are not "capable of objective verification." *Or. Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 606 (9th Cir. 2014).

Plaintiffs do not address nine of these 19 statements (¶¶109, 110 (two statements), 246-47, 299-300, 30-04), thus conceding they are puffery. *See* Opp. 18 (addressing three statements from ¶110); *id.* at 23-24 (addressing four statements from ¶¶242-45); *id.* at 26-27 (addressing three statements from ¶¶298, 301-02).[3] Those statements should be dismissed outright. *See In re Cutera Sec. Litig.*, 2025 WL 2782916, at *8 (N.D. Cal. Sep. 30, 2025) (granting motion to dismiss certain challenged statements, without leave to amend, when "Plaintiff failed to respond to Defendants' arguments" as to those statements); *Norfolk Cnty. Ret. Sys. v. Solazyme*, 2018 WL 3126393, at *3 n.3 (N.D. Cal. June 26, 2018) ("Plaintiffs do not address several of Solazyme's statements…thereby abandoning those statements as possible bases for their claim.").

Plaintiffs' arguments as to the 10 statements they do address fail for five reasons:

***First***, Plaintiffs misstate the legal standard, claiming that puffery is a "factual" question that requires a "demanding showing" before courts will dismiss statements on that basis. Opp. 3. That is not the law. "[C]ourts routinely dismiss securities actions premised on puffery at the motion

[3] The Opposition cites paragraphs 109, 299, 303, and 304, but does not discuss the language used in those challenged statements, cites no case law with comparable language, and provides no analysis to refute Defendants' arguments that they are inactionable puffery. Opp. 27.

to dismiss stage." *Barnes v. Edison Int'l*, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021) (rejecting plaintiffs' argument that "puffery is fact-intensive and is therefore 'premature' in a motion to dismiss"); *see also, e.g.*, *Weir v. Allianz SE*, 2025 WL 1792516, at *1 (9th Cir. June 27, 2025) (affirming dismissal of complaint based on puffery, among other grounds); *Cai v. Eargo*, 2025 WL 66041, at *1-2 (9th Cir. Jan. 10, 2025) (same); *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1060-61 (9th Cir. 2017) (same); *Apollo Grp.*, 774 F.3d at 606-07 (same).

***Second***, Plaintiffs declare—with almost no analysis—that Defendants' authorities finding identical or nearly identical language to be puffery are distinguishable. *See* Opp. 19 n.19, 24 n.28; MTD 13-14, 22-23, 28-29. They are wrong. To start, Plaintiffs conclude that *Retail Wholesale v. H.P.*, 845 F.3d 1268, 1276 (9th Cir. 2017), is limited to code-of-conduct statements and has no broader applicability. Opp. 19. But courts routinely rely on *H.P.* to find non-code-of-conduct statements inactionable. *E.g.*, *Lew v. ON Semiconductor*, 2025 WL 1918543, at *12 (D. Ariz. July 11, 2025) (citing *H.P.* to find "much better" was puffery); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *8 (N.D. Cal. Aug. 31, 2018) (same as to "competition is good" and "fun"). Similarly, Plaintiffs suggest *Waswick v. Torrid*, 2024 WL 3740052, at *7 (C.D. Cal. July 23, 2024), and *In re Intel Sec. Litig.*, 2019 WL 1427660, at *9 (N.D. Cal. Mar. 29, 2019), are limited to "inventory management" and "marketing" statements. Opp. 19 n.19. But they do not dispute that those courts assessed nearly identical language and found it inactionable, nor do they cite any authority for the proposition that subject matter controls the outcome. As to Defendants' remaining authorities, Plaintiffs offer only the bare assertion that the statements in those cases are "materially distinguishable" and the allegations are "unlike [those] here," Opp. 19 n.19, 24 n.28.[4]

---

[4] Plaintiffs attempt to distinguish *Gavaldon v. Standard Chartered Bank Int'l (Americas)*, 2020 WL 835311 (S.D. Cal. Feb. 20, 2020), by claiming that it "direct[ed] parties to look at the context"

That is insufficient. *See Habelt v. iRhythm Techs.*, 2022 WL 971580, at *8 (N.D. Cal. Mar. 31, 2022) (bare assertion that a case was distinguishable was insufficient); *In re Facebook S'holder Deriv. Priv. Litig.*, 411 F.Supp.3d 649, 653 (N.D. Cal. 2019) (labeling authority "inapposite" without factual distinction insufficient).

***Third***, Plaintiffs suggest their allegations about "documented violations" and "contradictory facts" transform the challenged puffing statements about safety and staffing into verifiable facts. Opp. 18, 23-24. That argument misapprehends the concept of puffery: the analysis turns on the statement itself, not the facts alleged to support falsity. *See Callan v. Motricity*, 2013 WL 195194, at *19 (W.D. Wash. Jan. 17, 2013) ("Whether an alleged misrepresentation is a statement of fact or is instead mere puffery is a legal question."). Plaintiffs' cases do not hold otherwise. Several of their cases involve concrete, measurable representations ***directly contradicted*** by the alleged facts. *See In re BHP Billiton Sec. Litig.*, 276 F.Supp.3d 65, 80 (S.D.N.Y. 2017) (company claimed "record low total recordable injury frequency and no fatalities," which was measurable against prior year results) (Opp. 19); *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 746 F.Supp.3d 1395, 1407 (S.D. Fla. 2024) (plaintiffs targeted "specific and quantifiable" actions the company claimed to have taken when "no such actions were taken" at all) (Opp. 24); *Uber*, 2020 WL 4569846, at *5 (statements of remediation made against backdrop of acknowledged past problems implied issues had been fixed when they had not) (Opp. 27). Other cases Plaintiffs cite involved safety statements made to reassure investors after a prior

---

to evaluate puffery." Opp. 24 n.28. But *Gavaldon* held it is ***plaintiff's*** burden to plead context "[t]o show that a statement is material and is intended to induce reliance, rather than amounting to mere puffery" and that "failing to plead enough facts to put particular remarks in context at all may deprive the allegations of the required particularity or plausibility." 2020 WL 835311, at *3. Plaintiffs have not offered that context here.

incident or amid known risks—transforming puffery into something actionable. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F.Supp.3d 189, 216, 218 (E.D. Pa. 2021) (safety statements "[o]ften...followed recent accidents" and "were purportedly intended to calm investors' worries," while "reckless construction" of a pipeline caused a "massive explosion") (Opp. 18-19); *In re Massey Energy Sec. Litig.*, 883 F.Supp.2d 597, 604-05 (S.D.W. Va. 2012) (after a fatal mining disaster, defendants emphasized safety to "restore the Company's reputation," while further violations of "basic mine safety practices" led to "one of the deadliest United States coal mining accidents in forty years") (Opp. 18-19); *BHP Billiton*, 276 F.Supp.3d at 70, 74-77 (safety statements made while concealing known "warning signs" at the Fundão dam, which collapsed in "the worst environmental disaster in Brazil's history") (Opp. 19); *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean*, 866 F.Supp.2d 223, 228 (S.D.N.Y. 2012) (proxy statement touted safety despite long-standing, systemic "personnel errors and equipment failures" causing the Deepwater Horizon explosion and "the worst oil spill in U.S. history") (Opp. 19, 24).[5] Plaintiffs allege nothing similar here that is either measurable or about a specific incident—only vague immeasurable statements such as that safety is a "top priority," and KinderCare takes measures to "promote safety." ¶110.

***Fourth***, Plaintiffs insist several statements are verifiable because they reference concrete, historical figures. Opp. 27 (quoting ¶¶301-02). But Plaintiffs do not allege that any of those figures are false or misleading. *See id.* at 8 (indicating Plaintiffs challenge only emphasized portions); App'x A (no emphasis added to any concrete figures). Rather, Plaintiffs challenge only the accompanying ***qualitative*** characterizations—*e.g.*, "demonstrated success" and "strong track

[5] The only other case Plaintiffs cite is *In re Alphabet Sec. Litig.*, Opp. 24, and the passage they quote does not relate to a puffery analysis. 1 F.4th 687, 702 (9th Cir. 2021).

record," Opp. 25-26 (quoting ¶¶298, 300-01)—which remain classic, non-actionable puffery. *See* MTD 28-29.

***Fifth***, Plaintiffs claim that analyst reporting on safety and staffing makes *every* statement on those topics necessarily material and thus not puffery. Opp. 18, 24 n.27, 29. But none of Plaintiffs' authorities suggests that analyst commentary is relevant to the puffery analysis. The only two cases that even mention analyst commentary address entirely different legal issues. *Baker v. SeaWorld*, 423 F.Supp.3d 878, 941 (S.D. Cal. 2019) (analyst commentary relevant to whether a factual dispute over business impact of a documentary precluded summary judgment); *Turocy v. El Pollo Loco Holdings*, 2017 WL 3328543, at *14 (C.D. Cal. Aug. 4, 2017) (repeated analyst questions about growth rate relevant to materiality of failure to meet growth projections).

**2. Three Challenged Statements Should Be Dismissed Because They Are Inactionable Opinions.**

Three of the 19 puffing statements are inactionable for an additional reason: they are opinion statements. ¶¶245, 301, 303. Thus, they cannot support a securities claim unless Plaintiffs plead facts that (i) the speaker did not actually hold the stated belief; (ii) the opinion contained an embedded false statement of material fact; or (iii) the opinion omitted material facts about the issuer's inquiry or knowledge that conflict with what a reasonable investor would understand from the opinion itself. *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-86, 194 (2015).

Plaintiffs do not dispute that these three statements are opinions or that *Omnicare* applies. They offer only two arguments across all three statements.

As to the first statement, ¶245 ("We believe we are particularly well positioned to attract talent…"), Plaintiffs rely entirely on *Omnicare's* third prong—material omissions about the speaker's inquiry—***but they identify no specific omissions***. Opp. 25. Instead, they cross-reference

two sections of their AC, spanning 46 paragraphs, and leave it to the Court to figure out what is relevant and why. *Id.* That is insufficient. *See Hadley v. Kellogg Sales*, 243 F.Supp.3d 1074, 1106 (N.D. Cal. 2017) ("[J]udges are not like pigs, hunting for truffles buried in briefs. The same is true of allegations, especially in a complaint that is 155 pages in length that alleges 65 different statements from 53 products.").

As to the remaining two statements, ¶301 ("We believe we are well positioned…"), ¶303 ("We believe the following are our core strengths…"), Plaintiffs invoke only the second prong—embedded false facts—***but they make no effort to identify what those purported facts are or which allegations render them false***. Opp. 27. The Court need not credit "conclusory statements without reference to its factual context," *Iqbal*, 556 U.S. at 686, and Defendants cannot be expected to respond to a theory Plaintiffs have not articulated.

### 3. Every Challenged Statement Should Be Dismissed Because None Is Supported by Well-Pled Facts Demonstrating Falsity.

All 25 challenged statements should be dismissed because Plaintiffs have failed to plead facts demonstrating they were materially false or misleading when made.

As a threshold matter, the Court need only address falsity (or lack thereof) for six statements because the other 19 are inactionable puffery and/or opinion. Of those remaining six statements, two are risk disclosures (addressed below in Part 3.d) and the other four are a subset of the statements Plaintiffs categorized as safety-related:

- "We make investments in our curriculum and in how we operate our centers to promote safety as well as physical, mental and emotional health." ¶110.
- "Center directors regularly provide safety training to their teachers and staff to ensure our employees are updated on our latest protocols and adhere to our safety standards." *Id.*
- "Our teachers and center staff participate in an onboarding program prior to conducting student-facing activities. The program ensures new employees are grounded in our protocols and culture, from safe interactions with children and

understanding local licensing regulations to building relationships with families." ¶113.

- "We do not expect the costs of continuing to comply with applicable laws and regulations to have a material effect on our business….In most jurisdictions where we operate, our child care centers are required by law to meet a variety of operational requirements, including minimum qualifications and background checks for our center personnel as well as teacher-to-child ratios and various employment, facility, and health, fire and safety regulations." ¶¶111-12.

None of these four statements is supported by well-pled facts of falsity.

As to the first statement, there is not a single well-pled fact that KinderCare did not make "investments in [its] curriculum." ¶110. No inspection report, lawsuit, or FE allegation addresses this topic. MTD 14-15. Plaintiffs' attempt to dispute the absence of such allegations only confirms the gap—they direct the Court to the alleged "substantiated" regulatory violations. Opp. 11. But the alleged regulatory violations, "substantiated" or otherwise, have nothing to do with curriculum investment. *See id.* Thus, they cannot render this statement false or misleading.

As to the second statement, there is not a single well-pled fact that center directors did not "regularly provide safety training to their teachers and staff." ¶110. Plaintiffs point to their allegations that 400 violations related to "inadequacy of staff training," Opp. 11 (citing ¶¶13, 295), but neither cited paragraph explains what those violations were or establishes any connection between those violations and the frequency with which center directors provided safety training. Nor do Plaintiffs address the Offering Documents' disclosures of specific training programs—including "comprehensive safe sleep training" and regular "annual training" for all center teachers. Ex. 1 at 123; *see Crews v. Rivian Auto.*, 2023 WL 3050081, at *10-11 (C.D. Cal. Feb. 16, 2023) (challenged statements must be "[r]ead reasonably and in context"). There is no well-pled fact that those programs did not exist or that the cited violations related to a failure to conduct those trainings.

As to the third statement, there is not a single well-pled fact that teachers and center staff did not "participate in an onboarding program prior to conducting student-facing activities." ¶113. To the contrary, the FE allegations confirm that onboarding programs exist and are required for "all KinderCare employees," "including Directors and teachers." ¶220 ("According to FE-3, 'all KinderCare employees' need to go through the 'First 100 Days' training handbook, including Directors and teachers. The First 100 Days training includes classroom training, payroll, HR materials, and other processes which are supposed to be completed within the first 100 days of employment."); ¶155 (addressing same onboarding program).

As to the final statement, Plaintiffs argue that KinderCare was not "continuing to comply with applicable laws and regulations," ¶¶111-12, because KinderCare purportedly had "*pervasive* non-compliance with the exact regulations discussed." Opp. 11. That premise fails for the reasons detailed in Defendants' Opening Brief and discussed further below: the AC's allegations do not support a conclusion of *pervasive* noncompliance. MTD 16-17, 27-28; *infra* Parts B.3.a-b. But even setting that aside, ***this*** statement would not be misleading because it addresses only the expected "***costs*** of continuing to comply" and it makes no representation about the rate of compliance across KinderCare's 2,400 sites. Thus, Plaintiffs' argument fails because it hinges on a reading that "bear[s] no connection to the substance of the statement[s]." *Ng v. Berkeley Lights*, 2024 WL 695699, at *8 (N.D. Cal. Feb. 20, 2024); *see Wochos v. Tesla*, 985 F.3d 1180, 1193 (9th Cir. 2021) (rejecting plaintiff's effort to "rewrite[] this statement" as if it asserted something else, when "that is not what the statement says").

*  *  *

More generally, as to all 25 challenged statements, Plaintiffs fail to plead facts demonstrating any was materially false or misleading when made. MTD 13-22 (addressing safety statements), 22-28 (staffing), 28-30 (operating strategy), 30-33 (risk disclosures).

**a. Safety statements were not materially false or misleading.**

No well-pled facts support the falsity of any safety statement.

Plaintiffs begin by making several broad arguments intended to show that "[c]ourts routinely credit far more minimal allegations." Opp. 10. None do. To start, the cases Plaintiffs cite are readily distinguishable. Take, for instance, *United Ass'n Nat'l Pension Fund v. Carvana*, where the company represented its DMV suspension in North Carolina was "unprecedented," yet it faced the same suspensions in multiple other states. 759 F.Supp.3d 926, 957 (D. Ariz. 2024); *Unprecedented*, Merriam-Webster (12th ed. 2025) ("having no precedent; novel, unexampled"). The same is true in *In re PG&E Sec. Litig.*, where the company told investors it complied with vegetation management laws and a later investigation showed it did not. 806 F.Supp.3d 962 (N.D. Cal. 2025). *Uber* is the same—there, the company claimed it had "changed" its practices after admitting "missteps" in the past by violating local laws and paying bribes to avoid fines when, in reality, it was continuing the very same practices. 2020 WL 4569846, at *5-6. And in *Reese v. Malone*, the defendant represented that it was "in compliance in all material respects with applicable environmental laws and regulations" when a guilty plea with the DOJ, civil settlement with the state, and millions in fines and penalties proved it was not. 747 F.3d 557, 578 (9th Cir. 2014). In each case, the allegations ***directly contradicted*** the statements. Here, Plaintiffs offer no such allegations, and KinderCare's disclosures accurately represented that it had faced governmental investigations and allegations concerning conduct at its centers. *See* Ex. 1 at 40. The Opposition merely reemphasizes the "quantity" of allegations, as though quantity can substitute for quality. It cannot.

Plaintiffs then attempt to dispense with all of Defendants' arguments in one fell swoop by labeling everything a "factual dispute" and proclaiming their allegations are sufficient under Rule 8. *See* Opp. 11-13, 19, 21-22, 26-27, 30, 32-33. But simply labeling something a factual dispute does not make it so. *See In re Trader Joe's Dark Chocolate Litig.*, 726 F.Supp.3d 1150, 1170 (S.D. Cal. 2024) (a "pleading deficiency" is "not a factual dispute"). None of Plaintiffs' allegations—about inspection reports, lawsuits, or FEs' experiences—survives a Rule 8 analysis.

**i. The inspection reports do not support falsity.**

Plaintiffs insist the challenged safety statements were materially false and misleading when made because their compilation of inspection reports purportedly shows that KinderCare had "pervasive" compliance failures. Opp. 2-3, 5, 9, 11-13. They are wrong, and each of their arguments fails to support this premise.

***First***, Plaintiffs claim Defendants' mathematical calculations showing that the incident rate is very low when viewed in context of KinderCare's nationwide operations—based entirely on the numbers Plaintiffs alleged in the AC—is nothing more than a factual dispute. Opp. 11-12. That is wrong. Defendants accepted Plaintiffs' proffered figures for violations, centers, children, teachers and staff, and performed straightforward arithmetic—multiplying and dividing those numbers. MTD 16. Plaintiffs do not dispute the math; they simply ask the Court to disregard the context it provides without any support for that request. Case law is clear that consideration of the math and the context it provides is undeniably proper. *See In re Dexcom Sec. Litig.*, 2026 WL 1948526, at *3-4 (S.D. Cal. Jan. 7, 2026) (crediting such mathematical calculations based on complaint allegations in granting judgment on the pleadings); *Omnicare*, 575 U.S. at 190 (requiring consideration of statement's "full context").

***Second***, Plaintiffs argue Defendants used the wrong denominator by including all facilities, rather than only ECE facilities. Opp. 12 n.9. But the challenged statements apply to *all* centers—

not just ECE facilities. *See, e.g.*, ¶109 ("across ***all*** classrooms"); ¶110 ("across ***all*** of our centers"). There is thus no basis to exclude Champions (the only "non-ECE facilities"), and Defendants used the very figures Plaintiffs alleged. In any event, Plaintiffs concede that even on the narrower ECE-only cohort, the figure amounts to just 1.3 violations per center over nine months. Opp. 12 n.9.

***Third***, Plaintiffs claim the *only* relevant metric is the percentage of centers with reported violations and urge the Court to find violations were pervasive because they impacted nearly half of ECE facilities and one-third of all facilities. *Id.* at 12-13. Plaintiffs offer no authority for that narrow view. To start, pervasiveness is not binary—it must be assessed in context with frequency, severity, and scale. *See, e.g.*, *Panelli v. First Am. Title Ins.*, 704 F.Supp.2d 1016, 1029 (D. Nev. 2010) (courts consider frequency, duration, nature, context, impact, and totality of circumstances); *Gipaya v. Dep't of the Air Force*, 345 F.Supp.3d 1286, 1298 (D. Haw. 2018) (same). Plaintiffs' chosen metric—whether ***any*** violation ever occurred at a given center—cannot support such an inference because it elevates occurrence over frequency. "Pervasive" connotes something "more than a few isolated incidents." *Landucci v. State Farm Ins.*, 65 F.Supp.3d 694, 708-09 (N.D. Cal. 2014); *see VanHorn v. Hana Grp.*, 979 F.Supp.2d 1083, 1098-99 (D. Haw. 2013) (sporadic incidents over three years not pervasive); *De Piero v. Pa. State Univ.*, 769 F.Supp.3d 329, 351-52 (E.D. Pa. 2025) (seven comments over three-plus years not pervasive); *Pervasive*, Merriam-Webster (12th ed. 2025) (defining "pervasive" as "existing in or spreading through every part of something").

The actual figures here tell a far different story that a mere count of centers with violations can provide: KinderCare operates more than 2,400 centers, employs approximately 42,000 teachers and staff, and serves over 148,000 children daily—equating to roughly 40 million days of childcare over the 9-month period at issue. Ex. 1 at 74, 119. Based on those figures, ***99.996% of***

***daily interactions resulted in no incidents whatsoever***. *Id.* Plaintiffs offer no explanation—legal or factual—for how a rate that low could be "pervasive."[6]

***Fourth***, Plaintiffs contend the 900 "hiring, training, and screening violations" should be treated as health-and-safety violations because they allegedly "protect health and safety" and can "precipitate injuries." Opp. 12. Even if those violations could be characterized as safety-related, Plaintiffs have already counted them in their analysis.[7] Recasting them as separate "safety violations" is double counting. Plaintiffs, not Defendants, created and defined the categories used to parse violations; they cannot now recharacterize the same violations to inflate their totals. In any event, even viewed in context, the numbers still do not support Plaintiffs' theory. MTD 16-17.[8]

---

[6] Plaintiffs also offer no competitor data to benchmark KinderCare's alleged violation rate, dismissing such data as having "no bearing" on falsity. Opp. 13. But *Omnicare* explains that investors "take[] into account the customs and practices of the relevant industry" when assessing statements. 575 U.S. at 190. Plaintiffs' theory—that KinderCare's incident rate contradicts its public statements—only works if that rate is meaningfully out of step with industry peers. Without comparative data, Plaintiffs cannot establish that it is.

[7] Plaintiffs further claim that Defendants cannot challenge their methodology until after discovery. Opp. 12. But Defendants do not challenge the methodology; they challenge the absence of sufficient information for the Court to assess how the determinations were made in the first place. MTD 16. Plaintiffs invoke *E. Ohman J:or Fonder AB v. NVIDIA*, but that case is far afield: the allegations were grounded in concrete, independent analyses with disclosed, conservative assumptions and transparent, step-by-step math set out in full in the complaint. 81 F.4th 918, 930-32 (9th Cir. 2023). They also relied on an international investment bank's independent analysis that arrived at a nearly identical conclusion—convergence across two separate, rigorous methodologies that gave the court a clear, reliable basis to evaluate the claims. *Id.* at 923-24, 941. Plaintiffs offer no comparable support here, leaving the Court with conclusions but no means to assess them.

[8] Plaintiffs label the argument that the inspection reports were publicly available an improper truth-on-the-market defense. Opp. 13; MTD 16-17. Not so. The Court must evaluate Plaintiffs' alleged misstatements in context, which necessarily includes information that is otherwise publicly available. *See* MTD 16-17. Plaintiffs offer no authority to suggest public information may not defeat a claim in *that* scenario.

**ii. Unadjudicated lawsuits do not support falsity.**

Plaintiffs advance two arguments as to why the lawsuits support falsity. All fail.

***First***, Plaintiffs do not (and cannot) dispute that there is no duty to disclose unadjudicated lawsuits.[9] MTD 17-18. Instead, they claim the lawsuits "*corroborate* systemic safety issues." Opp. 14. Thus, Plaintiffs concede the lawsuits are inadequate on their own. *Id.* And they cannot serve as corroboration because, as just discussed above, the incident reports also fail to demonstrate any "systemic safety issues." *Supra* Part B.3.a.i. But even assuming such systemic issues had been alleged, unproven allegations remain unproven, and Plaintiffs' own authorities involved far more "corroboration" than Plaintiffs offer here. For example, *Sherman v. Abengoa* involved a Spanish court ruling, an audit expert report, an investigation resolution, and forensic analyses from two firms. 156 F.4th 152 (2d Cir. 2025). *In re Bear Stearns Mortg. Pass-Through Certificates Litig.* relied on a detailed third-party study finding widespread breaches in nearly 89% of reviewed loan documents. 851 F.Supp.2d 746, 753 (S.D.N.Y. 2012).[10] Here, Plaintiffs identify no comparable study or independently verifiable facts—only allegations no court has assessed on the merits.

---

[9] Indeed, under the regulations governing the form and content of Registration Statements, KinderCare was not required to disclose ordinary claims of negligence unless they departed from the normal types of claims against the Company or had damages exceeding 10% of the Company's current assets. 17 C.F.R. § 229.103(b)(1)-(2).

[10] Plaintiffs cite *In re Lyft Sec. Litig*. to claim the lawsuits also rendered KinderCare's risk factors misleading. Opp. 14. But in *Lyft*, none of the risk disclosures made any mention of sexual assault, while numerous pre-IPO lawsuits made sexual assault allegations. 484 F.Supp.3d at 768. The fact that "sexual assault" litigation was completely omitted from Lyft's legal disclosures made the court unable to find, as a matter of law, that the disclosures were not misleading. *Id.* at 769-70. Here, KinderCare disclosed that it had been "subject to litigation and regulatory proceedings" that "have included" "allegations of inappropriate, illegal, or harmful acts to children at our child care centers or sites or through a third-party provider," as well as "claims and matters alleging negligence, inadequate supervision, illegal, inappropriate, abusive or neglectful behavior, health and safety, or other grounds for liability arising from injuries or other harm to the people we serve, primarily children." Ex. 1 at 40, 57; *see also infra* Part B.3.d (addressing challenged risk disclosures).

***Second***, Plaintiffs claim (in their arguments about FEs) that KinderCare engaged in retaliatory behavior against other former employees, purportedly based on five unadjudicated lawsuits. Opp. 17 (citing ¶¶184-89). They offer no explanation of how that relates to safety or renders any alleged statement about safety false or misleading.[11]

**iii. The FE allegations do not support falsity.**

Plaintiffs' arguments regarding the FE allegations each fall short. Opp. 14-17.

***First***, Plaintiffs conflate two distinct pleading requirements. They correctly note that the FE allegations must be described with sufficient particularity and that the Court must accept well-pled factual allegations as true. Opp. 14-15. But they improperly collapse those standards: they assume that if an FE's description is detailed enough, every allegation attributed to that FE automatically qualifies as a well-pled fact the Court must accept. *Id.* That is not the law. The purpose of the particularity requirement is to allow the Court to assess whether the FE was in a position to have firsthand knowledge of the specific facts alleged. *Zucco v. Digimarc*, 552 F.3d 981, 995 (9th Cir. 2009) (FEs' "reliability and personal knowledge" must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). Courts routinely decline to credit well-described FEs who lacked personal knowledge of the specific matters alleged. *E.g.*, *McGovney v. Aerohive Networks*, 2019 WL 8137143, at *9, 19-20 (N.D. Cal. Aug. 7, 2019) (rejecting CW allegations despite describing witness's role and duties where plaintiffs failed to allege sufficient personal knowledge); *Mazzaferro v. Aruba Networks*, 2015 WL 456534, at *2 (N.D. Cal. Feb. 2, 2015) ("territory manager" allegations unreliable as to company's overall performance); *Zucco*, 552 F.3d

[11] Plaintiffs also invoke purportedly "corroborating" FTC materials. Opp. 16-17. But those are unverified complaints, not findings. ¶184. They cite only two isolated examples and do not allege the FTC opened any investigation or initiated enforcement against KinderCare.

at 996 (former "human-resources employee" had "no firsthand knowledge of the workings of the finance or corporate departments"). Courts also decline to credit FE allegations that amount to personal opinions, impressions, or speculation. *E.g.*, *Garcia v. J2 Glob.*, 2022 WL 22717936, at *5 (C.D. Cal. Aug. 8, 2022) (discounting CW allegations that merely "second-guess[ed] [] management decisions"); *Ferreira v. Funko*, 2021 WL 880400, at *28 (C.D. Cal. Feb. 25, 2021) (rejecting CW allegations amounting to no more than his "disagreement with [company] management" and "own reading and interpretation of…sales data").

***Second***, Plaintiffs argue the FE allegations viewed collectively can substantiate claims about companywide conduct. Opp. 15-16 (citing *Glazer Cap. Mgmt. v. Forescout Techs.*, 63 F.4th 747, 771 (9th Cir. 2023)). Plaintiffs' reliance on *Glazer*—which concerned alleged misstatements about the company's sales pipeline—is misplaced. 63 F.4th at 768-69. That complaint included 20 confidential witnesses ("CWs") who provided firsthand, detailed accounts of specific deals that each CW was pressured into misclassifying as "committed" or conversations they personally heard about specific deals being misclassified. *Id.* at 771. From this, the court concluded that "[t]hough the CWs, as individuals, might not have known about corporate-level trends, their statements combine to tell a plausible story about Forescout's pipeline." *Id.* Here, conversely, the FE allegations provide none of those details. FE-5—who is invoked for the proposition that "centers were often out of ratio due to the labor model imposed by management," Opp. 15—worked at a single, unidentified facility in the Northeast and provides no information about which other centers were out of compliance or where she got that information. MTD 18; ¶77. FE-2, a "nationwide manager," is invoked for the proposition that "KinderCare lost several clients" due to health and safety problems, but Plaintiffs do not dispute that FE-2 fails to identify when those losses occurred,

how many clients were lost, or what problems caused the losses.[12] Opp. 15; *see* MTD 19-20. And Plaintiffs have no response to the fact that FE-3's allegation—that "management lacked experience and knowledge qualifying them to comply with the regulations and that ratio violations were very common" and that she saw health and safety issues "at various facilities"—fails to identify which managers lacked which qualifications, which facilities had which issues and when, how frequently, or how her knowledge extends beyond the three centers where she worked. *See* ¶75; Opp. 15; MTD 20. Invoking the "totality" of the accounts does not cure these deficiencies. MTD 18.

***Third***, Plaintiffs invoke the strict liability standard to argue they need not show scienter—only falsity. Opp. 16. Defendants never argued otherwise. The dispute is whether the FEs' allegations support falsity. They do not, and Plaintiffs fail to address Defendants' specific arguments on that point. Plaintiffs reiterate FE-5's claim that management denied her request for full-time teachers, *id.*, but they ignore she had only 8 children in her center and never claimed she needed more teachers to comply with minimum staffing ratios, MTD 19; ¶201. Thus, her complaint is that she wanted more help than the regulations required—not that KinderCare was out of compliance or that any of KinderCare's public statements were false. Plaintiffs similarly recycle FE-4's anecdote of a so-called "KinderCare shuffle" without addressing the controlling point:

---

[12] Again, while the health and safety of every client matters to KinderCare, without identifying the number of clients, this Court cannot assess whether the loss of "several clients" is material from a financial perspective to a company with $2.5 billion in revenue in the fiscal year preceding the IPO. Ex. 1 at 15. As the U.S. Supreme Court held in *TSC Indus. v. Northway*, 426 U.S. 438 (1976), "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important." *Id.* at 449. The Court explicitly calibrated this threshold to avoid a contrary result, warning that too low a standard "might bring an overabundance of information within its reach, and lead management 'simply to ***bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking***.'" *Basic v. Levinson*, 485 U.S. 224, 232 (1988) (quoting *TSC Indus.*, 426 U.S. at 448-49).

FE-4 never claimed KinderCare was out of compliance with required ratios—she said she wanted KinderCare to provide more than the ratios required.[13] MTD 19; ¶¶212-14.

***Fourth***, Plaintiffs argue Defendants misrepresent the FEs' experience, but each characterization tracks Plaintiffs' own allegations. As to FE-3, Plaintiffs claim Defendants improperly describe her role as "limited to" three centers, ignoring her Director responsibilities for enrollment, staffing, KPI tracking, and budget management. But the AC contains no allegation that she exercised those responsibilities outside of those three centers. MTD 18; ¶75. The same problem applies to FE-5. Plaintiffs object that Defendants describe FE-5 as merely working at "one unspecified center," ignoring that she was a Center Director for two years running daily operations. But again, her experience was tied to one out of 2,400 centers, and Plaintiffs plead no facts supporting any broader knowledge. MTD 18; ¶77.

***Fifth***, Plaintiffs do not dispute that they cannot confirm the Reddit posters were employees or establish any other details about them. MTD 18, 21-22. They instead rely on the proposition that anonymous online accounts may be credited if appropriately corroborated. Opp. 17. But the cases they cite involved substantial, independent corroboration. *Joyce v. Amazon.com*, 2023 WL 8370101, at *5-7 (W.D. Wash. Dec. 4, 2023) (government investigative reports, company procedures, and findings from European regulators); *Thorpe v. Walter Inv. Mgmt.*, 2014 WL 11961964, at *13 (S.D. Fla. Dec. 23, 2014) (multiple government investigations and placement of the company on a credit agency's "negative watch"). There is no comparable corroboration here, rendering those cases irrelevant.

---

[13] Plaintiffs claim there is no rule requiring FEs to be employed during the class period, Opp. 17, but that misses the point: the AC offers no basis for FE-1's knowledge *at the time of the IPO*, yet invokes FE-1's allegations to support conditions alleged to exist at the time of the IPO. ¶¶257-58, 267, 271, 287. That gap in the pleading is fatal to those allegations. MTD 20-21.

**b. Staffing statements were not materially false or misleading.**

Plaintiffs also fail to plead any staffing statements were materially false or misleading.

They begin with a broad proclamation that "[c]ourts sustain such claims" based on similar statements and allegations. Opp. 19. But they cite only one out-of-circuit case that does not support their position. *See Phoenix Ins. v. ATI Phys. Therapy*, 690 F.Supp.3d 862, 977-78 (N.D. Ill. 2023) (rejecting defendants' argument that statements about retention were puffery, but finding those about defendant's "competitive compensation model," "superior ability to recruit and retain physical therapists," and "favorable clinician retention rates and engagement scores" inactionable). Plaintiffs cite *no* case finding statements similar to those challenged here on facts similar to those alleged here sufficient to survive dismissal. Digging deeper into Plaintiffs' arguments on inspection reports, unadjudicated lawsuits, and FE allegations further confirms that they fail to plead that any staffing statements were false or misleading when made.

**i. Inspection reports do not support falsity.**

Plaintiffs offer three arguments regarding inspection reports; each fails.

***First***, Plaintiffs again claim KinderCare's math is skewed, this time because one inspection report can concern more than one staff member. Opp. 23. But Defendants did not base their math on the number of alleged reports; they based it on the number of alleged incidents. And Plaintiffs calculation of 900 staffing-related "incidents" *already* accounted for multiple violations from a single inspection. ¶122 (identifying "nearly 2,000 health and safety violations" from "1,181 reports"). Thus, there is no merit to Plaintiffs' claim that Defendants' math is skewed since it is based on the very numbers Plaintiffs themselves calculated and alleged in the AC.

***Second***, Plaintiffs assert that the inspection reports here are akin to those in *Carvana* and thus sufficient to support systemwide safety failures. Opp. 23. But the regulatory violations there involved multiple states revoking or suspending Carvana's license ***statewide*** or placing the ***entire***

***company*** on 18-month probation. 759 F.Supp.3d at 953. Here, the AC identifies no comparable statewide sanctions—only four ***individual*** centers (out of 2,400 nationwide) that experienced suspension, revocation, probation, or adverse press. ¶¶147-150, 152, 155.

***Third***, Plaintiffs try to recast Defendants' arguments about a lack of well-pled facts as trivializing serious issues. Opp. 23. They argue that failing to document background checks or training is more serious than a mere paperwork issue. *Id.* That argument misses the point. Violations for failure to document background checks/training might be a paperwork deficiency or something more serious—but Plaintiffs have given neither Defendants nor the Court any way to tell the difference. It is their burden to supply that information, even under Rule 8. *See Bridges v. Geringer*, 2015 WL 2438227, at *4 (N.D. Cal. May 21, 2015) ("Even under [Rule 8(a)'s] more liberal requirements, formulaic or wholly inferential allegations…are insufficient."). They did not.

**ii. Unadjudicated lawsuits do not support falsity.**

Plaintiffs' reliance on unadjudicated lawsuits likewise is misplaced. Opp. 22. Not one of the lawsuits they cite has resulted in a judicial finding of wrongdoing, and "federal securities laws do not impose upon companies a duty to disclose uncharged, unadjudicated wrongdoing." *In re Progenity Sec. Litig.*, 2023 WL 4498502, at *13 (S.D. Cal. July 12, 2023); *see also* 17 C.F.R. § 229.103(b)(1)-(2). *Bear Stearns*, the only case Plaintiffs cite in support, is distinguishable for the reasons discussed above in Part B.3.a.ii.

Plaintiffs do not raise any specific arguments as to the four lawsuits cited in the AC, relying solely on a 2023 Massachusetts Attorney General settlement. Opp. 22. That settlement, however, said nothing about competitive wages, benefits, hiring, retention, or systemic practices nationwide, Ex. 9; nor did Plaintiffs allege any specifics about the time period for the underlying conduct, ¶289. The "pattern" Plaintiffs claim this settlement shows is further taken out of context: it was not a finding or admission in the settlement, but a statement by the Massachusetts Attorney General

to the press referring to a claimed "pattern of denying [] employees access to meal breaks, earned wages, and paid sick time"—practices not at issue in the AC. Ex. 9 at 3.

### iii. The FE allegations do not support falsity.

Plaintiffs offer four arguments regarding the FE allegations. None supports falsity.

***First***, Plaintiffs argue the FEs provided sufficient detail about their own experiences to provide information about KinderCare's nationwide operations. *See* Opp. 20-21. They do not. *See supra* Part B.3.a.iii. Individual accounts of local problems at a handful of KinderCare's 2,400 sites—which is all the FEs provide—cannot support an inference that companywide policy statements were materially false or misleading. Plaintiffs try to bridge this gap with allegations about meetings at which local concerns purportedly were raised with KCLC President Michael Canavin. ¶¶255, 266. But simply because local concerns were purportedly elevated does not change their character from isolated, local issues into a companywide pattern. And here, there is no allegation that any FE even attended those meetings, so none had personal knowledge of what was actually discussed. *See In re Silver Lake Grp. Sec. Litig.*, 108 F.4th 1178, 1194 (9th Cir. 2024) (allegations of CWs not present at alleged meetings were "triple hearsay" and "not reliable under [Ninth Circuit] precedent").

***Second***, Plaintiffs argue the FEs adequately show that KinderCare paid below-market wages, offered uncompetitive compensation, and failed to retain high-value staff. *See* Opp. 20-22. They do not. To start, Plaintiffs do not challenge specific figures in the Offering Documents that contradict these allegations—such as KinderCare's 85% tenured-teacher retention rate—and they offer no data on competitor or market pay against which to benchmark KinderCare's compensation. *Id.*; *see In re Overstock Sec. Litig.*, 2020 WL 5775845, at *7 (D. Utah Sep. 28, 2020) (finding "specific" company data shared in public statements "undercut[] the more generalized allegations of the confidential witnesses"). Instead, Plaintiffs baldly insist there is no

inconsistency in FE-3's minimum-wage allegations and that, even if there is, KinderCare's identification of inconsistencies raises a factual dispute. *See* Opp. 21. But the inconsistencies appear on the face of the AC. FE-3 claimed teachers in Virginia were paid minimum wage, yet the AC also alleges they were paid $13 per hour—which is above minimum wage. ¶¶275-76; MTD 25. And FE-4 claimed "all teachers" were hired at $13 per hour, ¶283—nearly double Virginia's minimum wage—directly contradicting FE-3's statement. ¶¶275-76; MTD 26. These are not factual disputes; they are internal contradictions that render the FE allegations too unreliable to establish falsity. *See Sayce v. Forescout Techs.*, 2021 WL 1146031, at *5 (N.D. Cal. Mar. 25, 2021) ("no reliable CW statement" where one CW's allegations were "directly contradicted" by another); *Johnson v. Costco Wholesale*, 2019 WL 6327580, at *8 (W.D. Wash. Nov. 26, 2019) (lending "little weight" to "vague" and "internally inconsistent" CW statements); *Applestein v. Medivation*, 861 F.Supp.2d 1030, 1038 (N.D. Cal. 2012) (CW statements unreliable where they "contradict statements made by the same group of witnesses"). Plus, the minimum wage rates are judicially noticeable facts, *see* RJN Reply 3-4, that further show the FEs are wrong, Ex. 10 at 14, 16; *see Lyons v. Benson Indus.*, 2025 WL 908525, at *3, 7 (N.D. Cal. Mar. 17, 2025) (taking judicial notice of California minimum wage for its truth).

***Third***, Plaintiffs criticize KinderCare's characterization of FE-5's allegation that a Missouri center unknowingly hired a sex offender. Opp. 20 n.20. But FE-5 and Plaintiffs admit that the sex-offender status "was not included in the lists" maintained by the state that KinderCare checked. *Id.*; ¶206; MTD 19. FE-5—a Center Director at a facility in the Northeast—provides no basis for her knowledge of an incident at a single center in Missouri, and the AC offers no explanation for how she would have had that information. MTD 19; ¶206. Finally, FE-5 herself

acknowledges that KinderCare's lawyers "got involved immediately," ¶206, which demonstrates that KinderCare takes safety and hiring issues seriously and reacts swiftly when issues arise.

**c. Operating strategy statements were not materially false or misleading.**

The AC identifies seven challenged statements about KinderCare's operating strategy, ¶¶298-304, but alleges reasons for falsity as to only three (¶¶298, 300-01). MTD 28. Although the Opposition purports to supply reasons for the remaining four, there are no such allegations in the AC, and Plaintiffs may not amend their pleading through an opposition brief.[14] *Score Right Publ'g v. Nat'l Junior Basketball League*, 2020 WL 2510515, at *3 (C.D. Cal. Jan. 7, 2020).

In any event, Plaintiffs' arguments as to *every* challenged statement fail.

***First***, Plaintiffs argue that statements about KinderCare's "strong track record of improving occupancy rates" and "demonstrated success at driving occupancy improvement," ¶¶298, 300, were misleading because the Offering Documents failed to disclose that enrollment and occupancy had been "relatively flat" immediately before the IPO. Opp. 25. That is simply wrong. The Offering Documents expressly disclosed that "ECE same-center occupancy decreased by 150 basis points for the six months ended June 29, 2024 as compared to the six months ended July 1, 2023," and included a chart showing that occupancy at the lowest-performing centers had declined over the preceding five years. Ex. 1 at 75, 113. Because the Offering Documents disclosed the very information Plaintiffs claim was omitted, these statements were not misleading. *See Progenity*, 2023 WL 4498502, at *11-12 (statements not misleading where registration statement disclosed revenue decline compared to prior quarter).

---

[14] Plaintiffs dispute that the AC does not identify reasons for falsity for ¶¶303-04, but their argument proves the point. They cite no allegation in the "Operating Strategy" section of the AC, discussing only reasons for falsity of the safety statements, Opp. 25 n. 29 (citing ¶¶116, 241, 249, 287, 296), and risk factors statements, *id.* (citing ¶¶310-11, 315-16).

***Second***, Plaintiffs contend KinderCare's description of its "strategy of occupancy improvement," including "implementing best practices across [its] centers," ¶298, was misleading because it imposed "magical" occupancy targets while under-resourcing centers. Opp. 26. This allegation stems from FE-3, who purportedly said that "KinderCare management always asked its center Directors to achieve an 80% occupancy rate," and characterized that as the "magical number." ¶278. Accepting FE-3's statement at face value, this demonstrates nothing more than an internal goal. It is not inconsistent in any way with the statement that KinderCare implemented "best practices across [its] centers." ¶298.

***Third***, Plaintiffs characterize Defendants' argument—that even if "one out of 11 families withdrew their child within two weeks of a child-unattended incident," ¶114, that translates to a negligible impact on enrollment, MTD 30—as "fuzzy math" and a factual dispute. Opp. 25-26. Neither characterization holds. Defendants applied Plaintiffs' own alleged figures to demonstrate that any unenrollment attributable to the violations was immaterial. Applying those numbers is not a contested fact; it is arithmetic. And the gap between that negligible impact and Plaintiffs' allegations that KinderCare's broad statements about improving its occupancy were false only underscores those allegations' unreliability. *See Kipling v. Flex Ltd.*, 2020 WL 2793463, at *18 (N.D. Cal. May 29, 2020) (FE statements did not support falsity where the complaint alleged contradictory facts); *Garden City Emps.' Ret. Sys. v. Anixter*, 2011 WL 1303387, at *1, 23 (N.D. Ill. Mar. 31, 2011) (using "simple math applied to Plaintiffs' allegations" to conclude statements were not misleading).

***Fourth***, Plaintiffs claim KinderCare's purported identification of 150 underperforming centers contradicts its representations about implementation of "best practices" and resulting occupancy improvement. Opp. 26-27 (citing ¶¶299-300, 303-04). They are wrong. To start, the

AC provides no basis for its claim that KinderCare identified "approximately 150 underperforming centers." ¶305(c). That paragraph refers to (i) two FE allegations that refer to an audit in 2024 (though they disagree on timing), neither of which mentions underperforming centers, ¶¶207-08; and (ii) an August 12, 2025 earnings call, which cited an analysis that identified "a number of centers with growth opportunities where additional support and focus will help to unlock their potential," ¶345. Nowhere in those allegations is any quantification of 150 centers. Further, Plaintiffs' arguments take the challenged statement out of context. KinderCare never represented it had *already* implemented best practices at *every* center; it described an ***ongoing strategy*** of identifying best practices and applying them across centers. By definition, that is not something that can ever be "finished." The Offering Documents also made clear that a segment of centers (those in the bottom quintiles) had "growth potential"—*i.e.*, room to improve. ¶¶299-300, 305(c). And that improvement is exactly what KinderCare later described during the August 12, 2025 earnings call, stating these centers are "now benefiting from the same proven practices and frameworks that have driven strong results in our highest performing centers." ¶345.

**d. Risk disclosures were not materially false or misleading.**

Plaintiffs' claims regarding KinderCare's risk disclosures should be dismissed. As Plaintiffs' own allegations and arguments confirm, KinderCare's disclosures (¶¶309, 312, 314) were accurate, appropriately calibrated, and nothing like those at issue in Plaintiffs' cited cases.

Plaintiffs begin with the extreme premise that risk disclosures are *necessarily* false unless they state that a risk has already occurred. *See* Opp. 27-28 (citing *Alphabet*). That is not the law. *Alphabet* states only that such disclosures "***can***" mislead reasonable investors—not that they ***always*** do. 1 F.4th at 703. That is exactly what Defendants' argued from the start: a risk disclosure may "just be what it purports to be—an identification by the issuer of the type of facts and events that could make the investment risky ***and not necessarily a representation one way or the other***

regarding whether the event has occurred to the extent that it presents a risk." MTD 31 (citing *In re AppHarvest Sec. Litig.*, 684 F.Supp.3d 201, 267-68 (S.D.N.Y. 2023)).

Plaintiffs' arguments fail to address the difference between disclosing a risk and representing that the risk has never occurred. Here, KinderCare disclosed that "[o]ur business depends largely on our ability to hire and retain qualified teachers and maintain strong employee engagement…Difficulties in attracting, hiring and retaining qualified personnel…could negatively impact our business, financial condition and results of operations." Ex. 1 at 35-36. Addressing a nearly identical risk disclosure, the *AppHarvest* court held that "[n]o ordinary investor would understand such general disclosures to signify that [the company] had been able to retain all of its employees." 684 F.Supp.3d at 268 (considering risk disclosure that "[the company] depends on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact [its] business, results of operations and financial condition" and granting motion to dismiss). Plaintiffs' attempt to distinguish *HRSA-ILA Funds v. Adidas AG* also fails—like Adidas's disclosures, KinderCare's disclosures "did not contain language implying the non-existence of 'improper behavior.'" 745 F.Supp.3d 1127, 1141 (D. Or. 2024). The Offering Documents disclosed that KinderCare had faced litigation, investigations, regulatory actions, claims of misconduct, and the potential impact of those allegations on its business. Ex. 1 at 40.

Plaintiffs also challenge KinderCare's disclosures as "nonspecific" and "too generic." Opp. 29. But the disclosures were specific. KinderCare disclosed that it had been "subject to litigation and regulatory proceedings" that "have included" "governmental investigations and other proceedings and allegations of inappropriate, illegal, or harmful acts to children at our child care centers or sites or through a third-party provider," as well as "claims and matters alleging negligence, inadequate supervision, illegal, inappropriate, abusive or neglectful behavior, health

and safety, or other grounds for liability arising from injuries or other harm to the people we serve, primarily children." Ex. 1 at 40, 57; MTD 4-5. Plaintiffs cite no case requiring disclosure of every pending lawsuit or regulatory action and, as noted above in Part B.3.a.ii, the governing federal regulations discourage precisely those types of disclosures.

Plaintiffs' challenge to KinderCare's McDonald's analogy fares no better. Plaintiffs concede that a reasonable investor would expect a company of KinderCare's size to encounter regulatory violations and adverse publicity, yet simultaneously argue that a reasonable investor would not expect safety-related issues. Opp. 29. They cannot have it both ways. Defendants cited McDonald's risk disclosures for the unremarkable proposition that investors do not assume a large, nationwide operator has never faced regulatory citations, lawsuits, or negative commentary. The same logic applies to KinderCare: given its scale and extensive operations across a highly regulated industry, a reasonable investor would expect that KinderCare would at times face regulatory findings, litigation, and adverse publicity, including matters relating to safety and compliance.

Finally, each of Plaintiffs' cases is distinguishable. All involved the concealment of a singular, large-scale event with catastrophic business consequences—nothing comparable to what Plaintiffs allege here. In *Alphabet*, the company hid a security glitch that exposed the private data of hundreds of thousands of Google+ users for three years—issues so significant they caused global uproar and led Google to shut down Google+ entirely. *Id.* at 693, 704. *Facebook* involved the failure to disclose that a consulting firm had "improperly harvested personal data from millions of unwitting Facebook users"—*i.e.,* the Cambridge Analytica scandal. *In re Facebook Sec. Litig.*, 87 F.4th 934, 941 (9th Cir. 2023). In *Funko*, a companywide operational disaster destroyed over $30 million in inventory and drove the stock down nearly 60% overnight; meanwhile, the

company's risk disclosures "implied that it was not presently experiencing" the very issues that caused the collapse. *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko*, 166 F.4th 805, 819, 826-27 (9th Cir. 2026). And in *SunPower*, the company offered "boilerplate risk disclosures" while secretly defaulting on nearly $30 million in obligations amid a "severe liquidity crisis" that drove the company into Chapter 11 bankruptcy. *In re SunPower Sec. Litig.*, 769 F.Supp.3d 1042, 1052, 1055 (N.D. Cal. 2025). Plaintiffs identify no comparable event here. They point to only four single-center-specific instances of license suspensions, revocations, probation, or adverse press—localized incidents that align with the very kinds of risks KinderCare disclosed it had experienced in the past. MTD 32; Opp. 30; ¶¶147, 149, 152, 162. Across 50 years of operations, 2,400 sites, and over 42,000 employees and staff, those four instances do not create an "impression of a state of affairs" that materially differs from what actually existed. *Facebook*, 87 F.4th at 948.[15]

**C. Plaintiffs Fail to Plead an Omission Under Item 303 or Item 105.**

Plaintiffs arguments as to alleged omissions under Items 303 and 105 also fail.

***First***, Plaintiffs claim that they do not need to plead any facts about how (or if) the volume of violations increased in the nine-month pre-IPO period in order to plead a trend. Opp. 31 n.34. Stated differently, they argue that they need not plead any baseline to support the existence of a trend. They cite no authority for that proposition—and the cases they do cite refute it. In *Franchi*, the Item 303 claim survived because plaintiffs alleged that key metrics were declining at the time of the IPO, a comparison that by definition required a prior baseline. 633 F.Supp.3d at 1067. The

[15] Relatedly, Plaintiffs claim the risk disclosures failed to advise investors of systemic issues. Opp. 30. But, again, the AC identifies *only three instances* of license revocations, suspensions, or probations and *three instances* of adverse press—two of which overlap with the centers that were suspended or put on probation—for a total of four unique incidents. MTD 32; ¶¶147, 149, 152, 162. Plaintiffs offer no explanation for how four isolated incidents render KinderCare's risk disclosures materially misleading.

court specifically noted that plaintiffs had included graphs comparing metrics over time to demonstrate the alleged trend. *Id*. And in *Lyft* the plaintiffs alleged the company "saw an *increase* in the number of sexual assaults its drivers committed," so they necessarily had to have provided a baseline against which to measure that increase. 484 F.Supp.3d at 769 n.4.[16]

***Second***, Plaintiffs contend that senior management knew of below-market wages and staffing deficits at the time of the IPO, citing "lawsuits alleging KinderCare's understaffing and wage violations and hundreds of substantiated staffing violations" and the FE allegations. Opp. 32. Neither theory holds. As to the lawsuits, many were filed after the IPO, and, in any event, none establishes that management identified staffing deficiencies as a known, companywide trend. *Id.* (citing ¶¶168-174). As to the FE allegations, Plaintiffs themselves concede that no FE attended any meetings with Canavin—which fatally undermines any inference that local FE observations were known to senior management on a companywide basis. *Id.* at 22 n.25.

***Third***, Plaintiffs argue that KinderCare's internal analysis showed 150 underperforming centers as of the IPO. *Id.* at 32. As discussed above, there is no support for this allegation. *Supra* Part B.3.c. Regardless, the Offering Documents disclosed the same performance differences that Plaintiffs now claim were a hidden negative "trend": from 2019 to 2023, occupancy in the fourth-lowest group of centers fell slightly from 66% to 65% (a 1% decline), while occupancy in the

---

[16] The Merkley letter offers no help. *See* Opp. 32. To start, it is not alleged in the AC, so Plaintiffs cannot rely on it to show the AC states a claim. *See D & D Greek Rest. v. Great Greek Franchising*, 2021 WL 4459063, at *3 (C.D. Cal. May 19, 2021) ("A plaintiff cannot utilize judicially noticed documents for the purpose of supplementing the allegations in a complaint.") (collecting cases holding same). But even if Plaintiffs were granted leave to add it, their claim would still fail because the letter offers no insight into what KinderCare actually knew at the time of its disclosures, and the cited "pattern" is derived from disparate regulatory actions across "several states" and unspecified facilities. *See Pivotal*, 2020 WL 4193384, at *8 (noting Item 303 requires allegations of actual knowledge).

lowest-performing group fell from 64% to 50% (a 14% decline), and the highest-performing group improved by 11% during the same period. Ex. 1 at 112-13. Any investor who read the Offering Documents could see exactly which category of centers was underperforming and by how much. *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *8 (N.D. Cal. July 21, 2020) (no omission where information was disclosed).

***Fourth***, Plaintiffs insist that KinderCare violated Item 105 by mischaracterizing past harms as a future risk. Opp. 32. That argument fails for two reasons. First, KinderCare disclosed *both* past harms *and* future risks. *See supra* Part B.3.d (addressing risk disclosures). Second, the Ninth Circuit has stated unambiguously that "mischaracterizing a past harm as a future risk cannot, standing alone, violate Item 105." *Sodha v. Golubowski*, 154 F.4th 1019, 1042 (9th Cir. 2025).[17]

**D. Plaintiffs' Section 12 Claim Should Be Dismissed for All Individual Defendants.**

Plaintiffs contend that the Individual Defendants qualify as statutory sellers because they (i) directly and actively solicited purchases (ii) to serve their own financial interests. Opp. 33. Neither element is satisfied.

***First***, Plaintiffs argue that the Individual Defendants engaged in solicitation, relying on *Pino v. Cardone Capital*, 55 F.4th 1253 (9th Cir. 2022). Opp. 33. But the defendants' conduct in *Pino* was far more active. There, defendants hosted a conference to solicit investments, "relied significantly on social media to source investors," and used personal social media accounts "as an intentional strategy to reduce promotional costs." *Pino*, 55 F.4th at 1260. The court focused on

---

[17] Plaintiffs dispute that pure omissions are inactionable under Section 12. Opp. 34 n.38. But they cite no support and fail to distinguish *Lilien v. Olaplex Holdings*, 765 F.Supp.3d 993 (C.D. Cal. 2025), which holds exactly that, MTD 33 n.11, and which Plaintiffs rely on elsewhere in their Opposition, *see* Opp. 13.

defendants' personal Instagram and YouTube use, emphasizing those are "the types of potentially injurious solicitations that are intended to command attention and persuade potential purchasers to invest," making defendants "significant participants in the selling transaction." *Id.*

The communications here bear no resemblance to that campaign. The Individual Defendants' purported "solicitation" consists of signing the Registration Statement, unspecified "participation in the IPO roadshow," Thompson's signing of a standard cover letter, and a single press appearance each by Thompson and Amandi. ¶¶3, 35-43, 45-46, 99, 109. None of these actions "command[s] attention," and there is no allegation that Defendants "relied significantly on" them to source investors. *Pino*, 55 F.4th at 1260.

***Second***, Plaintiffs argue the AC sufficiently alleges the Individual Defendants' financial interest in the IPO and claim Defendants do not dispute the point. Opp. 33. Both assertions are wrong. Defendants expressly disputed it. MTD 35 ("Nor is there any allegation that the Defendants were acting for their own financial gain."). The AC alleges no facts about whether or how the Individual Defendants stood to benefit financially from the IPO, and Plaintiffs point to none. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not [] proper to assume that [Plaintiff] can prove facts that it has not alleged."). The contrast with *Pino* is stark: there, one defendant entity received 35% of the offering profits and the other defendant "personally controlled" that entity as its founder, CEO, and sole manager. 55 F.4th at 1255, 1258. The AC alleges nothing remotely comparable.

Thus, the Section 12(a)(2) claim should be dismissed as to all Individual Defendants.

## III. CONCLUSION

For the foregoing reasons and those set forth in the Motion, the Court should dismiss the AC in its entirety. Additionally, because Plaintiffs identify no new facts that would remedy the

AC's pleading failures, dismissal should be with prejudice. *See Eminence Cap. v. Aspeon*, 316 F.3d 1048, 1052 (9th Cir. 2003) (futility of amendment supports dismissal with prejudice)

Dated: July 8, 2026

/s/ *Koji F. Fukumura*

COOLEY LLP
KOJI F. FUKUMURA, *pro hac vice*
kfukumura@cooley.com
HEATHER M. SPEERS, *pro hac vice*
hspeers@cooley.com
CRISTINA M. FERRUOLO, *pro hac vice*
cferruolo@cooley.com
10265 Science Center Drive
San Diego, CA 92121
Telephone: 858.550.6000

TARA E. LEVENS, *pro hac vice*
tlevens@cooley.com
3175 Hanover Street
Palo Alto, CA 94304
Telephone: 650.843.5000

BALLARD SPAHR LLP
BRUCE H. CAHN, OSB No. 935450
cahnb@ballardspahr.com
RYAN O'HOLLAREN, OSB No. 231160
ohollarenr@ballardspahr.com
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Telephone: 503.778.2100

*Attorneys for Defendants KinderCare Learning Companies, Inc., Paul Thompson, Anthony Amandi, John T. Wyatt, Jean Desravines, Christine Deputy, Michael Nuzzo, Benjamin Russell, Joel Schwartz, Alyssa Waxenberg, and Preston Grasty*